UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUL 2 8 2004

Michael N. Milby
Clerk of Court

| | |
|---|---|
| JAMES DAVID GILBERT | * |
| | * |
| | * |
| | *  CIVIL ACTION NO. B04-CV-047 |
| VERSUS | * |
| | * |
| | *  JUDGE HILDA G. TAGLE |
| RIG VENTURES, INC. et al | |

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO EMILIO SANCHEZ'S MOTION FOR
PARTIAL SUMMARY JUDGMENT

TO THE HONORABLE HILDA G. TAGLE:

COMES NOW JAMES DAVID GILBERT, hereinafter sometimes referred to as "Plaintiff,"

and files this. his Plaintiff's Memorandum in Opposition to Defendant Emilio Sanchez's Motion

for Partial Summary Judgment, and in support hereof, would respectfully show:

PLAINTIFF'S EXHIBITS

Plaintiff offers the following exhibits in opposition to summary judgment, and requests

same be admitted into evidence and considered for all purposes:

EXHIBIT A:   Deposition of Emilio Sanchez, excerpt only

EXHIBIT B:   US Dept of Labor Form LS-202 (Original Report of Injury), with cover

correspondence from attorney for Defendant, Rig Ventures, Inc.

EXHIBIT C:   Deposition of Norma Garza, excerpt only

## Statement of the Issues to be Ruled Upon by the Court

Whether 8 Del. C. § 325 precludes Plaintiff's allegations of Pierce the Corporate Veil and Alter Ego, seeking to disregard the corporate status of Defendant Rig Ventures, Inc. unless and until judgment against Rig Ventures, Inc. goes unsatisfied.

## Summary of the Argument

Plaintiff requests the Court DENY Defendant Emilio Sanchez's Motion for Partial Summary Judgment because Defendant Emilio Sanchez's legal rationale offered in support of his motion for partial summary judgment is flawed; 8 Del. C. § 325 only operates to preclude claims by creditors brought pursuant to the Delaware statute. The equitable remedies known as "Alter ego" and "Pierce the Corporate Veil" are not rights granted by the Delaware corporate statute, thus § 325 does not preclude their application as defendant alleges.

## Factual Background

This is a personal injury action brought pursuant to state law and general maritime law.

Regarding the essential facts to the instant motion, Plaintiff concedes Rig Ventures, Inc. is a duly authorized Delaware corporation authorized to do business in the State of Texas, and Emilio Sanchez is the sole shareholder, sole director, and president of Rig Ventures, Inc.

The balance of facts contained in Defendant Emilio Sanchez's motion are not particularly relevant in connection with defendant's motion, and though mostly accurate, Plaintiff offers the following observations.

Defendant Emilio Sanchez states:

Plaintiff was engaged for the work aboard the MODU "Ocean 66" by an individual whom Rig Ventures, Inc. believed occupied a position as an independent contractor. However, for the sake of this Defendant's motion, it will

*Gilbert vs. Rig Ventures, Inc. et al.*
Page 2

be assumed that Plaintiff qualifies as an employee of Rig Ventures, Inc. by virtue of the definitions within the LHWCA. (Brief in Support of Motion for Partial Summary Judgment, p. 2)

The above statement is important because it belies Defendant Emilio Sanchez's and Rig Ventures, Inc's previous positions in this litigation and thus raises legitimate suspicion of Defendant's intentions herein. Defendant Emilio Sanchez and Rig Ventures, Inc. have until very recently steadfastly opposed the fact that Rig Ventures, Inc. employed Plaintiff James Gilbert. The Court may recall Rig Ventures, Inc.'s Motion to Abate Court Action filed May 25, 2004, seeking to abate all court proceedings herein in lieu of administrative remedies of the Longshore and Harbor Worker's Compensation Act (herein "LHWCA"). In essence, these defendants attempted to avoid tort remedies by conceding employment status they previously contested (See Deposition of Emilio Sanchez, p. 39, l. 24 – p. 40, l. 11, EXHIBIT A), only when their own interest was thought to be served. The filing of such motion, together with the filing of form LS-202 (Original Report of Injury) with the United States Department of Labor (attached hereto as EXHIBIT B) more than twenty-seven months after the injury-producing incident, contrasted with the above quoted allegation contained in Defendant Emilio Sanchez's Statement of Facts was and is very suggestive of both Emilio Sanchez's and Rig Ventures, Inc.'s less than candid position herein. Plaintiff points this out because such suspicious practices are valuable as a backdrop upon which the genuineness of their other allegations, including those contained in the instant motion, might be judged.

## ARGUMENT

Plaintiff agrees the jurisdiction of incorporation, Delaware, is controlling in the instant matter. Plaintiff disagrees with Defendant's contention that Delaware law requires unsatisfied

judgment against the corporation before Plaintiff can proceed with allegations of alter ego and pierce the corporate veil against Defendant Emilio Sanchez.

**Defendant's interpretation of 8 Del. C. § 325(b) is erroneous**: 8 Del. C. § 325(b) only operates to preclude claims by creditors <u>brought pursuant to the Delaware statute</u>, contrasted with equitable or common law claims. Plaintiff's claims of Alter Ego and Pierce the Corporate Veil are not brought pursuant to the Delaware statute, they are each equitable common law claims.

Section 325 of the Delaware Corporations statute provides in full:

> (a) When the officers, directors or stockholders of any corporation shall be liable *by the provisions of this chapter* to pay the debts of the corporation, or any part thereof, any person to whom they are liable may have an action, at law or in equity, against any one or more of them, and the complaint shall state the claim against the corporation, and the ground on which the plaintiff expects to charge the defendants personally.
> (b) No suit shall be brought against any officer, director or stockholder for any debt of a corporation of which such person is an officer, director or stockholder, until judgment be obtained therefore against the corporation and execution thereon return unsatisfied.
> (emphasis added)

Leading authorities interpret the interaction of these provisions, stating, "Section 325 does not require that judgment first be obtained against a corporation in a suit to recover a debt from an officer, director, or stockholder when the debt did not arise '<u>by the provisions of</u> the corporation statute</u>." Edward P. Welch and Andrew J. Turezyn, *Folk on the Delaware General Corporation Law, Fundamentals*, §325.1, p. 754-55 (2004)(emphasis added); <u>see also</u>, *Lone Star Indus., Inc. v. Redwine*, 757 F.2d 1544, 1553 (5th Cir. 1985).

The same authorities state, "This section will not be applicable, unless it is clear that the officers, directors, or stockholders are liable for the corporate debts under the circumstances presented." *Folk on the Delaware General Corporation Law, Fundamentals*, at 754. Defendant

has not suggested that it is clear that Mr. Sanchez is liable for the corporate debts as alleged herein, nor for that matter, is it so clear without a thorough consideration of numerous factual determinations regarding the application of the alter ego and "pierce the corporate veil" doctrines reserved for the fact finder. Should Emilio Sanchez concede his responsibility to personally make good on any judgment rendered herein against Rig Ventures, Inc., Plaintiff would concede it unnecessary to pursue alter ego and pierce the corporate veil allegations at this state of the proceedings. The rationale for this appears to be that if the ultimate issue of shareholder liability must be litigated, then better sooner than later.

Defendant has failed to meet his burden to conclusively establish the application of 8 Del.C. § 325, his affirmative defense. Defendant has simply cited the statute and then punted the issue of its application to this Court. Defendant has offered no caselaw helpful in the analysis of whether §325(b) precludes Plaintiff's allegations of "pierce the corporate veil" and "alter ego." In fact, the only case cited by Defendant pertaining to § 325 supports Plaintiff's position, not Defendant's position. Defendant cites *Dupont v. Ball*, 106 A. 39 (Del. 1918)[1], which involved stockholder's liability for unpaid stock, a statutory cause of action, unlike the instant case. The court said, "There can be no doubt that obtaining a judgment and unsatisfied execution against the corporation is a condition precedent to the employment of the remedies mentioned [in the corporate statute] by the creditor directly against the stockholders... But if he proceeds independently of the statute ... a judgment and execution are not required..." Id. at 42. (emphasis added). Such is precisely the case here – plaintiff is proceeding independently of the

---

[1] Defendant erroneously cites this case as *John W. Cooney Co. v. Arlington Hotel.*

Delaware corporate statute, thus a judgment and execution are not required before such allegations can be entertained.

The Oklahoma Supreme Court has recently addressed the issue before this Court. Oklahoma has a similar corporate law to that at issue here, requiring that a creditor of the corporation with a claim against the corporation arising under the corporate statute first obtain an unsatisfied judgment against a corporation before suit for the corporate debt can be brought against a shareholder, officer, or director. 18 O.S. 2001 § 1124[2]. In *Fanning v. Brown*, 85 P.3d 841, 847 (OK 2004), the Oklahoma Supreme Court found the trial court erred in dismissing claims based on alter ego and veil piercing, and stated in dicta that the plaintiff's action to pierce the corporate veil was not precluded by § 1124(B) because veil piercing was not an action founded upon the Oklahoma statute, but rather one derived from common law. *Fanning*, at 847, FN 8; citing *Lone Star Indus., Inc. v. Redwine*, 757 F.2d 1544, 1553 (5th Cir. 1985)(Section 325 of Delaware Corporations law only applies to actions conferred on claimant by the Delaware statute).

In fact, the *Redwine* case is cited in the comments to Section 325, attached as Exhibit D to Defendant's motion for partial summary judgment, for this very proposition and which squarely contradicts Defendant Rig Ventures, Inc.'s position. Those comments provide, "The purpose of this section is to prescribe the manner in which actions are pursued and not to restrict causes of action that have traditionally been available to creditors independently of the corporation law." (emphasis added) Like the Oklahoma statute, the Delaware corporate statute does not confer an action for veil piercing or alter ego, i.e. such action is not one arising "by the

---

[2] A copy of the Oklahoma statute is provided the Court.

*Gilbert vs. Rig Ventures, Inc. et al.*
Page 6

provisions of this chapter" pursuant to §325(a), and thus the condition precedent articulated in §325(b) does not preclude plaintiff's cause of action for veil piercing or alter ego prior to unsatisfied judgment against the corporation.

Notably, Defendant Sanchez, it his Reply to Plaintiff's Response to Defendant's Motion for Partial Summary Judgment previously filed in the state court proceeding before removal, argues that the language central to plaintiff's argument contained in § 325(a), "by the provisions of this chapter," do not apply to § 325(b). The Oklahoma Supreme court expressly rejected this view. See, *Fanning*, at 847, FN8.

In *Pinellas County v. Great American Industrial Group*, 1991 WL 259020 (N.D. Ill), the court, addressing the Delaware statute, found that 8 Del.C. § 325 does not preclude alter ego and veil piercing allegations against a shareholder before judgment against corporation goes unsatisfied. This case involved an insolvent corporation, as in the instant case (See, Deposition of Norma Garza, EXHIBIT C, p. 126, l. 13 – p. 127, l. 15), though insolvency did not appear to be the fact driving the court's determination.[3] Rather, the court was focused on the fact that Delaware corporate law – the statute and not the common law - "provides no means for holding shareholders of the corporation liable for its debts," and thus the requirement that unsatisfied judgment be returned before suit against a shareholder did not apply. Id. at 3. The *Pinellas* court ultimately dismissed the alter ego claim because it lacked factual basis.

---

[3] But see, *Burge v. Frey*, 545 F.Supp. 1160, 1169 (D. Kansas, 1982)(Kansas equivalent of Delaware statute at issue not applicable when corporation insolvent. Note in the instant case, the latest available financial data on Defendant Rig Ventures, Inc. is not current, thus this precedent is perhaps suggestive but not controlling herein. Pending discovery requests seek to obtain such information.

Moreover, other causes of action not conferred upon a creditor by the corporate statute have been found appropriate and not precluded by § 325(b). See *Hideout Records & Distribs. v. El Jay Dee, Inc.*, 601 F.Supp. 1048, 1052-53 (D.Del. 1984)(suit against a corporation and its officers for copyright infringement not prevented by § 325, when the plaintiffs claimed that the officers were personally liable under the copyright laws.); *Federal Deposit Ins. Corp. Kewa Metal Salts, Inc.*, C.A. No. 79C-SE-48, slip op. at 7-8 (Del. Super. Ct. Marc 26, 1985)(suit based on guarantees of a loan to a corporation, when the defendant guarantors were officers, directors, or stockholders of corporation.)

*Lone Star Indus., Inc. v. Redwine*, 757 F.2d 1544, 1553 (5th Cir. 1985) might suggest to the quick reader that alter ego and veil piercing are not allowed prior to return of unsatisfied judgment because the court, in allowing the claim to proceed, noted in dicta that the action at issue did not seek to pierce the corporate veil. But in it's holding, the Court very clearly indicated, "In any event, § 325(a) provides that § 325(b) applies only to claims conferred on creditors 'by the provisions of this chapter." Id. at 1553. The Court then noted that the Delaware General Corporate Laws "permits shareholders and directors to be held liable for the debts of the corporation in specific instances." Id, at 1554. There is no question that Plaintiff's efforts to pierce the corporate veil of Rig Ventures, Inc. to reach the personal assets of its sole shareholder, Emilio Sanchez, is not a statutorily recognized cause of action; rather, such is an equitable doctrine derived from the common law. Plaintiff first notified Defendant Rig Ventures of this fact and this interpretation of law by Plaintiff's Response to Defendant Rig Ventures, Inc.'s Motion for Partial Summary Judgment filed March 2, 2004, and yet Defendant Rig Ventures, Inc. has not presented a viable argument to the contrary and certainly has not indicated

that alter ego or pierce the corporate veil are statutory actions.   Instead, what one will find in the Delaware corporate statutes are causes of action against directors and stockholders for things such as unpaid subscriptions, and against directors for unlawful payment of dividends or unlawful stock purchase or redemption.  See, 8 Del. C. § 162, 172, 174.

Defendant has not conclusively established the application of its affirmative defense, 8 Del.C. § 325(b), thus summary judgment should be denied in its entirety.

## CONCLUSION

Defendant's motion for partial summary judgment should be denied because 8 Del.C. § 325 does not apply to the instant case because the doctrines of alter ego and pierce the corporate veil are not statutorily conferred upon plaintiff by the Delaware corporate laws, and thus § 325(b) does not preclude suit against shareholders prior to unsatisfied judgment against the corporation. Defendant Emilio Sanchez has filed the instant motion without any legitimate legal basis whatsoever; indeed, the only authority cited by defendant, the *Arlington Hotel* case, supports plaintiff's position, not defendant's position.

The undersigned has conveyed his opinions regarding the frivolous nature of defendant's motion to counsel for defendant, to no avail.

## PRAYER

Wherefore, premises considered, plaintiff requests Defendant Emilio Sanchez's Motion for Partial Summary Judgment be DENIED, and for such other and further relief to which Plaintiff may be entitled.

Date:   July 27, 2004                    Respectfully submitted,


                                         Scott Webre
                                         Attorney-in-Charge
                                         Texas State Bar Number 21050070
                                         Southern District Number 20150070
                                         556 Jefferson Street
                                         Jefferson Towers, Suite 200
                                         Lafayette, Louisiana 70501
                                         (337) 593-4178
                                         (337) 593-4159 (fax)

                                         Frank Costilla
                                         Texas State Bar Number 04856500
                                         Southern District Number 04856500
                                         The Law Office of Frank Costilla
                                         5 East Elizabeth Street
                                         Brownsville, Texas 78520
                                         (956) 541-4982
                                         (956) 544-3152 (fax)

                                         Ryan Krebs, M.D., J.D.
                                         Texas State Bar Number 00792088
                                         Southern District Number 00792088
                                         6601 Vaught Ranch Road, Suite 100
                                         Austin, Texas 78730
                                         (512) 478-2072
                                         (512) 494-0420 (fax)


                                         By: _____
                                             SCOTT WEBRE

                                         ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

By my signature below, I certify that a true and correct copy of the foregoing document was served on counsel for all parties that have appeared, as indicated below, on this _11_ day of July, 2004:

Mr. Tom Fleming          *Via CMRRR (and fax without exhibits)*
Mr. Luis R. Hernandez
Fleming & Hernandez, P.C.
1650 Paredes Line Road, Suite 102
Brownsville, TX 78521

SCOTT WEBRE

*Gilbert vs. Rig Ventures, Inc. et al.*
Page 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

JAMES DAVID GILBERT      *
             *
             * CIVIL ACTION NO. B04-CV-047
             *
VERSUS           *
             * JUDGE HILDA G. TAGLE
RIG VENTURES, INC. et al      *

INDEX OF EXHIBITS AND AUTHORITIES FOR
PLAINTIFF'S MEMORANDUM IN OPPOSITION TO EMILIO SANCHEZ'S MOTION FOR
PARTIAL SUMMARY JUDGMENT

## EXHIBITS

EXHIBIT A:  Deposition of Emilio Sanchez, excerpt only
EXHIBIT B:  US Dept of Labor Form LS-202 (Original Report of Injury), with cover
      correspondence from attorney for Defendant, Rig Ventures, Inc.
EXHIBIT C:  Deposition of Norma Garza, excerpt only

## AUTHORITIES

Statutes:
 1. 8 Del. C. §§ 162, 164, 172, 174, 325
 2. 18 O.S. 2001 § 1124

Cases:
 3. *Burge v. Frey*, 545 F.Supp. 1160 (D. Kansas 1982)
 4. *Dupont v. Ball*, 106 A. 39 (Del. 1918)
 5. *Fanning v. Brown*, 85 P.3d 841 (OK 2004)
 6. *Hideout Records & Distribs. v. El Jay Dee, Inc.*, 601 F.Supp. 1048 (D.Del. 1984)
 7. *Lone Star Indus., Inc. v. Redwine*, 757 F.2d 1544, 1553 (5th Cir. 1985).
 8. *Pinellas County v. Great American Industrial Group*, 1991 WL 259020 (N.D. Ill)

Secondary authorities:

 9. Edward P. Welch and Andrew J. Turezyn, *Folk on the Delaware General Corporation Law, Fundamentals*, §325.1, p. 754-55 (2004)

CAUSE NO. 2002-11-4448-D

| | | |
|---|---|---|
| JAMES DAVID GILBERT | ) | IN THE DISTRICT COURT |
| | ) | |
| | ) | |
| VS. | ) | CAMERON COUNTY, TEXAS |
| | ) | |
| | ) | |
| RIG VENTURES, INC.; EMILIO | ) | |
| SANCHEZ and PHIL WELLS | ) | 103RD JUDICIAL DISTRICT |

## ORAL AND VIDEOTAPED DEPOSITION OF EMILIO SANCHEZ

JANUARY 28, 2004                    BROWNSVILLE, TEXAS

~~~~~~~~A Better Court Reporting Service, Inc.~~~~~~~~

TRESSA GRANGER, PRESIDENT

*Certified Shorthand Reporters*

P.O. BOX 685229, AUSTIN, TEXAS 78768-5229
1-800-478-1989, 1-512-478-2968 (FAX)


EXHIBIT A

1                    CAUSE NO. 2002-11-4448-D

2   JAMES DAVID GILBERT        )    IN THE DISTRICT COURT
                               )
3                              )
    VS.                        )    CAMERON COUNTY, TEXAS
4                              )
                               )
5   RIG VENTURES, INC.; EMILIO )
    SANCHEZ and PHIL WELLS     )    103RD JUDICIAL DISTRICT
6
    _____
7
                 ORAL AND VIDEOTAPED DEPOSITION OF
8
                          EMILIO SANCHEZ
9
                        JANUARY 28, 2004
10
    _____
11      ORAL DEPOSITION OF EMILIO SANCEZ, produced as a

12  witness duly sworn by me at the instance of the

13  Plaintiff James David Gilbert, taken in the above-styled

14  and numbered cause on the 28th day of January 2004, from

15  9:51 a.m. to 3:28 p.m., before Karen Geddes Piland,

16  Certified Shorthand Reporter No. 5627, in and for the

17  State of Texas, at the offices of Fleming & Hernandez,

18  P.C,  1650 Paredes Line Road, Suite 102, Brownsville,

19  Texas, pursuant to the Texas Rules of Civil Procedure

20  (and the provisions stated on the record or attached

21  hereto).

22

23

24

25

1                    CAUSE NO. 2002-11-4448-D

2   JAMES DAVID GILBERT          )    IN THE DISTRICT COURT
                                 )
3                                )
    VS.                          )    CAMERON COUNTY, TEXAS
4                                )
                                 )
5   RIG VENTURES INC.; EMILIO    )
    SANCHEZ and PHIL WELLS       )    103RD JUDICIAL DISTRICT
6
                    REPORTER'S CERTIFICATION
7                 DEPOSITION OF EMILIO SANCHEZ
                       JANUARY 28, 2004
8
        I, Karen Geddes Piland, Certified Shorthand Reporter
9   in and for the State of Texas, hereby certify to the
    following:
10
        That the witness, EMILIO SANCHEZ, was duly sworn by
11  the officer and that the transcript of the oral
    deposition is a true record of the testimony given by
12  the witness;

13      That the deposition transcript was submitted on
    February 13, 2004 to the witness or to the attorney for
14  the witness for examination, signature, and return to me
    by March 4, 2004;
15
        That the amount of time used by each party at the
16  deposition is as follows:

17      Scott D. Webre - 03:40
        Luis R. Hernandez -  00:00
18
        That pursuant to information given to the deposition
19  officer at the time said testimony was taken, the
    following includes counsel for all parties of record:
20
        Scott D. Webre, Attorney for Plaintiff
21          James David Gilbert
        Luis R. Hernandez, Attorney for Defendants
22          Rig Ventures, Inc., Emilio Sanchez,
            and Phil Wells
23
        I further certify that I am neither counsel for,
24  related to, nor employed by any of the parties or
    attorneys in the action in which this proceeding was
25  taken, and further that I am not financially or
    otherwise interested in the outcome of the action.

1      Further certification requirements pursuant to Rule
203 of TRCP will be certified to after they have
2  occurred.

3      Certified to by me this 10th day of February, 2004.

4

5      *Karen Geddes Piland*

6  KAREN GEDDES PILAND, Texas CSR 5627
   Expiration Date: 12/31/04
7  A Better Court Reporting Service, Inc.
   Firm Registration No. 6
8  P. O. Box 685229
   Austin, Texas 78768-5229
9  (512) 478-1989

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.   Who is the person that actually writes the checks

2  for Rig Ventures?

3    A.   I do.

4    Q.   You do.  Any checks for Rig Ventures to vendors

5  or to any other source you write?

6    A.   I write, that's correct.

7    Q.   Does anyone else write them?

8    A.   There might have been an occasion where my son

9  wrote them at my instruction, but I don't think so.  I

10  sign all the checks.

11    Q.   What about Mr. Jaross?

12    A.   No.  He does not write the checks.

13    Q.   And no secretary of yours?

14    A.   I have no secretary.

15    Q.   You have no secretary --

16    A.   I have no secretary.

17    Q.   -- at Tex-Mex?

18    A.   I have secretaries, but they don't belong to --

19  they belong to Tex-Mex, not to Rig Ventures.  They're

20  not my secretaries in any of my corporations.  They're

21  secretaries for the cold storage.

22    Q.   And to be clear, Rig Ventures, you don't have a

23  secretary at all to assist you?

24    A.   We don't have any employees.  We have a policy

25  not to have employees unless absolutely necessary.  We

1    all subcontract everything out, everything is

2    independent contract.

3        Q.  Whose policy is that?

4        A.  Mine.

5        Q.  When did you develop this policy?

6        A.  Since the inception.

7        Q.  And what is that policy based upon?

8        A.  Based upon that I don't want to be involved in

9    tax reportings or workmen's compensation or anything of

10   that effect.  It's my policy not to have that.  I

11   subcontract everything out, as the files will show.

12       Q.  Are these the only bases for your policy of

13   having no employees?

14       A.  Mainly that, uh-huh.

15       Q.  Okay.  By your saying "mainly," it indicates that

16   there are other reasons that perhaps aren't the main

17   reasons, but nonetheless reasons.

18       A.  Well, you know, that our work is all temporary,

19   it's all for a short period of time, so for me to hire

20   someone and then let them go, you know, it's very

21   difficult to get people that are experienced.  So my

22   policy is to hire all outside people, come do the work

23   and no more obligations, unemployment, "duh-duh-duh-duh"

24   (phonetic).

25       Q.  Would you be the one at Rig Ventures -- and if I

# FLEMING & HERNANDEZ, P.C.

Attorneys at Law
1650 Paredes Line Road, Suite 102
Brownsville, Texas  78521-1602

Tom Fleming
Luis R. Hernandez
Jeffrey G. Mathews

(956) 982-4404
FAX (956) 982-0943
fleming&hernandez@bizrgv.rr.com

Rolando Olvera, P.C.
Of Counsel

April 16, 2004

*CERTIFIED UNITED STATES MAIL*
*RETURN RECEIPT REQUESTED*
*NUMBER 7002 2030 0007 1000 2938*

United States Department of Labor
Employment Standards Administrator
Office of Workers Compensation Programs
8866 Gulf Freeway, Suite 140
Houston, Texas  77017-6528

    Re:   Injury Report

       Injured:  James David Gilbert; Date of Accident:  December 30, 2001
       Employer:  Rig Ventures, Inc.

Gentlemen:

    Enclosed is the original injury report, referenced above, executed April 16, 2004 by Emilio Sanchez, President of Rig Ventures, Inc.

    Thank you for your assistance in this matter.  Should you have questions or require additional information, please advise.

           Very truly yours,

           FLEMING & HERNANDEZ, P.C.

           by:
              Tom Fleming

/bgw
Enclosure
cc(w/encl.):  Mr. James David Gilbert
          c/o Mr. Scott Webre
          556 Jefferson Street
          Jefferson Towers, Suite 200
          Lafayette, Louisiana  70501
          *(CMRRR, #7002 2030 0007 1000 4178)*



See Instructions on reverse—(see Items 1 and 2 blank)

Employment Standards Administration
Office of Workers' Compensation Programs

OMB No. 1215-003.

| 1. OWCP No. | 2. Carrier's No. | 3. Date and Time of Accident | | | |
|---|---|---|---|---|---|
| | | Mo. 12 | Day 30 | Yr. 01 | Hour 8:30 AM |

| 4. Name of Injured/Deceased Employee (Type or print—first, M.I., last) | 5. Employee's Address (No., street, city, state, ZIP code) |
|---|---|
| James David Gilbert    Telephone 956-943-6896 | c/o Scott D. Webre; 556 Jefferson St.; Lafayette, Louisiana 70501 |

| 6. Injury is Reported Under the Following Act (Mark one) | 7. Indicate Where Injury Occurred (Longshore Act only) (Mark one) | 8. Sex | 9. Date of Birth |
|---|---|---|---|
| A ☒ Longshore and Harbor Workers' Compensation Act | A ☒ Aboard Vessel or Over Navigable Waters | ☒ M   ☐ F | 02/11/58 |
| B ☐ Defense Base Act | B ☐ Pier/Wharf | **10. Social Security No. (Required by Law)** 4 2 8 - 1 5 1 - 4 8 0 7 | |
| C ☐ Nonappropriated Fund Instrumentalities Act | C ☐ Dry Dock | **11. Did Injury Cause Death?** ☒ NO ☐ Yes → If yes, skip to 16 | |
| D ☐ Outer Continental Shelf Lands Act | D ☐ Marine Terminal | **12. Did Injury Cause Less of Time Beyond Day or Shift of Accident?** ☒ Yes ☐ No | |
| | E ☐ Building Way | | |
| | F ☐ Marine Railway | **13. Date and Hour Employee First Lost Time Because of Injury** Mo. 12 Day 30 Yr. 01 Hour 8:30 AM | |
| | G ☐ Other Adjoining Area | | |

| 14. Did Employee Stop Work Immediately? ☒ Yes ☐ No | 15. Date and Hour Employee Returned to Work N/A | 16. Was Employee Doing Usual Work When Injured/Killed? (If no, explain in Item 26) ☒ Yes ☐ No |
|---|---|---|

| 17. Did Injury/Death Occur on Employer's Premises? ☒ Yes ☐ No | 18. Dept. In Which Employee Normally Worked SHIP DISMANTLING | 19. Occupation COMMON LABORER |
|---|---|---|

| 20. Date and Hour Pay Stopped 12/30/01 8:30 A.M. | 21. Which Days Usually Worked Per Week? (Mark OO days) S ☒ M ☒ T ☒ W ☒ T F S | 22. Date Employer or Foreman First Knew of Accident 12/30/01 |
|---|---|---|

| 23. Wages or earnings (include overtime, allowances, etc.) | | 24. Exact Place Where Accident Occurred (See instructions on reverse). This item should specify area if accident was in maritime employment and occurred in area adjoining, navigable waters. | 25. How was Knowledge of Accident or Occupational Illness Gained? |
|---|---|---|---|
| a. Hourly | $ | Lake Charles Harbour Lake Charles, Louisiana | Report by Foreman |
| b. Daily | $ 150.00 | | |
| c. Weekly | $ | | |
| d. Yearly | $ | | |

26. Describe in full how the accident occurred (Relate the events which resulted in the injury or occupational disease. Tell what the injured was doing at the time of the accident. Tell what happened and how it happened. Name any objects or substances involved and tell how they were involved. Give full details on all factors which led or contributed to the accident.) Mr. Gilbert was rigging a large valve for removal by the vessel's crane when he lost his balance and jumped from atop a pipe on which he was standing. His leap carried him over a safety railing, and he fell approximately 18 feet to a lower deck where he landed on his right foot. The force of the landing broke his right tibia.

| 27. Nature of Injury (Name part of body affected—fractured left leg, bruised right thumb, etc.) If there was amputation of a member of the body, describe. |
|---|
| FRACTURED RIGHT TIBIA |

| 28. Has Medical Attention Been Authorized? ☒ Yes ☐ No | 29. Enter Date of Authorization 12/30/01 | 30. Was First Treating Physician Chosen by Employee? ☐ Yes ☒ No | 31. Has Insurance Carrier Been Notified? ☒ Yes ☐ No |
|---|---|---|---|

| ► Name | Address—Enter Number, Street, City, State, ZIP Code |
|---|---|
| 32. Physician John W. Noble | 1701 Oak Park Boulevard Lake Charles, Louisiana 70601 |
| 33. Hospital Lake Charles Memorial Hospital | 1701 Oak Park Boulevard Lake Charles, Louisiana 70601 |
| 34. Insurance Carrier Worker Compensation | Policy No. 428154807 |
| 35. Employer Rig Ventures, Inc. | 6665 East 14th Street Brownsville, Texas 78521 |
| 36. Nature of Employer's Business Shipbreaking | 37. Signature of Person Authorized to Sign for Employer *[signature]* |
| 38. Official Title of Person Signing This Report President | 39. Date of This Report 4/16/04 |

Form LS-202
Rev. Mar. 1994

*** TOTAL PAGE.02 ***

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JAMES DAVID GILBERT,      *
        PLAINTIFF      *
                  *
                  *
VS.      *      C.A. NO. B04-CV-047
                  *
                  *
RIG VENTURES, INC.; EMILIO      *
SANCHEZ; AND      *
RICHARD JAROSS,      *
        DEFENDANT      *

---

## ORAL AND VIDEOTAPED DEPOSITION OF
## NORMA GARZA

### JULY 8, 2004

---

TAKEN BY: TRACIE WILSON, CSR           BROWNSVILLE, TEXAS

~~~~~~~~A Better Court Reporting Service, Inc.~~~~~~~~

TRESSA GRANGER, PRESIDENT
Certified Shorthand Reporters
P.O. BOX 685229, AUSTIN, TEXAS 78768-5229
1-800-478-1989, 1-512-476-2968 (FAX)


EXHIBIT

1    UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF TEXAS
2          BROWNSVILLE DIVISION

3  JAMES DAVID GILBERT          }
                                }
4                               }
   VS.                          } CIVIL ACTION NO. B04-CV-047
5                               }
                                }
6  RIG VENTURES, INC.;          } JUDGE HILDA G. TAGLE
   EMILIO SANCHEZ; AND          }
7  RICHARD JAROSS               }

8      *****************************************************
9
            ORAL AND VIDEOTAPED DEPOSITION OF
10
                    NORMA GARZA
11
                   July 7, 2004
12
       *****************************************************
13

14

15

16      ORAL AND VIDEOTAPED DEPOSITION OF NORMA GARZA,

17  produced as a witness at the instance of the Plaintiff,

18  and duly sworn, was taken in the above-styled and

19  numbered cause on the 7th of July, 2004, from 9:14 a.m.

