

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
FILED

AUG 0 6 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| **JAMES DAVID GILBERT** | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. B-04-047** |
| | § | |
| **RIG VENTURES, INC.; EMILIO SANCHEZ;** | § | |
| **PHIL WELLS; RICHARD JAROSS; and** | § | |
| **MODU "OCEAN 66"** | § | |
| **Defendants.** | § | |

## REPLY TO PLAINTIFF'S MEMORANDUM

TO THE HONORABLE JUDGE OF SAID COURT:

Movant **Emilio Sanchez** files this his reply to the Plaintiff's memorandum opposing the Movant's motion requesting partial summary judgment.

### Factual Basis

The Plaintiff's memorandum is a classic example of the Plaintiff kettle calling the Defendant teapot "tarnished". For instance, Plaintiff's comments at page 3 of his memorandum that Movant's "previous positions in this litigation . . . raises legitimate suspicion" and "is very suggestive of both Emilio Sanchez's and Rig Venture, Inc.'s less than candid position herein" are insulting, contemptible and irrelevant. Plaintiff neglects to admit that he never alleged a cause of action under the Longshore and Harbor Worker's Compensation Act (LHWCA) until his Third Amended Petition in State Court which resulted in removal of the case to Federal Court. A defendant is under

no obligation to foresee plaintiff's allegations. As stated in this Defendant's motion, the only reason the Plaintiff is assumed now to be an employee is because the LHWCA defines him as such. The tardy filing of a report with the Department of Labor was but a good faith effort to correct an oversight made by Rig Ventures, Inc. Plaintiff would have the Court punish Movant Emilio Sanchez for the good deeds of Defendant Rig Ventures, Inc.

### Argument and Authorities

Plaintiff's citation of inapposite judicial opinions in his effort to counter the plain meaning of 8 Del. C. § 325 is disingenuous. The citation to secondary sources without discussion of the entirety of such commentary is frantic reasoning. The use of opinions interpreting the law of Oklahoma and Illinois and attempting to analogize them to the laws of Delaware is clearly inappropriate. Most telling is Plaintiff's failure to set forth any evidence supporting the essential elements of his case against Emilio Sanchez. It has long been the law in this circuit that "(t)he nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence." *Weaver v. Kellogg*, 216 B. R. 563, 570 (S.D. Tex. 1997) and cases cited therein. Also see, *Roberts v. Wells Fargo Bank*, C.A. No. B-04-002, 7 (S.D. Tex. Jul. 26, 2004) attached hereto as Exhibit A. As recognized in *Alberto V. Diversified Group, Inc.*, 55 F.3d 201, 205 (5th Cir. 1995), there are a number of factors required under Delaware law (none of which are fraud) for a court to consider in determining to allow veil piercing

and "no single factor (can) justify a decision to disregard the corporate entity". The Plaintiff has presented no evidence to support even one of those listed factors. Delaware law further requires the Plaintiff to demonstrate a misuse of corporate form or an overall element of injustice or unfairness. *Alberto* at 205.

### Plaintiff's Cited Secondary Source

Plaintiff asserts that his attached treatise on the General Corporation Law supports his position; yet, he fails to discuss the entire commentary. The author(s) of such a commentary compiled a laundry list of cases in which Section 325 of the Act has been held to be inapplicable. See authorities for Plaintiff's Memorandum in Opposition to Emilio Sanchez' Motion for Partial Summary Judgment; Secondary Authority, Edward P. Welch and Andrew J. Turezyn, *Folk on Delaware General Corporation Law Fundamental*, § 325.1, p. 755. None of those listed cases concerned a tort claim under the LHWCA in spite of the State of Delaware being on the coast and containing many seaports which undoubtedly generates significant personal injury claims. The cases listed pertained to contract matters or suits involving an alleged breach of a statutorily granted property right (i.e., a copyright).

### Plaintiff's Cited Judicial Authority

Plaintiff attacks the case cited by Movant as *John W. Cooney v. Arlington Hotel*, 106 A. 39 (Del. 1918) as first being erroneously cited and secondly as being supportive of Plaintiff's position. The first complaint may be dealt with by review of the opinion. As can be readily seen, the Movant's citation is correct.

(Opinion attached as Exhibit B). The second complaint of Plaintiff is based upon his assumption that "section 49" of the Delaware Act in 1918 is, in fact, the same as the current section 365; yet, he presents no evidence of that assertion. His further quote from the opinion concerning a plaintiff proceeding independently of the statute is limited in the opinion itself to the request for a receiver "on the grounds of insolvency". The Plaintiff's partial quote is an obvious misstatement of that opinion.

Plaintiff's citation and discussion of an Oklahoma case [*Fanning v. Brown*, 85 P. 3D 841, 847 (OK 2004)] and an Illinois case [*Pinellas County v. Great American Industrial Group*, 1991 W.L. 259020 (N.D. 111)] are misleading at best. That portion of the Oklahoma opinion upon which Plaintiff relies is, at his own admission, *dicta*. The Illinois case cited by Plaintiff concerns an insolvent corporation which Plaintiff attempts to comport to the instant matter by referral to an accountant's deposition wherein the accountant agreed that from a balance sheet basis as opposed to a legal basis, Rig Ventures, Inc. is currently insolvent. As we have seen, the Delaware Courts have held that a request for a receiver based on insolvency is outside the protection of Section 325(b) and that is not a matter before this Court. See *John W. Cooney v. Arlington Hotel*, 106 A. 39, 42 (Del. 1918).

The Plaintiff's discussion of *Lone Star Indus., Inc. v. Redwine*, 757 F.2d 1544 (5th Cir. 1985) is likewise flawed. This case is yet another suit based upon an alleged breach of contract cause of action. As we have seen from Plaintiff's secondary source, cases alleging contract rights fall outside the protection of Section 325(b).

The "independent action" to which the Court refers at page 1544 of the opinion is the cause of action for recovery of distributions as a general partner of a limited partnership.    The Court's next comment clearly indicates that an attempt to "pierce the corporate veil" falls within Section 325. No further comment by the Court restricts that conclusion in spite of Plaintiff's reliance upon that opinion.

### Conclusion

The State of Delaware has concluded by statute and judicial fiat that stockholders of a Delaware corporation cannot be sued for corporate obligations until the corporation has demonstrated, under the duress of a writ of execution, the inability to answer for its determined liability. The exclusions to that protection are based on contractual obligations of the shareholders, violations of statutory property rights or corporate contractual obligations of a dissolved entity. Plaintiff has cited no authority for his premises that Movant is not entitled to the protection of Section 325(b) in a suit brought for personal injury.

Movant prays for entry of an order of his dismissal under Plaintiff's theories of alter ego and veil piercing until the provisions of applicable Delaware law are met.

DATED: August _6_, 2004.

Respectfully submitted,

**FLEMING & HERNANDEZ, P.C.**
1650 Paredes Line Road, Suite 102
Brownsville, Texas  78521-1602
Telephone:  (956) 982-4404
Telecopier:  (956) 982-0943


by: _Tom Fleming_
**Tom Fleming**
State Bar of Texas No. 07133000
Federal I. D. No. 1188

**Luis R. Hernandez**
State Bar of Texas No. 09518900
Federal I.D. No. 12978

**ATTORNEYS FOR MOVANT,**
**EMILIO SANCHEZ.**

## CERTIFICATE OF SERVICE

I certify that true and correct copies of the foregoing REPLY TO PLAINTIFF'S MEMORANDUM were served August _6_, 2004 in the manner(s) indicated below upon the following Counsel-of-record:

> CO-COUNSEL FOR PLAINTIFF,
> JAMES DAVID GILBERT:
> Scott D. Webre
> 556 Jefferson Street
> Jefferson Towers, Suite 200
> Lafayette, Louisiana 70501
> *(CERTIFIED UNITED STATES MAIL, R.R.R., #7002 2030 0007 1000 5441)*
>
> CO-COUNSEL FOR PLAINTIFF,
> JAMES DAVID GILBERT:
> Ryan Krebs, M.D., J.D.
> 6601 Vaught Ranch Road, Suite 100
> Austin, Texas 78730
> *(CERTIFIED UNITED STATES MAIL, R.R.R. #7002 2030 0007 1000 5465)*
>
> CO-COUNSEL FOR PLAINTIFF,
> JAMES DAVID GILBERT:
> Frank Costilla
> THE LAW OFFICES OF FRANK COSTILLA, L.P.
> 5 East Elizabeth Street
> Brownsville, Texas 78520
> *(CERTIFIED UNITED STATES MAIL, R.R.R., #7002 2030 0007 1000 5458)*

Tom Fleming

*40*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# —BROWNSVILLE DIVISION—

United States District Court
Southern District of Texas
ENTERED

JUL 2 6 2004

Michael N. Milby, Clerk of Court
By Deputy Clerk _D. Uturrado_

| | | |
|---|---|---|
| JOHN OCIE ROBERTS, | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-04-002 |
| | § | |
| WELLS FARGO BANK ET AL., | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Pending are the Defendants' respective motions for summary judgment.[1] Docket Nos. 20-22, 31. Ample additional briefing has been submitted on all of the relevant matters by the parties. Docket Nos. 25-28, 30, 32-33, 35-37, 39. Oral argument was heard on June 28, 2004. Docket No. 38. Having duly considered all of the foregoing, the Court hereby **GRANTS** summary judgment in favor of all three Defendants for the reasons set forth below.

