UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

| | |
|---|---|
| JAMES DAVID GILBERT | * |
| | * |
| | * |
| | * CIVIL ACTION NO. B04-CV-047 |
| VERSUS | * |
| | * |
| | * JUDGE HILDA G. TAGLE |
| RIG VENTURES, INC. et al | * |

## AFFIDAVIT OF SCOTT WEBRE

STATE OF LOUISIANA
PARISH OF LAFAYETTE

Before me, the undersigned notary, on this day, personally appeared SCOTT WEBRE, a person whose identity is known to me. After I administered an oath to him, upon his oath, he said:

"My name is Scott Webre. I am over the age of 18 years old, of sound mind, have never been convicted of a felony, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

I represent Plaintiff, James Gilbert, in the above styled matter. I am attorney-in-charge.

I was present at the depositions of Emilio Sanchez and Richard Jaross. Mr. Sanchez produced documents responsive to Plaintiff's subpoena duces tecum consisting of two large binders, probably in excess of 1,000 pages, though I have not counted the documents. Mr. Jaross produced documents responsive to Plaintiff's subpoena duces tecum consisting of approximately 150 to 200 pages, though I have not counted the documents.

Attached to this affidavit and referenced in Plaintiff's Memorandum and Exhibits in Opposition to Defendant Richard Jaross' Motion for Summary Judgment are the following exhibits.

EXHIBIT 1:   Deposition of Emilio Sanchez. I was present at the deposition of Emilio Sanchez. This exhibit is a true and correct copy of the deposition of Emilio Sanchez taken in this matter.

EXHIBIT 2:   2/19/01 memo with handwritten notations by both Richard Jaross and Emilio Sanchez. This document is a true and correct copy of an exhibit to Emilio Sanchez' deposition and is authentic by virtue of stipulation of counsel.

EXHIBIT 3:   Deposition of Richard Jaross.  I was present at the deposition of Richard Jaross.  This exhibit is a true and correct copy of the deposition of Richard Jaross taken in this matter.

EXHIBIT 4:   Plan for Removal.  This document is a true and correct copy of an exhibit attached to Emilio Sanchez' deposition and is authentic by virtue of stipulation of counsel.

EXHIBIT 5:   Rig Ventures, Inc.'s Response to Plaintiff's Third Request for Admission.  This document was produced to me by defendant's attorney in response to written discovery propounded to defendant by me.  This document is a true and correct copy of Rig Ventures, Inc.'s Response to Plaintiff's Third Request for Admission

EXHIBIT 6:   Vessel Custodial Agreement.  This document is a true and correct copy of an exhibit attached as an exhibit to Emilio Sanchez' deposition and is authentic by virtue of stipulation of counsel.

EXHIBIT 7:   Various correspondences by Richard Jaross on Rig Ventures, Inc.'s letterhead.  These documents are true and correct copies of exhibits attached to Emilio Sanchez' deposition and is authentic by virtue of stipulation of counsel.

EXHIBIT 8:   6/3/02 Louise Max correspondence on behalf of Rig Ventures to Greg Thory.  This document is a true and correct copy of an exhibit to Emilio Sanchez' deposition and is authentic by virtue of stipulation of counsel.

EXHIBIT 9:   2/7/02 Richard Jaross correspondence to Emilio Sanchez, AND 3/7/02 fax from Richard Jaross to Emilio Sanchez.  These documents are true and correct copies of exhibits attached to Emilio Sanchez' deposition and is authentic by virtue of stipulation of counsel.

EXHIBIT 10:  9/6/00 Richard Jaross correspondence to Jerry McCallum. This document is a true and correct copy of an exhibit attached to Emilio Sanchez' deposition and is authentic by virtue of stipulation of counsel.

EXHIBIT 11:  7/7/01 Richard Jaross correspondence to Jim Walker attaching itemized list of equipment and tools aboard Ocean 66.  This document is a true and correct copy of an exhibit attached to Richard Jaross' deposition.

EXHIBIT 12:  photograph of James Gilbert's injury.  This document has been produced to defendant in response to written discovery.  This document is a true and correct copy of a photograph of James Gilbert's leg.

EXHIBIT 13:  Counsel correspondence.  These documents are true and correct copies of correspondence exchanged by and between counsel.  These documents are my business records.

I prepared Plaintiff's Memorandum and Exhibits in Opposition to Defendant Richard Jaross' Motion for Summary Judgment.  I conducted all of the necessary legal research and reviewed the record herein in preparing citations to the record for inclusion in the memo I prepared.  I spent 21 hours in this task.

I attended Louisiana State University Law School from 1987 to 1990.  I am licensed to practice law in Texas and Louisiana.  I have been licensed to practice law in Texas since 1991 and in Louisiana since 2001.  I have focused my practice over the past twelve years on personal injury litigation.

A reasonable fee for my services, given my education, training, and experience is $175/hour, thus a reasonable fee in the preparation of plaintiff's memorandum in opposition to Mr. Jaross' motion for summary judgment is $3,675.

*Gilbert vs. Rig Ventures, et al*
Affidavit of Scott Webre
Page 2

Affiant sayeth not.

Scott Webre
Affiant

STATE OF LOUISIANA
PARISH OF LAFAYETTE

SUBSCRIBED AND SWORN TO before me on this the ___2 7___ day of September, 2004.

Notary Public In and For the State of Louisiana

My commission Expires:                    Notary's Printed Name:

_____Life_____                            _____

*Gilbert vs. Rig Ventures, et al*
Affidavit of Scott Webre
Page 3

SanchezEmilio

1

1                    CAUSE NO. 2002-11-4448-D

2    JAMES DAVID GILBERT        )    IN THE DISTRICT COURT
                                )
3                               )
     VS.                        )    CAMERON COUNTY, TEXAS
4                               )
                                )
5    RIG VENTURES, INC.; EMILIO )
     SANCHEZ and PHIL WELLS     )    103RD JUDICIAL DISTRICT
6    _____

7
                    ORAL AND VIDEOTAPED DEPOSITION OF
8
                            EMILIO SANCHEZ
9
                          JANUARY 28, 2004
10   _____

11       ORAL DEPOSITION OF EMILIO SANCEZ, produced as a

12   witness duly sworn by me at the instance of the

13   Plaintiff James David Gilbert, taken in the above-styled

14   and numbered cause on the 28th day of January 2004, from

15   9:51 a.m. to 3:28 p.m., before Karen Geddes Piland,

16   Certified Shorthand Reporter No. 5627, in and for the

17   State of Texas, at the offices of Fleming & Hernandez,

18   P.C,  1650 Paredes Line Road, Suite 102, Brownsville,

19   Texas, pursuant to the Texas Rules of Civil Procedure

20   (and the provisions stated on the record or attached

21   hereto).

