SanchezEmilio

14    A.  Mainly that, uh-huh.

15    Q.  Okay.  By your saying "mainly," it indicates that

16    there are other reasons that perhaps aren't the main

17    reasons, but nonetheless reasons.

18    A.  Well, you know, that our work is all temporary,

19    it's all for a short period of time, so for me to hire

20    someone and then let them go, you know, it's very

21    difficult to get people that are experienced.  So my

22    policy is to hire all outside people, come do the work

23    and no more obligations, unemployment, "duh-duh-duh-duh"

24    (phonetic).

25    Q.  Would you be the one at Rig Ventures -- and if I

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

41

1    asked you this, I apologize -- but that's responsible

2    for the determination of the skill levels of people you

3    hire as labor?

4    A.  No.  I would consider Richard Jaross to be -- his

5    recommendation I would rely on.

6    Q.  Okay.  So Mr. Jaross is the one who's making

7    determinations regarding the adequacy of the expertise

8    of persons employed by Rig Ventures to perform salvage?

9    A.  That's correct.  Uh-huh.  That's correct.

10    Q.  And you rely on any recommendations and

11    determinations he makes in this regard?

12    A.  Yes.  I would think that a hundred percent of the

13    time I would go along with his recommendation.

14    Q.  Do you know what efforts Mr. Jaross made to make

15    those determinations regarding the skill level or
Page 38

SanchezEmilio

16    expertise or training of persons that would board

17    vessels owned and operated by Rig Ventures?

18       A.  He had prior knowledge of the people he was

19    asking to do work over the years just from experience.

20       Q.  Do you have any specific knowledge regarding what

21    he knew about these people?

22       A.  What people?

23       Q.  The persons that Rig Ventures would put aboard

24    Ocean 66 to perform salvage operations.

25       A.  Yes.  I knew that Frank Ruiz, Junior, had done

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

42

1     salvage operations for us for 30 years.

2        Q.  Okay.

3        A.  And then he would -- Frank would get his crew.  I

4     don't -- he would get his crew.  Sometimes he used

5     his -- most of the time he used his son.  But this has

6     been over a 30-year period that Richard knew about these

7     people and the companies that we hire.  He had specific

8     knowledge of who he was hiring.

9        Q.  But specifically what he knew about them, you

10    don't know.  I'm going to have to ask Mr. Jaross; is

11    that fair to say?

12       A.  I would think on the majority -- yes, I would say

13    the majority of the case he would hire a company to do

14    towing and he'd have hired them before, and I don't know

15    who they are.  But he would get the rate and the

16    conditions and the daily charge and the fuel charge and

17    negotiate all of them things, towing contracts.  I

SanchezEmilio

18  didn't do the towing contracts.  He did the towing

19  contracts.

20      Q.  And from your perspective, anyway, the same would

21  hold true with regard to the actual manual labor that is

22  employed to get aboard the vessel and conduct

23  operations?

24      A.  I would -- yes, that would be correct.

25      Q.  And to be fair, a few minutes ago you spoke about

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

43

1   Frank Ruiz, "Junior," you meant "Senior," correct?

2       A.  I meant "Senior."  I meant "Senior."  If I said

3   "Junior," that was wrong.

4       Q.  Have you and Mr. Jaross ever discussed the need

5   or desire for policies and procedures that Rig Ventures

6   would adopt and implement regarding the determinations

7   of experience and expertise, skill level of persons to

8   board the Ocean 66?

9       A.  It's possible we would have discussed somebody's

10  qualifications on certain instances, but not very often.

11  I would say less than 10 percent of the time.

12      Q.  Do you recall any such discussions regarding Phil

13  Wells?

14      A.  No.  We never discussed Phil Wells.

15      Q.  Getting back, though, to my question, my question

16  was a little bit different than what you asked, I think,

17  and that is, did y'all ever discuss Rig Ventures

18  adopting or implementing policies and procedures

19  pertaining to how labor would be selected pursuant to

Page 40

SanchezEmilio

20  their qualifications?

21      A.  Never discussed that.

22      Q.  What about the same, policies and procedures

23  regarding training of any persons to board?

24      A.  Never.

25      Q.  Or supervision of persons to perform operations

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

44

1  aboard Rig Venture vessels?

2      A.  Other than the independent contractors who would

3  supervise for his crew, never discussed it.

4      Q.  But there was no policy or procedure by Rig

5  Ventures, written policy or procedure indicating that,

6  correct?

7      A.  None.  There was none.

8      Q.  In fact, Rig Ventures has no policies and

9  procedures at all?

10      A.  None.

11      Q.  Written policies and procedures, that is.

12      A.  That would be correct.

13      Q.  Does Rig Ventures have any bylaws?

14      A.  Corporate bylaws?

15      Q.  Yes, sir.

16      A.  I think they're part of the standard corporate

17  bylaws packages which are a matter of record.

18              MR. WEBRE:  Off the record, please.

19              (Off the record 10:41 a.m. to 10:47 a.m.)

20              MR. WEBRE:  Your attorney has provided to me

21  a copy of a document entitled "Bylaws of Rig Ventures,
Page 41

SanchezEmilio

22    Incorporated."  I'd like to mark this as Exhibit No. 6.

23                    (Exhibit No. 6 marked)

24    BY MR. WEBRE:

25      Q.  Have you seen this document before?


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

45


1      A.  Yes, I have.

2      Q.  And is it what it purports to be, the bylaws of

3    Rig Ventures?

4      A.  Yes, it does.

5      Q.  Do you know whether or not this document has ever

6    been signed by an officer of the corporation?

7      A.  I think it has.

8      Q.  And the reason I ask is this copy is not signed.

9      A.  I probably have -- my file might have a signed

10   copy.

11     Q.  I'm sorry?  Your --

12     A.  In my other file, corporate, I might have a

13   signed copy.

14     Q.  Okay.  Before, I thought we had -- okay.  Now, we

15   spoke --

16     A.  This is operations.

17     Q.  Okay.

18     A.  I might have a various financial and corporate

19   binder that has the finances and corporate, but I

20   generally depend on them to have everything on the

21   corporate matters.