20  to 3:21 p.m., before Tracie L. Wilson, CSR in and for

21  the State of Texas, reported by machine shorthand, at

22  the offices of Fleming & Hernandez, P.C., 1650 Paredes

23  Line Road, Suite 102, Brownsville, Texas, pursuant to

24  the Federal Rules of Civil Procedure and the provisions

25  attached hereto.

```
 1                    A P P E A R A N C E S

 2    FOR THE PLAINTIFF:

 3        Mr. Scott Webre
          ATTORNEY-IN-CHARGE
 4        556 Jefferson Street
          Jefferson Towers, Suite 200
 5        Lafayette, Louisiana  70501

 6            - and -

 7        Mr. Hondo Garcia
          THE LAW OFFICE OF FRANK COSTILLA
 8        5 East Elizabeth Street
          Brownsville, Texas  78520
 9

10    FOR THE DEFENDANT:

11        Mr. Luis R. Hernandez
          FLEMING & HERNANDEZ, P.C.
12        1650 Paredes Line Road, Suite 102
          Brownsville, Texas  78521
13

14    ALSO PRESENT:

15        Mr. Marvin Tang, Video Technician
          Mr. Joe Nelson, Accountant
16

17

18

19

20

21

22

23

24

25
```

Job No. <u>NGARZA</u>

## STIPULATIONS FOR THE DEPOSITION OF
### NORMA GARZA

| | |
|---|---|
| Taken on: <u>07/07/04</u> | Deposition Location: |
| Beginning: <u>9:14 a.m.</u> | <u>Fleming & Hernandez</u> |
| Finish: <u>3:21 p.m.</u> | <u>1650 Paredes Line Rd.</u> |
| Pursuant to: <u>Rules</u> | <u>Brownsville, TX 78520</u> |

SIGNATURE OF WITNESS:

    1. ( ) Is waived.
    2. (X) The witness shall read and sign this
deposition before any notary by:
       ( ) reading the original transcript sent to
his/her attorney.  Attorney:
       (X) reading the original transcript sent to
witness: <u>174 Robins Lane, Brownsville, Tx 78520</u>
       ( ) coming to the reporter's office.
    3. (X) If the original deposition is released from
the reporter's possession and is not returned for
timely filing with the custodial attorney, a copy may
be filed, unsigned and uncorrected.
       It is also understood that the court
reporter assumes no responsibility for filing when the
attorneys agree to release the original deposition.

OBJECTIONS:

    1. (X) All objections will be made in accordance
with the Federal Rules.
    2. ( ) All objections will be made in accordance
with the Texas Rules.

EXHIBITS:

    Exhibits A through W

---oo0oo---

1       A.   Because Rig lent money to Caswell Properties.

2       Q.   Okay.  Will you look at the balance sheet

3  from -- for Rig Ventures from December 31, '01 to

4  December 31, '02?

5       A.   December 31, '01 -- so 12-31-02?

6       Q.   Right.  I want to look at the --

7       A.   What --

8       Q.   -- at the two balance sheets from '01 to '02.

9       A.   Is there an exhibit here with that?

10       Q.   Yes, ma'am.  I believe the -- one of the first

11  exhibits.  Yeah, A -- it would be A and C.

12       A.   Okay.

13       Q.   First, would you agree with me that as of

14  December 31, '01, Rig Ventures was insolvent by

15  determination that its assets, or, rather, its

16  liabilities exceeded its assets?

17       A.   12-31-01, yes.

18       Q.   Insolvent?

19       A.   Insolvent.

20       Q.   The same is true for 12-31-02?

21       A.   Yes.

22       Q.   In 12-31-01, it had total assets of $3,314,576?

23       A.   Correct.

24       Q.   And the same period, the following year, its

25  assets were $225,749?

1    A.  Correct.

2    Q.  Which is a change of over three million

3  dollars --

4    A.  Correct.

5    Q.  -- correct?  Now, if you look at the

6  liabilities for 12-31-01 to 12-31-02, '01 it was 3.69

7  million and 500 something, correct?

8    A.  Correct.

9    Q.  And then 12-31-02, it was 1,626,000 and a few

10  bucks?

11    A.  Correct.

12    Q.  For a change of $2,064,397?

13    A.  Correct.

14    Q.  We know that year Rig Ventures wrote off

15  946,932 in bad debt, correct?

16    A.  Correct.

17    Q.  That leaves an additional amount of about

18  $75,000 that left the books somehow; do you agree with

19  that?

20    A.  That left the books?

21    Q.  Well, yeah.  There's a change of, well,

22  essentially, a 1,024,430 -- scratch that.  Will you

23  look at the 1120S for Rig Ventures, year '02?  I don't

24  know what schedule this is.  I'll show you what I'm

25  looking at.  My question is:  Beginning of tax year

# Delaware

## The First State

I, HARRIET SMITH-WINDSOR, SECRETARY OF STATE OF THE
STATE OF DELAWARE, DO HEREBY CERTIFY THAT THE ATTACHED COPY
OF SECTION 325 OF THE "DELAWARE CORPORATION LAWS
ANNOTATED", AS FOUND IN TITLE 8, CHAPTER 1, OF THE DELAWARE
CODE AND AS AMENDED AND APPROVED BY THE 2003 REGULAR
SESSION OF THE 142ND GENERAL ASSEMBLY, IS A TRUE AND CORRECT
COPY OF SAID LAW, AS AMENDED, NOW ON FILE IN THIS OFFICE.
THE CASE ANNOTATIONS OR CONSTRUCTIONS OF THE COURTS
INCLUDED IN THE TEXT ARE PROVIDED AS A CONVENIENCE BY THE
PUBLISHER AND ARE NOT SUBJECT TO THIS CERTIFICATION.

IN TESTIMONY WHEREOF, I HAVE HEREUNTO SET MY HAND AND
OFFICIAL SEAL AT DOVER THIS SIXTH DAY OF JULY IN THE YEAR
OF OUR LORD TWO THOUSAND AND FOUR.



040492348

Harriet Smith Windsor
Harriet Smith Windsor, Secretary of State

C. Chaney
July 6, 2004

EXHIBIT NO. D

**§ 325. Actions against officers, directors or stockholders to enforce liability of corporation; unsatisfied judgment against corporation.**

(a)  When the officers, directors or stockholders of any corporation shall be liable by the provisions of this chapter to pay the debts of the corporation, or any part thereof, any person to whom they are liable may have an action, at law or in equity, against any 1 or more of them, and the complaint shall state the claim against the corporation, and the ground on which the plaintiff expects to charge the defendants personally.

(b)  No suit shall be brought against any officer, director or stockholder for any debt of a corporation of which such person is an officer, director or stockholder, until judgment be obtained therefor against the corporation and execution thereon returned unsatisfied.

(8 Del. C. 1953, § 325; 56 Del. Laws, c. 50; 71 Del. Laws, c. 339, § 71.)

**Revisor's note.** - Section 114 of 71 Del. Laws, c. 339, provides: "This act shall be effective on July 1, 1998, except that §§ 43 through 46, 48, 54 and 56 of this act shall become effective with respect to agreements of merger or consolidation entered into on or after July 1, 1998."

**The purpose of this section** is to prescribe the manner in which actions are pursued and not to restrict causes of action that have traditionally been available to creditors independently of the corporation law. Lone Star Indus., Inc. v. Redwine, 757 F.2d 1544 (5th Cir. 1985).

**Judgment and unsatisfied execution against corporation as condition precedent.** - Obtaining a judgment and unsatisfied execution against the corporation is a condition precedent to the employment of the remedies mentioned in this section by the creditor directly against the stockholders. The law does not permit a creditor to collect a claim from stockholders if the creditor can recover it from the corporation, and the only way the creditor's inability to do this can be shown to the court is by a judgment and unsatisfied execution. But if the creditor proceeds independently of that statute, by a bill asking for the appointment of receivers on the ground of insolvency, a judgment and execution are not required because the court is compelled to determine the very fact that the judgment and execution are designed to establish. John W. Cooney Co. v. Arlington Hotel Co., 11 Del. Ch. 430, 106 A. 39 (1918).

**This section is plainly irrelevant in copyright infringement action,** since it is not a suit against an officer, director or stockholder for the debts of a corporation. Hideout Records & Distribs. v. El Jay Dee, Inc., 601 F. Supp. 1048 (D. Del. 1984).

**Joint liability.** - A director who joins with his or her associate directors in the wrongful authorization of the management is jointly liable with them for the injury which it did to the corporation. Eshleman v. Keenan, 21 Del. Ch. 259, 187 A. 25 (1936).

**Unpaid subscriptions.** - The debts of the company not having been ascertained and there being no showing that the assessment or collection on an unpaid subscription was necessary either for the payment of debts of the corporation or for the purpose of equalization among the stockholders, suit could not be maintained on a stock subscription note against a stockholder by a receiver for the unpaid subscription. Philips v. Slocomb, 35 Del. 462, 167 A. 698 (1933).

**Mere act of voting did not justify charge of participation in conspiracy.** - The mere act of a large corporate shareholder in a transferee corporation in voting in favor of a purchase of assets at an allegedly grossly exaggerated price could not of itself justify a charge against the shareholder of wrongful

© 2003 State of Delaware and Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

participation in an alleged conspiracy. Heil v. Standard Gas & Elec. Co., 17 Del. Ch. 214, 151 A. 303 (1930).

**Sole ownership of stock and common directors and officers between parent and subsidiary** are only some of the factors to be considered by courts in determining whether or not the corporate fiction should be disregarded and the shareholders held liable. Scott-Douglas Corp. v. Greyhound Corp., Del. Super. Ct. 304 A.2d 309 (1973).

It requires a strong case to induce a court to consider 2 corporations as 1 on account of 1 owning all the capital stock of the other. Scott-Douglas Corp. v. Greyhound Corp., Del. Super. Ct. 304 A.2d 309 (1973).

©2003 State of Delaware and Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

18 Okl.St.Ann. § 1124

**c**
Oklahoma Statutes Annotated Currentness
  Title 18. Corporations (Refs & Annos)
    🔖 Chapter 22. Oklahoma General Corporation Act (Refs & Annos)
    🔖 Suits Against Corporations, Directors, Officers or Shareholders

→**§ 1124. Actions against officers, directors or shareholders to enforce liability of corporation; unsatisfied judgment against corporation**


ACTIONS AGAINST OFFICERS, DIRECTORS OR SHAREHOLDERS TO ENFORCE LIABILITY OF CORPORATION; UNSATISFIED JUDGMENT AGAINST CORPORATION


A. When the officers, directors or shareholders of any corporation shall be liable **by the provisions** of the **Oklahoma General Corporation Act** [FN1] to pay the debts of the corporation, or any part thereof, any person to whom they are liable may have an action, at law or in equity, against any one or more of them, and the petition shall state the claim against the corporation, and the ground on which the plaintiff expects to charge the defendants personally.


B. No suit shall be brought against any officer, director or shareholder for any debt of a corporation of which he is an officer, director or shareholder, until judgment is obtained therefor against the corporation and execution thereon returned unsatisfied.


CREDIT(S)

Laws 1986, c. 292, § 124, eff. Nov. 1, 1986.


    [FN1] Title 18, § 1001 et seq.


18 Okl. St. Ann. § 1124, OK ST T. 18 § 1124


Current through end of 2003 1st Regular Session

Copr. © West Group 2004. All rights reserved.

END OF DOCUMENT


Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

545 F.Supp. 1160
**(Cite as: 545 F.Supp. 1160)**

Page 1

**C**

United States District Court, D. Kansas.

J. W. BURGE, Plaintiff,

v.

Dale FREY, Virginia Frey, Mt. Carmel Apartments,
Inc., Virdale, Inc., and Frey,
Inc., Defendants.

No. 79 1572.

Aug. 25, 1982.

Complaint was filed seeking an accounting and
recovery of damages from corporations and
individuals for compensation for services which
plaintiff contended he performed for defendants in
the promotion and development of an apartment
complex. The District Court, Crow, J., held that:
(1) preincorporation services were valid
consideration for the issuance of capital stock, and
(2) under doctrine of alter ego, corporate entity
would be disregarded and individual, who used
corporation as an instrumentality to conduct his
personal business, would be held responsible for his
acts knowingly and intentionally done in name of
corporation.

Ordered accordingly.

West Headnotes

**[1] Corporations** ☞353
101k353 Most Cited Cases

Where corporation was insolvent and would be
unable to satisfy judgment, plaintiff was not
required to pursue remedy against corporation prior
to bringing suit against individuals as former
directors of the corporation. K.S.A. 17-7101.

**[2] Principal and Agent** ☞81(1)
308k81(1) Most Cited Cases

If a principal specifies the accomplishment by an
agent of a particular result as a condition precedent
to payment of an agreed compensation, the agent is
not entitled to such agreed compensation unless he
accomplishes the indicated result; however, when a
principal expressly promises to pay for services
which he requests or permits another to perform for

him as his agent, he is bound by his promise unless
the parties have agreed otherwise.

**[3] Contracts** ☞164
95k164 Most Cited Cases

If a contract includes a series of writings, all
writings that are part of the same transaction are
interpreted together.

**[4] Evidence** ☞397(2)
157k397(2) Most Cited Cases

If parties to a contract have signed a writing which
they intended to be the final and exclusive statement
of the terms of the agreement between them, it is
completely integrated.

**[5] Contracts** ☞169
95k169 Most Cited Cases

**[5] Evidence** ☞397(2)
157k397(2) Most Cited Cases

When a writing is complete, the court must look
within the four corners of the instrument to
determine the terms of the agreement and evidence
which varies these terms is not admissible;
however, in order to determine in the first instance
if a writing is completely integrated, the court is not
restricted and it should inquire into the
circumstances surrounding the transaction,
including the words and actions of the parties.

**[6] Contracts** ☞1
95k1 Most Cited Cases

In absence of fraud, mistake or duress, parties may
make contracts on their own terms without judicial
interference.

**[7] Contracts** ☞218
95k218 Most Cited Cases

An event may be made a condition of a contract
either by agreement of the parties or by a term
supplied by the court.

**[8] Contracts** ☞168
95k168 Most Cited Cases

When a written instrument is complete, the court
will not imply an additional term.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

545 F.Supp. 1160
**(Cite as: 545 F.Supp. 1160)**

Page 2

**[9] Corporations ⬤➾99(2)**
101k99(2) Most Cited Cases

Preincorporation services were valid consideration for issuance of capital stock. K.S.A. 17-6402.

**[10] Corporations ⬤➾76**
101k76 Most Cited Cases

Vote of a board of directors to accept services in exchange for capital stock is an express adoption of a preincorporation subscription agreement.

**[11] Administrative Law and Procedure⬤➾416.1**
15Ak416.1 Most Cited Cases
(Formerly 15Ak416)

Interpretive regulations by state departments charged with the duty of administering and enforcing a statute have great weight in determining the application of the statute.

**[12] Corporations ⬤➾99(2)**
101k99(2) Most Cited Cases

Value of services performed by plaintiff for corporation was not grossly disproportionate to claimed compensation in capital stock.

**[13] Corporations ⬤➾76**
101k76 Most Cited Cases

Since shares were issued to plaintiff as consideration for services to corporation as fully paid and since no rights of creditors or stock purchasers were involved, corporation was bound.

**[14] Corporations ⬤➾94**
101k94 Most Cited Cases

Status of stockholder in a corporation is not dependent upon the issuance of a stock certificate which is only evidence of stock ownership.

**[15] Corporations ⬤➾94**
101k94 Most Cited Cases

Fact that a stockholder failed to notify corporation whether to issue a certificate to him or to his nominee will not defeat stockholder status when the record evidence discloses the directors voted unanimously to accept the stock subscription offer

on behalf of the corporation.

**[16] Corporations ⬤➾77**
101k77 Most Cited Cases

Plaintiff who performed preincorporation services for corporation in exchange for issuance of capital stock became a stockholder in corporation upon acceptance by the corporation of the stock subscription offer.

**[17] Corporations ⬤➾76**
101k76 Most Cited Cases

Attempt of board of directors of corporation to unilaterally rescind its subscription agreement with plaintiff, who performed preincorporation services for corporation in exchange for issuance of capital stock, on February 28, 1977, was void and of no effect.

**[18] Corporations ⬤➾93**
101k93 Most Cited Cases

A corporation is not authorized to forfeit shares of stock unless stockholder is in default of payment and the power is exercised in strict compliance with statutes requiring notice to the stockholder.

**[19] Corporations ⬤➾1.4(4)**
101k1.4(4) Most Cited Cases

Under doctrine of alter ego, corporate entity would be disregarded and individual, who used corporation as an instrumentality to conduct his personal business, would be held individually responsible for his acts knowingly and intentionally done in name of corporation.
*1162 Robert J. Roth, Hershberger, Patterson, Jones & Roth, Wichita, Kan., for plaintiff.

William C. Farmer, Smith, Shay, Farmer & Wetta, Wichita, Kan., for defendants.

MEMORANDUM AND ORDER

CROW, District Judge.

The plaintiff, J. W. Burge, filed a complaint seeking an accounting and recovery of damages from Dale Frey, Virginia Frey, Mt. Carmel Apartments, Inc., Virdale, Inc., and Frey, Inc. for

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

545 F.Supp. 1160
**(Cite as: 545 F.Supp. 1160)**

Page 3

compensation for services which he contends he performed for the defendants in the promotion and development of an apartment complex called the Mt. Carmel Apartments project. Plaintiff pleads in the alternative breach of contract, breach of fiduciary duty by the individual defendants, conversion and recovery on quantum meruit. Rule 8(e) (2), Fed.R.Civ.P. Plaintiff also alleges shareholder status in the now defunct Mt. Carmel Apartments, Inc. and seeks to bring a shareholders' derivative claim for an accounting against the individual defendants as former directors of Mt. Carmel Apartments, Inc. See Rule 23.1, Fed.R.Civ.P.

This proceeding is between a citizen of Colorado and citizens of Kansas with an amount in controversy in excess of $10,000, therefore, the court's jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. s 1332 (1966).

Plaintiff claims he rendered services to the defendants and accepted stock in Mt. Carmel Apartments, Inc. as compensation. Defendants deny that plaintiff is a shareholder and join in asserting counterclaims against the plaintiff for breach of contract, for negligence and for misrepresentation.

On January 12, 1982, this case proceeded to trial on all claims before the court sitting without a jury. At the close of plaintiff's evidence, the defendants moved for a directed verdict on behalf of Virginia Frey and Frey, Inc. Rule 50(a), Fed.R.Civ.P. The motions were taken under advisement by the court and will be ruled on in conjunction with this memorandum and order. The court, having heard the testimony and arguments of counsel and having examined the voluminous documentary evidence involved in this case, makes the following findings of fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P. We accept as proven the stipulations of the parties which appear in the pretrial order and incorporate them herein. See Pretrial Conference Order, Dk. 27.

### FINDINGS OF FACT

1. The defendant Dale Frey purchased 331/3 acres, referred to as the Mt. Carmel property, on October 21, 1974. The land had an appraised value on May 29, 1974, of $798,000. Trial exhibit 1. The Mt. Carmel property was subsequently transferred to

Virdale, Inc., a Kansas corporation wholly owned by Dale and Virginia Frey, husband and wife, on October 25, 1974.

2. Dale Frey authorized the plaintiff, J. W. Burge, a Colorado real estate broker, to find a developer for the Mt. Carmel property. Trial exhibit 5. Burge was to receive a commission if he could locate a lessor or purchaser for the property.

3. During 1975 Burge introduced Dale Frey to Paul Penner, a Denver, Colorado, contractor interested in developing the Mt. Carmel property. Trial exhibits 5 & 6. After a feasibility investigation, during which time the land was committed to Penner, the plans to develop the property were abandoned. See trial exhibit 7.

*1163 4. In February of 1976 the plaintiff proposed that he and Dale Frey jointly develop an apartment complex on the Mt. Carmel property. The parties verbally agreed that Dale Frey would contribute the Mt. Carmel property for the project and that plaintiff would act as developer of the project.

5. Neither Burge nor Dale Frey had developed an apartment complex prior to this occasion, although Burge was experienced in buying and developing commercial property and Frey was experienced in real estate investing. See trial exhibits 25 and 33.

6. A commercial loan application signed by Dale Frey and by J. W. Burge was submitted to Fidelity Investment Co., Wichita, Kansas, on or about March 31, 1976. Trial exhibit 22. At the same time, the parties signed a promissory note for $21,500 for the loan commitment fee to Fidelity Investment Co. Trial exhibit 28. J. W. Burge worked out cost estimates for the project. Trial exhibit 26. Fidelity Investment Co., through its property management division, agreed to manage the completed apartment complex. Trial exhibit 32. Although Fidelity Investment Co. declined to provide permanent financing for the project, they assisted Dale Frey and J. W. Burge by preparing and by endorsing a loan application package to present to the real estate financing division of the Metropolitan Life Insurance Co. See trial exhibits 35 & 38.

7. The Mt. Carmel project consisted of a phased-development apartment complex. Phase I was located on a 10-acre tract included within the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

545 F.Supp. 1160
**(Cite as: 545 F.Supp. 1160)**

Page 4

33 1/3 acres of the Mt. Carmel property. Phase I development consisted of seven (7) buildings plus a clubhouse. The construction was brick and stucco over wood framing. See trial exhibit 49. The Mt. Carmel property was considered an excellent location for apartments because the existing stands of mature trees created a park-like atmosphere. See trial exhibit 35.

8. At all times pertinent to this litigation, Dale Frey was ready to sell or trade the Mt. Carmel property and had authorized the plaintiff to act as his agent in that regard.

9. The financing of the Mt. Carmel project was to include an interim construction loan and a permanent take-out loan. The terms of the construction loan were for short-term financing secured by the real estate and improvements. The proceeds of the permanent loan were to be used to pay off the construction loan and were to be secured by a mortgage agreement on the completed project. See trial exhibit 47. After phase I was occupied, revenue from the rental units was to be used to finance other phases of the project.

10. In general, the climate of the construction financing industry from 1973 to 1977 was one of caution. Tight money policies by construction lenders and price escalation in construction materials increased the risk of underestimating project costs.

11. Dale Frey and his attorney, Orlin Wagner, met with J. W. Burge and his attorney, Lawrence Loftus, on March 31, 1976, to discuss the terms of the agreement between Dale Frey and J. W. Burge. The terms agreed upon were set out in a letter of April 8, 1976, from Orlin Wagner to J. W. Burge. In his letter, Mr. Wagner states,

Mr. Frey is in agreement with the understanding of the undersigned, as discussed in our last conference in my office, that Mr. Frey, or his designee, shall have 75% of the corporation, that the other 25% going as follows: (a) To you at the ratio of 70/150ths of 25%, (b) With the corporation having the option of requiring Mr. Baker (general contractor), or his corporation, to purchase 80/150th of 25%.

Trial exhibit 32. By subsequent agreement of the parties, the share of the plaintiff was adjusted to 12 1/2 percent. The interest in the Mt. Carmel

project of J. W. Burge was compensation in lieu of a fee for time and labor spent in project development. In a letter from Fidelity Investment Co. to Metropolitan Life Insurance Co., dated April 28, 1976, the arrangement was described as follows:

Mr. Jess Burge was engaged by Dale Frey to market the 33.3 acres on a regional *1164 basis to developers in the Kansas City-Denver areas. Because of the professional time and labor spent by Mr. Burge on Dale Frey's behalf, together with Mr. Burge's construction and cost consulting ability, it was agreed between Mr. Burge and Dale Frey that in lieu of a professional fee, that a 12.5% of the ownership of the subject development, would be allocated to Jess Burge.

Trial exhibit 38. The interest in the Mt. Carmel project of the contractor of 12 1/2 percent was compensation in lieu of a general contractor's fee for construction. See trial exhibits 38 & 39. The proposed issuance of stock as compensation for personal service fees due the plaintiff and the contractor reduced the cash expense requirements of Mt. Carmel Apartments, Inc.

12. The court finds that the plaintiff performed the following services for Dale Frey and Mt. Carmel Apartments, Inc. pursuant to their agreement. Plaintiff consulted with the Denver architects of the project (trial exhibit 23); calculated construction costs for the project (trial exhibit 26); executed a loan application to Fidelity Investment Co. (trial exhibit 22); executed a promissory note to Fidelity Investment Co. (trial exhibit 28); consulted lending institutions regarding financing, including Fidelity Investment Co., Realbanc, Inc. (trial exhibit 44), and Bankamerica (trial exhibit 45) and consulted with prospective contractors for the project (see generally defendant's exhibit D).

13. The Articles of Incorporation of Mt. Carmel Apartments, Inc. were filed with the Kansas Secretary of State on April 6, 1976, and in the office of Register of Deeds of Sedgwick County, Kansas, on April 16, 1976. Trial exhibits 63 & 64. On August 18, 1976, Fidelity Investment Co. obtained a permanent loan commitment from Metropolitan Life Insurance Co. on behalf of Mt. Carmel Apartments, Inc. as the take-out lender for phase I of the project. Trial exhibit 47.

14. The Articles of Incorporation of Mt. Carmel Apartments, Inc. authorized the issuance of 10,000

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

shares of voting stock with a par value of $100 per share. Trial exhibit 30. On October 1, 1976, the first meeting of the incorporators of Mt. Carmel was held (trial exhibit 63), the bylaws of the corporation were adopted, id., and the first meeting of the Board of Directors was held (trial exhibit 64). Dale Frey was elected President; Virginia Frey was elected Secretary-Treasurer and J. W. Burge was elected Vice President and Director subject to qualification by acceptance. Id. The minutes reflect that the offer of Virdale, Inc. to purchase 2,000 shares of stock in exchange for the transfer of 33 1/3 acres of land was accepted. Dale Frey represented both Virdale, Inc. and Mt. Carmel Apartments, Inc. Id. The stock certificate for 2,000 shares of stock with a par value of $100 per share was issued on October 1, 1976. Trial exhibit 65. On October 3, 1976, deeds transferring the real property to Mt. Carmel Apartments, Inc. were executed by Dale Frey as President of Virdale, Inc. Trial exhibits 66 & 67.

15. On October 29, 1976, a special meeting of the Board of Directors of Mt. Carmel Apartments, Inc. was called. J. W. Burge had not yet accepted a position on the Board of Directors. The minutes of the meeting state, in pertinent part:

Pursuant to the foregoing waiver of notice and call, a special meeting of the Board of Directors of said corporation was held at Wichita, Kansas, on the 29th day of October, 1976, with all of the qualified directors being present.

Thereupon, the President presided over the meeting, and there was presented to the Board of Directors the matter of the offer of J. W. Burge, or his nominee, to subscribe to 333 1/3 shares of stock. Thereupon, upon motion duly made, seconded and unanimously carried, the offer was accepted for and on behalf of the corporation, and the Secretary was instructed to issue a stock certificate to J. W. Burge, or his nominee, immediately upon receipt of written instructions from Mr. Burge to the Secretary of this corporation.

Trial exhibit 75. Upon motion the following resolution was adopted:

**\*1165** BE IT FURTHER RESOLVED That, J. W. Burge be authorized to negotiate with a contractor for a turnkey (sic) contract for labor and materials for the construction of 7-three story apartment buildings and clubhouse ... in an amount not to exceed $2,150,000.00, with performance and payment bond by contractor, all

subject to the final approval of the Board of Directors of Mt. Carmel Apartments, Inc.. to generally include the construction of what corporation commonly calls Phase I ....

Id. The minutes were duly executed by Dale Frey as President and attested by Virginia Frey as Secretary. Id.

16. The offer of J. W. Burge to subscribe to shares of stock in exchange for services performed by him was unconditionally accepted by the corporation and immediately thereafter, J. W. Burge became a stockholder with a 12 1/2 percent interest equated to a $70,000 interest in Mt. Carmel Apartments, Inc. Trial exhibits 75 & 109.

17. The minutes of the October 29, 1976, meeting authorized J. W. Burge to negotiate a turn-key contract. In the usages of trade of the construction industry, a turn-key contract is an agreement to complete a construction project to the point when it is ready for occupancy and the key to the front door can be handed to the owners.

18. The plaintiff and Dale Frey met with a representative of Realbanc, Inc. in Denver, Colorado, on January 28, 1977. H. M. Wells, a prospective contractor, was also present. The purpose of the meeting was to obtain construction financing for the project. Realbanc, Inc. agreed to consider a loan application for both interim and permanent financing. The proposal was considered by Dale Frey but was rejected because a commitment fee had already been given to Metropolitan Life Insurance Co. for a permanent loan. See trial exhibits 49 at P 27 & 57.

19. On November 26, 1976, H. M. Wells Construction Co. had bid $2,082,000 on phase I construction. Trial exhibit 94. On January 17, 1977, Design Systems, Inc. bid $2,200,000 on phase I construction. Trial exhibits 106 & 107. Design Systems, Inc. was owned by Paul Penner. During the Denver meeting with Realbanc, Inc. on January 28, 1977, Dale Frey personally selected H. M. Wells Construction Co. to be the general contractor on the project. Wells furnished letters from a bonding company stating that he could qualify to bond the Mt. Carmel project. See trial exhibits 51, 115, 119 & 151.

20. On January 28, 1977, J. W. Burge requested

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

545 F.Supp. 1160
(Cite as: 545 F.Supp. 1160)

Page 6

Dale Frey's confirmation of their agreement (see P 11 supra). A handwritten memorandum was drafted by J. W. Burge and signed by Dale Frey. The memo states, in pertinent part:

Dale Frey-dba as Mt Carmel apts Inc Hereby Agrees to $7000000 Development cost fee Due J. W. Burge acting as agent for Dale Frey & Mt Carmel apts-payable in stock of Mt Carmel equal to 121/2% of the stock issued and authorized as (full or final) payment.

1/28/77
Signed:
Dale Frey

Trial exhibit 109.

21. On February 3, 1977, an official of Fidelity Investment Co. orally advised Dale Frey that Fidelity would provide interim as well as permanent financing. Dissatisfaction was expressed with the further participation of J. W. Burge in the venture. Dale Frey refused to terminate the relationship.