## I.    BACKGROUND

Plaintiff's pro se complaint was filed in this Court on January 2, 2004. Docket No. 1. In it he alleges that Defendants Wells Fargo Bank ("Bank"), Tom Fleming, and Dan Huerta transgressed his civil rights in violation of 42 U.S.C. §§ 1981, 1983, 1985 and various constitutional amendments. Id. The precise nature of the alleged violations is often unclear;[2] however, the Plaintiff's allegations all stem from the Bank's foreclosure on land after Plaintiff defaulted on a note. Id. Fleming is alleged to have violated the Plaintiff's rights in his capacity as counsel for the Bank, and Huerta is alleged to

---

[1]  Defendant Dan Huerta's motion is actually styled as a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6). However, on June 1, 2004, the undersigned provided the parties with notice in open court that Defendant Huerta's motion would be construed as a motion for summary judgment under FED. R. CIV. P. 56. Docket No. 29; see Judwin Props., Inc. v. U.S. Fire Ins. Co., 973 F.2d 432, 436 (5th Cir. 1992) ("A district court may grant a motion for summary judgment sua sponte, provided that it gives proper notice to the adverse party.").

[2]  The Court has, however, afforded Plaintiff's initial pleading and subsequent filings the most sympathetic construction that their contents will bear. S.E.C. v. AMX Int'l, Inc., 7 F.3d 71, 75 (5th Cir. 1993) (pro se documents to be more liberally construed than those drafted by attorneys).

EXHIBIT NO. _A_

have done so in his capacity as the Cameron County Deputy Sheriff who executed the foreclosure sale on Plaintiff's property. Id.

The instant lawsuit is not the first case generated by the Plaintiff's default on the note and the Bank's subsequent foreclosure. Prior litigation involving some of the same parties has taken place in both state and federal court. These related legal proceedings are detailed below.

On May 30, 1997, the Plaintiff filed a lawsuit in the 138th Judicial District Court of Willacy County, Texas, alleging breach of contract and fraud against the Bank and multiple other defendants not named in the instant suit. Docket No. 22 at Exhibit 4 (original state court petition). The defendants in that suit were granted summary judgment on November 9, 2000. Id. at Exhibit 1. The Texas appellate courts subsequently affirmed the trial court's decision. Roberts v. First Valley Bank, No. 13-01-00207-CV, 2003 WL 21283154 (Tex. App.—Corpus Christi June 5, 2003, pet. denied); see also Docket No. 21 at Exhibit C (October 3, 2003 denial of petition for review); Docket No. 22 at Exhibit 3 (December 5, 2003 denial of motion for rehearing of petition for review).

On October 27, 2003, Defendant Huerta, in his capacity as Deputy Sheriff, executed a writ of execution stemming from the state court judgment on Plaintiff's real property. See Docket No. 31 ("Verification"). After notice, the property was sold on January 6, 2004. Id. Although the writ was executed prior to the Supreme Court of Texas's December 5, 2003 denial of the motion for rehearing, there is nothing in the record that suggests that the enforceability of the judgment was suspended in the interim. See generally TEX. R. APP. P. 24.1 ("Suspension of Enforcement").

Prior to their final resolution in state court, these matters also trickled into federal court. On December 1, 1997, while the prior lawsuit was pending in the state district court, the Plaintiff also filed a cryptic complaint in federal court against Defendant Fleming and the other members of his law firm, alleging various violations of his constitutional rights.[3] Docket No. 21 at Exhibit F. At that time, Plaintiff was also a debtor in a pending action in the Southern District of Texas's Bankruptcy Court, and his constitutional lawsuit was apparently consolidated with the pending bankruptcy matter due to the interrelation between the underlying facts and parties in each suit. On April 3, 2001, the Bankruptcy Court dismissed the Plaintiff's constitutional claims with prejudice under FED. R. CIV. P.

---

[3] A very similar document was also filed in the 138th Judicial District Court of Willacy County on October 14, 1997 as part of the same lawsuit in which the Plaintiff was alleging breach of contract and fraud. Docket No. 22 at Exhibit 5.

2

12(b)(6). Docket No. 21 at Exhibit G.

As previously noted, the instant suit was filed on January 2, 2004.[4] Docket No. 1. The Bank and Fleming originally moved to dismiss Plaintiff's complaint under Fed. R. Civ. P. 12(b) on January 9, 2004. Docket No. 6. Having received no response, the Court granted same on February 10, 2004. Docket No. 7; see LOCAL RULE 7.4 ("Failure to respond will be taken as a representation of no opposition."). However, on April 5, 2004, the undersigned granted Plaintiff's motion to reinstate his case in open court. Docket Nos. 8, 14. All three Defendants have filed motions seeking summary judgment that are now ripe for adjudication.

## II.   SUMMARY JUDGMENT

### A.   Standard of Review

Summary judgment is appropriate when it is apparent from the record that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Summary adjudication of this nature is only proper "if no reasonable jury could differ in weighing the evidence." Vulcan Materials Co. v. City of Tehuacana, 369 F.3d 882, 886 (5th Cir. 2004). In the context of a summary judgment motion, courts must examine the evidence "in the light most favorable to the nonmoving party." Id.; see also Baker v. Metro. Life Ins. Co., 364 F.3d 624, 627 (5th Cir. 2004) (noting that inferences drawn from the evidence are also viewed in light favorable to nonmoving party). The moving party bears the initial burden to demonstrate the absence of a bona fide issue of material fact. Norman v. Apache Corp., 19 F. 3d 1017, 1023 (5th Cir. 2003). Once the moving party has done so, however, the nonmoving party "must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial to avoid summary judgment." Templet v. HydroChem Inc., 367 F.3d 473, 477 (5th Cir. 2004).

---

[4] Two additional cases were contemporaneously filed by the Plaintiff in state court seeking to enjoin the sale of Plaintiff's real property that eventually occurred on January 6, 2004. Both cases were filed in Cameron County and were styled Roberts v. Wells Fargo Bank et al. (Case Nos. 2003-12-5738-A and 2004-01-0003-B). These cases have been consolidated and, perhaps, remain pending in one form or another. Docket No. 20 at 3-4; but cf. Docket No. 28 at Exhibit K-2 (April 5, 2004 state court order declaring Plaintiff to be a "vexatious litigant" under Texas law).

3

### B.    The Plaintiff's Complaint

The Plaintiff's allegations concerning the Bank all seem to turn on the contention that the note and the debt that it memorialized were invalid.  Docket No. 1 at ¶¶ 5-9, 30; Docket No. 8 at ¶ 15. Consequently, the judgment and foreclosure are likewise alleged to be invalid.  The Plaintiff's allegations concerning Fleming are to the effect that he has improperly wielded his influence as a member of the bar, has interfered with the Plaintiff's right to counsel, has subjected the Plaintiff himself to threats and harassment, and has improperly sought to enforce a judgment before it became final.  Docket No. 1 at ¶¶ 10-15, 24; Docket No. 8 at ¶ 3.  Finally, the Plaintiff alleges that Huerta acted illegally in executing the writ issued that led to the foreclosure sale.  Docket No. 1 at ¶¶ 16-23, 33-34; Docket No. 8 at ¶ 9.  All of the foregoing conduct is generally characterized as being in violation of various provisions of the United States Constitution.  Docket No. 1 at ¶¶ 4, 31; Docket No. 8 at ¶¶ 2, 8.