22

23

24

25


                    A BETTER COURT REPORTING SERVICE, INC.
                            (512) 478-1989

2

SanchezEmilio

```
1                    A P P E A R A N C E S

2

    FOR THE PLAINTIFF JAMES DAVID GILBERT:
3
               Mr. Scott D. Webre
4              Attorney at Law
               556 Jefferson Street
5              Jefferson Towers, Suite 200
               Lafayette, Louisiana 70501
6

7   FOR THE DEFENDANTS RIG VENTURES INC., EMILIO SANCHEZ,
    AND PHIL WELLS:
8
               Mr. Luis R. Hernandez
9              Attorney at Law
               FLEMING & HERNANDEZ, P.C.
10             1650 Paredes Line Road, Ste. 102
               Brownsville, Texas 78521
11

12  ALSO PRESENT:

13             Mr. Hector Zapata, Videographer

14

15

16

17

18

19

20

21

22

23

24

25
```

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

3

```
1                        INDEX

2                                                    PAGE
```

Page 2

SanchezEmilio

Appearances........................................  2
3  Stipulations (To follow last page of deposition)

4  EXAMINATION OF EMILIO SANCHEZ
   DATE:  JANUARY 28, 2004

5

6                    EXAMINATION INDEX

7  By Mr. Webre..................................    4

8  Signature and Changes.......................... 167
   Reporter's Certificate......................... 169

9

10                         EXHIBITS

11                                              PAGE
   NO.          DESCRIPTION                    MARKED

12
   1    File pertaining to operations aboard
13        the Ocean 66.......................   37

14  2    File pertaining to operations aboard
         the Ocean 66.......................   37
15
   3    File pertaining to operations aboard
16        the Ocean 66.  ....................   37

17  4    2000 bank statements................   38

18  5    2001 bank statements................   38

19  6    Bylaws of Rig Ventures, Inc..........  41

20  7    Fax Cover Sheet to Emilio Sanchez
         from Richard Jaross................. 148
21
   8    Ocean 66 Work Outline............... 148
22
   9    Correspondence to Rig Ventures Inc.
23        from Michael J. Blythe dated
          February 19, 2001................... 148
24
   10   FedEx Express Payment Type Detail.... 148
25

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

                                                 4

1                  EMILIO SANCHEZ,

2  having been first duly sworn, testified as follows:

3                     EXAMINATION

4  BY MR. WEBRE:

Page 3

SanchezEmilio

5    Q.  Good morning, sir.  Please state your name.

6    A.  Emilio Sanchez.

7    Q.  Sir, my name is Scott Webre.  I represent the

8  Plaintiffs in this case.  I believe that before today

9  you and I have never met; is that correct?

10   A.  That's correct.

11   Q.  We had this deposition scheduled earlier this

12  morning, but we're starting at 9:50 and I think that's

13  because you got the days mixed up?

14   A.  That's correct.

15   Q.  Sir, you are appearing here today as a Defendant

16  in a lawsuit brought in Cameron County, correct?

17   A.  That's correct.

18   Q.  And you're aware of the allegations brought in

19  that lawsuit?

20   A.  Yes, I am.

21   Q.  You are aware of the injuries suffered by

22  Mr. James Gilbert on December 31st of 2001 --

23   A.  Yes, I am.

24   Q.  -- while working aboard the Ocean 66?

25   A.  Yes, I am.

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

5

1    Q.  Have you ever given a deposition before today?

2    A.  Yes, I have.

3    Q.  In what context?

4    A.  A suit -- a marine-related suit that was -- a tug

5  hit one of our rigs and there was a suit in New Orleans

6  and I gave a deposition there, and the other times that

Page 4

SanchezEmilio

7    I've had suits.

8        Q.  So a tug hit one of your rigs, a rig that you

9    owned or --

10       A.  Yeah.  It was actually a barge that had sunk and

11   the tug hit it and the tug sank.

12       Q.  Okay.  The barge was your barge?

13       A.  Yes.  It belonged to us.

14       Q.  I'm sorry?  It --

15       A.  It belonged to Rig Ventures -- I believe it was

16   Rig Ventures sank of another company.

17       Q.  Okay.  And so another company sued Rig Ventures

18   to collect the damages they allege were caused by your

19   sunken barge?

20       A.  Yes.  Uh-huh.

21       Q.  Any other lawsuits brought against Rig Ventures

22   or by Rig Ventures?

23       A.  That's the only one I can recall.

24       Q.  No actions involving personal injury allegations?

25       A.  No.


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

6


1        Q.  Wrongful death?

2        A.  No.

3        Q.  Sir, you understand that your testimony today is

4    sworn testimony, and should it become necessary to do

5    so, we can use this testimony and show actual --

6    actual -- the videotape to the jury just as though you

7    were testifying live in court, correct?

8        A.  Yes, I do.
                    Page 5

SanchezEmilio

9      Q.  You're not under the influence of any medication

10  or anything else today that would make it impossible for

11  you to understand my questions or give coherent answers?

12      A.  I am not, no.

13      Q.  Will you agree with me that if you don't

14  understand a question of mine, you'll ask me to rephrase

15  it so that you can intelligently understand my question

16  and provide an adequate answer to the best of your

17  ability?

18      A.  Yes, I do.

19      Q.  And can I assume that if you answer a question

20  that you understood the question?

21      A.  Yes.

22      Q.  Can we have the agreement that before you provide

23  an answer to my question, you let me finish, and I'll

24  let you finish your answers before I ask a question?

25      A.  Yes.


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

7


1      Q.  Just as a matter of personal background, what's

2  your education, sir?