22     Q.  "Them" being your lawyers?

23     A.  That's correct.

Page 42

SanchezEmilio

24            MR. HERNANDEZ:  And not necessarily with me.

25  That means there were Delaware lawyers handling that

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

46

1  too.

2            THE WITNESS:  Was that a Delaware

3  Corporation?

4            MR. HERNANDEZ:  And I'm not sure where --

5  who --

6            THE WITNESS:  Then I might have it in that

7  file there.

8    Q.  What would you maintain in your financial file

9  you just referenced?

10    A.  The monthly P&L and the -- maybe some

11  certificates of good standing from the Delaware

12  Corporation and things of that nature.

13    Q.  What about loan ledgers?  Do you maintain a

14  document, a ledger or a spreadsheet of any kind that

15  would reflect the outstanding principal and interest and

16  payments due and received and that sort of thing by and

17  between or loans by and between yourself and your

18  corporations?

19    A.  My daughter has that.  My CPA has that.  She has

20  promissory notes between corporations with interest

21  bearing and things.

22    Q.  And do you know -- have you seen those

23  spreadsheets?

24    A.  I have seen them over a period of time.  I

25  haven't seen them lately.

Page 43

SanchezEmilio

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

47

1      Q.  Do you know what those documents are entitled?

2      A.  Promissory note something.  I'm not sure what the

3  title is.

4      Q.  But generally speaking, it's a spreadsheet that's

5  going to reflect all of the payments pursuant to that

6  note?

7      A.  Right.  It would show that there's a promissory

8  note between Rig Ventures and Saber Steel or whoever it

9  was or me or whoever it was, and the corresponding --

10  the agreement on that promissory note.

11      Q.  Who at Rig Ventures is responsible for job

12  procurement?  In other words, you mentioned earlier that

13  your son would kind of go out and scout some rigs, take

14  pictures and that sort of thing, but who -- who would

15  make the contacts with the perspective seller of a

16  vessel and then negotiate the eventual transfer of

17  ownership?

18      A.  Richard Jaross.

19      Q.  Mr. Jaross?  Would he handle all of that?

20      A.  Most of it, yeah, or 90 -- 90 percent of the time

21  he would do that.

22      Q.  Okay.  He would handle that at your direction?

23      A.  That is correct.

24      Q.  With your authority?

25      A.  That's correct.

A BETTER COURT REPORTING SERVICE, INC.
Page 44

SanchezEmilio
(512) 478-1989

48

1    Q.  Authorized to act as your agent or the agent of

2  Rig Ventures?

3    A.  That's correct.

4    Q.  Would he sign documents on behalf of Rig Ventures

5  binding Rig Ventures to anything?

6    A.  No.  I don't recall him doing that.  I was the

7  only one authorized to sign it.  Memorandum agreements

8  and things of that nature, protocol delivery --

9    Q.  Yes, sir.

10    A.  -- I would sign those.

11    Q.  Okay.  But prior to the drafting of those

12  documents, all the correspondence and such and

13  negotiations would basically be between the perspective

14  seller and Mr. Jaross?

15    A.  Correct.

16    Q.  And would he negotiate the sales price on

17  vessels?

18    A.  Yes, on -- right.  He would negotiate based on my

19  guidelines.

20    Q.  Okay.  And did he do that with regard to the

21  Ocean 66?

22    A.  I don't know whether he did that or I did that.

23  I think he might have come in after the fact and wrapped

24  up the memorandum agreement.  I think he was involved in

25  that one.

SanchezEmilio

1   Q.   Okay.   Did Mr. Jaross -- was Mr. Jaross the one
2   who first contacted and employed or --
3   A.   Uh-huh.
4   Q.   -- developed the partnership with Mr. McCallum?
5   A.   Yes.   He was -- he was instrumental in that.   He
6   was the one that met Jerry McCallum in Singapore.   We
7   were looking at a -- we were looking at a rig out at
8   Singapore and he ran into Jerry McCallum there, and
9   Jerry McCallum talked him into saying he would do all
10  these things and that we gave him 25 percent.   It turned
11  out that he didn't do his share.
12  Q.   Was Mr. McCallum paid anything?
13  A.   No.
14  Q.   So he didn't get any payment for whatever work he
15  did perform?
16  A.   Not none at all.
17  Q.   About how long was he --
18  A.   Three months.
19  Q.   -- involved in the operation?
20  A.   Three months.
21  Q.   And he performed at least some actual physical
22  operations aboard the Ocean 66?
23  A.   He went out there and went out and stayed on the
24  rig for a very short period of time, then left.
25  Q.   What about -- and I think you've answered this

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

50

1   before, but in connection with the bids from vendors

SanchezEmilio

2  and, you know, arranging all this various procurement of

3  supplies and materials and labor and expertise and so

4  forth, that was all handled by Mr. Jaross?

5       A.  That's correct.

6       Q.  On your direction and authority?

7       A.  That is correct.

8       Q.  Would he sign any agreements with any of those

9  vendors on behalf of Rig Ventures?

10      A.  I don't recall that he ever did that.

11      Q.  You don't know one way or the other?

12      A.  I couldn't say a hundred percent sure, but I

13 would say that it would be very unusual circumstances if

14 he did.  He might have signed as a consultant for Rig

15 Ventures or as a consultant for Rig Ventures or read the

16 letter and signed as a consultant for Rig Ventures.

17      Q.  Or in situations where an agreement, a written

18 agreement may not have been required by the vendor --

19      A.  That would be correct.

20      Q.  -- would he -- would he -- or make an agreement,

21 reach an agreement with a vendor pertaining to material

22 or supplies or equipment to be supplied Rig Ventures,

23 would he be the one that would make an agreement with

24 them before the services were rendered?

25      A.  Probably orally, yes.  If it required a

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

51

1  signature, generally I would have to sign it.

2       Q.  Okay.  But if it didn't require a signature, he

3  would probably handle that?