22. On February 22, 1977, Orlin Wagner, attorney for Mt. Carmel Apartments, Inc., wrote to Lawrence Loftus, attorney for the plaintiff, and advised him that "the only question remaining to cause issuance of the 121/2% of stock is our being advised of how that stock is to be issued, whether to Jess Burge, or some other designee." Trial exhibit 118.

23. H. M. Wells established a construction office in Wichita, Kansas, and was assisted by J. W. Burge in negotiations with subcontractors. When it became apparent that Wells was having difficulty bonding, Dale Frey, along with representatives of Fidelity and the architects broke phase I *1166 down into separate contracts. See trial exhibits 155-63.

24. On March 1, 1977, Fidelity Investment Co. put its commitment for the construction loan in writing. Trial exhibit 124. On March 3, 1977, Frey obtained building permits from the City of Wichita. Trial exhibit 126.

25. On February 28, 1977, a special meeting of the Board of Directors of Mt. Carmel Apartments, Inc. was called. Trial exhibit 121. Although the bylaws as adopted by the corporation call for notice to be given to stockholders entitled to vote, see trial exhibit 63 at s 6, plaintiff did not receive notice of the special meeting, nor did he have actual knowledge of what transpired at the meeting until

after the events which led to the abandonment of the Mt. Carmel project. The minutes of the meeting reflect that the board members voted to terminate and rescind plaintiff's election to the Board of Directors. Trial exhibit 121. J. W. Burge had actual knowledge that in order to qualify as a director, he had to formally accept the directorship.

26. The board then took up the matter of the stock issued to J. W. Burge:

Thereupon, there next came before the meeting of the Board of Directors, the offer of J. W. Burge, or his nominee, to subscribe to shares of stock, and the Board, after due discussion, determined that J. W. Burge has failed to perform agreements; that he has further failed to select his nominee; that he has been notified through his attorney, Lawrence T. Loftus, by letter from counsel of this corporation dated February 22, 1977 (see P 22, supra), and that the action of this board in submitting an offer to subscribe for 3331/3 shares of common stock should be withdrawn, and upon motion duly made, seconded and carried, the offer to permit J. W. Burge, or his nominee, to subscribe to common stock of this corporation is rescinded.

Id. The board then took up the authorization of J. W. Burge to negotiate for a contract on behalf of Mt. Carmel Apartments, Inc.:

Thereupon, there was further presented to the board the matter of authorizing Mr. Burge to negotiate with a contractor for a turnkey (sic) contract for the construction of certain apartments, and the board discussed that Mr. Burge had ceased working for the interest of the corporation in any manner; that Mr. Burge had at no time since October 29, 1976, obtained any progressive negotiations, and that said corporation through its president negotiated with others in an attempt to obtain a contractor, and upon motion duly made, seconded and adopted, the board rescinds any right Mr. Burge had, or might of (sic) had, to negotiate in any way for the benefit of this corporation.

Id.

27. On May 20, 1977, H. M. Wells was still unable to obtain performance bonds which were required to close the financing with Fidelity Investment Co. Wells left the Wichita area and went back to Denver, Colorado. On May 27, 1977, H. M. Wells

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

545 F.Supp. 1160
(Cite as: 545 F.Supp. 1160)

Page 7

filed a mechanic's lien in Sedgwick County, Kansas, District Court for $28,000 for his time and labor spent in Wichita trying to get his construction company qualified and ready to build. Trial exhibit 169.

28. On May 26, 1977, Design Systems, Inc. reaffirmed its bid of January 19, 1977. See trial exhibits 107 & 171. On June 3, 1977, a contract was signed on behalf of Mt. Carmel Apartments, Inc. with Design Systems, Inc. to build phase I of the Mt. Carmel project for $2,287,000. Trial exhibit 178. The claimed mechanics lien on the project was not an obstacle to completion of the project.

29. By June, 1977, interim and permanent financing was committed (trial exhibits 124 and 47); a signed contract (trial exhibit 178) was obtained from a contractor who could provide performance bonds (see trial exhibits 54, 171 & 187); building permits were obtained (trial exhibit 126); plans and specifications for the project were finalized and approved by the permanent lender except for minor qualifications (trial exhibit 172) and construction was *1167 ready to start. Gap costs, or soft costs are the difference between the construction loan and the permanent loan including interest, insurance, loan fees, bond premiums, legal fees, final surveys, recording fees, registration fees and closing costs. Soft costs for the Mt. Carmel project had increased significantly since early 1976, but Dale Frey had personal assets and credit to pay these costs. Everything had been accomplished in order to build phase I of the Mt. Carmel Apartments project.

30. On August 5, 1977, H. M. Wells filed suit and added a claim for $91,000 for lost profits to his mechanics lien claim and added Fidelity Investment Co. as a defendant. Trial exhibit 209. As a result, Fidelity withdraw interim financing from the project. The withdrawal of interim financing caused a default on the permanent loan commitment with Metropolitan Life Insurance Co. Immediately thereafter, the project was abandoned by Dale Frey. See trial exhibit 211. J. W. Burge did not cause the initial mechanic's lien to be filed, nor did he cause the additional claims to be filed.

31. J. W. Burge continued to attempt to find a buyer for the Mt. Carmel property unaware of the February 28, 1977, special meeting of the Board of

Directors. See trial exhibits 208, 215, 217 & 220. Finally, J. W. Burge attempted to clarify his position through his attorney, who received a letter from Orlin Wagner dated November 30, 1978, which states, in pertinent part:

I apologize for the delay in responding to your letter of October 27, 1978. I have visited with Mt. Carmel Apartments, Inc. relative to the subject matter of your letter prior to answering.

I believe you are familiar with most all that has transpired between J. W. Burge and Mt. Carmel Apartments, Inc. Both you and Mr. Burge are aware that Mr. Burge originally was going to put together the construction and development of the Mt. Carmel land for an interest, which among several other matters, included acquiring a general contractor and acquiring Harry Wells represented to be eminently qualified by skill and finances.

Mr. Burge did not follow through; did not, apparently, have the desire or the ability to conclude, or assist in the commencement of any development, refused to meet, contact, pursue, or negotiate with the necessary individuals or companies, and refrained from any written commitment personally to Mt. Carmel Apartments, Inc.

Mt. Carmel Apartments, Inc. was ultimately sued, successfully defended a petition alleging $119,000.00 in damages, and the trial court found Mt. Carmel had suffered something like $475,000.00 damages, but did not grant judgment for these damages on the cross-claim. As a result, Mt. Carmel Apartments, Inc. will pursue an appeal on its cross-claim therein.

Mr. Burge's failure to perform as he agreed and represented resulted, long ago, in his defaulting from earning any interest in the project, in the opinion of Mt. Carmel Apartments, Inc. It has conferred with the undersigned to possible litigation against Mr. Burge and we have recommended such a claim not be pursued although substantial testimony seems readily available to support extensive damages.

Trial exhibit 227.

32. Mt. Carmel Apartments, Inc., by Dale Frey, President, and Virginia Frey, Secretary, conveyed the Mt. Carmel property to Virdale, Inc. by quitclaim deed dated March 29, 1978, for only nominal consideration. Trial exhibit 213. Virdale, Inc., by Dale Frey, President and Virginia Frey,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

545 F.Supp. 1160
(Cite as: 545 F.Supp. 1160)

Page 8

Secretary, conveyed the Mt. Carmel property to Frey, Inc. as trustee by quitclaim deed dated September 28, 1978. Trial exhibit 218. By corporate warranty deed dated November 3, 1978, Frey, Inc., as trustee, by Dale Frey, President, and Orlin Wagner, Secretary, conveyed the Mt. Carmel property to a third party purchaser for $850,000. Trial exhibit 223. The plans and specifications for the Mt. Carmel Apartments were also provided with the property. The apartment complex was subsequently built according to the plans which were provided.

*1168 33. Dale Frey was president of the boards of directors of Mt. Carmel Apartments, Inc., Virdale, Inc. and Frey, Inc., as well as a major stockholder in the three corporations. See Pretrial Conference Order, Dk. 27 & trial exhibit 64. Assets of the corporations were included in personal financial statements of Dale Frey. See trial exhibits 24 & 80. Dale Frey personally guaranteed loans of the corporation. See trial exhibit 60. Funds and property were transferred at will by Dale Frey from corporation to corporation. See PP 1, 14 & 32, supra. Dale Frey set the policies and made the final decisions as the dominate stockholder of Mt. Carmel Apartments, Inc.

34. Virginia Frey was an officer of Mt. Carmel Apartments, Inc. but was not in a position to make decisions and did not take an active role in the day-to-day management of the corporate affairs.

CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and of the parties, venue is proper and all necessary parties are before the court.

2. Under the doctrine of Erie Railroad Co. v. Thompkins, 304 U.S. 64, 79- 80, 58 S.Ct. 817, 822-23, 82 L.Ed. 1188, 1195 (1938), a federal court hearing a case within the court's diversity jurisdiction applies the substantive law of the state where it is located. In effect, the court acts as a state court and is bound by the decisions of the Kansas Supreme Court. E.g., Commissioner v. Estate of Bosch, 387 U.S. 456, 462, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886, 894 (1967). In the absence of authoritative decisions of the highest state court, we must look to intermediate appellate decisions, statutes and, then, persuasive authorities to determine how the highest court of the state would

decide the issues. Id. 387 U.S. at 462, 87 S.Ct. at 1782-83, 18 L.Ed.2d at 893; see, e.g., Delano v. Kitch, 663 F.2d 990, 996 (10th Cir. 1981); see generally C. Wright, Law of Federal Courts s 58 (3d ed. 1976).

[1] 3. The Kansas General Corporation Code, chapter 52, 1972 Kansas Session Laws 252 (current version at K.S.A. 17-6001 et seq. (1981)), provides the legal framework within which corporate existence, rights and liabilities are defined and regulated by the state. Under state law, a dissolved corporation continues in existence for three years for the purpose of defending against civil suits until any judgment, order or decree is fully executed. [FN1] As a prerequisite to the filing of a law suit against an officer, director or stockholder, a plaintiff must obtain a judgment against the corporation and attempt execution on the judgment prior to bringing the suit unless to do so would be impossible or useless.[FN2] *1169Kilpatrick Brothers, Inc. v. Poynter, 205 Kan. 787, 794-95, 473 P.2d 33, 40 (1970). It is not controverted that Mt. Carmel Apartments, Inc. is insolvent and would be unable to satisfy a judgment. Therefore, the court finds that plaintiff is not required to pursue a remedy against Mt. Carmel Apartments, Inc. prior to bringing suit against Dale and Virginia Frey as former directors of Mt. Carmel Apartments, Inc. See Complaint, Trial Dk. 1 at P 19. All parties are properly before the court in accordance with state law.

FN1. Kan.Stat.Ann. s 17-6807 (1981) provides: All corporations whether they expire by their own limitation or are otherwise dissolved, including revocation or forfeiture of articles of incorporation pursuant to K.S.A. 17-6812 or 17-7510, shall be continued, nevertheless, for the term of three (3) years from such expiration or dissolution or for such longer period as the district court in its discretion shall direct, bodies corporate for the purpose of prosecuting and defending suits, whether civil, criminal or administrative, by or against them, and of enabling them gradually to settle and close their business, to dispose of and convey their property, to discharge their liabilities and to distribute to their stockholders any remaining assets, but not for the purpose of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

545 F.Supp. 1160
(Cite as: 545 F.Supp. 1160)

Page 9

continuing the business for which the corporation was organized. With respect to any action, suit or proceeding begun by or against the corporation either prior to or within three (3) years after the date of its expiration or dissolution, and for the purpose of such actions, suits or proceedings, the corporation shall be continued a body corporate beyond the three-year period and until any judgments, orders or decrees therein shall be fully executed, without the necessity for any special direction to that effect by the district court.

FN2. Kan.Stat.Ann. s 17-7101 (1981) provides:
(a) When the officers, directors or stockholders of any corporation shall be liable by the provisions of this act to pay the debts of the corporation, or any part thereof, any person to whom they are liable may have an action against any one or more of them. The petition in any such action shall state the claim against the corporation and the ground on which the plaintiff expects to charge the defendants personally.
(b) No suit shall be brought against any officer, director or stockholder for any debt of a corporation of which he is an officer, director or stockholder, until judgment be obtained therefor against the corporation and execution thereon returned unsatisfied.

4. The defendant, Dale Frey, promised the plaintiff $70,000 payable in 121/2 per cent of the capital stock of Mt. Carmel Apartments, Inc. in exchange for the plaintiff's promise to perform services on behalf of Dale Frey and Mt. Carmel Apartments, Inc. Findings of Fact P 11. The defendants seek to indirectly attack this preincorporation subscription agreement by claiming the agreement includes an express or implied-in-fact condition that the apartment complex be built prior to any duty on the part of the defendants to compensate the plaintiff. A preincorporation agreement is an agreement to form a corporation for the purpose of carrying on a business. J. Logan & A. Martin, Kansas Corporation Law & Practice s 2.06 (2d ed. 1979).

[2] 5. If a principal specifies the accomplishment by an agent of a particular result as a condition precedent to payment of an agreed compensation, the agent is not entitled to such agreed compensation unless he accomplishes the indicated result. See, e.g., Wallerius v. Hare, 194 Kan. 408, 412, 399 P.2d 543, 547 (1965); Davidson v. Robie, 345 Mass. 333, 187 N.E.2d 371, 375 (1955); Barbara Oil Co. v. Patrick Petroleum Co., 1 Kan.App.2d 437, 439-40, 566 P.2d 389, 392-93 (1977); Frederick A. Schmidt, Inc. v. Brock, 97 Ohio App. 469, 127 N.E.2d 219, 221-22 (1955); Restatement (Second) of Agency s 445 comment a (1958). However, when a principal expressly promises to pay for services which he requests or permits another to perform for him as his agent, he is bound by his promise unless the parties have agreed otherwise. See Rupf v. Mason, 147 Kan. 703, 705, 78 P.2d 848, 850 (1938).

[3] 6. If a contract includes a series of writings, all writings that are part of the same transaction are interpreted together. Reznik v. McKee, 216 Kan. 659, 673, 534 P.2d 243, 256 (1975); Restatement (Second) of Contracts s 202(2) (1981). The corporate minutes of October 29, 1976, of Mt. Carmel Apartments, Inc. authorized the plaintiff to negotiate a turn-key contract. A turn-key contract is a term used in the construction trade for contracts in which the builder assumes all risks inherent in the construction of the project. See Black's Law Dictionary 1359 (5th ed. 1979). The parties understood the plaintiff was not the general contractor and did not assume the risk of noncompletion of the project. The record before the court does not contain any writings which specify the plaintiff's compensation was to be contingent upon the completion of construction of the project.

7. The possible failure of the venture was a reasonably foreseeable event given the climate of the construction financing industry at that time. The defendants could have structured the transaction to shift the risk of noncompletion of the project to the plaintiff by specifying in writing the result to be accomplished by him. This was not done. The defendants produced testimony that an oral condition precedent was agreed upon. However, the court will resolve this question against the defendants since the circumstances make it clear the plaintiff did not assume the risk of noncompletion of the project, the alleged condition was not within

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

545 F.Supp. 1160
(Cite as: 545 F.Supp. 1160)

the plaintiff's control and enforcement of the alleged provision would result in a forfeiture by the plaintiff. See Restatement (Second) of Contracts s 227(1) (1981).

8. The weight of the evidence supports the memorandum of January 28, 1977, as the complete agreement between the parties. The agreement contains no express condition that the construction of the project was to be completed before the plaintiff was to receive the agreed compensation.

*1170 [4][5] 9. If the parties to a contract have signed a writing which they intended to be the final and exclusive statement of the terms of the agreement between them, it is completely integrated. There is no requirement of a formal writing and a handwritten memorandum containing the essential terms may be a binding and integrated contract. H. B. Zachary Co. v. O'Brien, 378 F.2d 423, 424 n.1 & 426 (10th Cir. 1967). When a writing is complete, the court must look within the four corners of the instrument to determine the terms of the agreement and evidence which varies those terms is not admissible. First National Bank of Olathe v. Clark, 226 Kan. 619, 624, 602 P.2d 1299, 1303 (1979); Steel v. Eagle, 207 Kan. 146, 149, 483 P.2d 1063, 1066 (1971); Smith v. Russ, 184 Kan. 773, 778, 339 P.2d 286, 291 (1959). However, in order to determine in the first instance if a writing is completely integrated, the court is not restricted and should inquire into the circumstances surrounding the transaction, including the words and actions of the parties. See Martin v. Edwards, 219 Kan. 466, 474, 548 P.2d 779, 786 (1976); Allen v. Bowling, 173 Kan. 485, 490, 249 P.2d 679, 682 (1952); Amortibank Investment Co. v. Jehan, 220 Kan. 33, 43, 551 P.2d 918, 926 (1976); J. Murray, Contracts s 106 (2d rev. ed. 1974).

10. The memorandum of January 28, 1977, was handwritten by the plaintiff and signed by the defendant, Dale Frey. Its authenticity was stipulated by the parties. See Pretrial Conference Order Dk. 27 at P H. It is a memorialization of the agreed compensation for services between the plaintiff and the defendants, Dale Frey and Mt. Carmel Apartments, Inc. While the specific services are not described, the contract is not so indefinite that it cannot be enforced. See, e.g., Augusta Bank & Trust Co. v. Broomfield, 231 Kan. 52, 643 P.2d 100, 107 (1982); Care Display, Inc. v. Didde-Glaser, Inc., 225 Kan. 232, 236, 589 P.2d

599, 604 (1979); Storts v. Martin E. Eby Construction Co., 217 Kan. 34, Syl. P 2, 535 P.2d 908, Syl. P 2 (1975); Hays v. Underwood, 196 Kan. 265, 268, 411 P.2d 717, 721 (1966). The evidence discloses that services were performed by the plaintiff to the apparent satisfaction of Dale Frey prior to the execution of the memorandum. After a careful examination of the record, the court finds the memorandum of January 28, 1977, was intended by the parties as a complete integration of their agreement.

[6][7][8] 11. The court finds that the completion of construction of the project was not an essential term to the agreement of January 28, 1977. In the absence of fraud, mistake or duress, parties may make contracts on their own terms without judicial interference. Squires v. Woodbury, 5 Kan.App.2d 596, 621 P.2d 443 (1980). An event may be made a condition of a contract either by agreement of the parties or by a term supplied by the court. E.g., Sykes v. Perry, 162 Kan. 365, 372-74, 176 P.2d 579, 585 (1947); see also Restatement (Second) of Contracts s 226 comment c (1981). When a written instrument is complete, the court will not imply an additional term. Ryder Truck Rental, Inc. v. Central Packing Co., 341 F.2d 321, 323 (10th Cir. 1965) (applying Kansas law); Duvenal v. Sinclair Refining Co., 170 Kan. 483, 488- 89, 227 P.2d 88, 92, 23 A.L.R.2d 649 (1951).

12. The defendants contend the term "development cost fee" contained in the memorandum of January 28, 1977, signifies that plaintiff's compensation was contingent upon the completion of the project. Based upon the evidence presented, the court is not persuaded this term has a special meaning. See Duffin v. Patrick, 212 Kan. 772, 778, 512 P.2d 442, 444, 448 (1973). The defendant bargained for the services of the plaintiff as developer of the project. Developer is a general term which the parties understood meant cost consulting and construction contracting. The ordinary meaning of fee is fixed compensation for services rendered. See Black's Law Dictionary 553 (5th ed. 1979). Thus, "development cost fee" meant fixed compensation for services in cost consulting and contracting.

[9] 13. The defendants contend the plaintiff did not give valid consideration for *1171 the issuance of capital stock in Mt. Carmel Apartments, Inc. The precise issue presented is whether preincorporation services are valid consideration for the issuance of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

545 F.Supp. 1160
(Cite as: 545 F.Supp. 1160)

Page 11

capital stock in a corporation. Under the laws of
the state of Kansas, the types of consideration
which may be accepted by a corporation in
exchange for its capital stock are controlled by
Kan.Stat.Ann. s 17-6402 (1981).

Subscriptions to, or the purchase price of, the
capital stock of any corporation organized under
any law of this state may be paid for, wholly or
partly, by cash, or labor done, by personal
property, or by real property or leases thereof;
and the stock so issued shall be declared and
taken to be full paid stock and not liable to any
further call, nor shall the holder thereof be liable
for any further payments under the provisions of
this act. In the absence of actual fraud in the
transaction, the judgment of the directors shall be
conclusive as to the value of such labor, property,
real estate or leases thereof. (emphasis added)

Id. It appears beyond doubt from the plain
meaning of labor done that a Kansas corporation is
authorized to accept labor or services in exchange
for its capital stock. Labor done is not statutorily
defined and no Kansas cases have been found which
construe this language. The Kansas statute is
modeled upon a similarly worded statute of the
Delaware General Corporation Law, title 8, ss
101-398 (1975).[FN3] In the absence of
authoritative decisions from this jurisdiction, the
court will give weight to decisions of the Delaware
courts. See Kan.Corp.Code Ann. Preface at v
(Vernon 1975) (suggesting this comparison).

FN3. Del.Code Ann. Tit. 8, s 152 (1975)
provides:
Subscriptions to, or the purchase price of,
the capital stock of any corporation
organized under any law of this State may
be paid for, wholly or partly, by cash, by
labor done, by personal property, or by
real property or leases thereof; and the
stock so issued shall be declared and taken
to be full paid stock and not liable to any
further call, nor shall the holder thereof be
liable for any further payments under the
provisions of this chapter. In the absence
of actual fraud in the transaction, the
judgment of the directors, as to the value
of such labor, property, real estate or
leases thereof, shall be conclusive.
This statute is no longer in force in
Delaware. The current version is found at

Del.Code Ann. Tit. 8, s 152 (Supp.1980).

[10] 14. When a statute recognizes a subscription
may be paid for by labor done, courts have held the
services must have been performed prior to the
issuance of stock. Champion v. Commissioner, 303
F.2d 887, 891 (5th Cir. 1962); Maclary v. Pleasant
Hills, Inc., 35 Del.Ch. 39, 109 A.2d 830, 834-35
(1954); Rice & Hutchins, Inc. v. Triplex Shoe Co.,
16 Del.Ch. 298, 147 A. 317, 320 (1929), aff'd, 17
Del.Ch. 356, 152 A. 342, 349 (1930); Scully v.
Automobile Finance Co., 12 Del.Ch. 174, 109 A.
49, 51 (1920); Finch v. Warrior Cement Corp., 16
Del.Ch. 44, 141 A. 54, 61 (1928); John W. Cooney
Co. v. Arlington Hotel Co., 11 Del.Ch. 286, 101 A.
879, 888 (1917), modified on other grounds, 11
Del.Ch. 430, 106 A. 39 (1918). It is generally
recognized that future services are not valid
consideration for the issuance of fully paid stock.
11 W. Fletcher, Cyclopedia of the Law of Private
Corporations s 5187; 18 C.J.S. Corporations s 241e
(1939). Early Delaware cases rejected
preincorporation services as valid consideration for
the issuance of capital stock. See, e.g., Rice &
Hutchins, Inc. v. Triplex Shoe Co., supra; John W.
Cooney Co. v. Arlington Hotel Co., supra. These
cases have been overruled sub silentio and the
prevailing view of the Delaware courts is that
preincorporation services may be valid
consideration for the issuance of capital stock if the
underlying agreement is adopted by the corporation.
Blish v. Thompson Automatic Arms Corp., 30
Del.Ch. 538, 64 A.2d 581, 595 (1948); Shore v.
Union Drug Co., 18 Del.Ch. 74, 156 A. 204
(Del.Ch.1931).

Services rendered and money paid constitute a
good consideration for the issuance of stock of a
corporation organized under Delaware law. If
consideration, lawful in quality, is laid out in
behalf of a proposed corporation by its promoters
before its actual existence, it is competent for the
corporation, under proper circumstances, to adopt
the contract made by *1172 the promoters that
payment therefor should be in stock and issue its
stock in consideration of the services thus
rendered and the money thus spent in its behalf ....

Id. 156 A. at 206. See also 11 W. Fletcher,
Cyclopedia of the Law of Private Corporations s
5210 (1971). The vote of a board of directors to
accept services in exchange for capital stock is an
express adoption of a preincorporation subscription

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

545 F.Supp. 1160
(Cite as: 545 F.Supp. 1160)

Page 12

agreement. United German Silver Co. v. Bronson, 92 Conn. 266, 102 A. 647, 648 (1917).

[11] Interpretive regulations by state departments charged with the duty of administering and enforcing a statute have great weight in determining the application of the statute. Cities Service Gas Co. v. State Corporation Commission, 192 Kan. 707, 714, 391 P.2d 74, 79-80 (1964). The Securities Commissioner of the State of Kansas regulates the issuance of stock to promoters as compensation by enforcing disclosure requirements and by requiring deposit of the securities in an escrow account.[FN4] Kan.Adm.Reg. 81-7-1 (1978); see J. Logan and A. Martin, Kansas Corporation Law & Practice s 7.03 (2d ed. 1979). Thus, the state of Kansas recognizes, in principle, that promoters may be compensated in capital stock for services or property transferred to the corporation. If the Kansas Supreme Court were to decide the issue facing this court, we predict it would construe labor done to include preincorporation services which have been adopted by the corporation. In applying the statute to this case, the court notes that the Board of Directors of Mt. Carmel Apartments, Inc. voted unanimously to accept the plaintiff's offer to subscribe for shares of stock with complete knowledge of the preincorporation agreement between the plaintiff and Dale Frey and of the services which the plaintiff had performed. Therefore, the court finds that the preincorporation services of the plaintiff were valid consideration for the issuance of capital stock of Mt. Carmel Apartments, Inc.

FN4. It appears that the transaction at issue in this case is exempt from regulation because it involves an issue of stock of a domestic corporation to less than 15 incorporators, Kan.Stat.Ann. s 17- 1262(h) (1981), or it is a sale by a domestic corporation to not more than 15 persons within 12 months, Kan.Stat.Ann. s 17-1262(m) (1981).

[12] 15. The defendants next contend that the value of the services performed by the plaintiff was grossly disproportionate to the claimed compensation. The plaintiff argues the defendants are estopped by the provision of Kan.Stat.Ann. s 17-6402 (1981), supra, which makes the judgment

of the directors conclusive in the absence of actual fraud. The Kansas General Corporation Code adopted the "good faith" valuation provision of the Delaware Corporation Code.[FN5] This provision does not require the directors to determine the actual or true value of property or services, rather the rule recognizes that opinions may differ regarding the value of property or services, and makes the judgment of the directors conclusive if it is made in good faith. See 11 W. Fletcher, Cyclopedia of the Law of Private Corporations s 5214.1 (1971 & Supp.1981) and cases cited therein. We do not think this rule applies to the case at bar because the good faith of the directors in valuing the plaintiff's services is not at issue. Cf. Mountain Iron & Supply Co. v. Jones, 201 Kan. 401, 411, 441 P.2d 795, 802 (1968) (creditors of corporation must prove actual fraud in order to hold stockholders liable for watered stock). The defendants seek to impeach the issuance of stock by showing that the consideration given by the plaintiff was so disproportionate to the value of the stock issued as to lead inevitably to the conclusion that the plaintiff perpetrated *1173 a fraud. Cf. Lewis v. Scotten Dillon Co., 306 A.2d 755, 757 (1973); Shepard v. Dick, 203 Kan. 164, 169, 453 P.2d 134, 138-39 (1969). The court will not set aside an otherwise valid exchange of stock for services based on the evidence presented. The court is not convinced that the value of $70,000 which was placed on the services performed by the plaintiff was excessive. Fraud was not established by the defendants during the course of the trial.

FN5. Del.Code Ann. Tit. 8, s 152 (revised 1974) and Kan.Stat.Ann. s 17-6402 (1981) make the judgment of the directors conclusive in the absence of actual fraud. A negligent overvaluation of services made in good faith is not "actual fraud" within the meaning of the statutes. MODEL BUSINESS CORP. ACT s 19 (1971). The statutes focus on the issue of good faith rather than focusing on the equivalency of the exchange of services or property for stock. However, if the value of consideration approaches zero, the contract fails regardless of the intent of the parties.

[13] 16. All facts pertaining to the exchange of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

545 F.Supp. 1160
**(Cite as: 545 F.Supp. 1160)**

Page 13

services for stock were known to the parties to the transaction. The directors of Mt. Carmel Apartments, Inc. could not have been deceived or defrauded by the plaintiff. The corporation accepted the services of the plaintiff and lawfully issued fully paid shares of its authorized common stock as compensation. The record evidence indicates the stockholders and directors formally approved and adopted the transaction with complete knowledge of the services performed by the plaintiff. The shares were issued as fully paid and since *no rights of creditors or stock purchasers were involved*, the corporation was bound. See Scovill v. Thayer, 105 U.S. 143, 154, 26 L.Ed. 968, 973 (1881); Blish v. Thompson Automatic Arms Corp., supra, 64 A.2d at 604; see also Walburn v. Chenault, 43 Kan. 352, 363, 23 P. 657, 661 (1890) (while an agreement to exchange property for stock stands unimpeached by proof of fraud, the court will treat that as payment which the parties have agreed should be payment); Annot., 56 A.L.R. 396 (1928) (right of corporation to complain about overvalued stock).

[14][15][16] 17. The status of stockholder in a corporation is not dependent upon the issuance of a *stock certificate which is only evidence of stock ownership.* See Hunt v. Eddy, 150 Kan. 1, 13, 90 P.2d 747, 754 (1939); Culp v. Mulvane, 66 Kan. 143, 71 P. 273 (1903).

> The stock in a corporation is personal estate. The stock is something apart from the certificates. These but evidence a fact which otherwise exists. They are but paper representations of an incorporeal right, and, as such, resemble other muniments of title. The right of stock may exist entirely separately and independently of the certificates.

Id. at 151-52, 71 P. 276. See also Dickinson County Hospital Co. v. Kessinger, 128 Kan. 576, Syl P 2, 279 P. 7, Syl P 2 (1929) (delivery of stock certificate is not necessary to perfect a subscription agreement). The fact that a stockholder failed to notify a corporation whether to issue a certificate to him or to his nominee will not defeat stockholder status when the record evidence discloses the directors voted unanimously to accept the stock subscription offer on behalf of the corporation. The court finds the plaintiff became a stockholder in Mt. Carmel Apartments, Inc. upon the acceptance by the corporation of the stock subscription offer.

[17][18] 18. The attempt of the Board of Directors

of Mt. Carmel Apartments, Inc. to unilaterally rescind its subscription agreement with the plaintiff on February 28, 1977, is void and of no effect. There is no provision in the Kansas General Corporation Code which would empower the directors to revoke acceptance of a valid subscription agreement absent the consent or acquiescence of the subscriber. A corporation is not authorized to forfeit shares of stock unless the stockholder is in default of payment and the power is exercised in strict compliance with statutes requiring notice to the stockholder. See Jent v. Friggeri, 141 Kan. 144, 145, 40 P.2d 343, 343-44 (1935) (construing predecessor statute to Kan.Stat.Ann. ss 17-6413 & - 6414); Kan.Stat.Ann. s 17-6413 (1981) (rights of directors for stock not paid in full); Kan.Stat.Ann. s 17-6414 (1981) (remedies for stock not paid in full).