### C.    The Defendants' Motions

The Bank requests summary judgment on the basis of claims preclusion.  Docket No. 22 at 6-8.  Citing United States ex rel. Laird v. Lockheed Martin Eng'g and Sci. Servs. Co., 336 F.3d 346, 357 (5th Cir. 2003), it argues that the Plaintiff is both precluded from relitigating issues resolved in the state lawsuit and litigating issues that could and should have been litigated in that proceeding. Docket No. 22 at 6-8; see also Amstadt v. United States Brass Corp., 919 S.W.2d 644, 652 (Tex. 1996) (setting forth elements of claims preclusion defense as "(1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; (3) a second action based on the same claims as were raised or could have been raised in the first action"); Barr v. Resolution Trust Corp., 837 S.W.2d 627, 628 (Tex. 1992) ("Res judicata, or claims preclusion, prevents the relitigation of a claim or cause of action that has been finally adjudicated, as well as matters that, with the use of diligence should have been litigated in the prior suit.") .

Fleming requests summary judgment on the basis of attorney immunity  Docket No. 20 at 4-10.  Citing Renfroe v. Jones & Assocs., 947 S.W.2d 285, 287-88 (Tex. App.—Fort Worth 1997, writ denied), and other cases, Fleming maintains that he cannot be liable to the Plaintiff for acts undertaken in his capacity as lawyer for the Bank.  Docket No. 20 at 4-10; see also Guthrie v. Buckley, 246 F.

4

Supp. 2d 589, 590-91 (E.D. Tex. 2003) (determining in diversity case that suit premised on representation of another party in course of litigation was barred under Texas law), aff'd, 2003 WL 22455394 (5th Cir. Oct. 29, 2003) (per curiam); Lewis v. Am. Exploration Co., 4 F. Supp. 2d 673, 676-80 (S.D. Tex. 1998) (holding in diversity action that Texas law immunizes attorneys from suit for conduct on behalf of client in the course of litigation); Taco Bell Corp. v. Bracken, 939 F. Supp. 528, 531-33 (N.D. Tex. 1996) (interpreting Texas law in diversity action to preclude suit against attorneys for conduct carried out in the capacity as opposing counsel in litigation).

Among other things, Huerta requests judgment as a matter of law on the basis of absolute or qualified immunity. Docket No. 31 at 6-10. He cites Mays v. Sudderth, 97 F.3d 107, 110-14 (5th Cir. 1996), and other cases, for this proposition. Docket No. 31 at 6-10. More particularly, Huerta argues that, as a law enforcement officer, he is immune from suit premised on his execution of a facially valid writ of execution issued pursuant to a final judgment by a court of competent jurisdiction. Id.; see also In re Foust, 310 F.3d 849, 855 (5th Cir. 2002) ("Law enforcement officers have absolute immunity for enforcing the terms of a court order but only qualified immunity for the manner in which they choose to enforce it."); Hart v. O'Brien, 127 F.3d 424, 445 & n.10, 447 (5th Cir. 1997) (observing that law enforcement officers are entitled to absolute or qualified immunity for executing a facially valid warrant issued by a court of competent jurisdiction), cert. denied, 525 U.S. 1103 (1999);[5] Turner v. Raynes, 611 F.2d 92, 93 (5th Cir. 1980) (holding that sheriff enjoyed qualified immunity when "he did no more than execute an arrest warrant valid and regular on its face" despite fact that crime charged turned out to be nonexistent), cert. denied, 449 U.S. 900 (1980).

**D.    Analysis**

The Plaintiff has filed multiple responses to the Defendants' motions for summary judgment, and the Defendants have filed multiple replies. Docket Nos. 25-28, 30, 32-37, 39. However, none of these filings truly alters the nature of the allegations against the Defendants or their respective defenses. Having reviewed each and every pertinent filing, the Court is of the opinion that no genuine issue of material fact remains for resolution at trial and all three Defendants are entitled to judgment as a matter of law.

---

[5] Hart has been abrogated on entirely different grounds. See Kalina v. Fletcher, 522 U.S. 118 (1997).

Although the Plaintiff does complain of some acts committed after the conclusion of the state lawsuit that ultimately led to the aforementioned foreclosure on his real property, see, e.g., Docket No. 25 at 5 ("The following are the facts on which this lawsuit is based and all have occurred after the state lawsuit . . . ."), it is clear that all of his allegations concerning the Bank turn on the validity of the underlying note and state court judgment. See, e.g., Docket No. 25 at Exhibit D (Plaintiff's "Affidavit"); Docket No. 28 at 1-2; Docket No. 33 at ¶¶ 1-3; Docket No. 36 at 2-4. While the Court is not unsympathetic to the Plaintiff's loss of his property, the proper forum for raising arguments concerning this matter was the state court proceeding. The allegations leveled against the Bank in this suit were, in fact, raised and addressed by the Bank and the Plaintiff and resolved in the former's favor in the state lawsuit. This resolution was affirmed by the highest state court. As per Laird, Amstadt, and Barr, any constitutional issues bearing on the validity of the note or the legal process by which the Bank was attempting to obtain a judgment thereon could and should have been raised in the state suit. Moreover, to the extent that the Plaintiff's various filings with this Court may be read as an attack on the constitutionality of the state court judgment and the proceedings that produced it, see, e.g., Docket No. 27 at 4 ("The trial court ignores all of Plaintiff's affidavits. The appeals court and the Supreme Court certified such actions."), this Court has no jurisdiction to entertain such claims. See Howell v. Supreme Court of Texas, 885 F.2d 308, 311 (5th Cir. 1989) ("Federal district courts have no authority to review the final determinations of a state court. Review of such determinations is only available in the United States Supreme Court on direct appeal or by writ of certiorari."), cert. denied, 496 U.S. 936 (1990).

Review of the record renders it equally clear that the allegations against Fleming all stem from the legal services he provided to the Bank during the course of litigation. Although Plaintiff depicts Fleming's conduct as extralegal harassment, the evidence in the record is to the contrary. See, e.g., Docket No. 21 at Exhibit E ("Affidavit of Tom Fleming"); Docket No. 25 at Exhibit A (various correspondence from Fleming to state court judges and an attorney who formerly represented Plaintiff). As per Renfroe, Guthrie, Lewis, and Bracken, there can be no doubt that attorneys generally enjoy immunity for acts taken in the course of representing their clients in litigation.

As the Plaintiff correctly notes, Docket No. 26 at 6, there are exceptions to the rule that attorneys are immune for litigation related representational conduct. See, e.g., Toles v. Toles, 113 S.W.3d 899, 911-13 (Tex. App.—Dallas 2003, no pet. h.) (recognizing exception for fraud or

6

conspiracy to defraud but not for constructive fraud); <u>Mendoza v. Fleming</u>, 41 S.W.3d 781, 787-88 (Tex. App.—Corpus Christi 2001, no pet. h.) (recognizing exception for certain types of malicious conduct). The Plaintiff frames his allegations so as to fall within these exceptions. <u>See, e.g.</u>, <u>Docket No. 26</u> at 6. However, even favorably construed, the summary judgment evidence lends no support to these allegations. Mere allegations alone are insufficient to avoid summary judgment. <u>See Freeman v. Texas Dept. of Criminal Justice</u>, 369 F.3d 854, 860 (5th Cir. 2004) (noting that nonmoving parties cannot satisfy their burden "with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence").

The summary judgment evidence in the record that Plaintiff relies on primarily consists of legal correspondence between Fleming and others. <u>Docket No. 25</u> at Exhibit A. However, the content of these letters, as well as Fleming's surrounding actions, clearly fall within the scope of conduct protected by the attorney immunity doctrine. There is "no right of recovery against the opposing attorney for that attorney's having made certain motions." <u>White v. Bayless</u>, 32 S.W.3d 271, 276 (Tex. App.—San Antonio 2000, pet denied). Nor generally may "[c]ommunications made in connection with and related to judicial proceedings . . . serve as the basis of a civil action." <u>IBP, Inc. v. Klumpe</u>, 101 S.W.3d 461, (Tex. App.—Amarillo 2001, pet denied). Zealous representation is likewise no basis for a cause of action. <u>See Chapman Children's Trust v. Porter & Hedges</u>, 32 S.W.3d 429, 439-43 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (rejecting claim against opposing attorney premised on "threatening to take legal action" against opposing counsel and party and accusing latter of wrongful conduct). Fleming's documented conduct does not transgress these boundaries.