3      A.  I finished the University of Texas with a BBA in

4  1958.

5      Q.  Any formal education after that?

6      A.  None.

7      Q.  Have you sought any training or certification at

8  any trade centers or any trades or any skills

9  whatsoever?

10      A.  None.

Page 6

SanchezEmilio

11    Q.  How would you characterize yourself today?

12  You're just a businessman, an entrepreneur?

13    A.  A businessman, entrepreneur, yes.

14    Q.  Okay.  And you own numerous ventures and

15  corporations down here in South Texas?

16    A.  Yes, I do.

17    Q.  Just to be clear, however, you possess no

18  certifications -- beyond your bachelor's degree, you

19  possess no certifications that have been issued to you

20  by any state or federal agency, correct?

21    A.  That's correct.

22    Q.  Or any local agency?

23    A.  That's correct.

24    Q.  You possess no licenses -- professional licenses,

25  either as a CPA or a lawyer or anything like that?

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

8

1    A.  That's correct.

2    Q.  No license or certifications to operate as a ship

3  captain or giving you any special expertise or

4  recognizing any special expertise in the oil field

5  industry; is that correct?

6    A.  That's correct.

7    Q.  And likewise, in the salvage or ship-breaking

8  industries?

9    A.  That's correct.

10    Q.  And any expertise that you have, any of your oil

11  field operations or ship-breaking and salvage operations

12  is -- was gained by you simply by doing; is that

Page 7

SanchezEmilio

13   correct?

14       A.  That's correct.

15       Q.  When did you first engage in salvage operations?

16       A.  1972.

17       Q.  And just for the record, so you and I understand

18   each other, Rig Ventures is a corporation that was

19   formed primarily for the purpose of ship salvage,

20   correct?

21       A.  Not so much salvage as -- it could be salvage, it

22   could be to purchase and re-sell the units as a

23   operating unit.

24       Q.  Okay.  Why don't you describe the difference for

25   the jury.


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

9


1        A.  When -- when a rig is beyond going back into

2    service, then you scrap it.  When it has potential to be

3    put into service, you try and sell it.

4        Q.  And it was the latter intention with regard to

5    the Ocean 66, correct?

6        A.  It was either -- we had options either way to do

7    it.  If it got to a point where it was not salvageable,

8    we would scrap it.

9        Q.  Are you a member of any associations or trade

10   organizations?

11       A.  I'm a member of the International Association of

12   Refrigerated Warehouse, cold storages.

13       Q.  Okay.

14       A.  And that's about it.
                          Page 8

SanchezEmilio

15     Q.  Okay.  No affiliations with any trade
16  associations or professional associations or
17  organizations concerning oil field operations?
18     A.  None.
19     Q.  Or ship-breaking or ship salvage operations?
20     A.  None.
21     Q.  Have you ever been?
22     A.  No.
23     Q.  Do you expect to provide any expert testimony in
24  connection with this case?
25     A.  I'm not sure if we will have someone on the

1  corporate they'll issue.
2     Q.  No.  Personally, do you expect to --
3     A.  Oh.
4     Q.  -- or are you going to tender yourself as an
5  expert witness in connection with any field of expertise
6  related to this case?
7     A.  To the best of my knowledge, I don't expect to
8  call anybody in other than myself on answering the
9  questions.
10     Q.  Okay.  Excuse me.
11     A.  I don't -- I can't think of anybody at this
12  moment.
13     Q.  Okay.  We'll get into that in a little bit --
14     A.  Yeah.  I mean, it could come up later on and say
15  I want to bring this guy in, but at the moment, I don't
16  contemplate bringing anybody in.

SanchezEmilio

17    Q.  Okay.  And I understand that.  But I'm asking

18  what you personally intend to present, the testimony

19  from your mouth, whether or not you consider yourself an

20  expert in any field as may be relevant to the facts and

21  issues in this lawsuit.  In other words, in oil field

22  salvage operations you indicated you don't have any

23  special training or expertise or licenses or

24  certifications regarding oil field salvage; is that

25  correct?

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

11

1    A.  Right.

2    Q.  So would you agree with me that in regard to the

3  operational aspects of oil field salvage, you would not

4  be an expert witness that we should look to to satisfy

5  questions?

6    A.  I would say no, I'm not considering myself an

7  expert on salvage or -- I've been dismantling for many

8  years, but whether I'm expert or not, that's somebody

9  else's opinion, not mine.

10    Q.  When was Rig Ventures created?

11    A.  If I take a guess, it would probably be in

12  nineteen -- no, nineteen -- nineteen ninety -- 1988,

13  something like that.  I don't know exact date.

14    Q.  Who conceptualized Rig Ventures?

15    A.  I did.

16    Q.  Why was it that you chose to form the company Rig

17  Ventures at that time?  In other words, had you been

18  discussing the opportunities for ship salvage and rig

Page 10

SanchezEmilio

19    purchases and resale with some person or --

20       A.   Yes.  It was to -- it was to buy some ships we

21    had, some oil rigs we had from -- I believe it was from

22    Diamond Offshore, and we decided to put those into Rig

23    Ventures.

24       Q.   Okay.  You say rigs "we" had from Diamond

25    Offshore.  Who is "we"?


                    A BETTER COURT REPORTING SERVICE, INC.
                              (512) 478-1989

                                                                    12


1        A.   Well, the -- I was purchasing some Diamond

2     Offshore rigs through Allen Mesh, and one of the rigs I

3     put into Rig Ventures.  I forget what rig it was.  It

4     was many years ago.

5        Q.   Sure.

6        A.   I don't know if it was the Ocean Viking or Ocean

7     Traveler.  I'm not sure.

8        Q.   So prior to the formation of Rig Ventures, you

9     had personally engaged in this type of rig purchase and

10    salvage and resale?

11       A.   Right.  Uh-huh.

12       Q.   And those were ships or vessels or oil field

13    platforms or whatever --

14       A.   That's correct.

15       Q.   -- that you personally bought, Emilio Sanchez

16    purchased; is that correct?

17       A.   Well, Emilio Sanchez, the company.  I mean, you

18    want me to clarify that?

19       Q.   Sure.

20       A.   It would be the company bought.  I did not --
                              Page 11

SanchezEmilio

21    never personally bought any rigs.