Page 47

SanchezEmilio

4    A.  He would probably handle that.

5    Q.  Is it fair to say that aside from Mr. Jaross,

6    whatever skills or expertise he may have, that there was

7    no employee or no officer or director of Rig Ventures

8    with expertise in oil field salvage?

9    A.  I would say that's correct.

10   Q.  Is your daughter still handling the bank

11   statements today?

12   A.  Yes.

13   Q.  And so -- and she has been for the last five

14   years?

15   A.  At least.  Many more years than that.

16   Q.  Is it fair to say that all of the operational

17   oversight regarding, you know, the materials supplied,

18   the labor provided, what task would be performed, when

19   it would be performed and that sort of thing, all of the

20   operational oversight regarding the salvage operations

21   aboard Ocean 66 was at the direction of Mr. Jaross?

22   A.  I would say yes.

23   Q.  And that was pursuant to direction and authority

24   from you as president of Rig Ventures?

25   A.  That is correct.

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

52

1    Q.  And all of this consistent and pursuant to his

2    consulting agreement whereby he's paid an amount of

3    money at your discretion, but with agreement with him,

4    when and if Rig Ventures enjoys a profit?

5    A.  That's correct.

Page 48

SanchezEmilio

6    Q.  And if they didn't enjoy a profit, he didn't get

7    paid a consultant fee?

8    A.  That is correct.

9    Q.  Was no other person authorized to sign Rig

10   Ventures checks besides you?

11   A.  My son Emilio was authorized to sign it, and my

12   daughter Christina, I think, was authorized to sign it.

13   Q.  And does Rig Ventures have just this one checking

14   account with Coastal Bank that we see referenced in the

15   documents?

16   A.  I think we've had that for many years, only one

17   account with them.  I don't know if we had another

18   account with another thing.  I believe during the period

19   of time, that's the only account we had.

20   Q.  Is that true today?

21   A.  Yes.

22   Q.  Does Rig Ventures have a savings account?

23   A.  No.

24   Q.  Does Rig Ventures have any other bank account

25   whatsoever?

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

53

1    A.  No.

2    Q.  Does Rig Ventures have any certificates of

3    deposit?

4    A.  No.

5    Q.  Are there any long-term investments that would

6    not be reflected on the balance sheet?

7    A.  None.

Page 49

SanchezEmilio

8    Q.  Or short-term investments, for that matter?

9    A.  None.

10   Q.  Any investments or any assets and liabilities of

11   Rig Ventures would be shown on the balance sheets that

12   your attorney has provided to me in conjunction with

13   this lawsuit?

14   A.  That's correct.

15   Q.  Does Rig Ventures borrow money from any bank?

16   A.  Yes.

17   Q.  From Coastal Bank?

18   A.  Coastal Bank.

19   Q.  Any other bank?

20   A.  No.

21   Q.  And that's Coastal Bank here in Brownsville?

22   A.  That is correct.

23   Q.  And who is your account manager there?

24   A.  Walter Pawkett, P-a-w-k-e-t-t.

25   Q.  Does Rig Ventures currently have any outstanding

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

54

1    loans with Coastal Bank?

2    A.  Yes.

3    Q.  For what amount?

4    A.  800,000 dollars related to that, but guarantied

5    probably about 4 million dollars.

6    Q.  Guarantied meaning what?

7    A.  Because Rig Ventures guarantied -- probably

8    totaled about 4 million dollars.

9    Q.  You mean on loans from other companies, Rig

Page 50

SanchezEmilio

10  Ventures is a guarantor?

11      A.  Well, Rig Ventures is a guarantor of other loans

12  that were made.

13      Q.  Okay.  Loans made to whom?

14      A.  It all related to the Ocean 66.

15      Q.  Loans made to whom?

16      A.  To Rig Ventures or -- well, it was -- they

17  guarantied -- it's cross-reference collateralized to --

18  it was to Tex-Mex Cold Storage and to, at that time,

19  Saber Steel.

20      Q.  Okay.  Let's take them one at a time.  Coastal

21  Bank loaned money to Tex-Mex Cold Storage, correct?

22      A.  Yes.  Uh-huh.

23      Q.  That Rig Ventures was guarantor for?

24      A.  Guarantor for.  They cross-guaranty all of those.

25      Q.  And why is Rig Ventures a guarantor of a debt by

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

55

1   Tex-Mex Cold Storage?

2       A.  Because the bank wants it that way.  That was

3   their requirements.  They cross-collateralized

4   everything.

5       Q.  Cross-collateralized?

6       A.  Yeah.

7       Q.  Is that what you're saying?

8       A.  Yeah.  Guarantied, cross-guarantied everything.

9       Q.  So then the assets and financial wherewithal of

10  all of these various corporations, or at this point in

11  time, anyway, just Saber Steel -- or excuse me -- just

Page 51

SanchezEmilio

12    Tex-Mex Cold Storage and Rig Ventures, Coastal Bank --

13    A.  And also Dominion Shipping, I think, is in that

14    group.

15    Q.  -- and Dominion Shipping, the bank looks at or

16    requires guaranties from any of the other two when

17    loaning to the third.  So they're looking at the assets

18    of all three --

19    A.  That is correct.

20    Q.  -- to guaranty the debt to any one?

21    A.  That is correct.  Probably in the neighborhood of

22    4 million dollars.

23    Q.  Okay.  And are you a guarantor on the Rig Venture

24    loan?

25    A.  Yes, I am.  Personal guaranty.


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

56


1     Q.  And is that true with regard to the loans made to

2     Tex-Mex Cold Storage and Dominion Shipping?

3     A.  That is correct.

4     Q.  And Dominion Shipping is an active corporation

5     today?