[19] 19. The court finds that Dale Frey violated his fiduciary duty of good faith and fair dealing by knowingly and intentionally revoking the corporation's acceptance of the stock subscription agreement of the plaintiff and by transferring assets of Mt. Carmel Apartments, Inc. for his personal benefit without receiving equivalent consideration in disregard of the plaintiff's interest. See Newton v. Hornblower, Inc. 224 Kan. 506, Syl P 8, 582 P.2d 1136 (1978). The *1174 court finds that Dale Frey used Mt. Carmel Apartments, Inc. as an instrumentality to conduct his personal business. See Findings of Fact P 33. Under the doctrine of alter ego, the court will disregard the corporate entity and hold the individual responsible for his acts knowingly and intentionally done in the name of the corporation. [FN6] Kirk v. H. G. P. Corporation, Inc., 208 Kan. 777, 780, 494 P.2d 1087, 1090-91 (1972); Kilpatrick Brothers, Inc. v. Poynter, supra. The court finds Dale Frey is personally liable to the plaintiff in the amount of $70,000. The finding of individual liability precludes consideration of plaintiff's other theories of liability.

> FN6. A corporation and its stockholders are presumed separate and distinct. Speer v. Dighton Grain, Inc., 229 Kan. 272, Syl P 5, 624 P.2d 952 (1981). The power to pierce the corporate veil should be exercised reluctantly and cautiously. Amoco Chemicals Corp. v. Bach, 222 Kan. 589, Syl P 3, 567 P.2d 1337, (1977).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

545 F.Supp. 1160
(Cite as: 545 F.Supp. 1160)

Page 14

The Kansas Supreme Court has identified eight guideposts to aid the court in determining when the corporate entity should be disregarded and liability fastened upon an individual director: undercapitalization, failure to observe corporate formalities, nonpayment of dividends, siphoning of corporate assets, nonfunctioning of officers, absence of corporate records, use of corporate form as an instrument to conduct personal business and use of corporate form to promote injustice or fraud. Amoco Chemicals Corp. v. Bach, supra, at 594, 567 P.2d 1341-42. See Findings of Fact P 33. When a corporate debt has been personally guaranteed or the corporation is the alter ego of the majority stockholder, the corporate form will be disregarded. Ramsey v. Adams, 4 Kan.App.2d 184, 185, 603 P.2d 1025, 1026 (1980).

20. The court finds the evidence as to the liability of Virginia Frey and Frey, Inc. is insufficient and grants the motions for directed verdict in favor of these defendants.

21. Based upon the evidence presented, the court finds in favor of the defendant, Virdale, Inc., and plaintiff is entitled to take nothing by his claim against this defendant.

22. Based upon the evidence presented the court finds in favor of the plaintiff and against the defendants on defendants' counterclaims for breach of contract, for negligence and for misrepresentation.

IT IS THEREFORE ORDERED that judgment will be entered in favor of the plaintiff and against the defendants, Dale Frey and Mt. Carmel Apartments, Inc., in the amount of seventy thousand dollars ($70,000) plus the costs of the action.

IT IS FURTHER ORDERED that judgment will be entered in favor of Virdale, Inc. on plaintiff's claims against it.

IT IS FURTHER ORDERED that a judgment of dismissal will be entered in favor of the defendants Virginia Frey and Frey, Inc.

IT IS FURTHER ORDERED that judgment will be entered in favor of the plaintiff and against the defendants upon defendants' counterclaims.

545 F.Supp. 1160

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

106 A. 39                                                                                          Page 1
11 Del.Ch. 430, 106 A. 39, 7 A.L.R. 955
**(Cite as: 106 A. 39)**

▷

Supreme Court of Delaware.

DU PONT et al.
v.
BALL et al. in Court of Chancery as
JOHN W. COONEY CO.
v.
ARLINGTON HOTEL CO.

Nov. 29, 1918.

Appeal from Court of Chancery.

Bill by the John W. Cooney Company against the
Arlington Hotel Company, in which receivers were
appointed. From a decree of the Chancellor upon
petition of the receivers, levying assessment against
T. Coleman Du Pont and others, as stockholders of
defendant company (101 Atl. 879), they separately
appeal. Decree affirmed, except as modified in
opinion.

The appellants were stockholders of the Arlington
Hotel Company, and from a decree of the
Chancellor entered on the 4th day of August, A. D.
1917, the appellants took separate appeals. The
facts, in addition to those stated in the report of the
case below (John W. Cooney Co. v. Arlington Hotel
Co., 101 Atl. 879), are sufficiently stated in the
opinion of the Supreme Court.

Heisel, J., dissenting in part.

West Headnotes

Corporations ☞232(1)
101k232(1) Most Cited Cases

Stockholder's liability for unpaid stock is unaffected
by fact that corporation issued stock as full-paid and
agreed that it should be nonassessable; such
agreement being ultra vires and void, and the

acceptance of stock raising an implied promise to
pay therefor.

Corporations ☞232(1)
101k232(1) Most Cited Cases

It is no defense to liability for unpaid stock that, the
stock having been issued without consideration,
contrary to the constitutional provision, the issue
was ultra vires and void; the ultra vires feature of
the transaction being, not the issuance, but the
failure to exact payment for the stock, and the
agreement that it need not be paid for.

Corporations ☞235
101k235 Most Cited Cases

Stockholder's liability in addition to unpaid
subscriptions, as under a "double liability" statute,
is not resorted to if the assets of the corporation,
including unpaid subscriptions, are sufficient to pay
creditors.

Corporations ☞240(1)
101k240(1) Most Cited Cases

The liability of stockholders for unpaid
subscriptions is unaffected by creditors' knowledge
or lack of knowledge of the facts and circumstances
under which the stock was issued

Corporations ☞240(1)
101k240(1) Most Cited Cases

That a creditor actually participated in the issuance
of unpaid stock as full-paid and nonassessable, or
consented thereto, does not estop him from
enforcing, as a statutory liability on unpaid stock,
his claim against other stockholders, to whom such
stock was issued with his assistance or
acquiescence, where there was no intention on his
part to perpetrate a fraud upon the others, or gain an
unfair advantage by the transaction.

Corporations ☞243(10)
101k243(10) Most Cited Cases

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

106 A. 39
11 Del.Ch. 430, 106 A. 39, 7 A.L.R. 955
**(Cite as: 106 A. 39)**

Page 2

One subscribing for and accepting preferred stock for his own benefit, and holding himself as the legal owner thereof, is estopped to deny liability as stockholder to bona fide creditors on the ground that his stock was illegally issued and void.

**Corporations ☞246**
101k246 Most Cited Cases

As to stockholders' liability for unpaid stock, there is no distinction or priority of liability between stock subscribed for and that which is issued and accepted without being paid for, or between preferred and common stock; the test, under the statute, being not the class or character of the stock, but whether it has been paid for.

**Corporations ☞252**
101k252 Most Cited Cases

Where creditor proceeds in equity to secure the appointment of receivers on ground of insolvency of the corporation, obtaining a judgment and unsatisfied execution is not a condition precedent to enforcement by the receivers of stockholders' liability for unpaid subscriptions.

**Corporations ☞259(7)**
101k259(7) Most Cited Cases

Creditor's remedy by "bill in chancrey" against a stockholder of a corporate debtor, given by General Corporation Law (22 Del. Laws, c. 394) § 49, must be initiated by a creditor's bill.

**Corporations ☞261**
101k261 Most Cited Cases

Obtaining judgment and unsatisfied execution is not condition precedent to enforcement by receivers of stockholders' liability for unpaid subscriptions.

**Corporations ☞262(2)**
101k262(2) Most Cited Cases

Although the General Corporation Law (22 Del. Laws, c. 394), provides that at no time shall the total amount of the preferred stock exceed two-thirds of the actual capital paid in cash or property, it is no defense to liability for unpaid preferred stock that the issue of preferred stock was

void and not assessable for the debts of the company, because the common stock was not paid for in cash, since creditors may assume that the par value of common stock has been paid, so that the words of the statute, "actual capital paid in cash or property," mean, as to creditors, the par value of the common stock issued.

**Corporations ☞273**
101k273 Most Cited Cases

In proceedings by receivers of insolvent corporation to assess stockholders on their liability for unpaid stock, interest on creditors' claims should commence at the time the receivers asked the court to make an assessment for the payment of such claims; there being nothing before which indicated that they would be expected to pay such claims.

**Corporations ☞274**
101k274 Most Cited Cases

Stockholders should not be assessed, and required to pay their assessments, before their legal liability is definitely determined, because the amounts assessed may be much in excess of what they are legally liable to pay.

**Corporations ☞274**
101k274 Most Cited Cases

In proceeding by receivers of an insolvent corporation to enforce stockholders' liability, it was inequitable to require the single stockholder found in the jurisdiction to pay the entire assessment, although such course was the most convenient for the receivers and expeditious for the creditors; but the receivers should have been ordered to collect every assessment they should find to be collectible, and that would justify the expense of collection, in order that the burden might be fairly distributed.

**Corporations ☞277**
101k277 Most Cited Cases

In proceeding by receivers of an insolvent corporation to enforce stockholders' liability for unpaid stock, the receivers are entitled to proper expenses and reasonable compensation, to be paid by the stockholders.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

106 A. 39
11 Del.Ch. 430, 106 A. 39, 7 A.L.R. 955
**(Cite as: 106 A. 39)**

**Corporations ☞562(1)**
101k562(1) Most Cited Cases

General Corporation Law (22 Del. Laws, c. 394) § 20, providing that stockholders' liability for unpaid subscriptions may be enforced as provided for in section 49, which section provides for creditor's action at law or bill in chancery, does not make such remedies exclusive, and such liability may be enforced by receivers in insolvency.

**Corporations ☞563(2)**
101k563(2) Most Cited Cases

The ordinary liability of a stockholder for unpaid subscription is an asset of the corporation, enforceable by its receivers upon insolvency, while a statutory liability for a sum in addition to unpaid subscriptions, as under a "double liability" statute, is not such an asset, but a liability directly to the creditors, which a receiver, in the absence of statutory authority, has no power to enforce.

**\*41** Argued before PENNEWILL, C. J., and BOYCE, CONRAD, RICE, and HEISEL, JJ.

William S. Hilles and Robert H. Richards, both of Wilmington, for appellants Du Pont, Fenn, Dunham, and Taft.

Saulsbury, Morris & Rodney, of Wilmington, for appellant Blackistone.

John R. Nicholson, of Wilmington, and Henry H. Glassie, of Washington, D. C., for appellees.

PENNEWILL, C. J., delivering the opinion of the Court:

The statement of the case contained in the opinion of the Chancellor, from whose decree this appeal was taken, is so clear and comprehensive that it is deemed unnecessary to restate in this opinion the facts, the pertinent constitutional and statutory provisions, the proceeding in the lower court, and the many questions argued by counsel. We shall discuss only those questions that appear to be important and upon which the appellants seemed to mainly rely.

Upon the much debated question of jurisdiction the court have reached the opinion, after a very careful examination of the case, that the conclusion of the Chancellor is sound. But our opinion is based upon reasoning somewhat different from that of the Chancellor.

The court are not much concerned about the history of the law respecting the stockholder's liability for the debts of the corporation before the enactment of our General Corporation Act (22 Del. Laws, c. 394). The learned and elaborate discussion of this subject, including the trust theory and the holding out theory, in the briefs of counsel, is interesting but not very helpful. Whatever may have been the law before, and whether the statute of this state is simply declaratory of pre-existing law or not, the important fact is that the statute clearly and expressly states the stockholder's liability to creditors to the extent of the par value of stock not paid for. The only troublesome question is: What proceeding may be employed to enforce the liability?

Are the two remedies mentioned in section 49 of the Delaware act exclusive of a preexisting remedy that would be equally, if not more, convenient and effective in carrying out its purpose; and if they are does the statute mean that the remedy "by bill in chancery" shall be initiated by what is known as a creditor's bill? Or does it mean any proceeding in that court that is adapted to the accomplishment of the purpose sought? It so happens that New Jersey has an incorporation law very similar to ours, and most of the questions raised in this case have been raised there and settled by decisions of the highest court of that state.

A good deal of ingenuity and refinement have been used by counsel for the appellants in the effort to show that there is a very substantial difference between the statutes of the two states, but the argument is not convincing. There is, of course, some difference in language, but it seems to us the effort to find any in principle is strained, and the distinction contended for exceedingly technical.

There is but one difference noted by the appellants which need be considered by the court. The difference to which we refer, and upon which alone it is possible to base an argument, is the concluding

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

106 A. 39
11 Del.Ch. 430, 106 A. 39, 7 A.L.R. 955
(Cite as: 106 A. 39)

Page 4

clause of section 20 of the Delaware act which does not appear in the New Jersey act, viz.:

"Which said sum or proportion thereof may be recovered as provided for in section 49 of this act *** after a writ of execution against the corporation has been returned unsatisfied, as provided for in section 51 of this act. ***"

The courts of New Jersey have held that the remedies prescribed by section 92 of their act (2 Comp. St. 1910, p. 1655), which corresponds with section 49 of the Delaware act, cannot be employed to enforce the liability of stockholders under section 21 of their act, which corresponds with section 20 of our act without the concluding clause. And the reason for so holding appears to be that said remedies are made available in actions against officers and directors, as well as stockholders, and that the Legislature in enacting section 92 had in mind liabilities other than those that might arise under their section 21.

We agree with the construction placed upon section 92 of the New Jersey act by the courts of that state, and, therefore, hold that the remedies prescribed by section 49 of the Delaware act could not be employed to enforce the stockholder's liability under section 20 if that section did not contain the clause which specifically makes such remedies available.

And we are more strongly confirmed in *42 this opinion because upon investigation it is found that said section 49 was taken from the Incorporation Act of 1883 (17 Del. Laws, c. 147), which did not contain the concluding clause of section 20 of the present act.

The concluding clause of section 20, unlike the New Jersey law, expressly makes said remedies applicable, so that the questions that arise, touching the matter of jurisdictions, are the two we have already mentioned.

[1] But assuming that the procedure adopted in the court below was not authorized or contemplated by the statute, are the remedies mentioned in section 49 and made available to creditors by section 20 of our statute exclusive of the usual procedure employed in collecting the assets and paying the debts of an insolvent corporation, viz. a bill in chancery for the

appointment of receivers on the ground of insolvency?

If the statute had not provided any remedy at all for enforcing the stockholder's liability under section 20, unquestionably the creditor would have a remedy in equity, and such has been the decision of the courts of New Jersey and other states in similar cases. Can it be that because the Delaware act provides that the creditor may enforce the stockholder's liability under section 20 by an action at law or by bill in chancery he is not permitted to enforce such liability by proceeding under the insolvency act? Are the remedies prescribed exclusive of or additional to the usual remedy in chancery?

It seems to the court that it was the purpose of the Legislature, not to take away from the creditor a plain and effective remedy that already existed, but to provide other remedies that he might use if he preferred to do so, and that might be more available and effective in some cases. It is reasonable to believe that the Legislature intended by the concluding part of section 20 to make the creditor independent of receivers appointed under the Insolvency Act, by providing remedies that he might employ directly against the stockholder. And it is also reasonable to believe that the Legislature thought there might be cases where the corporation would not be in such a condition of insolvency as would justify the appointment of receivers under the statute, but nevertheless in such a condition that the creditor could not collect his claim by judgment and execution. This view is strengthened by the fact that the statute provides that the particular remedies prescribed may be employed only after judgment has been recovered against the corporation and execution thereon returned unsatisfied.

[2] There can be no doubt that obtaining a judgment and unsatisfied execution against the corporation is a condition precedent to the employment of the remedies mentioned in section 49 by the creditor directly against the stockholders. And the reason is that the law does not permit a creditor to collect his claim from stockholders if he can recover it from the corporation, and the only way his inability to do this can be shown to the court is by a judgment and unsatisfied execution. But if he proceeds independently of the statute, by a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

106 A. 39                                                                  Page 5
11 Del.Ch. 430, 106 A. 39, 7 A.L.R. 955
**(Cite as: 106 A. 39)**

bill asking for the appointment of receivers on the ground of insolvency, a judgment and execution are not required because the court is compelled to determine the very fact that the judgment and execution are designed to establish. Firestone Tire & Rubber Co. v. Agnew et al., 194 N. Y. 165, 86 N. E. 1116, 24 L. R. A. (N. S.) 628, 16 Ann. Cas. 1150.

It will be observed that section 41 of the Incorporation Act of 1883, while providing for the creditor an action at law directly against the stockholder did not give him a remedy by bill in chancery. The natural inference from this circumstance is that the Legislature intended in the present act to provide for the creditor a direct remedy in chancery also, and in addition to the one he already had under the Insolvency Act.

The giving to the creditor a personal and direct remedy at law by the act of 1883 did not take away from receivers the power to collect the assets and pay the debts of a corporation; neither did the giving of such a remedy in chancery by the present act take away such power.

[3] It is the opinion of the court, therefore, that there are now two remedies in chancery for the enforcement of the stockholder's liability under section 20, viz.: (1) A proceeding under the Insolvency Act for collecting the assets and paying the debts of the corporation, which remedy existed prior to the passage of the statute and was the one employed in this case. (2) A proceeding by bill in chancery as prescribed by the statute; and this remedy was intended by the Legislature to be used by the creditor directly against the stockholder, and must be initiated by a creditor's bill. In the one case a bill would be filed asking for the appointment of a receiver because of insolvency, and this would probably be the procedure chosen where undoubted insolvency could be shown. In the other case the creditor would file a bill against the stockholder if he is unable to collect his claim by legal process as evidenced by a judgment and unsatisfied execution.

[4][5] The appellants argued strongly and with much confidence that receivers could not, under the law, enforce a stockholder's liability created by statute, as in this case, and cited many authorities which seemed to sustain such proposition. But upon examination the cases referred to do not seem

to us to be applicable to the present case. The statute of this state is unlike those that impose a liability upon the stockholder beyond the amount of his unpaid stock, such as double liability statutes. Appellants' cases, *43 for the most part, as well as their citation from 1 Cook on Corporations (7th Ed.) § 218, involved what may be termed double or additional liability laws. At the beginning of the section mentioned it is said:

"The state Legislatures, however, in many instances desire to increase the liability of stockholders to corporate creditors. Accordingly statutes are passed expressly declaring that the stockholders shall be liable for a specified sum, in addition to their unpaid subscriptions."

It is this kind of liability that is meant when "statutory liability" is referred to, and Mr. Cook says:

"This is called the statutory liability of stockholders."

The failure to note the distinction between the liability of stockholders to the extent of the par value of their stock and the statutory liability in excess thereof has resulted in some confusion in the cases and textbooks. The first mentioned, or ordinary liability, is an asset of the corporation, and the second or additional liability is not, it being a liability directly to the creditors, which a receiver, in the absence of statutory authority, has no power to enforce; and it is not resorted to if the assets of the corporation, including unpaid stock, are sufficient to pay the creditors.

Are the amounts unpaid by stockholders on their shares of capital stock assets within the meaning of the law? We think that much of the confusion in the law upon this subject is removed, and the solution of some of the questions in this case simplified when we recognize, as we must, that before the enactment of our incorporation law it had become a well-settled American doctrine that unpaid stock of a corporation constitutes in equity a trust fund for the benefit of creditors of the corporation. The doctrine was first announced by Mr. Justice Story in Wood v. Dummer (1824) 3 Mason, 308, Fed. Cas. No. 17944. And in Sanger v. Upton, 91 U S. 56. 23 L. Ed. 220, it was said:

"The capital stock of an incorporated company is a fund set apart for the payment of its debts. It is

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

106 A. 39
11 Del.Ch. 430, 106 A. 39, 7 A.L.R. 955
(Cite as: 106 A. 39)

a substitute for the personal liability which subsists in private copartnerships. When debts are incurred, a contract arises with the creditors that it shall not be withdrawn or applied, otherwise than upon their demands, until such demands are satisfied. The creditors have a lien upon it in equity. *** It is publicly pledged to those who deal with the corporation, for their security. Unpaid stock is as much a part of this pledge, and as much a part of the assets of the company, as the cash which has been paid in upon it. Creditors have the same right to look to it as to anything else, and the same right to insist upon its payment as upon the payment of any other debt due to the company. As regards creditors, there is no distinction between such a demand and any other asset which may form a part of the property and effects of the corporation."

One reason urged for the contention that unpaid stock is not liable for the debts of the corporation, as we understand the arguments, is because the company issued the stock as full paid, and agreed that it should be nonassessable. There can be no question, in view of the authorities, that, in the absence of such an agreement, unpaid stock is liable for the debts of the corporation and constitutes assets for such purpose.

[6] And clearly, according to the authorities, the agreement referred to was ultra vires and void, so that the situation is the same as though there was no such agreement. Stripped of the agreement it is a plain case of an issuance of stock by the company and acceptance by the holder without being paid for. Under such circumstances there can be no doubt that the acceptor impliedly agreed, and is equitably bound, to pay for the stock. Then it follows that even if the corporation, because of its agreement, could not enforce payment, the receiver appointed under the insolvency statute would have a right, in a court of equity and under the direction of chancellor, to collect it, there being no other assets out of which the debts of the corporation could be paid. Money or property paid for capital stock are assets liable for the debts of the company, and why should money due but unpaid for such stock not be equally liable? Unpaid *subscriptions* unquestionably are liable because they are legal assets, and in our opinion the acceptor of stock not

paid for or subscribed for, is likewise bound to pay for it, and his liability constitutes an equitable asset which a statutory receiver can enforce. It is admitted that such a receiver has power to collect unpaid *subscriptions* to the corporation for capital stock because the relation between the stockholder and the company is contractual and the unpaid subscription an asset of the corporation. But a contract or promise to pay may be implied as well as express, and it clearly appears from the authorities that the acceptance of shares of stock under a law similar to ours, without subscription, raises an implied promise to pay for them. Some courts call such a liability an equitable asset, but whatever it may be called it is a liability that may be enforced to pay the debts of the corporation, and by no one more properly than a receiver appointed under the insolvency statute.

In See v. Heppenheimer, 69 N. J. Eq. 36, 78, 61 Atl. 843, 860, the court said:
    "In equity, and as against creditors, the acceptance of stock, without paying for it, places the acceptor in the position of a subscriber."

See, also, Odd Fellows Hall Co. v. Glazier, 5 Har. 172; Easton Nat. Bank v. Amer. Brick. etc., Co., 70 N. J. Eq. 732, 64 Atl. 917, 8 L. R. A. (N. S.) 271, 10 Ann. Cas. 84; *44Holcombe v. Trenton White City Co., 80 N. J. Eq. 122, 82 Atl. 618.

[7] The common stock having been issued without consideration, it is contended that such an issue was ultra vires and void, and being void the holders thereof cannot be held liable to the creditors of the company.

This contention would be stronger if the issuance of the stock was ultra vires, and therefore void. But this is a different case from those referred to in which the stock issued was in excess of that authorized by the charter of the company. There the act was held to be ultra vires because the corporation had no power to issue the stock at all. It is not contended in this case that the corporation had no authority to issue the stock, but that it is void because it was issued without being paid for, and under an agreement that it should not be paid for.

It was said in the case of Rosoff v. Gilbert Transp. Co. (D. C.) 221 Fed. 986:

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

"Any contract by the company to issue shares at less than par was consequently ultra vires. The defendant, by taking the shares in question, became, under his contract of membership, liable to pay $100 for each of them. The condition that less was to be accepted, being ultra vires, was void. *** The company which the receiver represented could therefore have maintained this action, and the plaintiff has the same right."

The company in the present case having the right to issue the amount of stock that was issued, the only act that was ultra vires and void in the transaction was the issuance of the stock without its being paid for and the agreement that it was full paid and nonassessable. In legal effect, therefore, it was the same as though it had been issued without any such agreement.

The law of this state contemplates that stock *may* be issued contrary to the statute, that is, without being paid for, and if it is so issued the acceptors are made liable to the creditors of the company to the extent of its par value. If the stock issued without consideration is void and, therefore, nonassessable for the payment of creditors' claims there was no reason for the law that provides for its assessment. The law means, and practically says: Corporate stock shall not be issued without valid consideration, but if it is so issued, contrary to law, the acceptor will be bound to pay its par value if the debts of the company cannot be paid otherwise.

The cases cited, that were brought to enforce the stockholder's liability for unpaid stock would not have risen if the issuance of the stock was void, because they were brought to enforce the stockholder's liability for stock that was issued contrary to law.

Although the Constitution of this state provides that "no corporation shall issue stock, except for money paid, labor done, or personal property," etc. (article 9, § 3), it cannot be that directors who have issued bonus stock to themselves, or acquiesced in its issue, with full knowledge of all the circumstances, can escape the liability the law imposes by claiming that their stock was issued in violation of law. Persons who accept stock issued in violation of law, of which they had knowledge, cannot escape the liability incident to the relation of stockholders

which they have with full knowledge assumed.

And even though stock issued without consideration could be held to be void under our constitutional provision, and could be canceled by the corporation or upon the application of bona fide stockholders, it does not follow that the acceptor of such stock could claim immunity from assessment. Certainly a stockholder cannot escape such assessment if he has held himself out, or permitted himself to be held out, as the owner of the stock; and much less could he escape if he participated in the unlawful issue or acquiesced therein.

[8] It is insisted that the liability of common stockholders to pay the debts of the corporation cannot be enforced, if at all, until after subscriptions to the preferred stock have been collected; and the reason assigned is that subscriptions to the preferred stock are contracts made with the company and constitute assets which the corporation might have collected, and which, therefore, its receiver can collect.

Such subscriptions being clearly property or legal assets of the company, it is argued that they must be collected and applied in payment of the debts of the corporation before the common stockholders, whose stock was not subscribed for and not paid for, can be assessed, because the liability of such stockholders is not an asset of the corporation

But the statute that imposes the liability makes no distinction, and creates no priority, between stock subscribed for and that which is issued and accepted without being subscribed for. All stockholders to whom was issued stock not paid for are liable under the statute, and no distinction can be made between preferred and common holders without adding something to the statute. And, moreover, there is, as already said, a contractual relation in both cases, the promise to pay being express where the stock is subscribed for and implied where it is not.

Certainly no good reason can be given why one class of stock should be liable for the debts of the company before another, if neither has been paid for. The liability is the same, and the test, under the statute, is not the class or character of the stock but whether it has been paid for.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

106 A. 39
11 Del.Ch. 430, 106 A. 39, 7 A.L.R. 955
**(Cite as: 106 A. 39)**

[9] It is contended by one of the appellants, a holder of shares of preferred stock, that "the issue of preferred stock of the *45 company is wholly void and not subject to any assessment for the debts of the company." because the general corporation law of this state provides that "at no time shall the total amount of the preferred stock exceed two-thirds of the actual capital paid in cash or property."

It is not denied that the company had authority, under its certificate of incorporation, to issue all the preferred stock that was issued: so that the contention is not based on the fact that the company issued more stock than its charter or certificate of incorporation authorized.

The question raised is simply this: Is the issue of preferred stock void, and nonassessable for the payment of creditors' claims, because the common stock had not been paid for in cash to the company? Creditors could know, and perhaps would be bound to know whether the company, under its certificate of incorporation, was authorized to issue as much preferred stock as was issued, but they could not be expected to know that the common stock had not been paid for Indeed, they had a right to assume that the par value of the common stock had been paid to the corporation as required by law. It is reasonable, therefore, to hold that the words of the statute, "actual capital paid in cash or property," mean the par value of the common stock that is issued, and liable to be assessed for the debts of the corporation. So far as creditors are concerned stock not paid for may be treated as cash or property because it is liable for the payment of their claims. The position taken by the preferred stockholder is ingenious, but in the opinion of the court unsound in view of other provisions of the general incorporation law, and its manifest intent, when considered as a whole.

[10] To hold differently would, in many cases, not only cripple but make nugatory the purpose of the law to protect creditors' claims to the extent of the par value of all stock whether common or preferred. Moreover, the law does not contemplate that a person may subscribe for and accept preferred stock for his own benefit, hold himself out as the legal owner thereof, and escape liability to bona fide creditors on the ground that his stock was illegally issued and void. He will be estopped from making such defense.

[11] It is further insisted by the appellants that holders of common stock not paid for are not liable to pay the debts of those creditors who extended credit to the company with knowledge of the facts and circumstances under which the common stock was issued.

It may be conceded that in the absence of a statute the decided weight of authority sustains such contention. But we think this is not the law in any jurisdiction where there is a statute making the holders of unpaid stock liable to the creditors of the company. New Jersey and Illinois have statutes very similar to ours, and in neither have the courts recognized the rule contended for by the appellants. Our statute is very general in its language, and broad enough to comprehend all claims that are legally and equitably and collectible. Under it the stockholder's liability is express and unqualified: it makes no exception and recognizes no distinction between creditors. As was said by the court in the Easton Nat. Bank Case, 70 N. J. Eq. 732, 64 Atl. 917, 8 L. R. A. (N. S.) 271, 10 Ann. Cas. 84:

"In this state, however, the stockholder's liability to creditors no longer depends upon" the trust fund theory, but is held to be statutory. "It depends upon the stockholder's voluntary acceptance, for consideration touching his own interest, of a statutory scheme to which watered stock, under whatever device issued, is absolutely alien, and which requires stock subscriptions to be made good for the benefit of creditors of insolvent companies, without distinction between prior and subsequent creditors, or between creditors who had notice and those who had none."

But while our statute protects all creditors of the corporation, it comprehends only such claims as are just and valid under the well-settled principles of law. If the proceeding is brought in equity it must be governed by the principles of equity. And this leads us to inquire whether the claims of those creditors who gave credit to the company with full knowledge of all the facts attending the issuance of the stock, and who actively participated in the issuance of the stock, can enforce payment against the stockholders in a court of equity.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

106 A. 39
11 Del.Ch. 430, 106 A. 39, 7 A.L.R. 955
**(Cite as: 106 A. 39)**

Page 9

We are clearly of the opinion that mere knowledge that stock issued as full paid and nonassessable was not in fact paid for, should not preclude the creditor from enforcing the liability of the holder because the creditor may also know or have good reason to believe that the holders of such stock would be legally liable for the debts of the company to the extent of the par value of their stock. While the creditor with knowledge could not have given credit upon faith that the stock was paid for. he may very well have given credit upon the belief that the holder of the stock would be liable to the creditors under the statute whether he had paid for it or not.

It was said in the Easton Bank Case:
"Why, if they knew the stock issued as full paid was not full paid in fact, may they not be justified in dealing with the very stockholder's liability thus arising as a part of the assets of the company for the purpose of satisfying creditors' claims?"

[12] It did seem to the court for a while that the rule should be different if the creditor had actually participated in the issuance *46 of unpaid stock as full paid and nonassessable, or had consented thereto. The court were strongly inclined to believe that such a creditor should be estopped in a court of equity from enforcing his claim against other stockholders to whom stock was issued with his assistance or acquiescence. It seemed like permitting a party to take advantage of his own wrong, or to profit by an illegal transaction in which he was, in a sense, particeps criminis.