In one notable case, a federal district court did reject a lawyer's claim of attorney immunity involving a writ of execution. <u>See Miller v. Stonehenge/FASA–Texas, JDC, L.P.</u>, 993 F. Supp. 461, 464-65 (N.D. Tex. 1998). But, in <u>Miller</u>, counsel's immunity defense failed because the suit stemmed from the lawyer's actual participation in the execution of the writ by United States Marshals. <u>Id.</u> at 465. That is, the lawyer was not being sued for her rendition of <u>legal</u> services. <u>See id.</u> ("Collier may have been present as a representative of her client, but her skills <u>as an attorney</u> had no role in the events that transpired.") (emphasis in original). In the instant case, however, Fleming is being sued in his capacity as a professional for assisting his client to obtain a judgment via legal proceedings that ultimately led to the issuance of a writ of execution. The fact that Plaintiff casts his complaints

7

against Fleming as being constitutional in dimension does not make the conduct at issue any more actionable under these circumstances.

Finally, the evidence in the record leaves no doubt that Huerta is entitled to absolute immunity. The evidence is clear that Huerta was acting on a facially valid writ issued pursuant to a final judgment of a court of competent jurisdiction. Docket No. 28 at Exhibit J (December 8, 2003 state court hearing testimony of Huerta at pages 8-13); Docket No. 31 ("Verification"). As such, the principals announced in Sudderth, Foust, Hart, and Turner render Huerta immune from liability for his role in the execution of the writ and related conduct.

The Plaintiff lodges two principal arguments to the contrary. First, Plaintiff maintains that the judgment was not, in fact, final. Docket No. 1 at ¶ 15. This allegation appears to be premised on the fact that his petition for rehearing in the Supreme Court of Texas remained pending on the date that the writ of execution was originally issued. Docket No. 25 at 1; Docket No. 37 at 2-3, 8. However, as the Supreme Court of Texas had denied his petition for review and Plaintiff did not act in conformity with TEX. R. APP. P. 24.1 to suspend the enforcement of the judgment, his petition for rehearing in no way affected the otherwise final judgment's enforceability. See, e.g., Smith v. Texas Farmers Ins. Co., 82 S.W.3d 580, 585 (Tex. App.—San Antonio 2002, pet denied) ("[E]ven though an appeal may be pending, a judgment is final in the sense that execution will issue in the absence of a supersedeas bond.").

Second, Plaintiff also argues that Huerta had reason to know that the writ of execution was not valid due to two temporary restraining orders that were issued by the state court on December 1, 2003 and January 5, 2004 respectively. Docket No. 27 at 2; Docket No. 37 at 5. However, Plaintiff flatly acknowledges the any temporary restraining orders were also subsequently dissolved on that latter date (i.e., January 5, 2004) as well. Docket No. 28 at Exhibit C ("Order Dissolving Restraining Order"); id. at Exhibit D ("Order Dissolving Temporary Restraining Order and Denying Temporary Injunction"). As the real property at issue was not sold until January 6, 2004, Docket No. 31 ("Verification"), the restraining orders are of no relevance to Huerta's conduct. Moreover, as the restraining orders at issue were set aside and sanctions were levied against Plaintiff concerning same, Docket No. 28 at Exhibit D, they constitute no evidence of invalidity concerning the writ of execution.

8

**III.    CONCLUSION**

Finding that there is no genuine issue of material fact remaining for resolution at trial, the Court hereby **GRANTS** summary judgment in favor of Defendants Wells Fargo Bank, Tom Fleming, and Dan Huerta on the aforementioned grounds for the aforesaid reasons.

Signed in Brownsville, Texas, this 26th day of July, 2004.

ANDREW S. HANEN
UNITED STATES DISTRICT JUDGE

9

106 A. 39
11 Del.Ch. 430, 7 A.L.R. 955
**(Cite as: 106 A. 39)**
▷

Page 1

Supreme Court of Delaware.

DU PONT et al.
v.
BALL et al. in Court of Chancery as
JOHN W. COONEY CO.
v.
ARLINGTON HOTEL CO.

Nov. 29, 1918.

Appeal from Court of Chancery.

Bill by the John W. Cooney Company against the Arlington Hotel Company, in which receivers were appointed. From a decree of the Chancellor upon petition of the receivers, levying assessment against T. Coleman Du Pont and others, as stockholders of defendant company (101 Atl. 879), they separately appeal. Decree affirmed, except as modified in opinion.

The appellants were stockholders of the Arlington Hotel Company, and from a decree of the Chancellor entered on the 4th day of August, A. D. 1917, the appellants took separate appeals. The facts, in addition to those stated in the report of the case below (John W. Cooney Co. v. Arlington Hotel Co., 101 Atl. 879), are sufficiently stated in the opinion of the Supreme Court.

Heisel, J., dissenting in part.

West Headnotes

Corporations ☞232(1)
101k232(1)

Stockholder's liability for unpaid stock is unaffected by fact that corporation issued stock as full-paid and agreed that it should be nonassessable; such agreement being ultra vires and void, and the acceptance of stock raising an implied promise to pay therefor.

Corporations ☞232(1)
101k232(1)

It is no defense to liability for unpaid stock that, the stock having been issued without consideration, contrary to the constitutional provision, the issue was ultra vires and void; the ultra vires feature of the transaction being, not the issuance, but the failure to exact payment for the stock, and the agreement that it

need not be paid for.

Corporations ☞235
101k235

Stockholder's liability in addition to unpaid subscriptions, as under a "double liability" statute, is not resorted to if the assets of the corporation, including unpaid subscriptions, are sufficient to pay creditors.

Corporations ☞240(1)
101k240(1)

The liability of stockholders for unpaid subscriptions is unaffected by creditors' knowledge or lack of knowledge of the facts and circumstances under which the stock was issued.

Corporations ☞240(1)
101k240(1)

That a creditor actually participated in the issuance of unpaid stock as full-paid and nonassessable, or consented thereto, does not estop him from enforcing, as a statutory liability on unpaid stock, his claim against other stockholders, to whom such stock was issued with his assistance or acquiescence, where there was no intention on his part to perpetrate a fraud upon the others, or gain an unfair advantage by the transaction.

Corporations ☞243(10)
101k243(10)

One subscribing for and accepting preferred stock for his own benefit, and holding himself as the legal owner thereof, is estopped to deny liability as stockholder to bona fide creditors on the ground that his stock was illegally issued and void.

Corporations ☞246
101k246

As to stockholders' liability for unpaid stock, there is no distinction or priority of liability between stock subscribed for and that which is issued and accepted without being paid for, or between preferred and common stock; the test, under the statute, being not the class or character of the stock, but whether it has been paid for.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

EXHIBIT NO. B

106 A. 39                                                                      **Page 2**
**(Cite as: 106 A. 39)**

Corporations ☞252
101k252

Where creditor proceeds in equity to secure the appointment of receivers on ground of insolvency of the corporation, obtaining a judgment and unsatisfied execution is not a condition precedent to enforcement by the receivers of stockholders' liability for unpaid subscriptions.

Corporations ☞259(7)
101k259(7)

Creditor's remedy by "bill in chancrey" against a stockholder of a corporate debtor, given by General Corporation Law (22 Del. Laws, c. 394) § 49, must be initiated by a creditor's bill.

Corporations ☞261
101k261

Obtaining judgment and unsatisfied execution is not condition precedent to enforcement by receivers of stockholders' liability for unpaid subscriptions.

Corporations ☞262(2)
101k262(2)

Although the General Corporation Law (22 Del. Laws, c. 394), provides that at no time shall the total amount of the preferred stock exceed two-thirds of the actual capital paid in cash or property, it is no defense to liability for unpaid preferred stock that the issue of preferred stock was void and not assessable for the debts of the company, because the common stock was not paid for in cash, since creditors may assume that the par value of common stock has been paid, so that the words of the statute, "actual capital paid in cash or property," mean, as to creditors, the par value of the common stock issued.

Corporations ☞273
101k273

In proceedings by receivers of insolvent corporation to assess stockholders on their liability for unpaid stock, interest on creditors' claims should commence at the time the receivers asked the court to make an assessment for the payment of such claims; there being nothing before which indicated that they would be expected to pay such claims.

Corporations ☞274
101k274

Stockholders should not be assessed, and required to pay their assessments, before their legal liability is definitely determined, because the amounts assessed may be much in excess of what they are legally liable to pay.

Corporations ☞274
101k274

In proceeding by receivers of an insolvent corporation to enforce stockholders' liability, it was inequitable to require the single stockholder found in the jurisdiction to pay the entire assessment, although such course was the most convenient for the receivers and expeditious for the creditors; but the receivers should have been ordered to collect every assessment they should find to be collectible, and that would justify the expense of collection, in order that the burden might be fairly distributed.