22        Q.  And what company was that?

23        A.  That would be the Rig Ventures or Sanco

24    International or Saber Steel.

25        Q.  Okay.  Now, but prior to the formation of Rig

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

13

1    Ventures, when you say you bought some rigs from

2    Diamond, what entity was it that purchased those rigs?

3        A.  I think it was Sanco International, to the best

4    of my ability -- is my remembrance.

5        Q.  Is that a corporation that's still in existence

6    today?

7        A.  No, that is no longer in existence.  Sanco

8    International is no longer in existence.

9        Q.  Is that a corporation that at that time you were

10    the sole shareholder of?

11        A.  I would say so.  That is correct.  I was the sole

12    shareholder on that one.

13        Q.  And president?

14        A.  Right.  That's correct, president.

15        Q.  Okay.  Any other purposes for Rig Ventures when

16    formed other than rig salvage and ship-breaking?

17        A.  I would think that would be limited to that.  I

18    would say it would be limited to that.  But that doesn't

19    mean that I wouldn't do anything if I bought some scrap

20    and resold it to the mill, I would -- could do it under

21    that company.

22        Q.  Sure.  I understand.  And I'm not --

Page 12

SanchezEmilio

23    A.  But its main purpose, I would say, was for that.

24    Q.  Okay.  And I'm not --

25    A.  No.  I understand.

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

14

1    Q.  This isn't a game of gotcha.  I'm just trying to

2    understand, you know, what you know.

3    A.  I understand.

4    Q.  And the sole or the only shareholders of Rig

5    Ventures at the time of formation and since formation to

6    the current date has been you?

7    A.  That is correct.

8    Q.  There have never been any other shareholders?

9    A.  No.

10   Q.  You have always been the president?

11   A.  Yes.

12   Q.  Chief executive officer?

13   A.  Right.

14   Q.  Your son Emilio Sanchez, Junior, I believe, was

15   for a long period of time also an officer of the

16   company?

17   A.  I believe he was secretary-treasurer.

18   Q.  Is he still?

19   A.  I think he is.  I think -- I'm pretty sure he is.

20   Q.  And who serves on the board of directors?

21   A.  I think I'm sole director, if I'm not -- to the

22   best of my knowledge, I might be sole director on that.

23   Q.  And do you from time to time have -- you know,

24   and I don't mean to be cute about this, but a meeting

Page 13

SanchezEmilio

25    with yourself as the director?

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

15

1    A.  Well, not really.  You know, it's -- I'm the sole
2    operating chief officer.  I really don't meet with
3    myself.
4    Q.  So when you decide to do something as director of
5    Rig Ventures, it's simply a decision that you make and
6    then you put it into action as the president of the
7    corporation?
8    A.  Basically, yes.
9    Q.  Were you responsible -- or, rather, who was
10   responsible at Rig Ventures for the timely payment of
11   franchise fees for the corporation?
12   A.  That would be me.
13   Q.  Did you always accomplish that?
14   A.  I think we're current.
15   Q.  Were you always current?
16   A.  I believe we were current.  I don't remember
17   being late, but it's possible I could have been late.
18   Q.  Was there ever any other person in the
19   corporation that you charged with the duty to pay those
20   franchise fees?
21   A.  To pay them, no.  But to bring it to date, my
22   accountant was my daughter, Norma Garza.
23   Q.  I'm sorry?
24   A.  By daughter, Norma Garza, is my CPA accountant
25   and she brought these franchises up to date and brought

Page 14

SanchezEmilio

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

16

1    them to me, but I'm the one that paid them.

2        Q.  And how long has your daughter, Ms. Gardner --

3        A.  Garza.  G-a-r-z-a, Garza.

4        Q.  -- I'm sorry, Garza -- been the -- been the

5    accountant for the company?

6        A.  Many years.  I would say since -- 15 years, at

7    least.

8        Q.  And she has always assisted you in the

9    preparation and filing of income tax returns and related

10   tax documents in connection with Rig Ventures,

11   Incorporated?

12       A.  That is correct.  Uh-huh.

13       Q.  And also with Emilio Sanchez?

14       A.  That is correct.

15       Q.  And your wife's account, I believe y'all file

16   joint returns?

17       A.  That is correct.

18       Q.  And, likewise, with regard to your other

19   corporations?

20       A.  Yes.  However a CPA firm, which is Burton

21   McCumber, is the one that actually compiles the tax

22   returns for filing and has done it for many years.

23       Q.  Is she an employee of that firm?

24       A.  No.

25       Q.  So is your daughter more or less your bookkeeper

SanchezEmilio

17

1    and this accounting firm is your accountant?

2        A.  The tax preparation accountant, yes, that's

3    correct.

4        Q.  Is your daughter an employee of Rig Ventures?

5        A.  Not right now, no.  I don't think she has been

6    for many years.

7        Q.  When was she last an employee?

8        A.  I would say two or three years ago.

9        Q.  And how long was she an employee of Rig Ventures?

10       A.  For 15 years at least.

11       Q.  Why did she seek employment?

12       A.  Well, she still does it, but she doesn't receive

13   pay from Rig Ventures is what I'm trying to explain.

14       Q.  Okay.  So she just does it now as a loving

15   daughter?

16       A.  Sort of.  Uh-huh.

17       Q.  What other corporations -- starting only with the

18   corporations that you are the sole shareholder of, what

19   corporations fit that bill?

20       A.  Tex-Mex Cold Storage, Inc., Sanco International

21   --

22       Q.  I'm sorry.  Sanco?

23       A.  S-a-n-c-o International, Saber Steel Corp, Rig

24   Ventures, one that's no longer existing is S.J. Green

25   Shipping, those that I can recall.

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

18

Page 16

SanchezEmilio

1    Q.  S.J. Green?

2    A.  Yeah.  Uh-huh.

3    Q.  When did S.J. Green go out of business?

4    A.  About two years ago.

5    Q.  Did you formally dissolve that corporation?

6    A.  Yes, we dissolved that corporation.  That's

7  correct.

8    Q.  But Tex-Mex Cold Storage, Sanco International,

9  Saber Steel and Rig Ventures are all still current and

10  active, correct?