6     A.  Yes, it is active.

7     Q.  It's still fifty/fifty with you and Richard

8     Jaross?

9     A.  That is correct.

10    Q.  And you are the president?

11    A.  That's correct.

12    Q.  And he's a consultant?

13    A.  And half owner and consultant, right.

Page 52

SanchezEmilio

14    Q.  But he's not an employee?

15    A.  No.

16    Q.  Are you familiar with the principal and interest

17   payments and loan amounts with regard to the loans made

18   by you to Rig Ventures?  And I'm shifting gears here on

19   you.  We were talking about loans from the bank to Rig

20   Ventures.  Now I'm talking about loans from you to Rig

21   Ventures.

22    A.  I'd have to look at the records.  I don't recall

23   what they are.  Whatever the -- whatever the bank -- I

24   mean, the financials show and whatever the financials

25   show.  I don't recall what they are.


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

57


1    Q.  But if you looked at the financial statements?

2    A.  That would tell.  If I looked at them to show me

3   when I agreed to it, yes or no.

4    Q.  Okay.  We'll get there.

5         Likewise, you would be the person with

6   knowledge regarding any draws on equity of Rig Ventures,

7   correct?

8    A.  That's correct.  Yes, I would.

9    Q.  And would you as sole shareholder of Rig Ventures

10   take draws on equity from time to time?

11    A.  I don't recall ever having done that.

12    Q.  Where does your compensation, if any, from Rig

13   Ventures derive?

14    A.  Whenever we make a profit.  We haven't ever made

15   a profit in the last -- many years.

Page 53

SanchezEmilio

16    Q.  So you are saying that you never took any draws

17  on equity out of Rig Ventures?

18    A.  I am almost positive I never have, but I

19  wouldn't -- I'm about a hundred percent certain I never

20  have drawn any money out of Rig Ventures, other than

21  when I loaned money and I was paid back, maybe.

22    Q.  Okay.  So that's on a debt, correct?

23    A.  That's on debt.

24    Q.  Right now I'm talking about equity.

25    A.  No, never have.

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

58

1    Q.  Okay.  Now, earlier you indicated that Mr. Jaross

2  would be paid when the company enjoyed a profit.

3    A.  That's correct.

4    Q.  Has Mr. Jaross never been paid in connection with

5  the Ocean 66 job?

6    A.  I don't recall if he ever has.

7    Q.  You don't know one way or the other?

8    A.  I'd have to look at the records, because it's

9  many years and a lot of transactions, many corporations

10  and --

11    Q.  Okay.

12    A.  Whatever the records show is whatever it is.

13    Q.  Is it safe to say that with regard to bookkeeping

14  matters and accounting matters, we should direct any

15  inquiry on those matters to your daughter?

16    A.  Yes.  I would say she would be -- more

17  intelligently answer that.

Page 54

SanchezEmilio

18          MR. WEBRE:  Okay.  Luis, do you have a copy

19    of the financial statements that Mr. Sanchez could

20    follow?

21          MR. HERNANDEZ:  I can get one.  Are we still

22    on the record or off the record?

23          MR. WEBRE:  Off the record.

24          (Recess 11:04 a.m. to 11:21 a.m.)

25    BY MR. WEBRE:


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

59


1     Q.  We spoke about payments to Mr. Jaross and you

2     indicated how those were derived or determined.  Would

3     Mr. Jaross be paid for his expenses in connection with

4     salvage operations of the Ocean 66?

5     A.  Yes.

6     Q.  And how were those paid?  Were they paid monthly?

7     A.  As they occurred.  I would advance him money or

8     he would submit me an expense report and I would pay him

9     from there.  Could be Mystic Shipping, one of his

10    corporations.

11    Q.  Mystic Shipping?

12    A.  I think "Mystic," M-y -- Mystic Shipping is

13    mainly, I think, to that.

14    Q.  And you would advance money to Mystic Shipping?

15    A.  Or he would submit an invoice from Mystic

16    Shipping and I would pay him for expenses he had in

17    conjunction with going to do some work for Rig Ventures.

18    Q.  And do you think that he did so with regard to

19    the Ocean 66 job?

Page 55

SanchezEmilio
20    A.  I'm pretty sure he did, but I'm not positive.

21    Q.  Would you be able to make that determination from

22  looking at the balance sheet or income statement?

23    A.  Have to be from the bank -- from the bank

24  statement.

25    Q.  And you would also advance Mr. Jaross money

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

60

1  individually?

2    A.  Well, yes, to go and maybe do a job.  I think I

3  did it on occasions.

4    Q.  And this would be for -- for what?  Travel,

5  maybe?

6    A.  For travel, for hotel, for rental, car rentals

7  and things of that nature.

8    Q.  Would you also reimburse him after expenses were

9  incurred?

10    A.  Yes.  Uh-huh.

11    Q.  So sometimes you would advance --

12    A.  Sometimes he would just put out of his credit

13  card and then invoice me and I'd pay him, Mystic

14  Shipping.

15    Q.  Was it more often than not an expense incurred by

16  Mystic Shipping or by Mr. Jaross?

17    A.  He would -- he would invoice me under Mystic

18  Shipping.  I don't know how he handled his internal.

19  That's his company.  I don't know how he handled that,

20  to be frank with you.

21    Q.  Okay.  Going back to the agreement you had with

Page 56

SanchezEmilio

22    Mr. Jaross regarding Rig Venture operations and

23    specifically Ocean 66, you indicated that y'all have

24    this agreement whereby he provides technological

25    consulting and in that context he is essentially

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

61

1    conducting or directing the daily affairs of the salvage

2    operations, correct?

3        A.   Well, operating, I wouldn't consider that,

4    because sometimes we would hire a company called Unifab

5    in Lake Charles who is a subcontractor -- I mean a

6    contractor, and he would do certain things and we

7    wouldn't supervise him.

8        Q.   Sure.  And I understand there may be times when

9    that would occur, but you would also agree, though,

10   would you not, that by and large he was directing the

11   activities, the salvage activities that would be

12   performed and when they would be performed aboard the

13   Ocean --

14       A.   Yes, I would think so.  Uh-huh.  But as far as

15   operational, I look at operational -- he was on the rig

16   directing the people like Frank Garcia -- Frank Ruiz,

17   Senior, would do, or Phil Wells would do.  Richard

18   didn't do that.  He would just tell Frank this is what

19   we want done, go get your people and go get your, you

20   know, get your equipment and get your -- make your

21   arrangements and do it.  But he wouldn't -- Richard

22   would not go physically on the rig and watch it done.