But after a most careful consideration of the question we were forced to the conclusion that such a position could not be sustained by reason of authority. In Illinois and Connecticut the courts have held that knowledge was not a bar, and the reasoning is broad enough to cover participation as well. But the courts of New Jersey have dealt with cases in which participation was distinctly urged as a bar. The strong and leading case in which this question was involved is the Easton Bank Case. The court in that case carefully considered the question whether a creditor who was a stockholder with full knowledge of all the facts and circumstances connected with the issuance of the stock not paid for, and who in fact managed or directed the issuance of such stock, could enforce the statutory liability of stockholders in his own

behalf. The reasoning of the court seems to us to be sound and unanswerable.

Justice Pitney, in delivering the opinion, considered the status of a creditor with knowledge only and also one who had participated, saying:
"As to the status of Frederick Green in the case before us, the evidence does not satisfy us that he participated in the arrangement for the issuance of this stock for the patents. *** There is nothing, therefore, to bar his individual claim save that he had notice of the fact that the stock was issued as full paid for property purchased. As already shown, such notice is not sufficient to debar him. As to the claim of Henry Green, he, of course. did participate actively in the transaction that resulted in the improper issuance of the stock in question, and he received a part of the stock himself. But there is nothing to show that he intended any actual fraud upon his fellow stockholders *** We do not believe that at that time it was at all contemplated that any creditor of the company would be permitted to remain unpaid. Judge Green was, by common consent, permitted to assume and exercise the entire management of the concerns of the company, all parties being at the time sanguine of its ultimate success. The moneys that he loaned to the company were advanced for the general benefit of the stockholders, including himself. They are a just and lawful claim as against the company, and not an inequitable claim as against the delinquent stockholders. His estate cannot be debarred on the ground of estoppel, for his associates, who are now disputing their individual liability to pay, were not at all misled by the circumstance that their stock certificates were marked 'full paid,' and for 'property purchased,' since they knew the fact to be otherwise. Nor is the Green estate debarred by the operation of the maxim 'in pari delicto potior est conditio defendentis.' If it were seeking any advantage out of the unlawful agreement, this maxim would apply. But that agreement being absolutely void on grounds of public policy, his rights as a creditor for moneys actually advanced remain unimpaired. *** As against the delinquent stockholders, therefore, *** both the Green claims are entitled to payment. Payment of the Henry Green claim should, of course, be deferred until his estate contributes its proper portion of the amount

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

106 A. 39
11 Del.Ch. 430, 106 A. 39, 7 A.L.R. 955
(Cite as: 106 A. 39)

necessary to satisfy the decree."

And so in the present case, Mr. Taft, one of the largest creditors, advanced a large amount of money for the general benefit of all the stockholders, and there was no thought at the time that he would be permitted to lose any part of the sum loaned to the company. He must, of course, suffer his part of the loss, but it would not be just or equitable that he should lose the entire amount he advanced for the benefit of all, and with their knowledge and consent. While all those who participated in the issuance of the stock were acting contrary to law, there is nothing to indicate that any one was seeking to perpetrate a fraud upon the others, or gain an unfair advantage by the transaction. They were acting in good faith towards one another for the accomplishment of a common object, and it is just and equitable that one who gave credit to the company under such circumstances should be able to collect his claim under the statute.

If at the time the delinquent stockholders are given an opportunity to make defense, it is shown that any creditor is not equitably entitled to collect his claim, it will be the duty of the Chancellor to so decide. All that this court determines now is that any person who advanced money, rendered services or contributed other valuable thing to the company honestly, in good faith and for the general benefit of all is entitled to recover under the statute from the delinquent stockholders his just, reasonable and equitable claim.

[13] It is strongly insisted by the appellants that it is inequitable that the stockholders should be assessed and required to pay their assessments before their legal liability is definitely determined, because the amounts assessed may be very much in excess of what they are legally liable to pay. We think this is the correct procedure and should have been adopted by the Chancellor, but our conclusion, that knowledge or participation on the part of the creditor whose claim is just and equitable constitutes no defense for the stockholder, covers every claim with the possible exception of that of the company's counsel, which is strongly opposed by the appellants because it was upon his *47 advice that the bonus stock was issued as full paid and non-assessable. We do not think this court would be justified under the circumstances in

ordering the assessments already made set aside on account of this one claim, which the stockholders will be permitted to contest, if they desire to do so, at the time the distribution of the fund paid in is adjusted.

[4] With respect to the payment or allowance of interest on creditors' claims the court are of the opinion that the general rule should prevail. While it seems to be the rule in courts of equity that claims against an insolvent corporation should not bear interest after the appointment of a receiver, the reason is based largely upon the fact of insolvency, and the consequent insufficiency of the assets to pay the entire indebtedness. In the case of Blair v. Clayton Enterprise Co., 9 Del. Ch. 95, 77 Atl. 740, cited by the appellants, the court, in holding that interest should be calculated on claims down to the date of the order of the appointment of a receiver, said:

"This is the settled practice in the administration of estates of insolvent corporations in Delaware."

But the reason for such rule does not exist where the assets or property legally liable for the payments of creditors' claims is sufficient to pay all of them including interest. If the creditor had brought an action at law, as he might have done under the statute, or had filed in chancery what is known as a creditor's bill, it would not be contended, we think, that interest could not be collected from the time suit is brought, if there are sufficient assets to pay it.

This is the law in those jurisdictions where the statute provides that stockholders shall be liable for the debts of the company to the extent of the par value of their stocks and when the proceeding is directly against the stockholders. Burr v. Wilcox, 22 N. Y. 551; Handy v. Draper, 89 N. Y. 334; Mason v. Alexander, 44 Ohio St. 318, 7 N. E. 435; Corning v. McCullough, 1 N. Y. 58, 49 Am. Dec. 287; Baker v. Bank, 9 Metc. (Mass.) 182; Terry v. Anderson, 95 U. S. 628, 24 L. Ed. 365. And under the National Banking Act (Act Cong. June 3, 1864, c. 106, 13 Stat. 99), it has been held that interest runs from the date of the comptroller's order to collect an amount equal to the full par value of the stock, the amount due from the stockholders being then liquidated and payable. Casey v. Galli, 94 U. S. 673, 24 L. Ed. 168. In Burr v. Wilcox the court said:

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

106 A. 39
11 Del.Ch. 430, 106 A. 39, 7 A.L.R. 955
(Cite as: 106 A. 39)

Page 11

"This liability cannot, I think, be said to attach upon any particular stockholder until a suit is commenced against him to enforce it. The creditor has a right to select among the stockholders the individual against whom he will proceed; and until he has made the selection, no particular stockholder is liable, and hence no interest can be allowed for any previous time. But, from the time of the commencement of a suit for a debt exceeding the amount of the principal of the defendant's stock, I see no reason why interest should not be allowed. It has then become a fixed liability for a specific amount, and ought, upon general principles, to carry interest."

In the Ohio case the contentions of the parties were very clearly stated by the court as follows:
"It was held by the district court that interest should be charged against the stockholder as of the date of the commencement of the suit. The contention on part of plaintiffs in error is that in no case can the stockholder be liable for a sum beyond the amount of his stock, to be determined at the time the liability is finally fixed by judicial decree; in other words, that the liability is one created by statutory enactment under the Constitution, to be enforced by decree, and interest cannot be added except by virtue of the decree of the court declaring the liability, and no interest can accrue against the stockholder until the liability is thus declared. On the other hand, the claim is that, while the liability is created by the Constitution and the statute, yet the stockholder places himself under liability by contract when he subscribes or acquires the stock; and, resting as well upon contract as upon statute, the interest follows the maturing of the obligation, which is at the time when the corporation becomes insolvent and refuses to pay."

The court said:
"We agree with the counsel that the question is one which, upon principle, is of very considerable difficulty. *** The district court, in holding the stockholders for interest after the commencement of the suit, evidently followed the law of that case [Hooker v. Kilgour, 2 Cin. R. (Ohio) 350]; and, inasmuch as it has been generally acquiesced in as furnishing the true rule, we are not prepared to say it is not the law in this state."

In analogy to the cases mentioned we hold in the present case, that interest should commence at the time the receivers asked the court to make an assessment upon the stockholders for the payment of creditors' claims, there being nothing before which indicated that they would be expected to pay such claims.

[15] In respect to the expenses and compensation of receivers, and the fees of their counsel, the court are of the opinion that, inasmuch as the receivers are officers or instrumentalities appointed by the court to collect the creditors' claims and carry out the purpose of the statute, they are entitled to proper expenses and reasonable compensation to be paid by the stockholders. They are a part of the machinery employed by the court to accomplish the object sought under the statute, and their expenses and compensation are, therefore, legitimate court costs to be taxed against the respondents.

We think no good reason can be shown *48 why the fees of receiver's counsel should be separately taxed as a part of the costs. Inasmuch, however, as such is the established practice in this state the court are not disposed to change it. It is not certain in many cases that services of counsel will be required, and even if they should be it is impossible to tell even approximately, in advance of the service, what counsel will be entitled to receive. The court are of the opinion that the sum estimated by the Chancellor for receiver's compensation and expenses, and the fees of their counsel, as well as the estimate for interest on creditors' claims, is largely in excess of what they will be entitled to receive; that said sums should be substantially reduced, and the assessments modified accordingly.

[16] In conclusion, we say that, while we have no doubt the court below had power to require a resident stockholder to pay the entire assessment, we think it inequitable under the facts of this case, and, therefore, hold that the receivers should have been ordered to collect every assessment they should find to be collectible, and that would justify the expense of collection. The entire burden of payment should not, in the first instance, have been imposed upon a single stockholder, even though there be no other found in the jurisdiction. The course adopted may be the most convenient for the receivers and expeditious for the creditors, but in

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

106 A. 39
11 Del.Ch. 430, 106 A. 39, 7 A.L.R. 955
**(Cite as: 106 A. 39)**

Page 12

our opinion hardly fair to the resident stockholder.

And, moreover, it may very well be that statutory receivers appointed by the court would be more successful in collecting claims out of the state than a stockholder who might be subrogated to their rights by an order of said court. But whether that be so or not, it is manifestly unfair that the resident stockholder should in this case pay not only all the indebtedness but also the costs of collecting from other stockholders their proportional parts of the assessment. Under the peculiar facts and circumstances of this case the fair and equitable proceeding would be for the receivers to collect all the assessments, so far as practicable, and by so doing the burden would fall on all stockholders alike according to their holdings.

The decree of the Chancellor will be affirmed except as modified by this opinion.

HEISEL. J.

I concur in the opinion of the court, excepting as to the claims of Mr. Taft and Mr. Chapin.

Briefly and without argument I desire to state my conclusions as to those claims. Mr. Taft was a director and promoter of the company from its beginning and was fully advised of all actions taken in issuing the common stock as bonus for the preferred stock and participated therein. He knew that the preferred stock was being sold at par and the common stock, which had been declared by him and the other directors of the company to be "full paid and nonassessable," was being issued as a bonus to purchasers of said preferred stock who had nothing to do with the management of the company, to induce them to purchase the preferred stock. He could not, therefore, in good faith, have relied upon any assessment from such holders of common stock to repay advances made by him to the company in the event of the failure of the company to repay such advances. Mr. Chapin was counsel for the company and advised and directed the steps taken by Mr. Taft and the other directors in pursuing the course they did pursue. He directed them in the action they took to make the common stock, as he

thought, "full paid and nonassessable," and knew that as such, it was being issued as a bonus to purchasers of the preferred stock, who had no part in the management of the company, as an inducement to purchase that stock. He now claims the right to have this same common stock assessed in order that he may be paid for his services.

Excepting in the state of New Jersey, where the proceeding was under a statute which the court there said put the creditor's right on a different basis from that under the general law, the overwhelming weight of authority is opposed to such proceeding.

Whether the proceeding in the case at bar for the purpose of assessing the stockholders is under the liability imposed by section 20 of the Incorporation Act, or is under the liability that existed prior to that section, can be of no importance, because section 20 imposed no new liability upon the stockholder, but simply stated or declared a liability that existed prior to its passage.

Therefore, it seems to me that the law as generally applied by the courts outside New Jersey should be applied here.

11 Del.Ch. 430, 106 A. 39, 7 A.L.R. 955

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

85 P.3d 841                                                                                     Page 1
85 P.3d 841, 2004 OK 7
**(Cite as: 85 P.3d 841)**

c

Supreme Court of Oklahoma.

Lula **FANNING**, as Guardian of Eva Jackson, a
physically and mentally
incapacitated adult, Plaintiff/Appellant,
v.
James **BROWN**, Alex Dout, Grant Rhodes, Tony
Wilkins, and Jeff Young,
Defendants/Appellees.

No. 97,956.

Feb. 10, 2004.

**Background:** Guardian of a physically and
mentally incapacitated adult filed a petition
shareholders of corporate owner/operator of
specialized long-term nursing care facility, asserting
nursing home negligence, statutory violations of
Nursing Home Care Act (NHCA), Protective
Services for Vulnerable Adults Act, and breach of
contract for injuries resident received at facility, and
subsequently amended petition to assert claim to
pierce the corporate veil. The District Court, Tulsa
County, Ronald Shaffer, J., granted shareholders'
motion to dismiss. Guardian appealed. The Court of
Civil Appeals affirmed.

**Holdings:** On grant of petition for writ of
certiorari, the Supreme Court, Boudreau, J., held
that:
(1) petition failed to state a claim upon which
relief could be granted to the extent it asserted
shareholders were liable as owners of facility, but
(2) petition stated a claim to disregard the
corporate veil.

Vacated, and trial court affirmed in part, reversed
in part, and remanded.

West Headnotes

**[1] Appeal and Error** ☞1079

30k1079 Most Cited Cases

Guardian of resident abandoned for appellate
review claim against shareholders of corporate
owner/operator of specialized long-term nursing
facility under Protective Services for the Elderly
and for Incapacitated Adults Act for resident's
injuries, where claim was not supported by any
argument or legal authority. 43A Okl.St.Ann. §
10-101 et seq.

**[2] Appeal and Error** ☞893(1)
30k893(1) Most Cited Cases

Standard of review for an order dismissing a case
for failure to state a claim upon which relief can be
granted is de novo and involves consideration of
whether a plaintiff's petition is legally sufficient. 12
Okl.St.Ann. § 2012, subd. B, par. 6.

**[3] Appeal and Error** ☞919
30k919 Most Cited Cases

When reviewing a motion to dismiss, court must
take as true all of challenged pleading's allegations
together with all reasonable inferences which may
be drawn from them. 12 Okl.St.Ann. § 2012, subd.
B, par. 6.

**[4] Pretrial Procedure** ☞624
307Ak624 Most Cited Cases

A pleading must not be dismissed for failure to state
a legally cognizable claim unless the allegations
indicate beyond any doubt that the litigant can
prove no set of facts which would entitle him to
relief. 12 Okl.St.Ann. § 2012, subd. B, par. 6.

**[5] Pretrial Procedure** ☞675
307Ak675 Most Cited Cases

**[5] Pretrial Procedure** ☞683
307Ak683 Most Cited Cases

Burden to show legal insufficiency of a petition is
on party moving for dismissal and a motion for

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

85 P.3d 841
85 P.3d 841, 2004 OK 7
(Cite as: 85 P.3d 841)

Page 2

failure to state a claim upon which relief can be granted must separately state each omission or defect in petition; if it does not, the motion shall be denied without a hearing. 12 Okl.St.Ann. § 2012, subd. B, par. 6.

**[6] Health ☞780**
198Hk780 Most Cited Cases

Corporation, not its shareholders, was owner of specialized long-term nursing care facility under Nursing Home Care Act (NHCA), and thus, shareholders could not be sued by resident's guardian for injuries resident allegedly received as a result of nursing home negligence, even if shareholders profited incidentally from facility's operations; Act section providing that person or entity that stands to profit or lose as a result of financial success or failure of operation shall be presumed to be owner of facility did not extend liability beyond specific person or entity which had responsibility for providing relevant services. 12 Okl.St.Ann. § 2012, subd. B, par. 6; 63 Okl.St.Ann. § 1-1902, subd. 16.

**[7] Action ☞3**
13k3 Most Cited Cases

Nursing Home Care Act (NHCA) provides a private right of action for nursing home residents to redress a violation of rights conferred by the Act. 63 Okl.St.Ann. § 1-1901 et seq.

**[8] Statutes ☞176**
361k176 Most Cited Cases

Statutory construction presents a question of law.

**[9] Appeal and Error ☞893(1)**
30k893(1) Most Cited Cases

Questions of law are reviewed by a de novo standard.

**[10] Appeal and Error ☞893(1)**
30k893(1) Most Cited Cases

Under the de novo standard of appellate review, the Supreme Court has plenary, independent and nondeferential authority to determine whether the trial court erred in its legal ruling.

**[11] Statutes ☞190**
361k190 Most Cited Cases

Rules of statutory construction are employed when legislative intent cannot be ascertained from the language of a statute, as in cases of ambiguity.

**[12] Statutes ☞181(1)**
361k181(1) Most Cited Cases

**[12] Statutes ☞188**
361k188 Most Cited Cases

The fundamental rule of statutory construction is to ascertain and give effect to the legislative intent, and that intent is first sought in the language of a statute.

**[13] Statutes ☞188**
361k188 Most Cited Cases

Courts will give the words of a statute a plain and ordinary meaning, unless it is clear from the statute that a different meaning was intended by the Legislature.

**[14] Statutes ☞188**
361k188 Most Cited Cases

The Supreme Court looks to the language of a statute to ascertain legislative intent.

**[15] Health ☞784**
198Hk784 Most Cited Cases

Legislature intended language indicating who was the "owner" of a nursing facility to be construed narrowly so that it would not extend liability under Nursing Home Care Act (NHCA) to other persons and entities which have some sort of legal interest in the facility but are not the "owner." 63 Okl.St.Ann. § 1-1902, subd. 16.

**[16] Corporations ☞1.7(1)**
101k1.7(1) Most Cited Cases

Guardian of resident at long-term nursing care facility stated a claim to disregard corporate veil of owner/operator and hold corporate owner/operator's individual shareholders liable for obligations and conduct of facility where resident was allegedly

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

85 P.3d 841
85 P.3d 841, 2004 OK 7
(Cite as: 85 P.3d 841)

injured, by alleging that shareholders used corporate entity to defeat public policy of protecting a resident from neglect and abuse, that they failed to secure and maintain liability insurance, and that they allowed owner/operator to become suspended from doing business within state. 12 Okl.St.Ann. § 2012, subd. B, par. 6.

**[17] Corporations ☞1.3**
101k1.3 Most Cited Cases

Generally, a corporation is regarded as a legal entity, separate and distinct from the individuals comprising it; however, the notion of a corporation's legal entity, apart from the persons composing it, is introduced for convenience and to serve the ends of justice.

**[18] Corporations ☞1.4(2)**
101k1.4(2) Most Cited Cases

**[18] Corporations ☞1.4(3)**
101k1.4(3) Most Cited Cases

**[18] Corporations ☞1.4(4)**
101k1.4(4) Most Cited Cases

Courts may disregard the corporate entity and hold stockholders personally liable for corporate obligations or corporate conduct under the legal doctrines of fraud, alter ego and when necessary to protect the rights of third persons and accomplish justice.

**[19] Pleading ☞48**
302k48 Most Cited Cases

**[19] Pleading ☞72**
302k72 Most Cited Cases

Pleading Code requirement, that a plaintiff provide a short and plain statement of the claim showing that the pleader is entitled to relief, and a demand for judgment for the relief to which he deems himself entitled, is not onerous, but is merely to give an opposing party fair notice of the claim and the grounds upon which it rests. 12 Okl.St.Ann. § 2008, subd. A, pars. 1, 2.

**[20] Pretrial Procedure ☞695**
307Ak695 Most Cited Cases

Trial court erred in dismissing guardian's nursing home negligence case without providing guardian with an opportunity to amend her complaint, even if the allegations in her petition were not sufficient to withstand a motion to dismiss, where journal entry of judgment merely provided that the court sustained defendants' motion to dismiss. 12 Okl.St.Ann. § 2012, subds. B, par. 6, G.

**[21] Pretrial Procedure ☞695**
307Ak695 Most Cited Cases

In order for the courts to dismiss a claim for failure to state a cause of action without giving the plaintiff the opportunity to amend, it must appear that the claim does not exist rather than the claim has been defectively stated. 12 Okl.St.Ann. § 2012, subd. B, par. 6.
*843 On Certiorari to the Court of Civil Appeals, Division No. 1.

¶ 0 Plaintiff, Lula Fanning, as Guardian of Eva Jackson, filed suit against Sand Springs Care Center, Inc., its individual shareholders, and others for damages based on allegations of substandard medical care. Plaintiff alleged Eva Jackson was injured while a resident at Oak Dale Manor, a nursing home purportedly owned and operated by Sand Springs Care Center. The individual shareholders filed a motion to dismiss contending a shareholder cannot be liable for the negligent acts of the corporation. The trial court, the Honorable Ronald Shaffer, Judge of the District Court of Tulsa County, Oklahoma, granted the shareholders' motion to dismiss. Plaintiff dismissed all remaining defendants and appealed the shareholders' dismissal. The Court of Civil Appeals, Division No. 1, affirmed. We previously granted certiorari.

**COURT OF CIVIL APPEALS, DIVISION NO. 1, OPINION VACATED; TRIAL COURT AFFIRMED IN PART AND REVERSED IN PART AND CAUSE REMANDED FOR FURTHER PROCEEDINGS.**

Nancy Lloyd, Jim Lloyd, Lloyd & Lloyd, Sand Springs, OK, for plaintiff/appellant, Lula Fanning, as Guardian of Eva Jackson.

James E. Frasier, George M. Miles, Frasier, Frasier & Hickman, LLP, Tulsa, OK, for

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

85 P.3d 841
85 P.3d 841, 2004 OK 7
(Cite as: 85 P.3d 841)

Page 4

defendants/appellees, James Brown; Alex Dout; Grant Rhodes; Tony Wilkins; and Jeff Young.

BOUDREAU, J.

[1] ¶ 1 Lula Fanning, as Guardian of Eva Jackson, a physically and mentally incapacitated adult (Fanning), filed a petition in district court against James Brown, Alex Dout, Grant Rhodes, Tony Wilkins, and Jeff Young (defendants) who are the shareholders of Sand Springs Care Center, Inc. (SSCC). [FN1] *844 Fanning's petition alleged SSCC owned and operated Oak Dale Manor, a specialized long-term nursing care facility in Sand Springs, Oklahoma. Fanning asserts nursing home negligence, statutory violations of the Oklahoma Nursing Home Care Act (NHCA), 63 O.S.2001, § 1-1901 et seq. [FN2] and the Protective Services for Vulnerable Adults Act, 43A O.S.2001, § 10-101 et seq., [FN3] and breach of contract for injuries Eva Jackson received while a resident at Oak Dale Manor.

> FN1. Fanning's petition also named the following defendants: Sand Springs Care Center, Inc., d/b/a Oak Dale Manor; TLC Health Care, Inc., d/b/a Crescent Health Services; Rocky R. Lemon; H.A. Sand Springs, LLC, formerly known as H.A. Nevada Associates, LLC; Harvey Angell; Kenneth Dorsey, Court Appointed Receiver; Philip O. Watts, Receiver; Rex Hodges, Receiver; RHM Co., and Mid America Health Care Management Inc., all d/b/a Oak Dale Manor. Fanning dismissed without prejudice all claims against these defendants.

> FN2. Unless otherwise noted, the applicable sections of the NHCA have not been amended since the 2001 codification.

> FN3. In her brief-in-chief, Fanning mentions under the Concise Statement of Facts and Arguments that she sued the defendant shareholders alleging a claim

under the Protective Services for the Elderly and for Incapacitated Adults Act without any further argument. This claim is not supported by any argument or legal authority and is deemed abandoned. See Hadnot v. Shaw, 1992 OK 21, ¶ 7, 826 P.2d 978, 981; Wetsel v. Independent Sch. District I-1, 1983 OK 85, ¶ 8, 670 P.2d 986, 991.

¶ 2 Defendants filed a motion to dismiss on May 21, 2002, in which they asserted that Fanning failed to state a claim upon which relief could be granted. Defendants' motion provided that "[a]n individual and a corporation are two separate and distinct legal entities. An individual stockholder cannot be liable for the negligent acts of the corporation." On June 5, 2002, Fanning filed an amended petition adding a fourth cause of action to pierce the corporate veil. On June 6, 2002, Fanning filed a response to the motion to dismiss. In her response, Fanning maintained the NHCA expressly authorizes a direct action against "owners" and that there must be a factual determination as to whether defendants satisfy the definition of "owner" under the act. Fanning further argued that the equitable doctrine of piercing the corporate veil should be invoked to protect the rights of third persons and accomplish justice.

¶ 3 The trial judge granted defendants' motion to dismiss and Fanning appealed. The Court of Civil Appeals, Division I (COCA), affirmed, finding the petition failed to state a claim against the defendant shareholders. In making this determination, COCA found the NHCA contemplates that either a person or an entity will own a facility that there can be only one "owner" under the act. As a result, SSCC alone, and not its individual shareholders, own Oak Dale Manor and is subject to liability under the act. In addition, COCA held that Fanning failed to allege sufficient facts to justify the court disregarding the corporate entity and imputing liability for the acts of the corporation to the shareholders. This Court granted certiorari.

## I. STANDARD FOR REVIEWING A MOTION TO DISMISS

[2][3][4][5] ¶ 4 The standard of review for an

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

85 P.3d 841
85 P.3d 841, 2004 OK 7
(Cite as: 85 P.3d 841)

Page 5

order dismissing a case for failure to state a claim upon which relief can be granted is *de novo* and involves consideration of whether a plaintiff's petition is legally sufficient. *Hayes v. Eateries, Inc.,* 1995 OK 108, ¶ 2, 905 P.2d 778, 780. When reviewing a motion to dismiss, the court must take as true all of the challenged pleading's allegations together with all reasonable inferences which may be drawn from them. *Hayes,* 905 P.2d at 780. "A pleading must not be dismissed for failure to state a legally cognizable claim *unless* the allegations indicate *beyond any doubt* that the litigant can prove no set of facts which would entitle him to relief." *Frazier v. Bryan Mem. Hosp.,* 1989 OK 73, ¶ 13, 775 P.2d 281, 287. (emphasis in original). Furthermore, the burden to show the legal insufficiency of the petition is on the party moving for dismissal and a motion made under 12 O.S.2001, § 2012(B)(6) must separately state each omission or defect in the petition; if it does not, the motion shall be denied without a hearing. *Indiana Nat.'l Bank v. State of Oklahoma, Dept. of Human Serv.,* 1994 OK 98, ¶ 3, 880 P.2d 371, 375. Motions to dismiss are usually viewed with disfavor under this liberal standard. *Id.* at 375. The burden of demonstrating a petition's insufficiency *845 is not a light one. *Id.* The above standards guide our review in this case.

## II. DISCUSSION

**A. The Petition Fails to State a Claim Under the Oklahoma Nursing Home Care Act, 63 O.S.2001, § 1-1901 *et seq.***

[6][7] ¶ 5 The NHCA provides a private right of action for nursing home residents to redress a violation of rights conferred by the act. *Morgan v. Galilean Health Enter., Inc.,* 1998 OK 130, ¶ 8, 977 P.2d 357, 361. Every nursing home resident has "the right to receive adequate and appropriate medical care consistent with established and recognized medical practice standards within the community." 63 O.S.Supp.2003, § 1-1918. This right is enforceable against "[t]he owner and licensee [who] are liable to a resident for any intentional or negligent act or omission of their agents or employees which injures the resident." 63 O.S.Supp.2003, § 1-1939(A). [FN4]

FN4. The NHCA defines "licensee" as "the person, a corporation, partnership, or association who is the owner of the facility which is licensed by the Department pursuant to the provisions of the Nursing Home Care Act." 63 O.S.2001, § 1-1902(13). In this case, Fanning alleges SSCC is the "owner".

¶ 6 The NHCA defines "owner" as "[a] person, corporation, partnership, association, or other entity which owns a facility or leases a facility." 63 O.S.2001, § 1-1902(16). It also provides that "[t]he person or entity that stands to profit or lose as a result of the financial success or failure of the operation shall be presumed to be the owner of the facility." *Id.* [FN5] Fanning maintains the NHCA authorizes her to bring an action against the shareholders as "owners" because they stand to profit or lose as a result of the financial success or failure of the operations of Oak Dale Manor.

FN5. The definition of "owner" and "licensee", taken literally, are somewhat inconsistent. For example, "licensee" is defined as "the owner of the facility" whereas the "owner" may either "own" or "lease" a facility.

¶ 7 Defendants filed a motion to dismiss asserting that the corporation was an entity distinct from its individual members or shareholders. The trial court granted defendants' motion to dismiss without comment. On appeal, COCA rejected Fanning's argument that the shareholders were "owners" under the NHCA. COCA interpreted "owner" as either the person or entity that stands to profit or lose--that there can be only one "owner" under the act. As a result, COCA found that SSCC alone, and not its individual shareholders, is subject to liability within the meaning of the act.

[8][9][10] ¶ 8 At issue is the interpretation or construction of the definition of "owner". 63 O.S.2001, § 1-1902(16). Statutory construction presents a question of law. *Arrow Tool & Gauge v. Mead,* 2000 OK 86, ¶ 20, 16 P.3d 1120, 1122-23. Questions of law are reviewed by a *de novo*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

85 P.3d 841
85 P.3d 841, 2004 OK 7
(Cite as: 85 P.3d 841)

Page 6

standard. *Neil Acquisition v. Wingrod Investment Corp.,* 1996 OK 125, ¶ 5, 932 P.2d 1100, 1103. Under this standard, we have plenary, independent and nondeferential authority to determine whether the trial court erred in its legal ruling. *Id.*

¶ 9 This Court has stated that the language of the NHCA "is not a model of clarity and precision". *Morgan,* 977 P.2d at 361. The definition of "owner" exemplifies this statement. The first sentence which defines "owner" as the person or entity which owns or leases a facility is relatively unambiguous. [FN6] The second sentence, however, is ambiguous as it could include other persons or entities which profit incidentally from the facility's operation.

> FN6. *Price v. TLC Health Care, Inc.,* 2004 OK 8, adopted contemporaneously with the case at issue.

[11][12][13] ¶ 10 Rules of statutory construction are employed when legislative intent cannot be ascertained from the language of a statute, as in cases of ambiguity. *Johnson v. City of Woodward,* 2001 OK 85, ¶ 6, 38 P.3d 218, 222. The fundamental rule of statutory construction is to ascertain and give effect to the legislative intent, and that intent is first sought in the language of a statute. *The Pentagon Academy v. Independent Sch. Dist. No. 1 of Tulsa County,* 2003 OK 98, ¶ 19, 82 P.3d 587. Courts will give the words **\*846** of a statute a plain and ordinary meaning, unless it is clear from the statute that a different meaning was intended by the Legislature. *Id.*

[14] ¶ 11 Guided by these rules of construction, we look to the language of a statute to ascertain legislative intent. The NHCA defines "owner" as a person or entity which owns or leases a facility. 63 O.S.2001, § 1-1902(16). Since the Legislature tied the definition of "owner" to "facility", we must examine other provisions of the NHCA more closely. "Facility" is defined as a nursing facility and a specialized home. 63 O.S.2001, § 1-1902(9). "Nursing Facility" means a home or institution which is primarily engaged in providing nursing care, rehabilitation services or health-related care and "specialized home" means any home or institution which provides inpatient long-term care services. 63 O.S.2001, § 1-1902(10 & 11).