Corporations ☞277
101k277

In proceeding by receivers of an insolvent corporation to enforce stockholders' liability for unpaid stock, the receivers are entitled to proper expenses and reasonable compensation, to be paid by the stockholders.

Corporations ☞562(1)
101k562(1)

General Corporation Law (22 Del. Laws, c. 394) § 20, providing that stockholders' liability for unpaid subscriptions may be enforced as provided for in section 49, which section provides for creditor's action at law or bill in chancery, does not make such remedies exclusive, and such liability may be enforced by receivers in insolvency.

Corporations ☞563(2)
101k563(2)

The ordinary liability of a stockholder for unpaid subscription is an asset of the corporation, enforceable by its receivers upon insolvency, while a statutory liability for a sum in addition to unpaid subscriptions, as under a "double liability" statute, is not such an asset, but a liability directly to the creditors, which a receiver, in the absence of statutory authority, has no power to enforce.

*41 Argued before PENNEWILL, C. J., and BOYCE,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

CONRAD, RICE, and HEISEL, JJ.

William S. Hilles and Robert H. Richards, both of Wilmington, for appellants Du Pont, Fenn, Dunham, and Taft.

Saulsbury, Morris & Rodney, of Wilmington, for appellant Blackistone.

John R. Nicholson, of Wilmington, and Henry H. Glassie, of Washington, D. C., for appellees.

PENNEWILL, C. J., delivering the opinion of the Court:

The statement of the case contained in the opinion of the Chancellor, from whose decree this appeal was taken, is so clear and comprehensive that it is deemed unnecessary to restate in this opinion the facts, the pertinent constitutional and statutory provisions, the proceeding in the lower court, and the many questions argued by counsel. We shall discuss only those questions that appear to be important and upon which the appellants seemed to mainly rely.

Upon the much debated question of jurisdiction the court have reached the opinion, after a very careful examination of the case, that the conclusion of the Chancellor is sound. But our opinion is based upon reasoning somewhat different from that of the Chancellor.

The court are not much concerned about the history of the law respecting the stockholder's liability for the debts of the corporation before the enactment of our General Corporation Act (22 Del. Laws, c. 394). The learned and elaborate discussion of this subject, including the trust theory and the holding out theory, in the briefs of counsel, is interesting but not very helpful. Whatever may have been the law before, and whether the statute of this state is simply declaratory of pre-existing law or not, the important fact is that the statute clearly and expressly states the stockholder's liability to creditors to the extent of the par value of stock not paid for. The only troublesome question is: What proceeding may be employed to enforce the liability?

Are the two remedies mentioned in section 49 of the Delaware act exclusive of a preexisting remedy that would be equally, if not more, convenient and effective in carrying out its purpose; and if they are does the statute mean that the remedy "by bill in chancery" shall be initiated by what is known as a creditor's bill? Or does it mean any proceeding in that court that is

adapted to the accomplishment of the purpose sought? It so happens that New Jersey has an incorporation law very similar to ours, and most of the questions raised in this case have been raised there and settled by decisions of the highest court of that state.

A good deal of ingenuity and refinement have been used by counsel for the appellants in the effort to show that there is a very substantial difference between the statutes of the two states, but the argument is not convincing. There is, of course, some difference in language, but it seems to us the effort to find any in principle is strained, and the distinction contended for exceedingly technical.

There is but one difference noted by the appellants which need be considered by the court. The difference to which we refer, and upon which alone it is possible to base an argument, is the concluding clause of section 20 of the Delaware act which does not appear in the New Jersey act, viz.:

"Which said sum or proportion thereof may be recovered as provided for in section 49 of this act *** after a writ of execution against the corporation has been returned unsatisfied, as provided for in section 51 of this act. ***"

The courts of New Jersey have held that the remedies prescribed by section 92 of their act (2 Comp. St. 1910, p. 1655), which corresponds with section 49 of the Delaware act, cannot be employed to enforce the liability of stockholders under section 21 of their act, which corresponds with section 20 of our act without the concluding clause. And the reason for so holding appears to be that said remedies are made available in actions against officers and directors, as well as stockholders, and that the Legislature in enacting section 92 had in mind liabilities other than those that might arise under their section 21.

We agree with the construction placed upon section 92 of the New Jersey act by the courts of that state, and, therefore, hold that the remedies prescribed by section 49 of the Delaware act could not be employed to enforce the stockholder's liability under section 20 if that section did not contain the clause which specifically makes such remedies available.

And we are more strongly confirmed in *42 this opinion because upon investigation it is found that said section 49 was taken from the Incorporation Act of 1883 (17 Del. Laws, c. 147), which did not contain the concluding clause of section 20 of the present act.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

106 A. 39
(Cite as: 106 A. 39, *42)

The concluding clause of section 20, unlike the New Jersey law, expressly makes said remedies applicable, so that the questions that arise, touching the matter of jurisdictions, are the two we have already mentioned.

[1] But assuming that the procedure adopted in the court below was not authorized or contemplated by the statute, are the remedies mentioned in section 49 and made available to creditors by section 20 of our statute exclusive of the usual procedure employed in collecting the assets and paying the debts of an insolvent corporation, viz. a bill in chancery for the appointment of receivers on the ground of insolvency?

If the statute had not provided any remedy at all for enforcing the stockholder's liability under section 20, unquestionably the creditor would have a remedy in equity, and such has been the decision of the courts of New Jersey and other states in similar cases. Can it be that because the Delaware act provides that the creditor may enforce the stockholder's liability under section 20 by an action at law or by bill in chancery he is not permitted to enforce such liability by proceeding under the insolvency act? Are the remedies prescribed exclusive of or additional to the usual remedy in chancery?

It seems to the court that it was the purpose of the Legislature, not to take away from the creditor a plain and effective remedy that already existed, but to provide other remedies that he might use if he preferred to do so, and that might be more available and effective in some cases. It is reasonable to believe that the Legislature intended by the concluding part of section 20 to make the creditor independent of receivers appointed under the Insolvency Act, by providing remedies that he might employ directly against the stockholder. And it is also reasonable to believe that the Legislature thought there might be cases where the corporation would not be in such a condition of insolvency as would justify the appointment of receivers under the statute, but nevertheless in such a condition that the creditor could not collect his claim by judgment and execution. This view is strengthened by the fact that the statute provides that the particular remedies prescribed may be employed only after judgment has been recovered against the corporation and execution thereon returned unsatisfied.

[2] There can be no doubt that obtaining a judgment and unsatisfied execution against the corporation is a condition precedent to the employment of the remedies mentioned in section 49 by the creditor directly against

the stockholders. And the reason is that the law does not permit a creditor to collect his claim from stockholders if he can recover it from the corporation, and the only way his inability to do this can be shown to the court is by a judgment and unsatisfied execution. But if he proceeds independently of the statute, by a bill asking for the appointment of receivers on the ground of insolvency, a judgment and execution are not required because the court is compelled to determine the very fact that the judgment and execution are designed to establish. Firestone Tire & Rubber Co. v. Agnew et al., 194 N. Y. 165, 86 N. E. 1116, 24 L. R. A. (N. S.) 628, 16 Ann. Cas. 1150.

It will be observed that section 41 of the Incorporation Act of 1883, while providing for the creditor an action at law directly against the stockholder did not give him a remedy by bill in chancery. The natural inference from this circumstance is that the Legislature intended in the present act to provide for the creditor a direct remedy in chancery also, and in addition to the one he already had under the Insolvency Act.

The giving to the creditor a personal and direct remedy at law by the act of 1883 did not take away from receivers the power to collect the assets and pay the debts of a corporation; neither did the giving of such a remedy in chancery by the present act take away such power.

[3] It is the opinion of the court, therefore, that there are now two remedies in chancery for the enforcement of the stockholder's liability under section 20, viz.: (1) A proceeding under the Insolvency Act for collecting the assets and paying the debts of the corporation, which remedy existed prior to the passage of the statute and was the one employed in this case. (2) A proceeding by bill in chancery as prescribed by the statute; and this remedy was intended by the Legislature to be used by the creditor directly against the stockholder, and must be initiated by a creditor's bill. In the one case a bill would be filed asking for the appointment of a receiver because of insolvency, and this would probably be the procedure chosen where undoubted insolvency could be shown. In the other case the creditor would file a bill against the stockholder if he is unable to collect his claim by legal process as evidenced by a judgment and unsatisfied execution.