11    A.  No.  Sanco International and Saber Steel have

12  been dissolved.

13    Q.  When was Sanco International dissolved?

14    A.  I think last year.  That would be December 31st,

15  2002, I believe I remember.  The only existing ones are

16  Tex-Mex Cold Storage and Rig Ventures.

17    Q.  Okay.  And Saber Steel was dissolved when?

18    A.  Also December 31st, 2002.

19    Q.  Why were those two companies dissolved?

20    A.  There was no activity in them.  There was no

21  assets and so we just had no more longer use for them.

22    Q.  What was their business?

23    A.  Also the same thing, the purchase of rigs,

24  dismantling, selling the steel products.

25    Q.  Why did you have different corporations to

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

19

1  perform the same function?

2    A.  To limit liability.

Page 17

SanchezEmilio

3   Q.  Meaning what?

4   A.  In other words, have each -- each rig -- each

5   asset was in a different corporation, so that if -- if

6   there was some kind of legal liability or accident, it

7   limited the liability to that particular corporation.

8   Q.  Such as the potential liability in this suit?

9   A.  Yes.  Correct.

10  Q.  Any other corporations, start as of December

11  2001, that you were the majority shareholder in?

12  A.  Nothing I can think of that I recall being

13  majority, no.  I think that would be the extent of it.

14  Q.  Any that you were a minority shareholder?  And

15  I'm not talking about buying stocks on the exchange, but

16  closely held corporations.

17  A.  I would -- Dominion Shipping.

18  Q.  What is Dominion Shipping?

19  A.  It has one support vessel in it as an asset.

20  Q.  Support vessel?

21  A.  Yeah, diving support vessel.

22  Q.  And what's your ownership interest in that?

23  A.  I have a 50 percent ownership in that.

24  Q.  Who is the other 50 percent?

25  A.  Richard Jaross.


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

20


1   Q.  And when was Mr. -- or rather, when did you and

2   Mr. Jaross form Dominion Shipping?

3   A.  That's been five years ago, six years ago.

4   Q.  And what was the purpose of -- what is the

Page 18

SanchezEmilio

5  purpose of Dominion Shipping?

6     A.  It is -- that's that vessel in there that we

7  planned to sell, buy and sell the vessel called The

8  Cormorant.

9     Q.  One of my favorite birds.  What type of vessel is

10  The Cormorant?

11     A.  It's a diving support vessel, which means it has

12  a submarine in it and it supports diving operations for

13  going in -- under water in a submersible.

14     Q.  Is it specially designed to accommodate the oil

15  field industry or --

16     A.  No.

17     Q.  -- military?

18     A.  Just general.  General research and diving.

19     Q.  And are you -- who is the president of that

20  corporation?

21     A.  I am.

22     Q.  And what position, if any, does Mr. Jaross hold?

23     A.  I don't think he's -- he's a consultant at all to

24  that company.

25     Q.  He's a shareholder and a consultant?

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

21

1     A.  That is correct.

2     Q.  He's not an employee?

3     A.  No.

4     Q.  Okay.  Who are the employees of Rig Ventures?

5     A.  We don't have any.

6     Q.  You have none?

Page 19

SanchezEmilio

7    A.  None.  I have not had for two or three years, I

8  believe.

9    Q.  When was the last time you had an employee?

10    A.  It's been three years ago.

11    Q.  Do you know the approximate date that the last

12  employee was terminated or quit?

13    A.  If I'd have to guess, it would be December 31st

14  of 2001.

15    Q.  Why does that number stick out for you?

16    A.  Because you asked for it and I'm thinking it --

17  I'm not sure.  I'm not exactly sure.  But maybe it was

18  around that time.  It's been a while since we've had

19  employees.

20    Q.  And who were your employees at that time?

21    A.  My son, Emilio A. Sanchez.

22    Q.  Junior?

23    A.  Yes.  Uh-huh.

24    Q.  And what position did he hold?

25    A.  He was secretary-treasurer and just an employee

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

22

1  for the company.

2    Q.  And what salary did he take annually at that

3  time, if any?

4    A.  I would think it would be in the neighborhood of

5  about 35,000 dollars out of -- I'm guessing, annually.

6    Q.  And what functions would he serve?

7    A.  He would go out and see the rigs or do the

8  movement of the rigs or do everything associated with

Page 20

SanchezEmilio

9  the physical part of the rigs.

10   Q.  What do you mean by that, everything associated

11  --

12   A.  He would go out and take pictures of the rigs or

13  ships and bring them back to me, or he would go out and

14  prepare to move the rigs or -- everything associated

15  with the ships or the rigs that needed to be.

16   Q.  And would he -- I mean, I'm trying to get an

17  understanding if he's, you know, the guy on the vessel

18  that wouldn't get dirty or would he actually break out

19  the cutting torches and sledge hammers and --

20   A.  No, he would not get dirty.

21   Q.  Okay.  So he would be there to, in a sense, kind

22  of survey a vessel, determine if it's something --

23   A.  Direct.

24   Q.  -- that --

25   A.  Direct the activity.


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

23


1   Q.  And I don't want to admonish you, but we're

2  talking over each other and we need to try not to do

3  that --

4   A.  I remember that.

5   Q.  -- because --

6   A.  I understand.  Uh-huh.

7   Q.  Do you recall what vessels Mr. Sanchez your son

8  did this sort of surveying for?

9   A.  I don't recall.  He saw several of them, Ocean

10  Traveler, the Ocean Driller.

Page 21

SanchezEmilio

11    Q.  Ocean 66?

12    A.  Ocean 66, I don't think he ever saw that.

13    Q.  Did your son Mr. Sanchez have -- or rather, does

14    Mr. Sanchez your son have any special expertise,

15    training, licenses, certifications, et cetera, that

16    enable him to render professional opinions regarding the

17    condition of a ship or vessel?

18    A.  None.

19    Q.  What other employees did Rig Ventures have the

20    last time they had employees which as you testified was

21    the end of December 2001?

22    A.  It might have been my daughter on the payroll,

23    the accountant at one time, but I don't recall.