23       Q.   But he did -- he did visit the Ocean 66 on

Page 57

SanchezEmilio

24  occasion when the crew was aboard the Ocean 66

25  performing salvage operations, did he not?


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

62


1       A.  He might have.  The last operation on Jamie

2   Gilbert, I know he didn't.

3       Q.  Okay.  But prior to that time, he was --

4       A.  He did go on the rig when he was out at sea,

5   you're right.  When it was out at sea, he went out there

6   one time, I believe, to see how it was going.

7       Q.  And he -- and he spoke with Frank Ruiz pretty

8   much on a daily basis?

9       A.  I would -- he would communicate more or less on a

10  daily basis.

11      Q.  And he did that by way of a phone --

12      A.  Yes.

13      Q.  -- that Rig Ventures paid for, right?

14      A.  That is correct.  That is correct.

15      Q.  And Mr. Jaross presumably made those phone calls

16  from -- anywhere ranging from his office to his house to

17  his cell phone, correct?

18      A.  That is correct.

19      Q.  Where does Mr. Jaross live?

20      A.  He lives here in Brownsville now.

21      Q.  How long has he lived in Brownsville?

22      A.  He came back about eight months ago.  He was

23  living prior to this in Wilmington, North Carolina.

24      Q.  Why did he move back; do you know?

25      A.  To run the operations, ship dismantling operation

Page 58

SanchezEmilio

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

63

1    called Esco Marine.

2        Q.   Is that a company you own?

3        A.   Oh, yeah, that's another company I own -- I

4    owned.  I sold it.  Esco Marine, Inc.

5        Q.   You sold it to whom?

6        A.   To Richard -- wife, Richard's wife, and a company

7    out of New York called Redstone Capital.

8        Q.   When did you sell it?

9        A.   December -- 50 percent in about July, and

10   50 percent December of last year, 2003.  And Richard

11   came back to operate that company.

12       Q.   And what's the -- what did that company do?

13       A.   It's dismantle Maritime vessels.

14       Q.   Has the change of ownership, to your knowledge,

15   been communicated to the Texas Secretary of State?

16       A.   Yes.  I think it was -- they -- I think they

17   changed the registered agent.  They were instructed to

18   change the registered agent and we notified everybody

19   involved.  There's a lawyer out of New York that's

20   handling that called -- name is Richard Zimmerman, that

21   handled the affairs.

22       Q.   Was this a Delaware Corporation?

23       A.   It's a Delaware Corporation.

24       Q.   Still is?

25       A.   Uh-huh.  Yes.

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989
Page 59

SanchezEmilio

64

```
 1     Q.  Okay.  Now, do you know where Mr. Jaross's
 2  residential address is?
 3     A.  About half a block from here.  It's --
 4     Q.  If you don't know, that's fine.
 5     A.  It's -- I don't know.  It's -- I don't recall the
 6  name.
 7     Q.  Do you know the street name?
 8     A.  Yeah, I was trying to think of the street name.
 9  184 Shallow Brook or something like that, Shallow Lane.
10  I'm not exactly sure of the street address.
11     Q.  Do you know whether Esco Marine is a company
12  involved in the salvage of a U.S. Armed Services boat
13  that has been decommissioned, I think, in Corpus
14  Christi?
15     A.  They are the owners of that one.  A joint venture
16  with another company called Resolve Marines.
17     Q.  Are you involved in that project at all?
18     A.  Not now, because I sold my company.
19     Q.  Right.
20     A.  But Esco has got that contract with the Navy.
21  That's with the Navy.
22     Q.  And Rig Ventures isn't involved at all?
23     A.  No.
24     Q.  So is it fair to say, then, in connection with
25  the operations, salvage operations aboard the Ocean 66,
```

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

65

Page 60

SanchezEmilio

1    that Mr. Jaross was directing the operational aspect of

2    things and you were directing the financial aspect of

3    things; is that correct?

4        A.  That's correct.

5        Q.  And so that you each had a say in the direction

6    that Rig Ventures and the salvage of Ocean 66 was going?

7        A.  That would be correct.

8        Q.  Who -- or strike that.

9            Are you aware of any state or federal

10   statutory or regulatory requirements put upon the owner

11   of a vessel such as the Ocean 66 to provide a safe

12   workplace, including adequate supervision and training

13   of persons working aboard?

14       A.  I'm not -- I'm not familiar with that, but there

15   probably is.

16       Q.  Okay.  Who of Rig Ventures would be the person to

17   speak to about that?

18       A.  I would think Richard Jaross is more aware of it

19   than I am.

20       Q.  Have you and Mr. Jaross ever discussed any state

21   or federal regulatory requirements pertaining to salvage

22   operations conducted by Rig Ventures?

23       A.  In reference to state or federal regulations?

24       Q.  Any regulations, state, federal, local.

25       A.  Yes, we have.  Coast Guard regulations and what

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

66

1    we call COFR, which is pollution requirements insurance

2    and things of that nature, yes, we have discussed.

Page 61

SanchezEmilio

3    Q.  When was the last discussion of that kind?

4    A.  In reference to the Ocean 66, or reference to

5    other ships?

6    Q.  In reference to any ship.

7    A.  Probably three months ago.

8    Q.  Now, was that pertaining to Ocean 66?

9    A.  No.

10   Q.  Do you recall any specific discussions regarding

11   regulatory or statutory compliance regarding Ocean 66?

12   A.  Probably when we brought it into port of Lake

13   Charles, which was about two years ago, whatever it was.

14   Q.  Do you consider yourself an expert in Coast Guard

15   regulations?

16   A.  No.

17   Q.  OSHA regulations?

18   A.  No.

19   Q.  Or any state or federal regulatory --

20   A.  No.

21   Q.  -- requirements?

22   A.  Expert, no.

23   Q.  Do you have working knowledge of those

24   regulations?