¶ 12 Upon reviewing these provisions it is clear that the NHCA defines "facility" by reference to the nature and extent of services it provides to residents. Accordingly, as the definition of "owner" is defined by reference to "facility", the "owner" of a "facility" is a person or entity that has responsibility for providing the relevant services to residents. [FN7]

> FN7. *See* Edward J. Main, *Who Owns a Nursing Facility?,* 75 Okla.B.J. 111 (Jan. 17, 2004), a recent Oklahoma Bar Journal article which addressed the ambiguity contained in the definition of "owner" under the NHCA. He argues that an interpretation that ties the definition of "owner" to the provision of the relevant service is consistent with the general principle of "duty" that a person must be in a position to act or to fail to act in a way that will injure another.

[15] ¶ 13 In our view, the "profit or lose" language in the second sentence does not extend liability beyond the specific person or entity which has responsibility for providing the relevant services. We believe the Legislature intended the language to be construed narrowly so that it would not extend liability to other persons and entities which have some sort of legal interest in the facility but are not the "owner". These other persons or entities, like shareholders of a corporation, remain entitled to the protections otherwise available to the particular business form they have chosen.

¶ 14 A broad interpretation of the "profit or lose" language in the definition of "owner" would allow the joinder of defendants clearly never intended by the Legislature. We can imagine a variety of persons or entities that would "stand to profit or lose as a result of the financial success or failure of the operation." For instance, landlords, vendors, and even employees of the facility themselves, all could be said to have economic interests in the financial success of the nursing facility. It can not be seriously argued that anyone with an economic

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

interest in the success or failure of the facility should be a defendant in a malpractice action.

¶ 15 In sum, it is alleged that SSCC, as a corporation, owned and operated Oak Dale Manor. Although the defendant shareholders can be said to have profited incidentally from the facility's operations, they are not "owners" under the NHCA. We agree that Fanning's petition failed to state a claim upon which relief could be granted. We hold the trial court was correct in sustaining defendants' motion to dismiss.

**B. The Petition Adequately States a Claim to Disregard the Corporate Veil.**

[16][17][18] ¶ 16 Generally, a corporation is regarded as a legal entity, separate and distinct from the individuals comprising it. *Buckner v. Dillard,* 1939 OK 144, ¶ 21, 89 P.2d 326, 328. However, the notion of a corporation's legal entity, apart from the persons composing it, is introduced for convenience and to serve the ends of justice. *Mid-Continent Life Ins. Co. v. Goforth,* 1943 OK 244, ¶ 10, 143 P.2d 154, 156. Accordingly, Oklahoma has long recognized the doctrine of disregarding the corporate entity in certain circumstances. Courts may disregard the corporate entity and hold stockholders personally liable for corporate obligations or corporate conduct under the legal doctrines of fraud, alter ego and when necessary to protect the rights of third persons and accomplish justice. *See Goforth,* 143 P.2d at 156 (courts may disregarded the legal fiction that bestows on a corporation an existence separate and distinct from its stockholders *847 when necessary to protect the interests of the public, circumvent fraud and protect the rights of third persons or accomplish justice); *Frazier v. Bryan Memorial Hosp. Authority,* 1989 OK 73, ¶ 16, 775 P.2d 281, 288 (if one corporation is simply the instrumentality of another corporation, the separation between the two may be disregarded and treated as one).

¶ 17 Fanning filed an amended petition asserting a legal theory seeking to pierce the corporate veil and hold SSCC shareholders individually liable for the obligations and conduct of SSCC. Fanning alleged the shareholders used the corporate entity to defeat the public policy of protecting a resident from neglect and abuse, that they failed to secure and

maintain liability insurance, and that they allowed SSCC to become suspended from doing business within the state. She also argued that the public policy of protecting elderly residents is a compelling or overriding reason to disregard the corporate entity and pierce the corporate veil.

¶ 18 Shareholders moved to dismiss simply stating the general rule that a shareholder is a separate entity that cannot be liable for the negligent acts of the corporation. [FN8] The trial court dismissed the case and COCA affirmed. In affirming, COCA held that Fanning failed to allege sufficient facts to state a claim that would justify the court disregarding the corporate entity and imputing liability for the acts of the corporation to the shareholders.

> FN8. Amicus curiae and the defendants argue that pursuant to 18 O.S.2001, § 1124(B) Fanning is required to obtain a judgment against the corporation which must be returned unsatisfied before the plaintiff may bring suit against the shareholders for a corporate debt. This is a defense presented for the first time on appeal. Without deciding its application, we disagree. Subsection (B) of § 1124 must be read in relation to subsection (A). Subsection (A) provides that subsection (B) applies only to claims conferred "by the provisions of the Oklahoma General Corporation Act" which permits officers, directors, and shareholders to be held liable for the debts of the corporation in certain instances. *See Lone Star Indus., Inc. v. Redwine,* 757 F.2d 1544, 1553 (5th Cir.1985)(interpreting an identical section of the Delaware General Corporation Laws).

[19] ¶ 19 Oklahoma became a notice pleading state with the adoption of the Oklahoma Pleading Code in 1984. 12 O.S.2001, § 2008. The Pleading Code does not require a plaintiff to set out in detail the facts upon which the claim is based but merely requires "a short and plain statement of the claim showing that the pleader is entitled to relief; and ... [a] demand for judgment for the relief to which he

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

85 P.3d 841
85 P.3d 841, 2004 OK 7
**(Cite as: 85 P.3d 841)**

deems himself entitled." 12 O.S.2001, § 2008(A)(1) & (2). This requirement is not onerous, but is merely to give an opposing party fair notice of the claim and the grounds upon which it rests. *Gunn v. Consolidated Rural Water & Sewer Dist., No. 1, Jefferson County, Oklahoma,* 1992 OK 131, ¶ 13, 839 P.2d 1345, 1351.

¶ 20 The United States Supreme Court reaffirmed the liberal system of "notice pleading" in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit et al,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). [FN9] In *Leatherman,* homeowners filed a complaint which alleged that searches of their home violated the Fourth Amendment and that municipal corporations failed to adequately train officers. The trial court dismissed the complaint finding the plaintiffs had failed to meet the heightened pleading standard required in a civil rights suit alleging municipal liability under 42 U.S.C. § 1983. The Fifth Circuit affirmed. In reversing, the United States Supreme Court stated: "[t]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the *848 grounds upon which it rests." *Leatherman,* 507 U.S. at 168, 113 S.Ct. 1160, quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957).

> FN9. Since 12 O.S.2001, § 2008 is adopted from its federal counterpart, Rule 8 of the Federal Rules of Civil Procedure, we may look to federal case law to aid in its interpretation and application. *See Heffron v. District Court Oklahoma County,* 2003 OK 75, ¶¶ 13 & 14, 77 P.3d 1069, 1076 (when a statute is adopted from the Federal Rules of Civil Procedure, courts may look to relevant federal case law to assist them in interpreting the pertinent state provision); *State ex rel. Moshe Tal v. City of Oklahoma City,* 2002 OK 97, ¶ 2, 61 P.3d 234, 240 (in that 12 O.S.2001, § 2011 is adopted from its federal counterpart, Rule 11, we may look to federal case law to aid in its

interpretation and application).

¶ 21 Title 12 O.S.2001, § 2009(B) does impose a particularity requirement in some instances. In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. [FN10] Since this case does not involve fraud or mistake, Fanning was only required to set forth a short and plain statement of her claims so that the defendants would have fair notice of what Fanning's claims were and the grounds upon which they rest. As the Supreme Court pointed out in *Leatherman,* in the absence of an amendment to Rule 9, federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims. *Leatherman,* 507 U.S. at 168-69, 113 S.Ct. 1160.

> FN10. Although allegations of fraud must be stated with sufficient particularity to enable the opposing party to prepare his or her responsive pleadings and defenses, particularity does not mean the plaintiff has to plead detailed evidentiary matters. *A-Plus Janitorial & Carpet Cleaning v. The Employers' Workers' Compensation Assoc.,* 1997 OK 37, ¶ 35, 936 P.2d 916, 930-31.

¶ 22 In her petition, Fanning has asserted legal theories of negligence and breach of contract. Fanning seeks to pierce the corporate veil of SSCC and hold the individual shareholders liable for the obligations and conduct of the facility. Fanning has given the defendants fair notice of her claims and the grounds upon which they rest. Whether Fanning can prevail on her claim against the shareholders remains to be seen. However, Fanning must be afforded an opportunity to complete discovery so that the court will have a fully developed factual record to determine the issue. At this stage of the proceedings it does not appear beyond a doubt that Fanning can prove no set of facts in support of her theories of recovery. Accordingly, the trial court erred in dismissing Fanning's petition.

[20][21] ¶ 23 Even if the allegations in Fanning's petition were not sufficient to withstand a motion to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

85 P.3d 841
85 P.3d 841, 2004 OK 7
**(Cite as: 85 P.3d 841)**

dismiss, the trial court still erred in dismissing the case without providing Fanning with an opportunity to amend her complaint. Title 12 O.S.2001, § 2012(G) provides "(o)n granting a motion to dismiss a claim for relief, the court shall grant leave to amend if the defect can be remedied and shall specify the time within which an amended pleading shall be filed." This Court has interpreted the statute as a mandatory duty placed on trial courts, as long as the defect can be remedied. *See Kelly v. Abbott,* 1989 OK 124, ¶ 6, 781 P.2d 1188, 1190. In order for the courts to dismiss a claim for failure to state a cause of action without giving the plaintiff the opportunity to amend, it must appear that the claim does not exist rather than the claim has been defectively stated. *See Lockhart v. Loosen,* 1997 OK 103, ¶ 5, 943 P.2d 1074, 1078 (which draws a distinction between a petition that is dismissible for want of a cognizable legal theory of liability and one that is dismissible for insufficient facts under a recognized theory).

¶ 24 The journal entry of judgment in this case merely provides that the court "[h]ereby sustains these Defendants' Motion to Dismiss, pursuant to 12 Okla.Stat. § 2012(B)(6)." The judgment does not provide Fanning with leave to amend. Similarly, since Fanning pled a cognizable legal theory, i.e., piercing the corporate veil, the judgment does not contain a statement that no amendment of the petition could cure the defects in Fanning's petition. If the trial court was of the opinion that the claim was defectively pled, it should have provided Fanning with an opportunity to amend. Accordingly, the trial court erred in dismissing Fanning's petition.

### III. CONCLUSION

¶ 25 In conclusion, we hold the trial court was correct in granting the defendant *shareholders'* motion to dismiss for failure to state a claim under the Oklahoma Nursing Home Care Act. However, the trial court erred in dismissing Fanning's remaining theories of recovery as her petition adequately states a claim to disregard the corporate veil.

**COURT OF CIVIL APPEALS, DIVISION I, OPINION VACATED; TRIAL COURT AFFIRMED IN PART AND REVERSED IN**

PART AND CAUSE REMANDED *849 FOR FURTHER PROCEEDINGS.

ALL JUSTICES CONCUR.

85 P.3d 841, 2004 OK 7

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

601 F.Supp. 1048
224 U.S.P.Q. 90, 1984 Copr.L.Dec. P 25,662
**(Cite as: 601 F.Supp. 1048)**

Page 1

C

United States District Court,
D. Delaware.

HIDEOUT RECORDS AND DISTRIBUTORS, et
al., Plaintiffs,
v.
EL JAY DEE, INC., et al., Defendants.
ANGEL WING MUSIC, et al., Plaintiffs,
v.
EL JAY DEE, INC., et al., Defendants.

**Civ. A. Nos. 81-177 CMW, 81-428 CMW.**

March 19, 1984.

Actions brought by owners of copyrights to musical compositions against nightclub for copyright infringement were consolidated. On owners' motion for default judgment or in the alternative, for summary judgment, the District Court, Caleb M. Wright, Senior District Judge, held that: (1) performances of protected musical compositions were infringements of copyright even if failure of owners of nightclub to renew ASCAP license and pay license fees was based on their attorney's mistaken advice as to legal consequences of their actions and even if owners believed in good faith they were not infringing copyrights, and (2) deliberate violation of copyright laws for substantial period of time despite ASCAP's persistent attempts to induce nightclub owners to acquire and maintain a license and despite a previous loss in copyright litigation warranted award of $500 damages for each of eight infringing performances.

Motion granted.

West Headnotes

**[1] Copyrights and Intellectual Property⊂⇒ 83(1)**
99k83(1) Most Cited Cases

In order to prove that copyrights to popular songs had been infringed, owners bore burden of demonstrating originality and authorship of songs allegedly infringed, compliance with formalities of Copyright Act, that owners were in fact proprietors of copyrights, that songs were performed as alleged,

and that such performance was without proper authorization. 17 U.S.C.A. § 101 et seq.

**[2] Copyrights and Intellectual Property⊂⇒ 83(6)**
99k83(6) Most Cited Cases

Copies of copyright registration certificates and copies of all relevant assignments relating to popular songs at issue constituted prima facie evidence of originality and authorship of songs allegedly infringed, compliance with formalities of Copyright Act, and ownership of copyrights. 17 U.S.C.A. § 101 et seq.

**[3] Copyrights and Intellectual Property ⊂⇒66**
99k66 Most Cited Cases

Performances of protected musical compositions were infringements of copyright even if failure of nightclub owners to renew ASCAP license and pay license fees was based on their attorney's mistaken advice as to legal consequences of their actions and even if owners believed in good faith they were not infringing copyrights. 17 U.S.C.A. § 101 et seq.

**[4] Copyrights and Intellectual Property ⊂⇒77**
99k77 Most Cited Cases

In cases of copyright infringement by a corporation, an individual defendant's personal liability under Delaware law depends, inter alia, on whether he or she is dominant influence in infringing corporation and has capacity to control acts of corporation; if so, then he or she is jointly liable with corporation for copyright infringement. 17 U.S.C.A. § 101 et seq.; 8 Del.C. § 325.

**[5] Copyrights and Intellectual Property ⊂⇒77**
99k77 Most Cited Cases

President and vice-president/secretary of corporate defendant were jointly liable with corporate defendant for infringement of copyrights to musical compositions in view of their admissions that they had primary responsibility for control, management, operation and maintenance of affairs of corporate defendant. 17 U.S.C.A. § 101 et seq.

**[6] Federal Civil Procedure ⊂⇒2547.1**
170Ak2547.1 Most Cited Cases
(Formerly 170Ak2547)

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

601 F.Supp. 1048
224 U.S.P.Q. 90, 1984 Copr.L.Dec. P 25,662
**(Cite as: 601 F.Supp. 1048)**

Page 2

If facts stated in affidavits of party moving for summary judgment are not contradicted by facts stated in affidavits of party opposing motion for summary judgment, they should be accepted as true.

**[7] Federal Civil Procedure ☞2547.1**
170Ak2547.1 Most Cited Cases
(Formerly 170Ak2547)

An affiant's failure to remember an event is not a specific denial that event occurred for purpose of ruling on motion for summary judgment.

**[8] Federal Civil Procedure ☞2539**
170Ak2539 Most Cited Cases

Conclusory statements, general denials, and factual allegations not based on personal knowledge are insufficient to support summary judgment.

**[9] Copyrights and Intellectual Property☞ 87(1)**
99k87(1) Most Cited Cases

In determining statutory damages under Copyright Act, courts have wide discretion to set damages within statutory limits. 17 U.S.C.A. § 504(c)(1).

**[10] Copyrights and Intellectual Property☞ 87(2)**
99k87(2) Most Cited Cases

Deliberate violation of copyright laws for substantial period of time despite ASCAP's persistent attempts to induce nightclub owners to acquire and maintain a license and despite a previous loss in copyright litigation warranted award of $500 damages for each of eight infringing performances. 17 U.S.C.A. §§ 101 et seq., 504(c)(1).
**\*1049** Jane R. Roth, Richards, Layton & Finger, Wilmington, Del., for plaintiffs.

Phillip J. Collins, Wilmington, Del., for defendants.

### MEMORANDUM OPINION

CALEB M. WRIGHT, Senior District Judge.

This is a consolidated action for copyright infringement arising under the United States

Copyright Act, 17 U.S.C. §§ 101 et seq., in which plaintiffs seek an injunction prohibiting further infringing performances of the musical compositions in question, statutory damages in an amount ranging between $250 and $10,000 for each infringement, and costs, including reasonable attorneys' fees. Presently before the Court is plaintiffs' motion for default judgment or, in the alternative, for summary judgment. For the reasons discussed below, the Court grants plaintiffs' motion for summary judgment.

FACTS

Plaintiffs own the copyrights to seven popular songs [FN1] which they claim were infringed by the unauthorized public performances **\*1050** of the songs on the nights of February 20-21, 1981 and August 9-10, 1981 at defendants' establishment, the Red Lantern Inn in New Castle, Delaware. Each of the plaintiffs is a music publisher and a member of the American Society of Composers, Authors, and Publishers (hereinafter "ASCAP"), [FN2] and each of the plaintiffs has granted ASCAP a non-exclusive right to license non-dramatic public performances of their copyrighted musical compositions. Defendants are the proprietors of the Red Lantern Inn, an establishment providing live entertainment in New Castle, Delaware. Defendant El Jay Dee, Inc. owns and operates the Red Lantern Inn, with defendant Frank Nelkin, Jr. acting as President, and defendant Hiawanna Nelkin acting as Vice-President and Secretary. [FN3]

> FN1. The songs are titled: "Betty Lou's Getting Out Tonight", "Tulsa Time", "Fooled Around And Fell In Love", "Roadhouse Blues", "Jailhouse Rock", "She Believes In Me (a/k/a While She Lays)", and "Blues Eyes Crying In The Rain".

> FN2. ASCAP is a performing rights licensing organization which, on behalf of its members, licenses thousands of radio and television stations, restaurants, nightclubs, hotels, taverns and other establishments whose owners desire to perform publicly copyrighted musical compositions in the ASCAP repertory.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

601 F.Supp. 1048
224 U.S.P.Q. 90, 1984 Copr.L.Dec. P 25,662
(Cite as: 601 F.Supp. 1048)

Page 3

FN3. Defendants Frank and Hiawanna Nelkin have admitted that they had "primary responsibility for the control, operation and maintenance of the affairs of [El Jay Dee, Inc.]", and that "the acts hereinafter complained of were done with their active assistance, cooperation, acquiescence and procurement." *See* Complaint ¶ 5 (Dkt. No. 1); Answer ¶ 5 (Dkt. No. 5).

The basis for plaintiffs' motion for default judgment is the failure of defendant Hiawanna Nelkin to appear for one of her noticed depositions. This deposition was scheduled to occur on December 20, 1982. [FN4] *See* Appendix B to Plaintiffs' Opening Brief (Dkt. No. 47). Mrs. Nelkin contends that she was never given notice that a deposition had been scheduled for December 20, 1982 and that her failure to appear was not wilful but rather due to circumstances beyond her control. *See* Exhibit B to Defendants' Answering Brief (Dkt. No. 51). Plaintiffs contend that Mrs. Nelkin failed to appear even though she was repeatedly notified of it by her attorney. The plaintiffs conclude that her failure to appear constitutes a wilful disregard of her obligations sufficient to justify entry of default judgment. *See* Appendix A to Plaintiffs' Reply Brief and Plaintiffs' Reply Brief at 3-5 (Dkt. No. 57).

FN4. Mrs. Nelkin's deposition had been noticed on six prior occasions. *See* Appendix C to Plaintiffs' Opening Brief (Dkt. No. 47). These six prior occasions on which Mrs. Nelkin failed to appear are not in issue since these depositions were put over by agreement of counsel. *See* Plaintiffs' Opening Brief at 3 (Dkt. No. 47). Her failure to appear at the first six depositions was apparently due to her poor health. *See* Exhibits A and B to Defendant's Answering Brief (Dkt. No. 51).

As an alternative to entry of default judgment, plaintiffs seek entry of summary judgment, alleging that they have offered uncontradicted proof of both copyright ownership and infringing performance. Plaintiffs have submitted copies of copyright registration certificates and other documents to prove ownership and defendants do not dispute that plaintiffs are the owners of the copyrights to the musical compositions at issue in this litigation. *See* Affidavit of Anne Sullivan and accompanying Exhibits (Dkt. No. 48). However, defendants do dispute plaintiffs' affirmative proof of infringing performance, alleging that there are material issues of fact concerning whether the songs in issue were actually performed at the Red Lantern Inn on the nights in question. *See* Defendants' Answering Brief at 3-4 (Dkt. No. 51).

Plaintiffs have submitted the affidavits of four individuals as proof that the songs in issue were performed at the Red Lantern Inn on the nights of February 20-21, 1981 and August 9-10, 1981. The affidavits of Donald Hood and Raymond Verna state that the band playing at the Red Lantern Inn on the evening of February 20-21, 1981 performed five songs at issue in this litigation, titled "Betty Lou's Getting Out Tonight", "Tulsa Time", "Fooled Around And Fell In Love", "Roadhouse Blues", and "Jailhouse Rock". (Dkt. Nos. 44, 59, 61). The affidavits of Steven Shore and Michael Suchodolski state that the band playing at the Red Lantern Inn on the evening of August 9-10, 1981 performed *1051 three songs at issue in this litigation, titled "She Believes In Me (a/k/a While She Lays)", "Blue Eyes Crying In The Rain", and "Tulsa Time". (Dkt. Nos. 58, 60).

Defendants have submitted no affidavits to refute the affidavits of Shore and Suchodolski on the issue of performance of the three songs at issue on the night of August 9-10, 1981. Defendants have, however, submitted one affidavit that they allege refutes the affidavits of Hood and Verna on the issue of performance of the five songs at issue on the night of February 20-21, 1981. That affidavit, filed by Mrs. Nelkin, states in pertinent part:
    4. Although I had advertised that the band, Sheer Panic, would appear that night, Sheer Panic was not able to attend the Red Lantern Inn on February 20- 21, 1981. As their replacement, my calendar shows and I remember that, the band Southwind performed on that night. The statement that Sheer Panic appeared at the Red Lantern Inn on February 20-21, 1981 in the notes attached to the affidavit of David Hood, dated May 27, 1983, is not correct. I do not keep notes of every song bands played at the Red Lantern

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Inn, but I do not recall hearing Southwind play any of the five songs that Donald Hood says in his affidavit and notes that Southwind played. As I recall, Southwind did not play the kind of music represented by the five (5) songs in Donald Hood's affidavit. I have tried to locate Southwind or its members or agent but have been unsuccessful. Southwind disbanded long ago. I have examined and read Donald Hood's affidavit.

*See* Exhibit B to Defendants' Answering Brief (Dkt. No. 51). Defendants conclude that Mrs. Nelkin's affidavit is sufficient to raise a genuine issue of fact precluding summary judgment.

Defendants raise two other matters relevant to plaintiffs' motion for summary judgment. First, defendants contend that summary judgment against the individual defendants is inappropriate since they are shielded from personal liability by 8 *Del.C.* § 325. *See* Defendants' Answering Brief at 3-4 (Dkt. No. 51). Second, defendants contend that, while they had no ASCAP license at the time of the alleged performances, [FN5] their failure to renew the license and pay the license fees was based on their attorney's advice that ASCAP's licensing scheme violated the antitrust laws. *See* Exhibit B to Defendants' Answering Brief (Dkt. No. 51). Defendants conclude that plaintiffs' claims for injunctive relief, statutory damages, costs and reasonable attorneys' fees should be denied.

> FN5. ASCAP has, since May 1970, attempted to secure a license agreement with the owners of the Red Lantern Inn. When ASCAP's attempts proved unsuccessful, they sued and obtained a judgment for infringements of their copyrighted musical compositions which occurred in 1977 and 1978. *See Milene Music, Inc., et al. v. El Jay Dee, Inc.,* C.A. 78-167 (D.Del.) and *Swallow Turn Music, et al. v. El Jay Dee, Inc.,* C.A. No. 78-553 (D.Del.). This judgment was satisfied in February, 1981. In the course of the litigation, defendants entered into a license agreement for the Red Lantern Inn commencing on April 1, 1979. This agreement was terminated on January 11, 1981 for default in payment of fees. *See* Affidavit of William Fielder (Dkt. No. 45).

DISCUSSION

The Court finds that plaintiffs are entitled to summary judgment and grants plaintiffs' request for injunctive relief, statutory damages, costs and reasonable attorneys' fees. [FN6] In so holding, the Court concludes that there are no genuine issues of material fact remaining to be tried and that defendants' other contentions relating to plaintiffs' motion for summary judgment are without merit.

> FN6. Since this is a summary judgment motion, the Court has resolved any doubt as to the existence of genuine issues of material fact against the moving party and has resolved the reasonable inferences from the facts in favor of the party against whom judgment may be entered. *See, e.g., Hollinger v. Wagner Mining Equipment Co.,* 667 F.2d 402, 405 (3d Cir.1981). The Court finds it unnecessary to address plaintiffs' claim that a default judgment should be entered since the Court finds that there are no genuine issues of material fact precluding summary judgment.

**\*1052** [1][2] In order to prove that their copyrights have been infringed, plaintiffs bear the burden of demonstrating five elements:
  1. the originality and authorship of the songs allegedly infringed;
  2. compliance with the formalities of the Copyright Act;
  3. that plaintiffs are proprietors of the copyrights;
  4. that the songs were performed as alleged; and
  5. that such performance was without proper authorization.

*See, e.g., Broadcast Music, Inc. v. Moor-Law, Inc.,* 484 F.Supp. 357, 362 (D.Del.1980). In this case, there is no genuine issue of material fact relating to plaintiffs' evidence of originality and authorship, compliance with the statutory formalities, and ownership of the works allegedly infringed. Plaintiffs have filed copies of the copyright registration certificates and copies of all relevant assignments relating to the seven songs at issue here. *See* Affidavit of Anne Sullivan and accompanying exhibits (Dkt. No. 48). These

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

601 F.Supp. 1048
224 U.S.P.Q. 90, 1984 Copr.L.Dec. P 25,662
(Cite as: 601 F.Supp. 1048)

Page 5

documents constitute prima facie evidence of the first three elements required to be established by plaintiffs, *see Broadcast Music, Inc. v. Moor- Law, Inc., supra*, at 362-63, and defendants do not dispute plaintiffs' contentions relating to these elements.

[3] Defendants, however, do dispute plaintiffs' contentions relating to the last two elements required to be proved in a claim for copyright infringement. Apparently, defendants contend that their reliance on their attorney's erroneous advice that ASCAP's licensing scheme violated the antitrust laws justified their failure to renew the license and pay the license fees. The Court finds that this contention is meritless. In the absence of permission from the copyright owner, performances of protected musical compositions are infringements of copyright. This is so even if defendants' failure to renew the license and pay the license fees was based on their attorney's mistaken advice as to the legal consequences of their actions and even if defendants believed in good faith that they were not infringing plaintiffs' copyrights. *See, e.g., Universal City Studios v. Sony Corp. of America*, 659 F.2d 963, 975 (9th Cir.1981), *rev'd on other grounds*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) ("a defendant's mistake as to the legal consequences of his actions does not constitute an excuse for infringement"); *Pye v. Mitchell*, 574 F.2d 476, 481 (9th Cir.1978) (even if defendant believes in good faith that he is not infringing plaintiff's copyright, he may be found liable). Therefore, defendants' contentions relating to their failure to renew their license prior to the time of the alleged infringing performances provide no excuse for their failure to obtain proper authorization and cannot prevent the entry of summary judgment if the alleged infringing performances occurred.

[4][5] Moreover, if the alleged infringing performances occurred, defendants' contentions that the individual defendants are shielded from personal liability by 8 *Del.C.* § 325 cannot prevent the entry of summary judgment. 8 *Del.C.* § 325 provides:

(a) When the officers, directors, or stockholders of any corporation shall be liable by the provisions of this chapter to pay the debts of the corporation, or any part thereof, any person to whom they are liable may have an action, at law

or in equity, against any 1 or more of them, and the complaint shall state the claim against the corporation, and the ground on which plaintiff expects to charge the defendants personally.

(b) No suit shall be brought against any officer, director, or stockholder for any debt of a corporation of which he is an officer, director, or stockholder, until judgment be obtained therefor against the corporation and execution thereon returned unsatisfied.

This statute is plainly irrelevant since this is a copyright infringement action and not a suit against an officer, director or stockholder for the debts of a corporation. In cases of copyright infringement, an individual defendant's personal liability depends, *inter alia*, on whether he or she is the *1053 dominant influence in a corporation and has the capacity to control the acts of the corporation. If so, then he or she is jointly liable with the corporation for copyright infringement. *See Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307-09 (2d Cir.1963); *Milene Music, Inc. v. Gotauco*, 551 F.Supp. 1288, 1295 (D.R.I.1982); *Boz Scaggs Music, et al. v. KND Corp.*, 491 F.Supp. 908, 914 (D.Conn.1980); *Warner Bros., Inc., et al. v. O'Keefe*, 468 F.Supp. 16, 20 (S.D.Iowa 1978). In this case, the individual defendants admit that they are the President and Vice President/Secretary of the corporate defendant and that they had "primary responsibility for the control, management, operation and maintenance of affairs of said corporation." *See* Answer ¶ 5 (Dkt. No. 5). Therefore, the Court holds that they are jointly liable with the corporate defendant for any alleged infringements that occurred.

[6] Thus, the only issue that could preclude summary judgment in this case is the issue of whether any alleged infringing performances occurred. However, Mrs. Nelkin's affidavit, which is the only affidavit relied on by defendants to dispute plaintiffs' proof of infringing performance, does not contradict or refute plaintiffs' evidence on this issue. As numerous courts have held, if the facts stated in the affidavits of the moving party are not contradicted by facts stated in the affidavits of the party opposing the motion for summary judgment, they should be accepted as true. *See, e.g., Morrison v. Walker*, 404 F.2d 1046, 1048-49 (9th Cir.1968); *Anthony v. White*, 376 F.Supp. 567,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

601 F.Supp. 1048
224 U.S.P.Q. 90, 1984 Copr.L.Dec. P 25,662
(Cite as: 601 F.Supp. 1048)

Page 6

574 (D.Del.1974). In this case, Mrs. Nelkin's affidavit simply states that she cannot remember hearing the band that performed on the night of February 20-21, 1981 play any of the five songs that the affidavit of Donald Hood says were performed. It also states that she recalls that the band that performed on the night of February 20-21, 1981 did not play the kind of music represented by the five songs in Hood's affidavit. *See* Exhibit B to Defendants' Answering Brief (Dkt. No. 51). These allegations are not sufficient to contradict or refute the affidavits of Donald Hood and Raymond Verna.