[4][5] The appellants argued strongly and with much confidence that receivers could not, under the law, enforce a stockholder's liability created by statute, as in this case, and cited many authorities which seemed to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

106 A. 39
(Cite as: 106 A. 39, *42)

sustain such proposition. But upon examination the cases referred to do not seem to us to be applicable to the present case. The statute of this state is unlike those that impose a liability upon the stockholder beyond the amount of his unpaid stock, such as double liability statutes. Appellants' cases, *43 for the most part, as well as their citation from 1 Cook on Corporations (7th Ed.) § 218, involved what may be termed double or additional liability laws. At the beginning of the section mentioned it is said:

"The state Legislatures, however, in many instances desire to increase the liability of stockholders to corporate creditors. Accordingly statutes are passed expressly declaring that the stockholders shall be liable for a specified sum, in addition to their unpaid subscriptions."

It is this kind of liability that is meant when "statutory liability" is referred to, and Mr. Cook says:

"This is called the statutory liability of stockholders."

The failure to note the distinction between the liability of stockholders to the extent of the par value of their stock and the statutory liability in excess thereof has resulted in some confusion in the cases and textbooks. The first mentioned, or ordinary liability, is an asset of the corporation, and the second or additional liability is not, it being a liability directly to the creditors, which a receiver, in the absence of statutory authority, has no power to enforce; and it is not resorted to if the assets of the corporation, including unpaid stock, are sufficient to pay the creditors.

Are the amounts unpaid by stockholders on their shares of capital stock assets within the meaning of the law? We think that much of the confusion in the law upon this subject is removed, and the solution of some of the questions in this case simplified when we recognize, as we must, that before the enactment of our incorporation law it had become a well-settled American doctrine that unpaid stock of a corporation constitutes in equity a trust fund for the benefit of creditors of the corporation. The doctrine was first announced by Mr. Justice Story in Wood v. Dummer (1824) 3 Mason, 308, Fed. Cas. No. 17944. And in Sanger v. Upton, 91 U. S. 56, 23 L. Ed. 220, it was said:

"The capital stock of an incorporated company is a fund set apart for the payment of its debts. It is a substitute for the personal liability which subsists in private copartnerships. When debts are incurred, a contract arises with the creditors that it shall not be withdrawn or applied, otherwise than upon their demands, until such demands are satisfied. The

creditors have a lien upon it in equity. *** It is publicly pledged to those who deal with the corporation, for their security. Unpaid stock is as much a part of this pledge, and as much a part of the assets of the company, as the cash which has been paid in upon it. Creditors have the same right to look to it as to anything else, and the same right to insist upon its payment as upon the payment of any other debt due to the company. As regards creditors, there is no distinction between such a demand and any other asset which may form a part of the property and effects of the corporation."

One reason urged for the contention that unpaid stock is not liable for the debts of the corporation, as we understand the arguments, is because the company issued the stock as full paid, and agreed that it should be nonassessable. There can be no question, in view of the authorities, that, in the absence of such an agreement, unpaid stock is liable for the debts of the corporation and constitutes assets for such purpose.

[6] And clearly, according to the authorities, the agreement referred to was ultra vires and void, so that the situation is the same as though there was no such agreement. Stripped of the agreement it is a plain case of an issuance of stock by the company and acceptance by the holder without being paid for. Under such circumstances there can be no doubt that the acceptor impliedly agreed, and is equitably bound, to pay for the stock. Then it follows that even if the corporation, because of its agreement, could not enforce payment, the receiver appointed under the insolvency statute would have a right, in a court of equity and under the direction of chancellor, to collect it, there being no other assets out of which the debts of the corporation could be paid. Money or property paid for capital stock are assets liable for the debts of the company, and why should money due but unpaid for such stock not be equally liable? Unpaid *subscriptions* unquestionably are liable because they are legal assets, and in our opinion the acceptor of stock not paid for or subscribed for, is likewise bound to pay for it, and his liability constitutes an equitable asset which a statutory receiver can enforce. It is admitted that such a receiver has power to collect unpaid *subscriptions* to the corporation for capital stock because the relation between the stockholder and the company is contractual and the unpaid subscription an asset of the corporation. But a contract or promise to pay may be implied as well as express, and it clearly appears from the authorities that the acceptance of shares of stock under a law similar to ours, without subscription, raises an implied promise to pay for them. Some courts call

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

106 A. 39
(Cite as: 106 A. 39, *43)

Page 6

such a liability an equitable asset, but whatever it may be called it is a liability that may be enforced to pay the debts of the corporation, and by no one more properly than a receiver appointed under the insolvency statute.

In See v. Heppenheimer, 69 N. J. Eq. 36, 78, 61 Atl. 843, 860, the court said:
"In equity, and as against creditors, the acceptance of stock, without paying for it, places the acceptor in the position of a subscriber."

See, also, Odd Fellows Hall Co. v. Glazier, 5 Har. 172; Easton Nat. Bank v. Amer. Brick, etc., Co., 70 N. J. Eq. 732, 64 Atl. 917, 8 L. R. A. (N. S.) 271, 10 Ann. Cas. 84; Holcombe *44 v. Trenton White City Co., 80 N. J. Eq. 122, 82 Atl. 618.

[7] The common stock having been issued without consideration, it is contended that such an issue was ultra vires and void, and being void the holders thereof cannot be held liable to the creditors of the company.

This contention would be stronger if the issuance of the stock was ultra vires, and therefore void. But this is a different case from those referred to in which the stock issued was in excess of that authorized by the charter of the company. There the act was held to be ultra vires because the corporation had no power to issue the stock at all. It is not contended in this case that the corporation had no authority to issue the stock, but that it is void because it was issued without being paid for, and under an agreement that it should not be paid for.

It was said in the case of Rosoff v. Gilbert Transp. Co. (D. C.) 221 Fed. 986:
"Any contract by the company to issue shares at less than par was consequently ultra vires. The defendant, by taking the shares in question, became, under his contract of membership, liable to pay $100 for each of them. The condition that less was to be accepted, being ultra vires, was void. *** The company which the receiver represented could therefore have maintained this action, and the plaintiff has the same right."

The company in the present case having the right to issue the amount of stock that was issued, the only act that was ultra vires and void in the transaction was the issuance of the stock without its being paid for and the agreement that it was full paid and nonassessable. In legal effect, therefore, it was the same as though it had been issued without any such agreement.

The law of this state contemplates that stock *may* be issued contrary to the statute, that is, without being paid for, and if it is so issued the acceptors are made liable to the creditors of the company to the extent of its par value. If the stock issued without consideration is void and, therefore, nonassessable for the payment of creditors' claims there was no reason for the law that provides for its assessment. The law means, and practically says: Corporate stock shall not be issued without valid consideration, but if it is so issued, contrary to law, the acceptor will be bound to pay its par value if the debts of the company cannot be paid otherwise.

The cases cited, that were brought to enforce the stockholder's liability for unpaid stock would not have risen if the issuance of the stock was void, because they were brought to enforce the stockholder's liability for stock that was issued contrary to law.

Although the Constitution of this state provides that "no corporation shall issue stock, except for money paid, labor done, or personal property," etc. (article 9, § 3), it cannot be that directors who have issued bonus stock to themselves, or acquiesced in its issue, with full knowledge of all the circumstances, can escape the liability the law imposes by claiming that their stock was issued in violation of law. Persons who accept stock issued in violation of law, of which they had knowledge, cannot escape the liability incident to the relation of stockholders which they have with full knowledge assumed.

And even though stock issued without consideration could be held to be void under our constitutional provision, and could be canceled by the corporation or upon the application of bona fide stockholders, it does not follow that the acceptor of such stock could claim immunity from assessment. Certainly a stockholder cannot escape such assessment if he has held himself out, or permitted himself to be held out, as the owner of the stock; and much less could he escape if he participated in the unlawful issue or acquiesced therein.

[8] It is insisted that the liability of common stockholders to pay the debts of the corporation cannot be enforced, if at all, until after subscriptions to the preferred stock have been collected; and the reason assigned is that subscriptions to the preferred stock are contracts made with the company and constitute assets which the corporation might have collected, and which, therefore, its receiver can collect.

Such subscriptions being clearly property or legal

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

assets of the company, it is argued that they must be collected and applied in payment of the debts of the corporation before the common stockholders, whose stock was not subscribed for and not paid for, can be assessed, because the liability of such stockholders is not an asset of the corporation.