24    Q.  And I'm sorry.  Did you tell me her name is

25    Norma?

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

24

1    A.  Yes.  Norma Garza, G-a-r-z-a.

2    Q.  Where would we turn to determine when -- what

3    documents would we look at to determine what employees

4    Rig Ventures last had, what those employees were paid,

5    and for what period of time those persons were employed?

6    A.  The bank statements.

7    Q.  The bank statements?

8    A.  Yeah.

9    Q.  Do you believe Rig Ventures maintained personnel

10    files on either -- on any of its employees?

11    A.  I don't believe we did.

12    Q.  Do you know -- can you tell us what additional

Page 22

SanchezEmilio

13    employees other than Emilio Sanchez, Junior, and Norma

14    Garza of Rig Ventures had at any point in time?

15        A.  To the best of my knowledge, none.

16        Q.  Well, are you the best person for me to speak to

17    regarding these personnel matters for Rig Ventures?  In

18    other words, I mean, who else would I talk to in order

19    to learn what employees, if any, Rig Ventures employed

20    and when?

21        A.  I would be the best source of that.

22        Q.  But to the best of your knowledge, Rig Ventures

23    never had any other employees besides your daughter and

24    son?

25        A.  To the best of my knowledge, no.

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

25

1        Q.  Did you draw a salary from Rig Ventures?

2        A.  I don't think I ever -- no, I never drew a salary

3    from Rig Ventures.  I'm pretty sure on that.

4        Q.  Did your wife ever draw a salary from Rig

5    Ventures?

6        A.  No, my wife does not draw a salary on Rig

7    Ventures.

8        Q.  Did Mr. Jaross draw a salary?

9        A.  No, he never drew a salary.

10        Q.  Did any of Mr. Jaross's associates or employees

11    draw a salary from Rig Ventures?

12        A.  No.

13        Q.  I'm looking through a number of documents.  Well,

14    let me ask you, who is Michael Cantu?

Page 23

SanchezEmilio

15    A.  Michael Cantu?

16    Q.  Yes, sir.

17    A.  I don't recall.

18    Q.  Do you recall a Mr. Jerry McCallum?

19    A.  Yes.  Jerry was involved with the Ocean 66.

20    Q.  Was he an employee of Rig Ventures?

21    A.  No.  He was a partner in Rig Ventures.

22    Q.  He was a partner.  A partner in what sense?  I

23  mean --

24    A.  He was -- when we bought the rig, he was involved

25  in the agreement of the rig when we bought it that we

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

26

1  were going to jointly operate and sell it, or rather,

2  buy it and sell it.

3    Q.  He was a party to the agreement for purchase from

4  Murphy Oil?

5    A.  No.  I believe he was -- agreement between me and

6  Jerry McCallum after the purchase.

7    Q.  Between you personally and Jerry McCallum?

8    A.  Well, between Rig Ventures and McCallum.

9    Q.  And was that a written agreement?

10    A.  I think it's a written agreement in the files.

11  There should be a written agreement in the files.

12    Q.  Do you recall the general terms of that written

13  agreement?

14    A.  I think he was to receive 25 percent of the net

15  profit of that venture.

16    Q.  Net profit meaning after all expenses were paid

Page 24

SanchezEmilio

17    to salvage it, everything from chain to towing, then

18    considering the in-flow?

19        A.  That is correct.  Uh-huh.

20        Q.  Do the math at the end, that's the net profit,

21    correct?

22        A.  That is correct.

23        Q.  And he was to take 25 percent of the net profit?

24        A.  That is correct.

25        Q.  Is he still a partner pursuant to this agreement

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

27

1    to the Ocean 66?

2        A.  Well, it has not been terminated, but he breached

3    his contract and we haven't -- he abandoned the project.

4        Q.  How did he abandon the project?

5        A.  He left the rig and didn't do anything else.

6        Q.  When is the last time you spoke with

7    Mr. McCallum?

8        A.  At least two years, three years ago.

9        Q.  What was the content of that discussion?

10        A.  Just that why did he abandon the rig.

11        Q.  And what did he tell you?

12        A.  He said he didn't -- he didn't like what he was

13    seeing up there or something.  He disagreed the way we

14    were asking him to do things.

15        Q.  Have you or your lawyers notified Mr. McCallum of

16    his breach of contract?

17        A.  No, we have not.

18        Q.  You have not put him on notice of breach of

Page 25

SanchezEmilio

19  contract?

20    A.  We have not, no.

21    Q.  Has he put you on notice of any claim against you

22  or Rig Ventures in connection with the Ocean 66?

23    A.  No, he has not.

24    Q.  Either orally or in writing?

25    A.  That's correct, neither one.


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

28


1    Q.  Who at Rig Ventures was in charge of selecting

2  persons to perform operations aboard the Ocean 66?

3    A.  Richard Jaross, my consultant.

4    Q.  Mr. Jaross is your consultant?

5    A.  He's Rig Ventures' consultant.  When you speak of

6  me, I don't operate personally.  I operate under the

7  company.  He was Rig Ventures' consultant.

8    Q.  And how long has he been consultant to Rig

9  Ventures?

10    A.  Since its inception.

11    Q.  Is there a written agreement memorializing that

12  consultation agreement?

13    A.  No.

14    Q.  Why not?

15    A.  Because we have been operating together in some

16  kind of capacity for -- since 1972.

17    Q.  Okay.  Why don't you tell me a bit about that.

18  How did you first meet Mr. Jaross and what did y'all

19  first do together --

20    A.  He was in the -- I'm sorry.  I interrupted you.

Page 26

SanchezEmilio

21    Q.  That's okay.  Go ahead and talk about it.

22    A.  He was in the dismantling business here in

23  Brownsville with a company called Luria and he set up

24  his own company called Andy International.

25    Q.  I'm sorry.  And --

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

29

1    A.  Andy International.  And he was needing some

2  financing, so he invited me to come into the dismantling

3  business with him and I furnished some money and we

4  continued together until 1976 when he bought me out.

5    Q.  He bought you out of what organization?

6    A.  Of Andy International.  I had 50 percent of it.

7    Q.  Okay.  So you -- he needed financing for Andy

8  International and you contributed how much money to buy

9  50 percent of it?

10    A.  I don't recall.  It's been many years ago, 30

11  years ago.  Something like 50,000 dollars, something

12  like that.