25   A.  Some of it I have working knowledge, but mainly

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

67

1    Coast Guard regulations.

2    Q.  Do you know whether any Coast Guard regulations

3    put upon the owner of the Ocean 66 any obligations to

4    provide a safe workplace?

Page 62

SanchezEmilio

5    A.  I'm not familiar with that.

6    Q.  And you have told me you have never had any kind

7  of ship captain's license or anything like that, right?

8    A.  Never have.

9    Q.  And you never have any -- or rather, you don't

10  have any certifications or awards or recognitions of any

11  kind in connection with Coast Guard or OSHA regs?

12    A.  None.

13    Q.  And to your knowledge, neither does Mr. Jaross?

14    A.  I do not know.

15    Q.  Does Rig Ventures employ any person or company,

16  employee or contract labor, to assist Rig Ventures in

17  navigating these regulatory waters, if you will?

18    A.  To a very limited extent.  I think Frank Ruiz,

19  Senior, had a rig master's license, but Mr. Jaross would

20  have to explain what that is.  I heard that he had

21  rig -- I know he had a rig -- because the Coast Guard

22  would check on us and he had to have a current rig

23  master, I think they call it.

24          Could I clarify something?

25    Q.  Sure.

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

68

1    A.  There's another company that I own called

2  "Sanship, Inc."  It also is in the dismantling

3  operation.

4    Q.  I'm sorry.  What's the name of that company?

5    A.  S-a-n-s-h-i-p, Sanship, Inc.

6    Q.  Is that an active --
Page 63

SanchezEmilio

7    A.  Yes, that's an active corporation.

8    Q.  And you're sole shareholder?

9    A.  Yes.

10   Q.  Does Coastal Bank also require

11   cross-collateralization as you indicated before

12   regarding Sanship, Inc.?

13   A.  Sanship, Inc., has borrowed money from my --

14   Texas State Bank.  It's not involved in Coastal Bank.

15   Q.  Okay.  Does Texas State Bank require the

16   collateral of any of these other corporations you have

17   mentioned or that the other corporations be guarantors

18   for Sanship?

19   A.  Yes.  Yes.

20   Q.  It has?

21   A.  Yes.

22   Q.  Likewise, have you been required to be guarantor?

23   A.  Yes.

24   Q.  In connection with your being a guarantor on

25   these various loans, have you provided financial

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

69

1    statements to Coastal Bank or this other bank you

2    mentioned?

3    A.  Yes.

4    Q.  You have?

5    A.  Uh-huh.

6    Q.  As recently as when?

7    A.  Last week.

8    Q.  Last week.  And to what bank?

Page 64

SanchezEmilio

9      A.   I think I did it at Coastal, for Dominion

10   Shipping, and I've done it over the last three months to

11   Texas State Bank.

12      Q.   In connection with a loan made to Sanship?

13      A.   To Sanship, right.  And Texas -- Tex-Mex Cold

14   Storage also was a loan from Texas State Bank to

15   Sanship, Emilio Sanchez, et cetera, et cetera.

16      Q.   Wait.  I'm sorry.  I missed that.

17      A.   Okay.

18      Q.   Texas State Bank loaned Tex-Mex Cold Storage?

19      A.   They bought the note from Coastal.  Texas State

20   Bank paid off Coastal for --

21      Q.   And when did that happen?

22      A.   Around three months ago.

23      Q.   Why did you switch from Coastal to Texas State on

24   that?

25      A.   Coastal wanted me to reduce the line there,


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

70


1    because they were in the process of being bought out by

2    Hibernia, which I think it's going to happen.

3       Q.   And who is the contact person, your contact

4    person at Texas State Bank?

5       A.   John Robello.  He's the president of the

6    corporation -- Brownsville, president of Brownsville.

7       Q.   Do you recall how much money you put into Rig

8    Ventures when it was formed; in other words, your

9    initial capitalization?

10      A.   I think it was a thousand dollars, the standard
                          Page 65

SanchezEmilio

11  thousand dollar capitalization fee.

12      Q.  You say standard.

13      A.  Yes.  Common -- common -- here it is, common

14  stock, a thousand dollars.

15      Q.  Okay.  When you say standard, that's --

16      A.  Well, that's a figure I always use.  It's maybe

17  just standard for me.

18      Q.  At that time did you also purchase any type of

19  liability insurance?

20      A.  No.

21      Q.  Any time thereafter did you purchase any type of

22  liability insurance to cover potential liabilities

23  arising from operations aboard vessels?

24      A.  Only towing insurance, I believe.  We also had

25  towing insurance and pollution insurance when we towed

1  the ship.

2      Q.  Okay.  And that would cover what type of loss?

3      A.  In the event that the tow damaged the ship or the

4  ship was lost or the vessel was lost, or Ocean 66, or it

5  polluted the waters, that was what it would cover.

6      Q.  It wouldn't cover bodily injury or death?

7      A.  No.

8      Q.  Are you sure about that?

9      A.  Well, when it was being towed?

10      Q.  Yes, sir.

11      A.  There was nobody on it.  Oh, yes, there was.

12  They were on it.  They were on the ship.  No, I don't

SanchezEmilio

13    believe we had -- I don't believe we had -- I'm not

14    positive.

15        Q.  Who would handle -- who would handle matters such

16    as procuring liability insurance in connection with

17    operations aboard a Rig Ventures vessel?

18        A.  Mainly Richard.

19        Q.  Richard?

20        A.  Yeah.  He would get the towing insurance, because

21    he'd deal with the insurance companies and the COFR,

22    what we call COFR, the pollution, and he might have had

23    employees, but I don't recall, and -- when it was in

24    tow.