[7][8] First, Mrs. Nelkin's statement that she cannot remember hearing the songs played does not place in dispute the statements of Hood and Verna that the songs were in fact played since an affiant's failure to remember an event is not a specific denial that the event occurred. *See, e.g., Lemelson v. The Bendix Corp., et al.,* C.A. No. 82-308, Slip Op. at 3, fn. 2 (D.Del., January 23, 1984). Second, Mrs. Nelkin's statement that, as she recalls, the band performing on the night of February 20-21, 1981 did not play the kind of music represented by the five songs in Hood's affidavit does not raise a triable issue since conclusory statements, general denials and factual allegations not based on personal knowledge are insufficient to avoid summary judgment. [FN7] *See Olympic Junior, Inc. v. David Crystal, Inc.,* 463 F.2d 1141, 1146 (3d Cir.1972). Finally, Mrs. Nelkin's statements do not raise a triable issue of fact since they are essentially addressed to the issues of what band played that night [FN8] and not to the critical issue of whether the five songs in issue were performed. Thus, the Court finds that there is no genuine issue *1054 of material fact regarding the infringing performance of the five songs played on the night of February 20-21, 1981.

FN7. Mrs. Nelkin's affidavit provides the Court with no basis for concluding that she had personal knowledge of the kind of music typically played by the band that performed on the night of February 20-21, 1981. *See, e.g., Doza v. American National Ins. Co.,* 314 F.2d 230, 232 (8th Cir.1963) (affidavit must not only be made on the personal knowledge of affiant, but must show that the affiant possesses the knowledge asserted). Nor does it

specifically deny that the five songs were played. It simply states a general conclusion about the type of music that this particular band typically played. Therefore, the Court cannot conclude that the affidavit has succeeded in setting forth "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) .

FN8. The Nelkin affidavit states that the group "Southwind" played that night; the original Hood affidavit stated that the group "Sheer Panic" performed. *See* Affidavit of Donald Hood (Dkt. No. 44). Hood's supplemental affidavit states that regardless of the identity of the band, the five songs were in fact played. *See* Affidavit of Donald Hood (Dkt. No. 61).

The Court also finds that there is no genuine issue of material fact regarding the infringing performance of the three songs played on the night of August 9- 10, 1981. Defendants have offered no evidence, by affidavit or otherwise, to refute the affidavits of Steven Shore and Michael Suchodolski (Dkt. Nos. 58, 60). These affidavits establish the performance of "She Believes In Me (a/k/a While She Lays)", "Blue Eyes Crying In The Rain", and "Tulsa Time" at the Red Lantern Inn on the night of August 9-10, 1981. Defendants have had over one month to submit counteraffidavits and have not done so. Therefore, the Court finds that summary judgment is appropriate since plaintiffs have affirmatively established the five elements required to find liability for copyright infringement and defendants have raised no genuine issues of material fact concerning plaintiffs' evidence.

Having prevailed on their motion for summary judgment, plaintiffs may be entitled to injunctive relief, statutory damages, costs and reasonable attorneys' fees. *See* 17 U.S.C. § 502(a) (court may "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of copyright."); 17 U.S.C. § 504(c) (plaintiffs may elect to recover statutory damages in lieu of actual damages and profits; statutory damages to range, in the court's discretion, from $250 to $10,000, and up to $50,000 if

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

601 F.Supp. 1048
224 U.S.P.Q. 90, 1984 Copr.L.Dec. P 25,662
(Cite as: 601 F.Supp. 1048)

Page 7

infringement is wilful); 17 U.S.C. § 505 (court, in its discretion, may award attorneys' fees and costs to the prevailing party). In this case, plaintiffs have elected to recover statutory damages and have suggested that $1000 for each of the eight infringing performances is an appropriate amount of statutory damages. *See* Plaintiffs' Opening Brief at 15 (Dkt. No. 47). Defendants suggest that, if they are liable, only the statutory minimum of $250 should be awarded.

[9][10] In determining statutory damages under 17 U.S.C. § 504(c)(1), courts have wide discretion to set damages within the statutory limits and awards of damages for more than the statutory minimum are frequent. *See, e.g., Milene Music, Inc. v. Gotauco,* 551 F.Supp. 1288 (D.R.I.1982) ($625 per infringement plus costs and attorneys' fees); *Broadcast Music, Inc. v. Tadych,* 203 U.S.P.Q. 506 (E.D.Wis.1979) ($1,000 per infringement); *Jerry DeNicola, Inc. v. Genesco, Pakula & Co.,* 188 U.S.P.Q. 306 (S.D.N.Y.1975) ( $5,000 per infringement). Two factors often considered by courts in determining an amount appropriate to vindicate statutory policy are the award's deterrent value and the wilful nature of defendants' infringement. *See, e.g., Milene Music, Inc. v. Gotauco, supra,* at 1296-97. In this case, the evidence shows that defendants have deliberately violated the copyright laws for a substantial period of time despite ASCAP's persistent attempts to induce defendants to acquire and maintain a license and despite a previous loss in copyright litigation. *See* Affidavit of William Fielder (Dkt. No. 45). Since the evidence indicates that defendants deliberately violated the copyright laws, and since defendants' previous defeat in a copyright infringement action has not deterred them from further violations of the law, the Court finds that an award of $500 for each of the eight infringing performances is appropriate.

In addition, the Court will issue an injunction prohibiting defendants from any further unlawful infringements of the musical compositions at issue in this litigation and will award plaintiffs costs and reasonable attorneys' fees. *See, e.g., Milene Music, Inc. v. Gotauco, supra,* at 1297-98 (costs routinely awarded to victor in copyright cases and attorneys' fees particularly appropriate in case of deliberate infringement). Defendants will be given an opportunity to dispute the reasonableness of the fee

award requested by plaintiffs' counsel.

An Order will be entered consistent with this Opinion.

601 F.Supp. 1048, 224 U.S.P.Q. 90, 1984 Copr.L.Dec. P 25,662

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

757 F.2d 1544
2 Fed.R.Serv.3d 40
**(Cite as: 757 F.2d 1544)**

Page 1

**H**

United States Court of Appeals,
Fifth Circuit.

LONE STAR INDUSTRIES, INC.,
Plaintiff-Appellant

v.

Charles REDWINE, as Trustee of the OKC
Corporation Liquidating Trust; Charles
Redwine, individually; OKC Limited Partnership;
Cloyce K. Box; and CKB &
Associates, Inc., Defendants-Appellees.

**No. 84-3470.**

April 22, 1985.

Creditor of dissolved Delaware corporation brought suit against trustee of corporation's liquidating trust and other transferees of corporation's assets seeking damages arising out of alleged breach of construction contract entered into between creditor and corporation. Upon motions to dismiss, the District Court, George Arceneaux, Jr., J., 590 F.Supp. 547, granted motion, and creditor appealed. The Court of Appeals, Robert Madden Hill, Circuit Judge, held that: (1) dissolved corporation was not indispensable party to creditor's action; (2) appointment of trust after dissolution was proper method of winding up corporation; (3) assignment of construction contract to trust was valid; (4) trust agreement did not nullify assignment of contract obligations; (5) complaint stated claim against trust; and (6) Delaware statute which requires plaintiff to procure judgment against corporation where he seeks to recover against officers, directors or shareholders personally for debt of corporation was inapplicable.

Reversed and remanded.

West Headnotes

**[1] Federal Courts ☞373**
170Bk373 Most Cited Cases

While indispensability is issue determined by federal law, state law will define substantive rights of parties and interests concerned.

**[2] Federal Courts ☞781**
170Bk781 Most Cited Cases

In determining substantive rights of parties and interests concerned under state law, Court of Appeals is required to apply law of state in which district court sits, even to extent of applying that state's choice of law principles.

**[3] Corporations ☞640**
101k640 Most Cited Cases

Under Louisiana law, law of state of incorporation is applicable in determining viability of corporation after dissolution.

**[4] Federal Civil Procedure ☞215**
170Ak215 Most Cited Cases

Where corporation had ceased to exist as legal entity and disposed of virtually all of its assets, corporation was not "indispensable party" in action for breach of construction agreement brought against trustee of liquidating trust established by corporation, limited partnership to which corporation had contributed substantial oil and gas interest, and general partners of limited partnership. Fed.Rules Civ.Proc.Rules 19, 19(a, b), 28 U.S.C.A.

**[5] Federal Civil Procedure ☞215**
170Ak215 Most Cited Cases

Even if creation of liquidating trust violated Delaware law and assignment of construction contracts from corporation to liquidating trust was invalid under terms of trust agreement and contract itself, corporation was still not "indispensable" in breach of construction agreement action brought against, inter alia, trustee of liquidating trust, where corporation, by virtue of its dissolution had ceased to exist. Fed.Rules Civ.Proc.Rule 19(b), 28 U.S.C.A.

**[6] Corporations ☞618**
101k618 Most Cited Cases

Under Delaware law, winding up of dissolved corporation can be accomplished by trust duly created by directors of dissolved corporation. 8 Del.C. § 278.

**[7] Assignments ☞58**

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

757 F.2d 1544
2 Fed.R.Serv.3d 40
**(Cite as: 757 F.2d 1544)**

38k58 Most Cited Cases

Although construction contract provided that corporation could assign its rights and obligations under contract to any financially responsible party, even if trust was not "financially responsible party," assignment of construction contract from corporation to trust was valid, where parties had power to waive, modify, or even abrogate completely by agreement financial responsibility provision, and parties had so agreed.

**[8] Corporations** 619
101k619 Most Cited Cases

Trust agreement did not nullify corporation's assignment to trust of its contract obligation, notwithstanding provision of trust agreement which prohibited trustee from engaging in any business in name of trust, where purpose of provision was to restrict trustee's discretion in administering trust's assets, thus protecting creditors and settlors alike, trust agreement was approved by corporation's directors at same time they provided for transfer of corporation's assets and liabilities to trust, and trustee could assume all of corporation's obligations under contract without undertaking performance of it by merely assuming obligation to satisfy any judgment arising from its breach, which would circumvent need of engaging in business.

**[9] Federal Civil Procedure** 1747
170Ak1747 Most Cited Cases

Federal Rule of Civil Procedure governing consequences of failure to join indispensable party is not intended to exclude considerations that are applicable in particular case. Fed.Rules Civ.Proc.Rule 19(b), 28 U.S.C.A.

**[10] Federal Civil Procedure** 1747
170Ak1747 Most Cited Cases

Pragmatic and equitable considerations control analysis under Federal Rule of Civil Procedure governing consequences of failure to join indispensable party. Fed.Rules Civ.Proc.Rule 19(b), 28 U.S.C.A.

**[11] Federal Civil Procedure** 203
170Ak203 Most Cited Cases

"Indispensability" is conclusory term, applied to particular party only after court has examined factors relevant to facts of particular case in light of equity and good conscience. Fed.Rules Civ.Proc.Rule 19(b), 28 U.S.C.A.

**[12] Corporations** 619
101k619 Most Cited Cases

Where trust was properly formed under Delaware law, and construction contract was properly assigned from dissolved corporation to liquidating trust, party which had purchased corporation's cement manufacturing plant conditioned upon corporation's agreement to complete dock facility under construction at plant stated claim against trust for breach of that construction contract.

**[13] Federal Civil Procedure** 215
170Ak215 Most Cited Cases

Mere claim that other shareholders of dissolved corporation might be liable with general partner of limited partnership which received assets from corporation as general partner of limited partnership as well as shareholder did not render corporation "indispensable" in action brought against corporation's liquidating trust trustee, limited partnership, and general partners on grounds that corporation had wrongfully transferred its assets to those parties, where general shareholders failed to show prejudice and inadequacy of judgment resulting from corporation's absence, not merely absence of other shareholders. Fed.Rules Civ.Proc.Rule 19(b), 28 U.S.C.A.

**[14] Federal Civil Procedure** 215
170Ak215 Most Cited Cases

Where party bringing breach of construction contract action against parties to which dissolved corporation had allegedly wrongfully transferred its assets was seeking damages, not nullification of conveyance, debtor had retained no control of assets transferred, and corporation was defunct and held no assets whatsoever so that joinder would be futile, if not prejudicial to plaintiff, dissolved corporation was not indispensable in action against general partner which had received assets directly from corporation as general partner of limited partnership formed when corporation was dissolved. Fed.Rules Civ.Proc.Rule 19(b), 28 U.S.C.A.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

757 F.2d 1544
2 Fed.R.Serv.3d 40
(Cite as: 757 F.2d 1544)

Page 3

**[15] Partnership ⬅️375**
289k375 Most Cited Cases



Where party bringing breach of contract action proceeded against general partner of limited partnership, which was formed when corporation was dissolved, based on distributions general partner received as general partner, and plaintiff did not seek to "pierce the **corporate veil**" of corporation and hold general partner liable in capacity as shareholder of that corporation, Delaware statute which requires plaintiff to procure judgment against corporation when he seeks to recover against officers, directors or shareholders personally for debt of corporation was inapplicable. 8 Del.C. § 325.

*1546 Wilkinson & Wilkinson, John B. Wilkinson, New Orleans, La., Steven J. Rothschild, Skadden, Arps, Slate, Wilmington, for plaintiff-appellant.

Brice & Barron, John P. Lilly, Jim K. Choate, Dallas, Tex., for Redwine.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before RUBIN, HILL, Circuit Judges, and HINOJOSA, [FN*] District Judge.

> FN* District Judge of the Southern District of Texas, sitting by designation.

ROBERT MADDEN HILL, Circuit Judge:

Lone Star Industries, Inc. (Lone Star) brought this diversity action against Charles Redwine, as Trustee of OKC Corporation Liquidating Trust (the Trust); the *1547 OKC Limited Partnership; Cloyce K. Box (Box), individually; and CKB & Associates, Inc. The district court dismissed, 590 F.Supp. 547, holding that the OKC Corporation (OKC), a non-diverse party, was an indispensable party to Lone Star's action against all defendants. We reverse.

## I.

OKC was a Delaware corporation with its principal

place of business in Texas. On May 13, 1980, the shareholders of OKC adopted a plan of liquidation. The plan called for the complete liquidation and distribution of OKC's assets within the year, i.e., by May 12, 1981. The plan excepted from distribution those assets reasonably necessary to provide for payment of OKC's liabilities on the expenses of liquidation. If the distribution could not be completed within the year, the plan called for transfer of the remaining assets and liabilities to a trust created for the benefit of OKC's stockholders. On September 13, 1980, Lone Star purchased OKC's cement manufacturing plant in New Orleans, Louisiana. As part of the purchase agreement, OKC agreed to complete a dock facility under construction at the New Orleans plant. The agreement further required that construction be completed by March 31, 1981. On April 1, 1981, Lone Star sent a notice of default to OKC.

On May 5, 1981, anticipating that not all of OKC's assets would be distributed by May 12, the OKC Board of Directors adopted a resolution establishing the Trust proposed in the plan of liquidation and appointing Charles Redwine trustee. In the same resolution the Board approved transfer of OKC's assets and liabilities to the Trust.

On May 11, 1981, OKC filed its certificate of dissolution with the Secretary of State of Delaware. On the same day, the certificate and articles of incorporation of OKC Limited Partnership were filed in Texas. The articles named Cloyce Box and CKB & Associates, Inc. as general partners and OKC as a limited partner. [FN1] OKC contributed substantial oil and gas interests to the partnership. OKC then distributed its limited partnership interest among its shareholders as a liquidating distribution. On May 12, 1981, OKC formally executed the Liquidating Trust Agreement (the Trust Agreement) pursuant to the May 5 resolution. The Trust Agreement provided that the Trustee assume all of OKC's liabilities and claims. On November 9, 1981, construction of the dock facility was finally completed.

> FN1. Box, who was general partner of the OKC Limited Partnership and also principal shareholder of CKB & Associates, Inc., served as chairman of the board of OKC as well as being a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

757 F.2d 1544
2 Fed.R.Serv.3d 40
(Cite as: 757 F.2d 1544)

Page 4

substantial shareholder of OKC.

In June 1982, Lone Star filed this action against Redwine, as trustee of the Liquidating Trust, seeking damages for breach of the dock construction agreement. In September 1983, upon learning of the insolvency of the Trust, Lone Star added as defendants, Redwine, in his individual capacity, the OKC Limited Partnership, Cloyce Box and CKB & Associates, Inc., seeking recovery of assets allegedly wrongfully transferred from OKC to the three added defendants.

On June 12, 1984, the district court granted the defendants' motion to dismiss on alternative theories, viz., failure to join a party needed for just adjudication, and failure to state a claim on which relief may be granted.

II.
On its own motion, the district court dismissed the action against the Trust because of the failure to join OKC, it being "regarded as indispensable" under Fed.R.Civ.P. 19(b). [FN2] OKC could not feasibly be *1548 joined under Rule 19(a) because joinder would destroy diversity, both OKC and Lone Star being Delaware corporations. *See supra* note 2. All defendants agree with Lone Star that the court erred in dismissing the action on this theory. The court's holding rested on a single foundation: the invalidity of the Trust's assumption of OKC's liabilities (which included performance of the construction contract) pursuant to the Trust Agreement. Despite this, we are of the opinion that OKC could not have been indispensable. We therefore join the parties in the conclusion that dismissal was improper.

> FN2. Fed.R.Civ.P. 19 provides, in part:
> (a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical

matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.
(b) Determination by Court Whenever Joinder not Feasible. If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

A.

[1][2][3] Regardless of the validity of the creation of the Trust itself and that of the assignment of OKC's obligations under the dock facility construction contract, which we discuss below, OKC could not have been indispensable to this action. One fact is critical: in May 1984, one month before the district court ruled, OKC ceased to exist as a legal entity. Under Del.Code Ann. tit. 8, § 278 (1983), [FN3] a corporation's legal existence is continued for three years, and only three years, after dissolution unless extended by order of court. [FN4] OKC filed its dissolution in May 1981 and, consequently, expired by operation of law in May 1984. Further, by this date OKC had also disposed of virtually all of its assets.

> FN3. While indispensability is an issue determined by federal law, state law will define the substantive rights of the parties

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

757 F.2d 1544
2 Fed.R.Serv.3d 40
**(Cite as: 757 F.2d 1544)**

Page 5

and the interests concerned. *Provident Bank & Trust Co. v. Patterson,* 390 U.S. 102, 124 n. 22, 88 S.Ct. 733, 745 n. 22, 19 L.Ed.2d 936 (1968); *Boone v. General Motors Acceptance Corp.,* 682 F.2d 552, 553 (5th Cir.1982). Under *Klaxon v. Stentor Elec. Mfr. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), we are required to apply the law of the state in which the district court sits, even to the extent of applying that state's choice of law principles. *Day & Zimmerman, Inc. v. Challoner,* 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975) (per curiam). This entails a determination of state law as we believe the highest court in the state would view it. *See, e.g., Walker v. Savell,* 335 F.2d 536, 540-41 (5th Cir.1964); *McKenna v. Ortho Pharmaceutical Corp.,* 622 F.2d 657, 662-63 (3rd Cir.), *cert. denied,* 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980). Although the Louisiana courts have not ruled on the precise issue, we think they would apply the law of the state of incorporation in determining the viability of a corporation after dissolution. *See Quickick, Inc., v. Quickick Int'l,* 304 So.2d 402, 406-07 (La.App.), *writs denied,* 305 So.2d 123 (1974) (law of state of incorporation applied to determine whether individual was **alter ego** of corporation); *Jagers v. Royal Indemnity Co.,* 276 So.2d 309 (La.1973) (interest analysis).

FN4. Section 278 provides, in part:
All corporations, whether they expire by their own limitations or are otherwise dissolved shall nevertheless be continued, for the term of 3 years from such expiration or dissolution or for such longer period as the Court of Chancery shall in its discretion direct, bodies corporate for the purpose of prosecuting and defending suits, whether civil, criminal or administrative, by or against them, and of enabling them gradually to settle and close their business, to dispose of and convey their property, to discharge their liabilities and to distribute to their stockholders any remaining assets, but not for the purpose of

continuing the business for which the corporation was organized.
All subsequent references to title 8 of the Delaware Code are to the 1983 revision.

[4] In light of OKC's expiration, it is clear that it could not have been indispensable under Fed.R.Civ.P. 19(b). [FN5] Nothing **\*1549** "prejudicial" to OKC or to those already parties could result from judgment in OKC's absence since, for all that appears, OKC had no assets or interests, legal or financial, that needed protection and since OKC would not be capable of suing the present parties in its own behalf at some later date. Thus, no "shaping of relief" would be necessary and whether or not "judgment rendered in [OKC's] absence [would] be adequate," addition of OKC as a party would not make it any more so. Finally, it is probable that no "adequate remedy" would be available to Lone Star if we dismiss for non-joinder since it is unlikely that OKC could be joined in a Delaware state court and since, as we are informed, the Delaware statute of limitations appears to have run on Lone Star's contract action.

> FN5. In fact, it appears that Delaware law would prohibit joinder of OKC since a defunct corporation without assets cannot be resurrected in order to sue or be sued after the three year period has run. *In re Citadel Industries, Inc.,* 423 A.2d 500, 506-07 (Del.Ch.1980) (§ 278 likened to a statute of limitations); *Smith-Johnson Steamship Corp. v. United States,* 231 F.Supp. 184, 186 (D.Del.1964) (same).

[5] The district court, however, reasoned that no adequate judgment could be rendered in OKC's absence because creation of the Trust violated Delaware law and, alternatively, because the assignment of the construction contract was invalid under the terms of the trust agreement and the contract itself. Thus, the court concluded, OKC was the only party that could have been liable on the contract and therefore was indispensable to Lone Star's suit. While we hold that even this could not render OKC itself indispensable, since it does not exist, we address this reasoning in order to refute any suggestion that it is OKC's legal

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

757 F.2d 1544
2 Fed.R.Serv.3d 40
**(Cite as: 757 F.2d 1544)**

Page 6

successor (whomever that may be) that is indispensable. We note that the district court's reasoning is also directed at the very merits of the contract action to the extent that it undermines the possibility of the Trust's liability. That provides all the more reason for us to address the court's alternative holdings on this issue. We turn first to the court's conclusion that the Trust was not validly created.

## B.

[6] Assuming that the Trust came into existence on May 12, 1981, the day following dissolution of OKC itself, the district court held that under Delaware law appointment of the Trust after dissolution was an improper method of "winding up." However, Del.Code Ann. tit. 8, § 278 provides that the corporation itself may conduct winding up, presumably through its officers and directors. *See supra* note 4; *see also In re Citadel Industries, Inc.,* 423 A.2d 500, 504 (Del.Ch.1980). Section 279 of the same title provides for the alternative method of "winding up" by a court-appointed trustee, usually a director of the dissolved corporation, under the continuing supervision of the Delaware Court of Chancery. [FN6] We think it clear that § 278 permits winding up by a trust such as the one employed here, that is duly created by the directors of the dissolved corporation.

> FN6. Section 279 of Del.Code Ann. tit. 8 provides, in part:
> When any corporation organized under this chapter shall be dissolved in any manner whatever, the Court of Chancery, on application of any creditor or stockholder of the corporation or on application of anyone, who ... shows good cause therefor ... may either appoint 1 or more of the directors of the corporation to be trustees, or appoint 1 or more persons to be receivers, of and for the corporation, to take charge of the corporation's property, and to collect the debts and property due and belonging to the corporation, with power to prosecute and defend, in the name of the corporation, or otherwise, all such suits as may be necessary or proper for the purposes

aforesaid ... and to do all other acts which might be done by the corporation, if in being, that may be necessary for the final settlement of the unfinished business of the corporation.

Section 278 expressly continues for three years the corporate existence of a dissolved corporation for certain limited purposes, including discharging its liabilities, distributing its assets and generally winding up its affairs. Likewise, the directors continue in their capacities as directors after dissolution and therefore oversee the final acts of the corporation. *Carle v. International Clay Products Co.,* 15 Del. 166, 132 A. 892, 892 (Del.Ch.1926). In effect, § 278 *1550 prolongs the dissolved corporation's life, giving it authority to decide its own conclusion. *See In re Citadel Industries, Inc.,* 423 A.2d 500, 504-05 (Del.Ch.1980); *Harned v. Beacon Hill Real Estate Co.,* 9 Del.Ch. 411, 84 A. 229, 234-35 (Del.1912) (discussing statutory predecessor of § 278).

While § 278 undoubtedly limits the activities in which a dissolved corporation may engage, nothing in the statute purports to limit in any way the board's discretion as to how permissible activities--such as winding up--may be accomplished. Contrary to the interpretation of the district court, § 278 does not require the directors or officers of a dissolved corporation to execute personally every aspect of winding up. Nor does it prohibit them from vesting such power in a trustee.

*In re Citadel,* 423 A.2d 500 (Del.Ch.1980), is not to the contrary. In *Citadel* the Delaware Court of Chancery described § 278 as applying to situations "where the dissolved corporation has continuing legal existence and is capable of winding up its affairs through its own officers and directors." 423 A.2d at 504. That language was not intended to suggest that directors and officers must personally oversee every aspect of winding up, but merely to underscore the contrast between dissolution situations in which § 278 would apply (i.e., where the corporation is capable of winding up its affairs on its own, through its own officers and directors, without judicial intervention) and those that call for the application of § 279 (i.e., where judicial intervention is necessary to fill the void left by the officers' and directors' inability or unwillingness to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

act.). *Citadel*, 423 A.2d at 504-05. So long as a corporation's directors have the authority and will to wind up the dissolved corporation's affairs, the court held, there is no need to invoke the assistance of the Court of Chancery through § 279. *Id.*

We find no indication either in *Citadel* or in § 278 [FN7] that the directors may not demonstrate the capability of which *Citadel* speaks precisely by creating and structuring a trust arrangement such as the one with which we are here concerned. The district court held that had the Trust been created prior to dissolution, it would have been valid. However, the propriety of the trust as a winding up device should not depend on the date of its formal effectiveness since under Delaware law, i.e., § 278 and *Citadel*, the formal act of dissolution does not disturb the directors' authority to determine the means by which winding up is to be accomplished.

> FN7. Our reasoning is buttressed by the legislative action that preceded the passage of §§ 278 and 279. In the early 1920's, the Delaware legislature repealed the statute (§ 41) that had formerly automatically made directors, upon voluntary dissolution, trustees in dissolution, with the attendant limitations on their ability to act that are traditionally imposed on the managers of a trust corpus. The statute was replaced with a provision (similar to § 279) that permitted imposition of trust strictures upon director action only upon an express designation by the Court of Chancery. The move away from automatic imposition of trust strictures indicates legislative intent not to tie the hands of directors in a § 278 situation, but to give them as much authority after dissolution as they had before dissolution. *See Townsend v. Delaware Glue Co.*, 12 Del.Ch. 25, 103 A. 576, 576 (Del.Ch.1918) (text of former Section 41); *Carle*, 132 A. at 892 (effect of repeal of § 41).

### C.

Assuming that the Trust itself was properly constituted, the concerted operation of provisions of the construction contract and provisions of the Trust

Agreement does not invalidate the attempted assignment to the Trust of OKC's obligations under the construction contract.

The construction contract provides that "OKC shall have the right after April 15, 1981, to assign its rights and obligations under the contract to any financially responsible party." The Trust Agreement itself, at article 6.1, prohibited the Trustee from engaging in any business even to benefit the Trust. This provision was intended to enforce compliance with certain provisions of the Internal Revenue Code, the benefits of which the parties to the agreement sought to reap. The district *1551 court held that the Trust was not a "financially responsible party" under the contract and that the Trust could not, under the Trust Agreement, rightfully "engage in the business" of completing construction of the dock facility. We disagree with both holdings.

We cannot conclude, as a matter of law, that the Trust was not a "financially responsible party." The issue involves not only interpretation of that term in the intention of the parties to the construction contract, but also factual determinations concerning the Trust's financial status. However, the united position the parties have taken relieves us--and the district court--of the burden of adjudicating these issues.

The district court's holding rests on a provision of the construction contract that the parties had the power to waive, modify, or even abrogate completely by agreement. *See, e.g., Husband (P.J.O.) v. Wife (L.O.)*, 418 A.2d 994 (Del.1980); *Reeder v. Sanford School, Inc.*, 397 A.2d 139 (Del.Super.Ct.1979); *Pepsi-Cola Bottling Co. v. Pepsico, Inc.*, 297 A.2d 28 (Del.1972). All parties agree that the assignment to the Trust was valid and effective and that the Trust is now responsible for the obligations of OKC. Indeed, the Trust has actually completed the construction called for by the contract. Whether this is interpreted as a modification of the assignment limitation, or as a waiver of a non-essential term, or as a refusal to nullify a merely voidable assignment, or as an understanding that the Trust was in fact a "responsible party" in the usage of the parties, we need not, nor have we been requested to, decide. It is sufficient that the parties have agreed.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

757 F.2d 1544
2 Fed.R.Serv.3d 40
(Cite as: 757 F.2d 1544)

Page 8

[7] When called upon to do so, it is our duty to protect the interests the contract was intended to serve. The remedy for violation of the provision lies in a suit for breach of the contract and avoidance of the assignment by a party to the contract (presumably Lone Star). Since "financial responsibility" was an issue resolvable in the first instance by agreement of the parties themselves, we hold that the assignment from OKC to the Trust was effective and no impediment to suit against the Trust in the absence of OKC.

[8] The district court also held that the Trust Agreement nullified the assignment of the contract obligation because a provision of the Trust Agreement prohibited the Trustee from engaging in any business in the name of the Trust. We disagree with the court's understanding of the legal effect of this provision and of the assignment itself.

First, the provision is to be read in context and construed in light of its clear purpose: to restrict the Trustee's discretion in administering the Trust's assets, thus protecting creditors and settlors alike. The proper remedy for enforcement of the provision would be suit against the Trustee by an interested party for breach of fiduciary duty. The Trust Agreement was approved by OKC's directors in the May 5 resolution, which also provided for transfer of OKC's assets and liabilities to the Trust. To use a limitation on the powers of the Trustee as a device for rendering null an assignment of liability approved in the very document that gave the Trust its life would clearly be contrary to what was intended.

Moreover, the Trustee could assume all of OKC's obligations under the contract without undertaking performance of it by merely assuming the obligation to satisfy any judgment arising from its breach. [FN8] This would circumvent the need of engaging in business. [FN9]

FN8. The Trust Agreement explicitly confers on the Trustee the power to defend actions in the name of OKC and to provide for payment of OKC's "liabilities, debts, or obligations."

FN9. That the Trust actually did complete

the construction in no way undermines our reasoning. If this was wrongful, the remedy is elsewhere than in nullification of the assignment.

[9][10][11] Rule 19(b) is not intended to exclude considerations, not enumerated, that are applicable in a particular case. See Committee Note to amended rule. One such consideration is the expiration of OKC as a legal entity and the consequent futility *1552 of joining it. Pragmatic and equitable considerations control the Rule 19(b) analysis. See, e.g., Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 116 n. 12, 88 S.Ct. 733, 741 n. 12, 19 L.Ed.2d 936; Schutten v. Shell Oil Co., 421 F.2d 869, 873-74 (5th Cir.1970). Indispensability is a conclusory term, applied to a particular party only after the court has examined the enumerated factors and others relevant to the facts of a particular case in the light of "equity and good conscience." See Committee Note; Provident Tradesmens, 390 U.S. at 118-19 n. 15, 88 S.Ct. at 742-43 n. 15. If after this examination the court is convinced that it cannot proceed without a party, the party is labelled "indispensable" and the action is dismissed. Id. We are convinced that this action can and should proceed without OKC as a party since OKC does not exist as a legal entity and since OKC's obligations under the construction contract properly devolved upon the Trust. We therefore hold that OKC is not indispensable under Rule 19(b) in Lone Star's action against the Trust.