But the statute that imposes the liability makes no distinction, and creates no priority, between stock subscribed for and that which is issued and accepted without being subscribed for. All stockholders to whom was issued stock not paid for are liable under the statute, and no distinction can be made between preferred and common holders without adding something to the statute. And, moreover, there is, as already said, a contractual relation in both cases, the promise to pay being express where the stock is subscribed for and implied where it is not.

Certainly no good reason can be given why one class of stock should be liable for the debts of the company before another, if neither has been paid for. The liability is the same, and the test, under the statute, is not the class or character of the stock but whether it has been paid for.

[9] It is contended by one of the appellants, a holder of shares of preferred stock, that "the issue of preferred stock of the *45 company is wholly void and not subject to any assessment for the debts of the company," because the general corporation law of this state provides that "at no time shall the total amount of the preferred stock exceed two-thirds of the actual capital paid in cash or property."

It is not denied that the company had authority, under its certificate of incorporation, to issue all the preferred stock that was issued; so that the contention is not based on the fact that the company issued more stock than its charter or certificate of incorporation authorized.

The question raised is simply this: Is the issue of preferred stock void, and nonassessable for the payment of creditors' claims, because the common stock had not been paid for in cash to the company? Creditors could know, and perhaps would be bound to know whether the company, under its certificate of incorporation, was authorized to issue as much preferred stock as was issued, but they could not be expected to know that the common stock had not been paid for. Indeed, they had a right to assume that the par value of the common stock had been paid to the corporation as required by law. It is reasonable,

therefore, to hold that the words of the statute, "actual capital paid in cash or property," mean the par value of the common stock that is issued, and liable to be assessed for the debts of the corporation. So far as creditors are concerned stock not paid for may be treated as cash or property because it is liable for the payment of their claims. The position taken by the preferred stockholder is ingenious, but in the opinion of the court unsound in view of other provisions of the general incorporation law, and its manifest intent, when considered as a whole.

[10] To hold differently would, in many cases, not only cripple but make nugatory the purpose of the law to protect creditors' claims to the extent of the par value of all stock whether common or preferred. Moreover, the law does not contemplate that a person may subscribe for and accept preferred stock for his own benefit, hold himself out as the legal owner thereof, and escape liability to bona fide creditors on the ground that his stock was illegally issued and void. He will be estopped from making such defense.

[11] It is further insisted by the appellants that holders of common stock not paid for are not liable to pay the debts of those creditors who extended credit to the company with knowledge of the facts and circumstances under which the common stock was issued.

It may be conceded that in the absence of a statute the decided weight of authority sustains such contention. But we think this is not the law in any jurisdiction where there is a statute making the holders of unpaid stock liable to the creditors of the company. New Jersey and Illinois have statutes very similar to ours, and in neither have the courts recognized the rule contended for by the appellants. Our statute is very general in its language, and broad enough to comprehend all claims that are legally and equitably and collectible. Under it the stockholder's liability is express and unqualified; it makes no exception and recognizes no distinction between creditors. As was said by the court in the Easton Nat. Bank Case, 70 N. J. Eq. 732, 64 Atl. 917, 8 L. R. A. (N. S.) 271, 10 Ann. Cas. 84:

"In this state, however, the stockholder's liability to creditors no longer depends upon" the trust fund theory, but is held to be statutory. "It depends upon the stockholder's voluntary acceptance, for consideration touching his own interest, of a statutory scheme to which watered stock, under whatever device issued, is absolutely alien, and which requires stock subscriptions to be made good for the benefit of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

creditors of insolvent companies, without distinction between prior and subsequent creditors, or between creditors who had notice and those who had none."

But while our statute protects all creditors of the corporation, it comprehends only such claims as are just and valid under the well-settled principles of law. If the proceeding is brought in equity it must be governed by the principles of equity. And this leads us to inquire whether the claims of those creditors who gave credit to the company with full knowledge of all the facts attending the issuance of the stock, and who actively participated in the issuance of the stock, can enforce payment against the stockholders in a court of equity.

We are clearly of the opinion that mere knowledge that stock issued as full paid and nonassessable was not in fact paid for, should not preclude the creditor from enforcing the liability of the holder because the creditor may also know or have good reason to believe that the holders of such stock would be legally liable for the debts of the company to the extent of the par value of their stock. While the creditor with knowledge could not have given credit upon faith that the stock was paid for, he may very well have given credit upon the belief that the holder of the stock would be liable to the creditors under the statute whether he had paid for it or not.

It was said in the Easton Bank Case:
"Why, if they knew the stock issued as full paid was not full paid in fact, may they not be justified in dealing with the very stockholder's liability thus arising as a part of the assets of the company for the purpose of satisfying creditors' claims?"

[12] It did seem to the court for a while that the rule should be different if the creditor had actually participated in the issuance *46 of unpaid stock as full paid and nonassessable, or had consented thereto. The court were strongly inclined to believe that such a creditor should be estopped in a court of equity from enforcing his claim against other stockholders to whom stock was issued with his assistance or acquiescence. It seemed like permitting a party to take advantage of his own wrong, or to profit by an illegal transaction in which he was, in a sense, particeps criminis.

But after a most careful consideration of the question we were forced to the conclusion that such a position could not be sustained by reason or authority. In Illinois and Connecticut the courts have held that knowledge was not a bar, and the reasoning is broad

enough to cover participation as well. But the courts of New Jersey have dealt with cases in which participation was distinctly urged as a bar. The strong and leading case in which this question was involved is the Easton Bank Case. The court in that case carefully considered the question whether a creditor who was a stockholder with full knowledge of all the facts and circumstances connected with the issuance of the stock not paid for, and who in fact managed or directed the issuance of such stock, could enforce the statutory liability of stockholders in his own behalf. The reasoning of the court seems to us to be sound and unanswerable.

Justice Pitney, in delivering the opinion, considered the status of a creditor with knowledge only and also one who had participated, saying:
"As to the status of Frederick Green in the case before us, the evidence does not satisfy us that he participated in the arrangement for the issuance of this stock for the patents. *** There is nothing, therefore, to bar his individual claim save that he had notice of the fact that the stock was issued as full paid for property purchased. As already shown, such notice is not sufficient to debar him. As to the claim of Henry Green, he, of course, did participate actively in the transaction that resulted in the improper issuance of the stock in question, and he received a part of the stock himself. But there is nothing to show that he intended any actual fraud upon his fellow stockholders. *** We do not believe that at that time it was at all contemplated that any creditor of the company would be permitted to remain unpaid. Judge Green was, by common consent, permitted to assume and exercise the entire management of the concerns of the company, all parties being at the time sanguine of its ultimate success. The moneys that he loaned to the company were advanced for the general benefit of the stockholders, including himself. They are a just and lawful claim as against the company, and not an inequitable claim as against the delinquent stockholders. His estate cannot be debarred on the ground of estoppel, for his associates, who are now disputing their individual liability to pay, were not at all misled by the circumstance that their stock certificates were marked 'full paid,' and for 'property purchased,' since they knew the fact to be otherwise. Nor is the Green estate debarred by the operation of the maxim 'in pari delicto potior est conditio defendentis.' If it were seeking any advantage out of the unlawful agreement, this maxim would apply. But that agreement being absolutely void on grounds of public policy, his rights as a creditor for moneys actually advanced remain unimpaired. *** As against

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

the delinquent stockholders, therefore, *** both the Green claims are entitled to payment. Payment of the Henry Green claim should, of course, be deferred until his estate contributes its proper portion of the amount necessary to satisfy the decree."

And so in the present case, Mr. Taft, one of the largest creditors, advanced a large amount of money for the general benefit of all the stockholders, and there was no thought at the time that he would be permitted to lose any part of the sum loaned to the company. He must, of course, suffer his part of the loss, but it would not be just or equitable that he should lose the entire amount he advanced for the benefit of all, and with their knowledge and consent. While all those who participated in the issuance of the stock were acting contrary to law, there is nothing to indicate that any one was seeking to perpetrate a fraud upon the others, or gain an unfair advantage by the transaction. They were acting in good faith towards one another for the accomplishment of a common object, and it is just and equitable that one who gave credit to the company under such circumstances should be able to collect his claim under the statute.

If at the time the delinquent stockholders are given an opportunity to make defense, it is shown that any creditor is not equitably entitled to collect his claim, it will be the duty of the Chancellor to so decide. All that this court determines now is that any person who advanced money, rendered services or contributed other valuable thing to the company honestly, in good faith and for the general benefit of all is entitled to recover under the statute from the delinquent stockholders his just, reasonable and equitable claim.