13    Q.  And then when did he buy you out?

14    A.  1976.

15    Q.  When was your next venture together?

16    A.  Then we came back together about 14 years ago.

17    Q.  So in about -- what's that, '90, '89?

18    A.  Something like that.  Yes, about '89.

19    Q.  And what did y'all do together in '89?

20    A.  We bought a ship called the Omi Charger.  It was

21  a tanker.

22    Q.  Can you spell that, "Omi."

Page 27

SanchezEmilio
23    A.  O-m-i and then "Charger," C-h-a-r-g-e-r.  It was

24    a tanker in Houston that blew up.

25    Q.  Okay.  And you bought that together under what

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

30

1    corporation?

2    A.  One of them.  I don't recall.  It could be Sanco,

3    it could have been Saber, it could have been Rig

4    Ventures.  One of the three probably.  I don't recall

5    which one.

6    Q.  What is the substance of the consultation

7    agreement between you and Mr. Jaross?

8    A.  That he would handle the technical end of the

9    operation and I would handle the financing.

10    Q.  Do you know what technical expertise Mr. Jaross

11    has concerning ship-breaking and ship salvage?

12    A.  His many years of experience have done that,

13    since nineteen -- salvaging of several things, many

14    years, all his life.

15    Q.  Do you know what licenses or certifications,

16    training, that kind of thing, that Mr. Jaross may have?

17    A.  I do not know.

18    Q.  Have you ever known?

19    A.  Nothing I'd ever asked and I don't know.

20    Q.  Okay.  And in exchange for Mr. Jaross's technical

21    assistance, what -- what's his compensation?  How is he

22    paid?

23    A.  He's paid a consultant fee off of different

24    corporations.

Page 28

SanchezEmilio
25    Q.  And how is that consultant fee determined?

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

31

1     A.  Well, it's depending on the corporation, he would
2  receive funds from the one that had the most activity at
3  the time.
4     Q.  Okay.  But how is the amount of those funds
5  determined?
6     A.  It was determined just on whatever activity we
7  would engage in.  If there was no activity, there was no
8  fund -- no consulting fees.  In other words, if Saber
9  and Sanco were dormant for three years, we didn't have
10  consultant fees, but if there's something active, then
11  he would get a consultant fee for some activity.
12    Q.  So is it fair --
13    A.  It wasn't a specific amount or agreed amount on
14  it, just the amount what we were doing.
15    Q.  So then he would be paid at an amount pursuant to
16  your discretion?
17    A.  More or less, uh-huh.
18    Q.  And then if he was unhappy with the amount he was
19  paid, then y'all would have a head-to-head and figure it
20  out?
21    A.  Basically, yes.
22    Q.  And he was paid, essentially, when and only if
23  there was a profit enjoyed by the company that he would
24  be paid by?
25    A.  Basically, yes.

Page 29

SanchezEmilio
A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

32

1    Q.  So if and when Rig Ventures would enjoy a profit,

2    Mr. Jaross would be paid an amount pursuant to an

3    agreement between you and Mr. Jaross?

4    A.  That's correct.

5    Q.  Were those payments -- can you give the jury any

6    idea at all regarding the frequency of those payments?

7    A.  I would say they were -- when the activity was

8    strong, monthly, and when the activity died, like it is

9    now, it's been a while, maybe a year and a half since I

10   have given him any consulting fees.

11   Q.  I'm sorry.  It's been --

12   A.  I think a year, a year and a half.

13   Q.  Do you recall the fees, the consultant fees he

14   was paid on Ocean 66?

15   A.  I don't recall, no.  I have to look at the

16   record.

17   Q.  Okay.  Your attorney has provided today three

18   folders, two-ring punched folders, in response to

19   discovery requests.  These folders were maintained by

20   Rig Ventures, correct?

21   A.  By Rig Ventures, by me, uh-huh.

22   Q.  And are maintained by Rig Ventures?

23   A.  That is correct, uh-huh.

24   Q.  These are --

25            MR. WEBRE:  Do I have to go through the

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

33

Page 30

SanchezEmilio

1   business records things?  Can we have a stipulation
2   these are business records?
3              MR. HERNANDEZ:  They are business records,
4   yes.
5      Q.  Okay.  I would like to attach -- well, can we
6   copy these ourselves and then make them an exhibit to
7   the deposition after the fact?
8              THE REPORTER:  Yes.  Uh-huh.
9              MR. WEBRE:  Okay.  Can we do that?
10             MR. HERNANDEZ:  Certainly.  Subject to any
11  privileges that may be enclosed in those documents, you
12  can have them and I'll bring them up to you later on.
13             MR. WEBRE:  Okay.
14             MR. HERNANDEZ:  But I'm not waiving any
15  privileges by disclosing the files that we have.  So you
16  can have them.  I'll ask them back from you at a later
17  date.  They're privileged documents.
18     Q.  And these three files are all files pertaining to
19  the operations aboard the Ocean 66?
20     A.  That's correct.
21     Q.  From inception of the project through today's
22  date?
23     A.  That is correct.  They are marked 1, 2, and 3,
24  which I would fill up one folder, number 1, and go to
25  number two, and go to number 3.  That was the way it is.

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

34

1      Q.  Okay.  Is it -- are they -- and what's the filing
Page 31

SanchezEmilio

2  system?  Is it simply chronological?

3      A.  Chronological.

4      Q.  So whatever it might be that came up

5  pertaining --

6      A.  It's put in that file.

7      Q.  Just put it in the file.  So whether it's

8  correspondence with a vendor, an agreement with the

9  seller, invoices, et cetera, et cetera, it just goes in

10  the file chronologically?

11      A.  Goes in the file, yes, with the exception that

12  when we paid some bills, because it's so voluminous, I

13  had another box of paid bills.  Unfortunately, I'm in

14  the cold storage business and there's a lot of water

15  around, and a pipe busted and all those records got

16  soaked because they were on the floor in my closet and

17  they had to be destroyed.  The girl destroyed them

18  without me being able to look at them.

19      Q.  This was -- these records were located in your

20  office at the time?