25        Q.  Yes, sir.  I understand.  When it was in tow from

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

72

1    Ship Shoal 134 to Lake Charles, Louisiana?

2        A.  That's correct.

3        Q.  Does Rig Ventures still own Ocean 66?

4        A.  Yes.

5        Q.  And it's still in Lake Charles, Louisiana?

6        A.  That is correct.

7        Q.  Is there any contract for sale --

8        A.  No.

9        Q.  -- pending?

10        A.  No.

11        Q.  Are you listing, advertising its sale anywhere?

12        A.  Yes, we are.

13        Q.  Where are you advertising its sale?

14        A.  There's a company called VenueBid, it's out of

Page 67

SanchezEmilio

15   Houston, that advertises for sale.

16       Q.  What's your asking price on the Ocean 66?

17       A.  About 1.4 million.

18       Q.  Has that always been the asking price, or have

19   you come down recently?

20       A.  We've come down, because there's nobody.

21       Q.  From what price?

22       A.  From 3 million, something like that.

23       Q.  You didn't have any nibbles at 3 million?

24       A.  No, I have not.

25       Q.  Did you have any prospective for potential buyers

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

73

1    at one point in time?

2        A.  There's tire kickers around, but you have a lot

3    of that in this industry.

4        Q.  See, and I didn't even know ships had tires.

5        A.  They do.  Tire kickers they have.

6        Q.  I believe you've indicated, perhaps in discovery

7    or elsewhere, and correct me if I'm wrong, but is it

8    generally true that Rig Ventures provided the equipment

9    and tools necessary for the operations aboard the Ocean

10   66?

11       A.  Not all of them.  I would say a lot -- majority

12   of them we did.  Because the contractors had their own

13   tools a lot of time, welding -- cutting torches,

14   welding, pumps, sometimes, they furnish a lot of that,

15   hoses.  Or we would get it for them.  We would get them

16   the big items like compressors, generators, things like

SanchezEmilio

17    that.

18        Q.  Does Tex-Mex Cold Storage have employees?

19        A.  Yes.

20        Q.  How many employees?

21        A.  65.

22        Q.  Do you use contract labor to perform any of the

23    functions required at Tex-Mex?

24        A.  Yes.  Uh-huh, we do.

25        Q.  Like what?

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

74

1        A.  Heading -- heading the shrimp, it's all under

2    contract work.

3        Q.  Why is that?

4        A.  Well, because they -- it's more productive, first

5    of all, and we don't want to hire them because they're

6    temporary.  You know, they work and they come

7    whenever -- come and go whenever they want.  They're

8    independent contractors.

9        Q.  Do you hire them through a temp service?

10        A.  No.

11        Q.  You just --

12        A.  We just open the doors and they come and they go

13    when they want to.

14        Q.  Do you pay them cash?

15        A.  Cash, uh-huh.

16        Q.  Do you issue 1099's?

17        A.  No.

18        Q.  Why not?

Page 69

SanchezEmilio

19    A.  Because they're independent contractors and we

20   don't -- their casual workers.  They come and go

21   whenever they want to.

22    Q.  Same question regarding Rig Ventures.  Did you

23   issue 1099s to any of the laborers?

24    A.  I don't recall that we did, but my daughter would

25   have to answer that, Norma Garza.  I don't know if we

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

75

1    did.  I think we might have.

2     Q.  If you did not, can you tell me why you did not?

3     A.  I cannot tell you that.  Maybe an oversight.

4     Q.  Who would be the person typically responsible for

5    ensuring that 1099s would be --

6     A.  Well, my daughter would be the one that would be

7    able to answer that question.  She would be responsible

8    for issuing those.

9     Q.  And she's been off the clock, so to speak, and

10   not being paid anything for how long now?

11    A.  A couple of years, something like that.

12    Q.  But as we sit here today, your testimony is that

13   she's the one responsible for issuing 1099s?

14    A.  She handles all the financials on the thing right

15   here, that is correct.

16    Q.  Is this a job or a task that you have assigned to

17   her, or is it just understood between the two of you?

18    A.  Well, she handles all my -- all my corporation --

19   except Tex-Mex.  It's handled by another firm called

20   Long and Chilton.  We do our internal one and she

Page 70

SanchezEmilio

21  doesn't handle Tex-Mex.  It's done by another accounting

22  firm.  But she prepares all the tax things and -- for

23  the other corporations.  All these are prepared by her.

24      Q.  These financial statements?

25      A.  Yeah.  Uh-huh.


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

76


1       Q.  And the tax returns?

2       A.  Tax returns were prepared by Burton McCumber.

3           I'm sorry.  I didn't turn this off.

4   Prepared by a company called Burton McCumber.

5       Q.  Yes, sir.

6       A.  They're the ones that have been preparing the tax

7   returns for many years.

8       Q.  Would your daughter provide to that CPA a Quick

9   Books or something like that?

10      A.  That's correct.

11      Q.  To your knowledge, those source documents

12  provided to the CPA still exist?

13      A.  I think they should.  Yes.  Uh-huh.

14      Q.  Do you know whether this balance sheet and income

15  statement were a product of Quick Books?

16      A.  Yes, they were.

17      Q.  They were?

18      A.  Uh-huh.

19      Q.  And is it -- I mean, I'm saying Quick Books, but,

20  you know, there's several such --

21      A.  Quick Books.

22      Q.  It is Quick Books?
                    Page 71

SanchezEmilio

23    A.  Quick Books.

24    Q.  Okay.  Do you have those -- scratch that.

25        Do you have the same type of financial

1    statements for your personal finance?

2    A.  Personal finance?

3    Q.  Yes, sir.  In other words, you provided financial

4    statements to Coastal Bank and to Texas State Bank

5    fairly recently.

6    A.  Oh, you mean my personal financial statements?

7    Q.  Yes, sir.

8    A.  I prepare those myself.

9    Q.  Do you use any type of software program?

10   A.  No.

11   Q.  Just the old fashioned ledger and pencil?

12   A.  I just go -- I just go to the corporation and

13   say, well, this one is worth this and I write it, and

14   this one lost this and write it.

15   Q.  And that's what you have recently provided to

16   both --

17   A.  I've been both banks for many years.

18   Q.  Okay.  Looking at the Rig Venture balance sheet

19   as of December 31, '01 --

20   A.  Uh-huh.

21   Q.  -- there's a document, top left that indicates

22   3:28 p.m.