III.

[12] The district court dismissed, in the alternative, for failure to state a claim against the Trust under Fed.R.Civ.P. 12(b)(6). [FN10] The court reasoned that since the Trust was improperly formed and the construction contract was improperly assigned, the Trust could not be held liable under the contract. Having rejected both of these holdings, we conclude that Lone Star stated a claim against the Trust. In addition, on remand, Lone Star should be given leave to amend its complaint if any other infirmities become apparent.

FN10. We first note that the district court's conclusion that the Trust was not

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

757 F.2d 1544
2 Fed.R.Serv.3d 40
**(Cite as: 757 F.2d 1544)**

Page 9

"financially responsible" was premised on factual findings made without benefit of the parties' briefing or an evidentiary hearing, or submission of affidavits. The court issued its decision in response to the defendant Box's Rule 12(b)(6) motion. Since the case was dismissed while still in that posture, we would ordinarily reverse if any of the facts as alleged would support a finding that the construction contract obligation was properly transferred to the Trust. *See, e.g., Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957); *Miller v. Stanmore,* 636 F.2d 986, 992 (5th Cir.1981). However, when the district court appeals to matters outside the pleadings in making these factual findings we approach those findings as if made on a motion for summary judgment and reverse if there is any material issue of fact raised in the record. *See* Fed.R.Civ.P. 12(b); Fed.R.Civ.P. 56; *Francis Oil & Gas, Inc. v. Exxon Corp.,* 661 F.2d 873, 879-80 (10th Cir.1981) ( Rule 19(b) dismissal reversed where factual issues were raised); *Davis v. Howard,* 561 F.2d 565, 568-69, 570 (5th Cir.1977). Yet converted orders are ineffective unless they meet the mandatory notice requirements of Rule 56. *Davis,* 561 F.2d at 569-70. However, given our disposition, on issues of law, of the district court's ruling, we need not confront these procedural infirmities.

## IV.

We also conclude, contrary to the district court's holding, that OKC was not indispensable to Lone Star's action against Box, OKC Limited Partnership and CKB & Associates, Inc. (collectively, the Box defendants). Our discussion concerning the expiration of OKC and the dissipation of any resulting prejudice under the factors articulated in Rule 19(b) applies with full force here. The Box defendants, however, present additional arguments supporting a finding of unacceptable prejudice. Their arguments are not well taken.

[13] Several of the Box defendants' arguments speak to prejudice resulting only from their inclusion in this action and the simultaneous exclusion of the other shareholders of OKC. All shareholders of OKC, of which Box (individually) was one, received assets of OKC as distributions after the limited partnership was created and OKC became the limited partner. Box and CKB & Associates, Inc., also received assets directly from OKC as the only general partners of the limited partnership. Merely because Box claims that the other shareholders of OKC may be liable with him *as a shareholder* does not demonstrate or even affect the indispensability of OKC itself. Under Rule 19(b) the Box defendants must show prejudice and inadequacy of judgment resulting from *OKC's* absence, not the other shareholders'. That they may at **\*1553** some point desire to join the other shareholders as third party defendants because Lone Star did not join them as direct defendants is not an argument for OKC's indispensability.

Nor do the "proof problems" that the Box defendants imagine militate in favor of OKC's indispensability. The problems are in fact illusory. For example, to the extent OKC's knowledge and intent in transferring its mineral interests to Box and the limited partnership are relevant, OKC's former directors and officers will be available to testify thereto. Moreover, joinder of OKC itself would in no way help resolve any such problems that actually do confront the Box defendants.

[14] *Armour & Co. of Delaware v. B.F. Bailey, Inc.,* 132 F.2d 386 (5th Cir.1942), does not support the Box defendants' position. There the debtor was considered indispensable because (a) the plaintiff sought to set aside the allegedly fraudulent conveyance, (b) in any event, the debtor had retained, even after the conveyance, "complete dominance and control" of the assets transferred, and (c) the debtor was solvent and financially healthy so that forced joinder would be effective. None of these factors is present here since (a) Lone Star seeks damages, not nullification of the conveyance [FN11], (b) OKC, the debtor here, has retained no control of the assets transferred, [FN12] and (c) OKC is defunct and holds no assets whatsoever so that forced joinder would be futile, if not prejudicial to Lone Star. [FN13] In light of these practical considerations and the Box defendants' failure to call our attention to any other circumstance even remotely resembling actual prejudice, it is clear that OKC is not indispensable

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

757 F.2d 1544
2 Fed.R.Serv.3d 40
**(Cite as: 757 F.2d 1544)**

Page 10

to the action against Box. *See Provident Tradesmens,* 390 U.S. at 116 n. 12, 88 S.Ct. at 741 n. 12; *Schutten,* 421 F.2d at 873-74.

> FN11. *See Berwick v. Associated Gas & Electric Co.,* 20 Del.Ch. 265, 174 A. 122, 123-24 (Del.Ch.1934) (debtor not indispensable to extent damages only are sought).

> FN12. *See Keene v. Hale-Halsell Co.,* 118 F.2d 332, 334-35 (5th Cir.1941) (no necessity to join transferor that has "finally parted with all interest in the property conveyed.")

> FN13. *See United States Shoe Machinery Corp. v. Becker,* 7 Fed.R.Serv. 18 b.32, Case 1 (E.D.N.Y.1943) (useless to compel joinder of defunct fraudulent transferor.)

The district court relied on Del.Code Ann. tit. 8, § 325 in holding OKC to be indispensable to the action against the Box defendants. Section **325(b)** requires that a plaintiff procure a judgment against a corporation where he seeks to recover against officers, directors or stockholders personally for a debt of the corporation. [FN14] Section 325 does not apply to these facts. This being so, we are not called upon to resolve a conflict between this state statute and Fed.R.Civ.P. 18(b) which permits a plaintiff to bring an action on a fraudulent conveyance without first obtaining a judgment against the debtor. *See, e.g., Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) (*Erie* doctrine applied to resolve direct conflict between Federal Rule of Civil Procedure and state rule).

> FN14. Section 325 provides, in full:
> (a) When the officers, directors or stockholders of any corporation shall be *liable by the provisions of this chapter* to pay the debts of the corporation, or any part thereof, any person to whom they are liable may have an action, at law or in equity, against any 1 or more of them, and the complaint shall state the claim against

the corporation, and the ground on which the plaintiff expects to charge the defendants personally.
(b) No suit shall be brought against any officer, director or stockholder for any debt of a corporation of which he is an officer, director or stockholder, *until judgment be obtained therefor against the corporation* and execution thereon returned unsatisfied.
(emphasis added).

[15] Lone Star proceeds against Box based on the distributions he received as a general partner of the limited partnership; Lone Star does not seek to "pierce the **corporate veil**" of OKC and hold Box liable in his capacity as a shareholder of OKC. Section 325 does not apply to such independent causes of action. *See Berwick,* 174 A. at 123-24.

In any event, § 325(a) provides that § 325(b) applies only to claims conferred on *1554 creditors "by the provisions of this chapter." The chapter referred to, the Delaware General Corporation Laws, permits shareholders and directors to be held liable for the debts of the corporation in certain specific instances. *See, e.g.,* former § 31 of the General Corporation Law which provided that any officer who signed a false certificate would be liable for all debts of the corporation contracted during officer's tenure. Thus, § 325 was meant to prescribe the manner in which such actions were pursued and not to restrict causes of action that had traditionally been available to creditors independently of the corporation law. *See Berwick,* 174 A. at 124; *DuPont v. Ball,* 11 Del.Ch. 430, 106 A. 39, 42 (Del.1918) (predecessor of § 325 not applicable where cause of action not within chapter); *see generally, John A. Roeblings Sons Co. v. Mode,* 17 Pennewill 515, 43 A. 480, 482 (Del.Super.Ct.1899); E. Folk, The Delaware General Corporation Law 481-82 (1972) ("This section is not exclusive of other means of satisfaction ..."). Thus, § 325 provides no basis for dismissal of the action against Box.

V.

The issue whether Lone Star's complaint stated a claim against Box, CKB & Associates, Inc., and the OKC Limited Partnership is not before us. The

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

757 F.2d 1544
2 Fed.R.Serv.3d 40
**(Cite as: 757 F.2d 1544)**

Page 11

district court did not dismiss on this ground. We refrain from deciding this issue until the district court has ruled. *See, e.g., Shuford v. Anderson,* 352 F.2d 755, 765 (10th Cir.1965) (on petition for rehearing). Moreover, the district court, in its opinion, clearly recognized that the essence of Lone Star's claim against the Box defendants was fraud. The issue of fraud was "specifically presented" in the pre-trial order under the heading "Contested Issues of Fact." The absence of any explicit allegation of fraud is the only infirmity pointed out by the Box defendants. Yet it is clear that they had actual notice of the nature of Lone Star's claim. *Cf., Bennett v. Berg,* 685 F.2d 1053, 1058 (8th Cir.1982), *on rehearing,* 710 F.2d 1361 (8th Cir.), *cert. denied sub. nom., Prudential Insurance Co. v. Bennett,* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). In any event, Lone Star should be permitted to amend its complaint on remand to correct any material omissions.

For these reasons, the judgment of the district court is REVERSED AND REMANDED.

757 F.2d 1544, 2 Fed.R.Serv.3d 40

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.                                                                        Page 1
(Cite as: 1991 WL 259020 (N.D.Ill.))

**C**
Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

PINELLAS COUNTY, a political subdivision of the State of Florida, Plaintiff,
v.
GREAT AMERICAN INDUSTRIAL GROUP, INC., a Delaware corporation, et al., Defendants.

No. 90 C 5254.

Dec. 2, 1991.

*MEMORANDUM OPINION AND ORDER*

NORDBERG, District Judge.

STATEMENT OF FACTS

*1 Plaintiff Pinellas County, Florida has sued defendants Madison Management Group, Inc. ("Madison"), Great American Industrial Group, Inc. ("GAIG"), and Great American Management and Investment, Inc. ("GAMI"), all of which are Delaware corporations with their principal places of business in Illinois, asking the court to order GAIG to return a $5,000,000 dividend paid to it by its wholly owned subsidiary Madison Management Group, Inc., and to declare that GAMI is the alter ego of Madison, and therefore liable for plaintiff's $25,000,000 judgment against Madison. Before the court is defendants' motion to dismiss plaintiff's amended complaint.

The facts alleged in the amended complaint are as follows. Plaintiff obtained a judgment against Madison in Florida state court in the amount of $25,000,000, including a $5,000,000 punitive damages claim on June 6, 1990. Prior to the judgment against it, Madison engaged in two corporate acts which effectively rendered it insolvent in the judgment of the Florida court. First, Madison paid a $5,000,000 dividend to GAIG, its sole shareholder, on October 21, 1988. Second, during the period just before trial in state court, Madison paid GAMI, the majority

shareholder of GAIG, $40,000,000 to satisfy promissory notes payable to GAMI, even though the notes were not due until October 2, 1992. [FN1] Plaintiff claims that the dividend payment should be voided because it was made during a period of corporate insolvency, and that the corporate veil between Madison and GAMI should be pierced, allowing plaintiff to collect on its judgment against Madison from GAMI's assets. In support of its second claim, plaintiff also alleges that the boards of directors of all three corporations contain many of the same members.

ANALYSIS
I. Jurisdictional Grounds

Defendants' have moved to dismiss the complaint on both substantive and jurisdictional grounds. First, defendants contend that this court lacks subject matter jurisdiction over plaintiff's complaint because as a political subdivision of Florida, plaintiff is not a citizen of Florida within the meaning of the federal diversity statute. 28 U.S.C. § 1332(a)(1) (1976). As a general rule, the political subdivision of a state, unless it is simply the arm or alter ego of the state, is a citizen of the state for diversity purposes. *Moor v. County of Alameda,* 412 U.S. 693, 717-18 (1973). Defendant's have seized on the language "arm of the state," and attempt to portray plaintiff as a mere agent of the State of Florida by citing to Florida cases finding county governments county employees and state agencies to be agents of the state for purposes of state sovereign immunity. This is irrelevant to any issue of federal jurisdiction. There is simply no connection between the policy of the State of Florida regarding the immunity of its political subdivisions and officers from suit, and Congress' policies regarding the jurisdiction of the federal courts. *cf. Edelman v. Jordan,* 415 U.S. 651, 667, n. 12 (1974) (a county action can be state action for purposes of the Fourteenth Amendment, but the county may not necessarily be a state defendant for purposes of the Eleventh Amendment).

*2 The *Moor* court's approach to determining the alter ego status of a state's political subdivision was to examine the degree of independence the subdivision had under state law. In *Moor,* the court found that under California's Constitution and statutes, the County of Alameda engaged in sufficient activities independent of the State of California to be considered more than a mere alter

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
(Cite as: 1991 WL 259020 (N.D.Ill.))

Page 2

ego of the state. In particular the court noted that the County of Alameda could sue and be sued, deal in or hold property, issue bonds with no obligation on the part of the state, provide public services, contract for the construction and repair of structures, and levy taxes for judgments against it. *Moor,* 412 U.S. at 719-20.

Accordingly, this court turns to an examination of the powers of plaintiff under Florida law. Plaintiff is a non-charter county. Under the Florida Constitution, non-charter counties shall have such powers of self-government as is provided by general or special statute. The commissioners of a non-charter county may enact ordinances consistent with such laws, provided they do not conflict with the ordinances of municipalities located within the county. FLA. CONST. art. VIII, § 1. This constitutional provision has been interpreted to give non-charter counties the potential for sweeping powers. *Fillingham v. State,* 446 So.2d 1099, 1102 (Fla.App.Dist. 1 1984). Under the general statute used to empower counties, charter and non-charter counties in Florida may sue and be sued, provide for and maintain county buildings, provide hospitals, cultural facilities and water and sewage services, create public transportation systems, purchase lands for environmental management, and levy taxes and issue bonds to provide county services. FLA.STAT. ch. 125.001 (1989). Under the standard set by *Moor,* plaintiff is clearly a citizen of the State of Florida for purposes of the diversity statute.

II. Substantive Grounds

Before proceeding to the merits of defendant's substantive grounds for dismissal, the court must first address which state's law to apply to each count of the complaint. Defendants' argue that the conflict is a false one, because Illinois and Delaware law yield the same result. However their argument is based on a finding that Illinois' *corporations* law requires the court to look to the state of incorporation. This is merely a disguised choice of law argument. Plaintiff, for its part, argues that Illinois choice of law principles dictate that Illinois substantive law should apply, but fails to discuss what that law is, and why it would prevent dismissal.

Federal courts sitting in diversity apply the conflict of law rules of the forum state in which they sit.

*DeValk Lincoln Mercury v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.). Illinois follows the Restatement (Second) of Conflict of Laws' "most significant relationship" test with regard to issues of tort, *Rosett v. Schatzman,* 157 Ill.App.3d 939, 510 N.E.2d 968, 970 (1st Dist.1987), and contract. *Purcell and Wardrope Chartered v. Hertz Corp.,* 175 Ill.App.3d 1069, 530 N.E.2d 994, 1001 (1st. Dist.1988). Choice of law issues involving corporations will be determined according to the Restatement (Second) if their underlying issue is really one of tort or contract. Thus, a question of the liability of a successor corporation in a products liability action is determined according to the choice of law provisions for tort law. *Kramer v. Weedhopper of Utah, Inc.,* 204 Ill.App.3d 469, 562 N.E.2d 271, 276 (1st. Dist.1990).

*3 In the present case, Count I of plaintiff's complaint asks the court to set aside a dividend payment by a corporation to its sole shareholder, while Count II asks the court to pierce the corporate veil between a parent corporation and its subsidiary. Where purely internal corporate affairs are concerned, Illinois choice of law rules require application of the law of the state of incorporation. *Treco, Inc. v. Land of Lincoln Savings,* 749 F.2d 374, 377 (7th Cir.1984); *Upholsterer's Intern. Union v. Pontiac Furniture,* 647 F.Supp. 1053, 1057 (C.D.Ill 1986); *United National Records, Inc. v. MCA, Inc.,* 616 F.Supp. 1429, 1431 (N.D.Ill 1985); *Pros v. Mid-America Computer Corp.,* 142 Ill.app.3d 453, 491 N.E.2d 572, 577 (2d Dist.1986); *Paulman v. Kritzer,* 74 Ill.App.3d 284, 219 N.E.2d 541, 543 (2d Dist.1966), *aff'd,* 38 Ill.2d 101, 230 N.E.2d 262 (1967). Since defendants are all incorporated in Delaware, Delaware law should be applied to plaintiff's claims. [FN2]

A. Count I

Defendants argue that under Delaware law Count I must be dismissed because plaintiff lacks standing to sue them under Delaware's statutory corporate law. Defendant's point out that although Delaware law allows corporate creditors to sue directors and officers of an insolvent corporation for unlawful dividend distributions or stock purchases, this right is only given to entities who became creditors of the corporation before the unlawful distribution or stock purchase took place. 8 Del C § 174 (1990). *Johnston v. Wolff,* 487 A.2d 1132, 1134, 1136 (Del.1985). While this is quite correct, plaintiff

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
(Cite as: 1991 WL 259020 (N.D.Ill.))

does not seek to pursue the officers and directors of Madison, but Madison's sole corporate shareholder and its corporate parent. Delaware law provides two means of doing so. Under 8 Del C § 325, if the officers, directors or shareholders of a corporation are otherwise liable for the corporation's debts under statutory law, a corporate creditor may sue any or all of them, after first obtaining judgment and an unsatisfied execution against the corporation. This provision does not afford plaintiff a cause of action, because statutory corporate law provides no means for holding shareholders of the corporation liable for its debts. However, § 325 does not restrict causes of action traditionally available to corporate creditors at common law. *Lone Star Industries v. Redwine,* 757 F.2d 1544, 1553-54 (5th Cir.1985).

Plaintiff may maintain an action against defendant GAIG under Count I at Delaware common law. Where a corporation distributes its assets to its shareholders, leaving creditors unsatisfied, those creditors are entitled to recover directly from the shareholders, without resort to fraudulent conveyance law, and without obtaining a prior judgment against the corporate debtor. *Banker's Trust Co. v. Hale & Kilburn Corp.,* 84 F.2d 401, 403 (2d Cir.1936); *Unemployment Compensation Commission of Delaware v. George W. McCaulley & Son,* 22 A.2d 862, 864-65 (Del.Ch.1941); *Berwick v. Associated Gas & Electric,* 174 A. 122, 123-24 (Del.Ch.1934); *John Julian Construction Co. v. Monarch Builders, Inc.,* 306 A.2d 29, 35 (Del.Super.Ct.1973), *aff'd,* 324 A.2d 208 (Del.1974) . Plaintiff's complaint alleges that the dividend payment to GAIG occurred at a time when Madison was technically bankrupt, and thus constituted substantially all of the assets of Madison. These allegations are sufficient to sustain Count I.

*4 Defendants GAMI and GAIG also allege that Count I should be dismissed because they are not bound by the Florida court's judgment against Madison. This is irrelevant to the merits of Count I. [FN3] Count I does not seek to apply the state court judgment against defendants GAIG and GAMI directly, but rather to enjoin GAIG, ordering the return of the alleged unlawful dividend payment to Madison, the defendant in the state court judgment, which is entitled to full faith and credit in federal court.

B. Count II

As for Count II, the court is again puzzled by defendants' choice of law arguments. Having taken the trouble to show that Delaware law should apply to the complaint, defendants base their arguments for dismissal of Count II on Illinois and Seventh Circuit case law. An independent foray into Delaware law by the court reveals that Count II of the complaint should be dismissed.

A corporation is an entity distinct from its shareholders, even if they consist solely of a single individual or corporation. *Buechner v. Farbenfabriken Bayer Aktien Gesellschaft,* 154 A.2d 684, 687 (Del.1959); *Pauley Petroleum, Inc. v. Continental Oil, Inc.,* 43 Del.Ch. 366, 231 A.2d 450, 454 (1967), *aff'd,* 43 Del.Ch. 516, 239 A.2d 629 (Sup.1968). Allegations of total ownership, common management and common officers and directors are insufficient to warrant disregard of the corporate form between a corporate subsidiary and its parent. *Skouras v. Admiralty Enterprises, Inc.,* 386 A.2d 674, 681 (Del.Ch.1978); *Pauley Petroleum,* 231 A.2d at 454; *Scott-Douglas Corp. v. Greyhound Corp.,* 304 A.2d 309 (Del.Super.Ct.1978). This is particularly true when the subsidiary corporation has a function and purpose peculiar to it which it fulfills, and corporate formalities between parent and subsidiary are respected. *Pauley Petroleum,* 231 A.2d at 454. Absent a showing of fraud or that the subsidiary is the alter ego of the parent, the Delaware courts will not disregard the corporate fiction between subsidiary and parent. *Buechner,* 154 A.2d at 687; *Skouras,* 386, A.2d at 681.

Although Delaware law on piercing the corporate veil is thus relatively strict, there are indications Delaware may be moving toward an adoption of the less rigid, federal common law in this area. *See* Stephen B. Presser, Piercing The Corporate Veil, § 2.08, at p 2-55--2-63 (1991). In *Irwin & Leighton, Inc. v. W.M. Anderson Co.,* 523 A.2d 983 (Del.Ch.1987), the court acknowledged the existence of the "control or instrumentality theory." Under this theory, a plaintiff seeking to pierce the corporate veil need not show an active intent to deceive on the part of those controlling the corporation, if the corporation has been ignored as a distinct legal entity and treated as a mere instrumentality. *Id.,* 523 A.2d at 987. In particular, a corporate creditor may hold another corporate creditor liable for the corporation's debts to it if the second corporate creditor assumed

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
(Cite as: 1991 WL 259020 (N.D.Ill.))

Page 4

"actual participatory total control" of the debtor corporation. *Id.,* at 988.

**\*5** The *Irwin & Leighton* court indicated that the observation of corporate formalities is one important factor in making this determination. Where the party controlling the corporation is another creditor, the creditor must have been active in the formation of the corporation, and not merely an arm's length extender of credit, and the corporation must have been operated merely as an arm of the creditor's business. *Id.,* at 989.

In, *Harco National Insurance Co. v. Green Farms, Inc.,* No. 1131. 1989 WL 110357 (Del.Ch.), the court officially adopted use of the alter ego theory in Delaware. The *Harco* court indicated that a glaring lack of observation of corporate formalities, combined with initial undercapitalization of the corporation and a commingling of corporate and shareholder assets presented a good case for piercing the corporate veil between the corporation and its shareholders. *Id.,* at 6. However, the court was unclear in explaining whether an element of fraud would still need to be established, or merely an inequitable or unfair result. *Id.,* at 4-6.

Plaintiff's complaint alleges total ownership of Madison by GAIG, and majority interest in GAIG by GAMI. The complaint also alleges that GAIG and GAMI share at least four common officers or directors, and Madison shares one common director with both corporations. No allegations that corporate formalities are not followed between the three corporations are pleaded. There are also a lack of allegations that the Madison was initially undercapitalized, that GAMI was not an arms length creditor of Madison, or that Madison was intended from the outset to be merely an arm of GAIG or GAMI. The complaint's allegations, if true, are insufficient for the court to regard the corporate structure existing between Madison, GAIG and GAMI as a fiction.

Plaintiff also alleges that Madison paid promissory notes payable to GAMI before they matured, effectively rendering Madison insolvent, while Madison had notice of plaintiff's litigation against it. These facts, without more, are insufficient to support a claim of fraud allowing the corporate veil between defendants to be pierced. *See Justice v. D & R Builders, Inc.,* 5 Del J.Corp.L. 322, No. 5387, 1978 WL 2513 (DelCh.) (under Delaware

fraudulent conveyance statute, 6 Del.C. § 1304, payment of antecedent debt to corporate creditor is fair consideration for conveyance). They are also insufficient to demonstrate that Madison is the alter ego of GAMI. *Harco,* at 6 (plaintiff must show transfer of assets to creditors was done to defraud other creditors or to siphon off assets, not merely to repay outstanding loans).

Plaintiff argues that under the liberal notice pleading requirements of the Federal Rules of Civil Procedure, it has given fair notice of Count II to defendant, and should be allowed to proceed to discovery. A Rule 12(b)(6) motion tests the formal, legal sufficiency of the complaint without subjecting defendants to discovery. *Rutman Wine Co. v. E & J Gallo Winery,* 829 F.2d 729, 738 (9th Cir.1987); 5A Wright & Miller, Federal Practice and Procedure § 1356, at 294 (1990). If a defendant's motion to dismiss has shown that plaintiff's factual allegations can not constitute a valid legal claim, there is no point to proceed to discovery to attempt to prove those allegations. However, in light of the possibility that plaintiff may, for lack of actual knowledge, be unable to plead all the essential facts sufficient to constitute a good faith claim for piercing the corporate veil at the present time, the court grants plaintiff sixty days to conduct additional discovery on Count II.

**\*6** For the foregoing reasons, defendants' motion to dismiss is granted in part. Accordingly, Count II of the complaint is dismissed without prejudice. Plaintiff shall have sixty days within which to file an amended complaint stating a cause of action, if it is appropriate to do so. Failure to file within sixty days will result in dismissal of Count II of the complaint. Defendants' motion to dismiss Count I is denied.

> FN1. Plaintiff does not allege that either action violated a preexisting order of the state court, or that it asserted a claim for prejudgment attachment of Madison's assets.

> FN2. There is authority that Illinois law is controlling over a foreign corporation transacting business in Illinois, regardless of choice of law rules, *Pontiac Furniture,* 647 F.Supp. at 1057, but that situation

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
(Cite as: 1991 WL 259020 (N.D.Ill.))

does not apply here. Foreign corporations authorized to transact business in Illinois, "shall be subject to all the limitations, restrictions, liabilities and duties prescribed herein for foreign corporations ..." Ill.Rev.Stat. ch. 32 para. 13.65 (1984). However the Illinois Business Corporation Act is structured so that where its provisions are meant to apply to foreign corporations, they are explicitly mentioned in those provisions. *See* Ill.Rev.Stat. ch. 32, para. 14.05 (annual report of foreign of domestic corporations), 15.50 (license fees payable by foreign corporations). Foreign corporations are not mentioned in paragraph 9.10 of the act, placing limitations on distributions to shareholders.

FN3. Although defendants do not appear to seek to apply this argument to Count II, it would be irrelevant there as well. Since Count II asserts that the corporate veil between defendants should be pierced, common identity between defendants would exist, and collateral estoppel would apply.

1991 WL 259020 (N.D.Ill.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



# FOLK
## on the
## DELAWARE GENERAL CORPORATION LAW: FUNDAMENTALS

2004 Edition

**EDWARD P. WELCH**
**Partner**
**Skadden, Arps, Slate, Meagher & Flom LLP**
**Wilmington, Delaware**

**ANDREW J. TUREZYN, Esquire**



**ASPEN**
P U B L I S H E R S

1185 Avenue of the Américas, New York, NY 10036
www.aspenpublishers.com

IULANI LAW LIBRARY

### §325. Actions against officers, directors or stockholders to enforce liability of corporation; unsatisfied judgment against corporation.

(a) When the officers, directors or stockholders of any corporation shall be liable by the provisions of this chapter to pay the debts of the corporation, or any part thereof, any person to whom they are liable may have an action, at law or in equity, against any one or more of them, and the complaint shall state the claim against the corporation, and the ground on which the plaintiff expects to charge the defendants personally.

(b) No suit shall be brought against any officer, director, or stockholder for any debt of a corporation of which such person is an officer, director or stockholder, until judgment be obtained therefor against the corporation and execution thereon returned unsatisfied. (8 Del. C. §325 (1983); 56 Del. Laws ch. 50 (1967); 71 Del. Laws ch. 339, §71 (1998).)


## COMMENT TO SECTION 325


§325.1.        In general


## §325.1.  In general.

Section 325 provides that a creditor of a corporation may sue an officer, director, or stockholder of the corporation whenever a provision of the corporation statute makes them liable for any part of the debts of the corporation. The complaint must set out the basis for the suit,[1] and no suit can be maintained unless a judgment has been obtained against the corporation and returned unsatisfied.[2]

This section is not exclusive of other means of satisfaction, such as insolvency proceedings, but it is intended "to make the creditor independent of receivers appointed under the Insolvency Act, by providing remedies that he might employ directly against the stockholder."[3]

This section will not be applicable, unless it is clear that the officers, directors, or stockholders are liable for the corporate debts under the circumstances presented

§325.   [1] Section 325(a).
[2] Section 325(b); see Kyle v. Bulluck, C.A. No. 83C-JN-131, slip op. at 2–3 (Del. Super. Ct. Feb. 28, 1984)
[3] DuPont v. Ball, 106 A. 39, 42 (Del. 1918).

754

Section 325 does not require that judgment first be obtained against a corporation in a suit to recover a debt from an officer, director, or stockholder when the debt did not arise "by the provisions of" the corporation statute.[4]

Section 325 has also been held inapplicable in the following situations: a suit against a corporation and its sole stockholder for back wages, when the plaintiff claimed that the stockholder was his employer;[5] a suit based on guarantees of a loan to a corporation, when the defendant guarantors also were officers, directors, or stockholders of the corporation;[6] a suit on a lease against the sole stockholder of the dissolved lessor corporation because the lease was an asset that passed to the stockholder, which became principally liable under it;[7] and a suit against a corporation and its officers for copyright infringement, when the plaintiffs claimed that the officers were personally liable under the copyright laws.[8]

A stockholder of a foreign corporation who resides in Delaware may be sued in Delaware for personal liabilities imposed by the law of the foreign state, even though the law may conflict with Delaware's, because section 325 applies only to corporations created and organized under Delaware law; it does not govern "the relations, liabilities, rights, and remedies of stockholders and creditors of corporations created, empowered, and organized solely by authority" of another state.[9]

Many cases dealing with suits against stockholders for a monetary recovery arise when a person has not paid, or has only partially paid, the subscription price for his stock.[10]

## §326. Action by officer, director or stockholder against corporation for corporate debt paid.

When any officer, director or stockholder shall pay any debt of a corporation for which such person is made liable by the provisions of this chapter, such person may recover the amount so paid in an action against the corporation for money paid for its use, and in such action only the property of the corporation shall be liable to be taken, and not the property of any stockholder. (8 Del. C. §326 (1983); 56 Del. Laws ch. 50 (1967); 71 Del. Laws ch. 339, §72 (1998).)

[4] Section 325(a).
[5] Defendants' Kennedy & Leighmik Corp. Motion for Summary Judgment and/or Dismissal, C A No. 82C-NO-64, letter op. at 4–5 (Del. Super. Ct. July 17, 1985).
[6] Federal Deposit Ins. Corp. v. Kewa Metal Salts, Inc., C A No. 79C-SE-48, slip op. at 7–8 (Del. Super. Ct. Mar. 26, 1985).
[7] Middendorf v. Fuqua Indus., 623 F.2d 13, 16–17 (6th Cir. 1980).
[8] Hideout Records & Distribs. v. El Jay Dee, Inc., 601 F. Supp. 1048, 1052–1053 (D. Del. 1984).
[9] Love v. Pusey & Jones Co., 52 A. 542, 543 (Del. Super. Ct. 1902) (construing a predecessor to §325).
[10] For the law dealing with such suits, see generally §162 and comments thereto