[13] It is strongly insisted by the appellants that it is inequitable that the stockholders should be assessed and required to pay their assessments before their legal liability is definitely determined, because the amounts assessed may be very much in excess of what they are legally liable to pay. We think this is the correct procedure and should have been adopted by the Chancellor, but our conclusion, that knowledge or participation on the part of the creditor whose claim is just and equitable constitutes no defense for the stockholder, covers every claim with the possible exception of that of the company's counsel, which is strongly opposed by the appellants because it was upon his *47 advice that the bonus stock was issued as full paid and non-assessable. We do not think this court would be justified under the circumstances in ordering the assessments already made set aside on account of this one claim, which the stockholders will be

permitted to contest, if they desire to do so, at the time the distribution of the fund paid in is adjusted.

[4] With respect to the payment or allowance of interest on creditors' claims the court are of the opinion that the general rule should prevail. While it seems to be the rule in courts of equity that claims against an insolvent corporation should not bear interest after the appointment of a receiver, the reason is based largely upon the fact of insolvency, and the consequent insufficiency of the assets to pay the entire indebtedness. In the case of Blair v. Clayton Enterprise Co., 9 Del. Ch. 95, 77 Atl. 740, cited by the appellants, the court, in holding that interest should be calculated on claims down to the date of the order of the appointment of a receiver, said:
"This is the settled practice in the administration of estates of insolvent corporations in Delaware."

But the reason for such rule does not exist where the assets or property legally liable for the payments of creditors' claims is sufficient to pay all of them including interest. If the creditor had brought an action at law, as he might have done under the statute, or had filed in chancery what is known as a creditor's bill, it would not be contended, we think, that interest could not be collected from the time suit is brought, if there are sufficient assets to pay it.

This is the law in those jurisdictions where the statute provides that stockholders shall be liable for the debts of the company to the extent of the par value of their stocks and when the proceeding is directly against the stockholders. Burr v. Wilcox, 22 N. Y. 551; Handy v. Draper, 89 N. Y. 334; Mason v. Alexander, 44 Ohio St. 318, 7 N. E. 435; Corning v. McCullough, 1 N. Y. 58, 49 Am. Dec. 287; Baker v. Bank, 9 Metc. (Mass.) 182; Terry v. Anderson, 95 U. S. 628, 24 L. Ed. 365. And under the National Banking Act (Act Cong. June 3, 1864, c. 106, 13 Stat. 99), it has been held that interest runs from the date of the comptroller's order to collect an amount equal to the full par value of the stock, the amount due from the stockholders being then liquidated and payable. Casey v. Galli, 94 U. S. 673, 24 L. Ed. 168. In Burr v. Wilcox the court said:
"This liability cannot, I think, be said to attach upon any particular stockholder until a suit is commenced against him to enforce it. The creditor has a right to select among the stockholders the individual against whom he will proceed; and until he has made the selection, no particular stockholder is liable, and hence no interest can be allowed for any previous time. But, from the time of the commencement of a suit for a debt exceeding the amount of the principal

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

of the defendant's stock, I see no reason why interest should not be allowed. It has then become a fixed liability for a specific amount, and ought, upon general principles, to carry interest."

In the Ohio case the contentions of the parties were very clearly stated by the court as follows:
"It was held by the district court that interest should be charged against the stockholder as of the date of the commencement of the suit. The contention on part of plaintiffs in error is that in no case can the stockholder be liable for a sum beyond the amount of his stock, to be determined at the time the liability is finally fixed by judicial decree; in other words, that the liability is one created by statutory enactment under the Constitution, to be enforced by decree, and interest cannot be added except by virtue of the decree of the court declaring the liability, and no interest can accrue against the stockholder until the liability is thus declared. On the other hand, the claim is that, while the liability is created by the Constitution and the statute, yet the stockholder places himself under liability by contract when he subscribes or acquires the stock; and, resting as well upon contract as upon statute, the interest follows the maturing of the obligation, which is at the time when the corporation becomes insolvent and refuses to pay."

The court said:
"We agree with the counsel that the question is one which, upon principle, is of very considerable difficulty. *** The district court, in holding the stockholders for interest after the commencement of the suit, evidently followed the law of that case [Hooker v. Kilgour, 2 Cin. R. (Ohio) 350]; and, inasmuch as it has been generally acquiesced in as furnishing the true rule, we are not prepared to say it is not the law in this state."

In analogy to the cases mentioned we hold in the present case, that interest should commence at the time the receivers asked the court to make an assessment upon the stockholders for the payment of creditors' claims, there being nothing before which indicated that they would be expected to pay such claims.

[15] In respect to the expenses and compensation of receivers, and the fees of their counsel, the court are of the opinion that, inasmuch as the receivers are officers or instrumentalities appointed by the court to collect the creditors' claims and carry out the purpose of the statute, they are entitled to proper expenses and reasonable compensation to be paid by the

stockholders. They are a part of the machinery employed by the court to accomplish the object sought under the statute, and their expenses and compensation are, therefore, legitimate court costs to be taxed against the respondents.

We think no good reason can be shown *48 why the fees of receiver's counsel should be separately taxed as a part of the costs. Inasmuch, however, as such is the established practice in this state the court are not disposed to change it. It is not certain in many cases that services of counsel will be required, and even if they should be it is impossible to tell even approximately, in advance of the service, what counsel will be entitled to receive. The court are of the opinion that the sum estimated by the Chancellor for receiver's compensation and expenses, and the fees of their counsel, as well as the estimate for interest on creditors' claims, is largely in excess of what they will be entitled to receive; that said sums should be substantially reduced, and the assessments modified accordingly.

[16] In conclusion, we say that, while we have no doubt the court below had power to require a resident stockholder to pay the entire assessment, we think it inequitable under the facts of this case, and, therefore, hold that the receivers should have been ordered to collect every assessment they should find to be collectible, and that would justify the expense of collection. The entire burden of payment should not, in the first instance, have been imposed upon a single stockholder, even though there be no other found in the jurisdiction. The course adopted may be the most convenient for the receivers and expeditious for the creditors, but in our opinion hardly fair to the resident stockholder.

And, moreover, it may very well be that statutory receivers appointed by the court would be more successful in collecting claims out of the state than a stockholder who might be subrogated to their rights by an order of said court. But whether that be so or not, it is manifestly unfair that the resident stockholder should in this case pay not only all the indebtedness but also the costs of collecting from other stockholders their proportional parts of the assessment. Under the peculiar facts and circumstances of this case the fair and equitable proceeding would be for the receivers to collect all the assessments, so far as practicable, and by so doing the burden would fall on all stockholders alike according to their holdings.

The decree of the Chancellor will be affirmed except as modified by this opinion.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

HEISEL, J.

I concur in the opinion of the court, excepting as to the claims of Mr. Taft and Mr. Chapin.

Briefly and without argument I desire to state my conclusions as to those claims. Mr. Taft was a director and promoter of the company from its beginning and was fully advised of all actions taken in issuing the common stock as bonus for the preferred stock and participated therein. He knew that the preferred stock was being sold at par and the common stock, which had been declared by him and the other directors of the company to be "full paid and nonassessable," was being issued as a bonus to purchasers of said preferred stock who had nothing to do with the management of the company, to induce them to purchase the preferred stock. He could not, therefore, in good faith, have relied upon any assessment from such holders of common stock to repay advances made by him to the company in the event of the failure of the company to repay him such advances. Mr. Chapin was counsel for the company and advised and directed the steps taken by Mr. Taft and the other directors in pursuing the course they did pursue. He directed them in the action they took to make the common stock, as he thought, "full paid and nonassessable," and knew that as such, it was being issued as a bonus to purchasers of the preferred stock, who had no part in the management of the company, as an inducement to purchase that stock. He now claims the right to have this same common stock assessed in order that he may be paid for his services.

Excepting in the state of New Jersey, where the proceeding was under a statute which the court there said put the creditor's right on a different basis from that under the general law, the overwhelming weight of authority is opposed to such proceeding.

Whether the proceeding in the case at bar for the purpose of assessing the stockholders is under the liability imposed by section 20 of the Incorporation Act, or is under the liability that existed prior to that section, can be of no importance, because section 20 imposed no new liability upon the stockholder, but simply stated or declared a liability that existed prior to its passage.

Therefore, it seems to me that the law as generally applied by the courts outside New Jersey should be applied here.

106 A. 39, 11 Del.Ch. 430, 7 A.L.R. 955

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works