21      A.  Yes, that is correct.

22      Q.  Your office at Tex-Mex Cold Storage?

23      A.  That is correct.

24      Q.  And is that the only office that you maintain?

25      A.  That's the only office I maintain.


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

35


1      Q.  Does Rig Ventures have a physical facility?

2      A.  No.  It just has the office where I am at.

3      Q.  If I went to your office today, would I find a
                        Page 32

SanchezEmilio

4    sign that said "Rig Ventures" on the wall?

5    A.  No.

6    Q.  There's no Rig Ventures sign outside or --

7    A.  None.

8    Q.  So unless I know that you're president of Rig

9    Ventures, I go in your office and I don't know anything

10   about Rig Ventures?

11   A.  That's correct.

12   Q.  When did this pipe rupture occur?

13   A.  Approximately a year ago.

14   Q.  And when were the documents destroyed?

15   A.  Right after that.  They had water four inches

16   thick, and unfortunately these files with the expense

17   report were on the bottom floor and the water just went

18   through them.

19   Q.  So the files were not in your office, they

20   were --

21   A.  Yes, they were there in the closet.

22   Q.  In your actual office?

23   A.  Yes.

24   Q.  Not in another room or another part of the

25   building?

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

36

1    A.  No.  They were in my closet where I office.

2    That's where I keep all these records.

3    Q.  And your office flooded?

4    A.  Yes.  Uh-huh.

5    Q.  How much water got on your office floor?

Page 33

SanchezEmilio

6    A.  About four inches.

7    Q.  Did you hire out to have the pipe repaired?

8    A.  Yes -- no.  We -- internally, we have our own

9    maintenance crew there at the cold storage.

10    Q.  And likewise, do they also do all the clean-up in

11    your office?

12    A.  Yes.

13    Q.  Were other offices in the area flooded?

14    A.  Yes.

15    Q.  About how many?

16    A.  All the office in the -- about three offices were

17    flooded.

18    Q.  What other documents were destroyed in that

19    flood?

20    A.  I don't recall.  I think that was basically it.

21    I was able to salvage some of them that pertained to

22    other corporations, because they happened to be a little

23    higher up than the bottom.

24    Q.  So is it your testimony then today that these

25    three files constitute the entirety of your written

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

37

1    record pertaining to activities regarding the Ocean 66?

2    A.  That, plus my bank statements.  So you should be

3    able to pick up in my bank statements payments to

4    vendors that I had in my file.

5    Q.  Okay.  And your attorney has also provided me

6    this morning bank statements, it looks like they are

7    stapled in monthly increments, and I believe they are

Page 34

SanchezEmilio

8    for the period of time -- well, do you know what period
9    of time these are for?
10      A.  2000, 2001.
11      Q.  I think that's right.  Perhaps through January of
12   2002.
13      A.  I believe that's what you asked for and that's
14   what we gave you.
15              THE WITNESS:  Is that right?
16              MR. HERNANDEZ:  I believe that's what we
17   talked about this week.
18              THE WITNESS:  Are those originals?
19              MR. HERNANDEZ:  Yes.
20              THE WITNESS:  We need to make sure we
21   don't -- we keep a copy, because that's all we have.
22              MR. WEBRE:  Okay.  I'd like to mark this
23   as -- you know what, let's do this 1, 2, and 3.
24              (Exhibit Nos. 1 through 3 marked)
25              MR. WEBRE:  These first three -- the three

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

38

1    binders we've referenced and been speaking of we've
2    marked sequentially 1, 2, and 3, and the folders
3    correspond to the exhibit number.  "Ocean 66 Jack Up 1"
4    is Exhibit 1, number 2 of 2, et cetera.  And we'll make
5    Exhibits 4 and 5 the 2000 and 2001 bank statements
6    respectively.  I saw as part of those documents --
7              (Exhibit Nos. 4 and 5 marked)
8      Q.  I saw as part of those documents, Exhibits 4 and
9    5, copies of checks.  Have you reviewed these documents?
Page 35

SanchezEmilio

10    A.  No, I have not.

11    Q.  You don't go through the bank statements?

12    A.  Not really.  No, not really.  My daughter --

13    Q.  Who does it?

14    A.  My daughter Norma.

15    Q.  Does -- does she come into your -- well, is she

16  an employee of Tex-Mex?

17    A.  She's an employee of Tex-Mex, right.

18    Q.  Okay.  So there she's sitting in her office in

19  Tex-Mex Cold Storage facility --

20    A.  Well, she does it at home.  I'm sorry to

21  interrupt you.

22    Q.  That's all right.

23          So she takes the Rig Ventures records home?

24    A.  Bank statements and compiles the P&L and Quick

25  Books.

1    Q.  Who is the person that actually writes the checks

2  for Rig Ventures?

3    A.  I do.

4    Q.  You do.  Any checks for Rig Ventures to vendors

5  or to any other source you write?

6    A.  I write, that's correct.

7    Q.  Does anyone else write them?

8    A.  There might have been an occasion where my son

9  wrote them at my instruction, but I don't think so.  I

10  sign all the checks.

11    Q.  What about Mr. Jaross?

SanchezEmilio

12    A.  No.  He does not write the checks.

13    Q.  And no secretary of yours?

14    A.  I have no secretary.

15    Q.  You have no secretary --

16    A.  I have no secretary.

17    Q.  -- at Tex-Mex?

18    A.  I have secretaries, but they don't belong to --

19    they belong to Tex-Mex, not to Rig Ventures.  They're

20    not my secretaries in any of my corporations.  They're

21    secretaries for the cold storage.

22    Q.  And to be clear, Rig Ventures, you don't have a

23    secretary at all to assist you?

24    A.  We don't have any employees.  We have a policy

25    not to have employees unless absolutely necessary.  We

1    all subcontract everything out, everything is

2    independent contract.

3    Q.  Whose policy is that?

4    A.  Mine.

5    Q.  When did you develop this policy?

6    A.  Since the inception.

7    Q.  And what is that policy based upon?

8    A.  Based upon that I don't want to be involved in

9    tax reportings or workmen's compensation or anything of

10    that effect.  It's my policy not to have that.  I

11    subcontract everything out, as the files will show.

12    Q.  Are these the only bases for your policy of

13    having no employees?

Page 37