23   A.  Uh-huh.

24   Q.  We're looking at the same document?
                        Page 72

SanchezEmilio

25     A.  Yes.


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

78


1     Q.  Can you tell me -- let's just kind of go through

2     this stuff.  The first thing I'm concerned or interested

3     in is the loan to Jonathan Feffer.

4     A.  That is a person we dealt with in Europe that we

5     advanced him moneys and then we owed him moneys in the

6     corporation.

7     Q.  I'm sorry.  You advanced him -- how much money

8     did you advance him?

9     A.  Well, 703,000 at that time.

10     Q.  Who is this gentleman?

11     A.  He's a broker and one that handled a lot of our

12     stuff that we brought out of Russia.

13     Q.  So you provided -- do you have --

14     A.  Advance him funds.

15     Q.  Do you have a document, a promissory note of some

16     type reflecting this --

17     A.  It's been a while since that's -- I don't know

18     what we have on that.  It's some kind of document on

19     that.  I'm not sure where it is.

20     Q.  Well, you would agree with me that this is a

21     fairly extraordinary loan, correct?

22     A.  Right.

23     Q.  And surely there is some document reflecting the

24     terms and conditions --

25     A.  There was some transaction -- I'm sorry.


Page 73

```
 1      Q.  There is some document reflecting the terms and
 2   conditions surrounding this loan of seven-tenth's of a
 3   million dollars?
 4      A.  Right.  Uh-huh.
 5      Q.  Right?
 6      A.  Yes.  Because we also -- on the notes payable, we
 7   owed him 2.1 million dollars.
 8      Q.  Is that the --
 9      A.  Part of the same operation.
10      Q.  -- Bomar Limited?
11      A.  Uh-huh.
12      Q.  Jonathan Feffer is a principal --
13      A.  Yes, he was --
14      Q.  -- of Bomar Limited?
15      A.  Right.  Uh-huh.
16      Q.  But the note, the loan to Jonathan Feffer, is
17   that a loan to him in his individual capacity?
18      A.  There was some advances on there we have coded as
19   a loan to him.  It was advances and we owed him.  It was
20   a back-and-forth thing, you know.  We left it on the
21   books for many years and finally --
22      Q.  What is the status of that today?
23      A.  I think it's been canceled out.
24      Q.  As bad debt?
25      A.  Yeah.  Uh-huh.  And the debt that we owed him has
```

SanchezEmilio

80

1  been canceled out.

2      Q.  Was that pursuant to discussions or an agreement

3  with Bomar or --

4      A.  Well, it just was on the books for many years and

5  nothing happened on it, nothing was happening on it.  We

6  just canceled it out.  It was a -- it's an off -- it's a

7  channel island corporation of his.

8      Q.  Channel island corporation?

9      A.  Yeah.  Uh-huh.

10     Q.  An offshore corporation?

11     A.  Right.  Uh-huh.

12     Q.  Did you employ an attorney to assist you with

13 collection of any portion of this debt?

14     A.  No.

15     Q.  And did Bomar employ an attorney?

16     A.  No.

17     Q.  How is it that an amount of this magnitude simply

18 is written off?

19     A.  Well, because we have continued business in

20 Russia on some other rigs we bought called the Shelf

21 four and that was under -- I think it was Rig Ventures.

22 I don't recall the circumstances.  It's been a while.

23 It's been a while.

24     Q.  Well, are you saying that your continuing

25 business in Russia is in some -- is in some way

SanchezEmilio

1  consideration for your forgiveness of this debt?

2      A.  I think that -- we just decided to wipe it out.

3      Q.  So you are continuing to do business with Bomar

4  Limited and/or Jonathan Feffer in Russia?

5      A.  Yes.

6      Q.  Has the IRS or the bank questioned you or Rig

7  Ventures --

8      A.  No.

9      Q.  -- in connection with that loan?

10     A.  No, they have not.

11     Q.  December 31, this same balance sheet shows

12  payroll liability of 9,845, and you testified earlier

13  that Rig Ventures has not had any employees for two or

14  three years.  So does it look to you like maybe '01 was

15  the last year you had employees and there was an

16  outstanding amount owed?

17     A.  Evidently that would be correct, because on the

18  profit and loss, I show a payroll expense of 5,512

19  dollars.

20     Q.  Okay.  Now, hold on.  You're talking about the

21  January through December --

22     A.  Right.

23     Q.  -- 2001 profit and loss statement of Rig

24  Ventures?

25     A.  So evidently that was about the time we probably

1  owed money on taxes and showed it as a liability, right.

2      Q.  You showed taxes on your payroll as a liability

SanchezEmilio

3  entitled "Payroll Liability" on your balance sheet?

4      A.  Right.

5      Q.  And earlier you were referencing a figure on the

6  P&L statement from '01, and what was that?  A salary?

7      A.  It says payroll taxes.

8      Q.  Oh, I see.

9      A.  Down at the bottom, 5,512.  Evidently we had

10  employees at that time.

11      Q.  You think that salary of 68,000 in change was --

12  or 68,564 was split between your daughter and son?

13      A.  Daughter and son and might have been at that time

14  we had another employee that was a secretary up in

15  Wilmington called Ila Louise that at one time she drew a

16  salary on Rig Ventures.  She worked up there and worked

17  for Richard and we paid her some salary there.

18      Q.  What did you pay her?

19      A.  I forget.  It was -- I remember the net was about

20  1,056 every two weeks, something like that.

21      Q.  And when did that end?

22      A.  I don't know.  Probably right around this time.

23      Q.  Does your son or has your son or your daughter,

24  Emilio Sanchez, Junior, or Norma Garza -- is it Garza?

25      A.  Garza, uh-huh.

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

83

1      Q.  -- have either of them drawn any equity from Rig

2  Ventures?

3      A.  No.

4      Q.  Do either of them have any loans to or from Rig

Page 77