SanchezEmilio

5   Ventures?

6       A.  No.

7       Q.  Does your wife have any loans to or from Rig

8   Ventures?

9       A.  No.

10      Q.  Has your wife drawn any equity on Rig Ventures?

11      A.  No.

12      Q.  And your wife is not a party to any of the loans

13  that you have made to Rig Ventures or that Rig Ventures

14  has made to you?

15      A.  No.

16      Q.  On this P&L statement from '01 that you mentioned

17  when you first looked at with me --

18      A.  Right.

19      Q.  -- the consulting fee of 105,000 dollars --

20      A.  That might -- you know, I bet that's -- I don't

21  know what that break-out is.  It might be Richard

22  Jaross.

23      Q.  Is that something you could determine from the

24  bank statements?

25      A.  Yeah, I think I could.  Yeah.  Well, I have to go

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

84

1   through the whole year.  Probably Richard Jaross,

2   because we're making money, as you can see, so he was

3   getting compensation.

4       Q.  And earlier you testified that --

5       A.  Oh, these don't have the name of it.

6       Q.  I think if you look, you'll see reduced copies of

Page 78

SanchezEmilio

7  checks at the end of each statement or at the end of

8  some of them anyway.

9     A.  Yeah.

10    Q.  Would those consulting fees by Rig Ventures to

11  Richard Jaross be paid to Richard Jaross or to Mystic --

12    A.  Probably to Mystic or Richard Jaross or -- you

13  know, I don't recall.

14    Q.  Is Mystic a Texas corporation; do you know?

15    A.  See, Tina.  There's my daughter, Tina Flores was

16  on a salary one time and Norma Garza was on a -- she was

17  drawing a salary on this one here.  I beg your pardon?

18    Q.  Do you know if Mystic is a Texas corporation?

19    A.  I don't think so.  I don't know.

20    Q.  What did your daughter Tina do for the company?

21    A.  She was my filing -- she'd file and write up the

22  checks.  I'd give her payables and she'd write up.  Then

23  she -- she would -- then she left.  She went to

24  teaching.

25    Q.  And what did you pay your daughter Tina for this

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

85

1  service?

2     A.  It's in the file here.  Probably about 2,500 a

3  month, something like that.

4     Q.  For filing and assisting you?

5     A.  Assisting me in doing letter writing and a lot of

6  things.  Then she left about two or three years ago, and

7  Norma was paying at that time.  I was giving her about

8  2,000 a month, something like that.

Page 79

SanchezEmilio

9    Q.  Was Tina also an employee of Tex-Mex Cold Storage

10   at that time?

11   A.  No.

12   Q.  What about your son Emilio?  Is he an employee of

13   Tex-Mex Cold Storage?

14   A.  He just started up last week.

15   Q.  In what capacity?

16   A.  He's handling the real estate development.  We

17   build houses.

18   Q.  Tex-Mex Cold Storage builds houses?

19   A.  We build homes there.  We have an investment in

20   building homes and selling them.

21   Q.  So Tex-Mex Cold Storage builds spec homes as they

22   are commonly called?

23   A.  Yeah.  Uh-huh.  Generally they're already sold,

24   but we invested a little bit in that and he handles

25   that.


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

86


1    Q.  Is he a contractor?

2    A.  No.  He has another person that contracts

3    building homes.  Tex-Mex is just an investor.  But he

4    handles all the paperwork between Tex-Mex and Dream

5    Homes who has contracted with another called "Jackie

6    Homes."

7    Q.  So he oversees, in a sense, the construction of

8    your spec homes?

9    A.  I would think it's under Mystic Shipping, but I

10   don't pick it up here.

Page 80

SanchezEmilio

11   Q.  Well, it would be during 2000 -- no, excuse me --

12   2001.

13   A.  Sometimes he would ask me -- he would invoice me

14   and then ask me to wire it to his wife's account in

15   wilmington, which was fine with me.  I couldn't care

16   less.

17   Q.  Okay.  And then that invoice from Mystic would be

18   paid?

19   A.  Should be in there.

20   Q.  Should be in here (indicating)?

21   A.  Yeah, I would think it would be in there.

22   Q.  Okay.  Well, let's look here.  We're looking for

23   --

24   A.  Or maybe it's in -- I have a file called "Richard

25   Jaross."  I might have stuck it in there.

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

87

1   Q.  You maintain that file at your office?

2   A.  Yeah.

3   Q.  And what do you maintain in that file?

4   A.  Just correspondence related to Richard Jaross,

5   which I don't know if I put it in here or put it in

6   there.

7   Q.  Would that include correspondence potentially

8   pertaining to the Ocean 66?

9   A.  Yeah.  Uh-huh.  This file?  This one

10   (indicating)?

11   Q.  No, sir.

12   A.  No.  No.

SanchezEmilio

13    Q.   Your Richard Jaross file.

14    A.   No, that would not contain Ocean 66.  It's all in

15    here.

16    Q.   Well, but you early indicated that this payment

17    you made to Mystic in connection with consultation on

18    the Ocean 66 may be in that file.

19    A.   It may be in Richards Jaross's file which is just

20    miscellaneous ship offers and a lot of other stuff that

21    we have.  I might have put it in there.  I don't know if

22    I put it here, whatever you want.

23    Q.   Okay.  So then your Richard Jaross file

24    maintained at your office may well --

25    A.   Could possibly be in there.


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

88

1    Q.   -- include some Ocean 66 documents?

2    A.   No.  Just the Richard Jaross consulting fee is

3    the only thing it would contain, if anything.  It

4    doesn't contain any -- all the Ocean 66 stuff is in

5    here, that goes pertaining to the Ocean 66.  But because

6    of -- I had a Richard Jaross file, when I paid him a

7    thing, I would put it -- maybe put it in there.  Like

8    when I paid invoices, I had a big box on the floor, I

9    put it in there because it would be (indicating).

10    Q.   Yes, sir.  But just so I'm clear, that Richard

11    Jaross file may contain documents referencing payments

12    to him by Rig Ventures regarding Ocean 66?

13    A.   Possibly.  I don't know if he referred to Ocean

14    66, because he was -- we were doing Sanco and Saber and

Page 82

SanchezEmilio

15  other things. We did a variety of things. I don't know

16  what he referred to.

17     Q. Well, when you paid Mr. Jaross -- when Rig

18  Ventures paid Mr. Jaross for his consultations, would

19  those payments be specific to a certain project?

20     A. Not really, no. That would be -- could be over

21  several projects.

22     Q. Okay. During calendar year 2001, what other

23  projects was Rig Ventures involved in?

24     A. Ocean 66, Dominion, Cormorant.

25     Q. I thought Cormorant was a project of Dominion

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

89

1  Shipping.

2     A. Yeah. But I mean he -- he would consult on that

3  too. I mean, it's a mixture of several things he would

4  consult on you're talking about.

5     Q. Yes, sir, I understand. But Dominion Shipping,

6  or Cormorant, rather, was a project of Dominion

7  Shipping.

8     A. That's correct.

9     Q. And so any consultation regarding the Cormorant

10  provided by Mr. --

11     A. Jaross.

12     Q. -- Jaross was pursuant to his relationship with

13  Dominion Shipping.

14     A. Right.

15     Q. And if he's paid on the Cormorant job, then it's

16  going to be a payment coming from Dominion Shipping.

Page 83

SanchezEmilio

17   A.  He never got paid a penny on that.  He never got
18  paid a penny yet, because we haven't made any money.
19   Q.  Okay.  And that's what I'm trying to figure out.
20   A.  Because, I mean, you don't -- to break it out,
21  the invoice say twenty-two -- 2,222 was The Cormorant,
22  3,850 was Ocean 66, 4,500 was Esco Marine.  I mean, it
23  doesn't break it out like that.
24   Q.  So when Rig Ventures would make a payment to
25  Richard Jaross, this amount is not --

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

90

1   A.  Exclusively for.
2   Q.  I mean, it's not an amount that we can trace to
3  work performed on the Ocean 66?
4   A.  Not specifically.
5   Q.  But we do know that during 2001 the only project
6  in which Rig Ventures and Richard Jaross were involved
7  with together was Ocean 66?
8   A.  Rig Ventures?
9   Q.  Yes, sir.
10   A.  Yes, I think that would be correct.
11   Q.  And the same for 2000?
12   A.  I'm not -- oh, Rig Ventures?  I'd have to look at
13  the records, but I think that might be correct.
14   Q.  What records do you need to look at?
15   A.  Well, if I could -- I know -- see, I can tell
16  right here that the only activity that we had --
17   Q.  Right here --
18   A.  -- in 2001 -- okay.  I'm referring to the profit

Page 84

SanchezEmilio

19  and loss for December of 2001.

20      Q.  Okay.

21      A.  It shows all activity was related to the Ocean

22  66.

23      Q.  Meaning what?  You're looking up there --

24      A.  Ordinary income.  The income.

25      Q.  Okay.


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

91


1       A.  So I know that no other ship was involved in

2   that.  Now, you asked me about 2000 -- 2000?

3       Q.  Yes, sir.

4       A.  I'd have to look at the -- do you have the P&L

5   for 2000?

6       Q.  No, sir, I do not.

7       A.  Okay.  I'd have to look at that and then I could

8   tell whether --

9       Q.  What project are you thinking Rig Ventures may

10  have been involved with in 2000?

11      A.  Might have been another rig.

12      Q.  Pan Producer?

13      A.  Pan Producer was under Pan Holdings.  No.

14      Q.  Pan Producer was under another corporation?

15      A.  Corporation Pan Holdings, Inc.

16      Q.  Okay.  Has Rig Ventures ever conducted salvage

17  operations aboard any vessel or pertaining to any vessel

18  other than Ocean 66?

19      A.  I think it has.  I'd have to look at the records,

20  but Rig Ventures probably owned Ocean Traveler and

Page 85

SanchezEmilio
21  Ocean -- I'd have to look at the records.  I believe it
22  had.
23     Q.  Okay.  And what records do you need to look at to
24  make that determination?
25     A.  Well, I'd have to look -- go back and see the

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

92

 1  records from Ocean -- in the particular ships to see if
 2  it was under Ocean -- under Rig Ventures.  See, I've
 3  done 11 offshore rigs in the last 11 years, 12 years, so
 4  each corporation -- I did some in Rig Ventures, some in
 5  Saber Steel, some in Sanco.  So I'd have to go back --
 6  and you're asking me about Rig Ventures, I'd have to go
 7  back and look at Rig Ventures and see if the Ocean --
 8  the Ocean --
 9     Q.  66?
10     A.  Well, the Ocean 66 was there, but the Ocean
11  Traveler, the Ocean Driller, the Ocean Explorer, there
12  was the Ocean Star, the Ocean Liberty, Shelf 4, Shelf 6.
13  You know, I'd have to look at the records.
14     Q.  I understand.
15     A.  I mean, there's so many rigs and corporations, we
16  put one in each one.
17     Q.  Okay.  Will you make an effort to look at those
18  necessary records and when you get your deposition for
19  review, indicate in the errata sheet what other vessels
20  Rig Ventures salvaged?
21     A.  Okay.
22     Q.  Will you do that?
Page 86

SanchezEmilio

23    A.  For what period of time?

24    Q.  Any period of time, ever.

25    A.  From its inception?


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

93


1    Q.  Yes, sir.

2    A.  All right.  There are other rigs.

3    Q.  Okay.  And specifically for years 2000.  We know

4    not in 2001, because you just --

5    A.  I would suspect 2000, the Ocean 66 would be the

6    only one.

7    Q.  Will you confirm that and look up the records?

8    A.  Uh-huh.

9        MR. WEBRE:  Thank you.

10       THE VIDEOGRAPHER:  Can I change my tape?

11       MR. WEBRE:  Absolutely.

12       (Off the record 12:04 p.m. to 12:07 p.m.)

13    BY MR. WEBRE:

14    Q.  On the balance sheet December 31, '01, other

15    assets, see notes receivable of 2.357 million?

16    A.  Right.

17    Q.  Who borrowed that?

18    A.  I'd have to -- they're break-out payments.  It's

19    several corporations.  I'm not sure who that would be.

20    Q.  So that's -- that's --

21    A.  Intercompany stuff, you know.

22    Q.  That's a sum of various notes?

23    A.  That's the -- that's right.  Uh-huh.

24    Q.  Okay.  Where do we look to make --

Page 87

SanchezEmilio
25    A.  There would be a break-out.  We'd have to get a

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

94

1    break-out of that.  I don't think we have that here in

2    the files.

3        Q.  Is that in the tax returns?

4        A.  Maybe just something like this one probably.  I'm

5    not sure.

6        Q.  Are you looking at the tax returns for Rig

7    Ventures now?

8        A.  Right.

9        Q.  Can you determine from those returns --

10       A.  No.

11       Q.  -- the various notes that we just mentioned?

12       A.  I show notes receivable of 3 million and I don't

13   pick it up as a break-out in there.

14       Q.  And where are you looking at that, sir?

15       A.  That's on page -- Rig Ventures here, this page

16   here.

17       Q.  First of all, it's the income tax return for Rig

18   Ventures, correct?

19       A.  This 1120-S?

20       Q.  Yes, sir.

21       A.  All right.

22       Q.  And year 2001?

23       A.  Right.

24       Q.  And what page are you looking at?

25       A.  Well, it doesn't have a page.  It's this one

95

 1    here.  Okay.

 2       Q.  What schedule?

 3       A.  Other deductions at the top.

 4       Q.  Okay.  So you're looking at other current

 5    assets --

 6       A.  Right.  Uh-huh.

 7       Q.  -- notes receivable, 3 million 12?

 8       A.  Right.  Doesn't have a break-out either.

 9       Q.  Where would we go to find --

10       A.  We'd have to get that from -- probably Norma

11    should have that.

12       Q.  Okay.  Do you as president of Rig Ventures have

13    any -- any indication, any knowledge whatsoever as to

14    who these various notes totaling more than 3 million

15    dollars --

16       A.  Not -- no, I don't, right offhand.  When I look

17    at it, I'd recognize it.  I review it -- I review it

18    when I see it, but --

19       Q.  Do you think that at least part of that amount is

20    a loan to Emilio Sanchez, to you?

21       A.  I don't think so.

22       Q.  No?

23       A.  No.  Because it would be offset, because they

24    show down here that they owe me.  It would just offset

25    it, see.

SanchezEmilio

1      Q.  Well, I don't know that it would or not.

2      A.  Maybe not, yeah.  I don't know.  I don't -- I

3  would think it would not be any loan to me.

4      Q.  Okay.  And I just missed what you were talking

5  about.  Where is it indicated the loan to you?

6      A.  Here in the quick sheet, the Quick Book.

7      Q.  Okay.  This is the balance sheet '01.

8      A.  Right.  December 31st, '01, on the long-term

9  liabilities?

10      Q.  Yes, sir.  So you had loaned, at that point in

11  time anyway, the -- is that principal and interest

12  outstanding?

13      A.  I would think so.

14      Q.  Okay.  And that total is 342,869.

15      A.  Right.  That's correct.

16      Q.  And is this going to be pursuant, or was that,

17  rather, pursuant to the promissory note dated

18  December 31, '99?

19      A.  I would think so.

20      Q.  What was the interest rate on that note; do you

21  know?

22      A.  Do you have it there in front of you?

23      Q.  Yes, sir.

24      A.  Does it show?

25      Q.  It doesn't.  It doesn't show a number amount

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

97

1    anyway.
                        Page 90

SanchezEmilio

2    A.  I'm not familiar.  I don't recall.

3    Q.  I think, if I'm reading it correctly, that it's

4  the highest amount allowed by law.  Does that sound

5  right to you?

6    A.  That sounds right to me.

7    Q.  Okay.  Do you know what that amount was during --

8    A.  I'm not familiar with it, at that time, no.

9    Q.  What documents would you need to refer to -- to

10  inform us?

11    A.  Whatever -- whatever my accountant charged the

12  other people on the interest for that particular time.

13  I don't have those figures.  Norma Garza probably has

14  it.

15        MR. HERNANDEZ:  Scott, can we go off the

16  record one second?

17        MR. WEBRE:  Sure.

18        (Lunch Recess 12:12 p.m. to 1:22 p.m.)

19  BY MR. WEBRE:

20    Q.  Mr. Sanchez, earlier we looked at this Exhibit 6,

21  bylaws of Rig Ventures, and though it's not signed, you

22  indicated you would try and find a signed copy?

23    A.  Yes, that's correct.

24    Q.  Do you have any way of knowing whether or not the

25  copy that was eventually signed is the same as this one?

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

98

1    A.  I would think so.  The only copy I've ever seen

2  around is that one.  I'm pretty sure it would be the

3  same one.

Page 91

SanchezEmilio

4          MR. WEBRE:  Luis, can we agree that this is
5     a business record and in the event that the signed one
6     comes in, then would you supply us with that one?
7          MR. HERNANDEZ:  That's fine.
8     Q.  Mr. Sanchez, your lawyer and I spoke about how we
9     should best conduct an inquiry into the cash flow of Rig
10    Ventures in years 2001 and 2002, and for that matter,
11    I'll have to look at it, but potentially in 2000 which
12    would go back to the beginning of the Ocean 66 project.
13    And given that we are lacking some of the documents here
14    today, I think it's been agreed that we will postpone
15    those questions until a time where we have the documents
16    and you can designate the person you would like to
17    testify about that.
18    A.  That would be fine.
19         MR. WEBRE:  Is that okay Mr. Hernandez?
20         MR. HERNANDEZ:  Yes.
21    Q.  Did Richard Jaross have authority to -- I mean,
22    say, one of these occasions where he visited the Ocean
23    66, if he saw that work wasn't being performed pursuant
24    or to his satisfaction he could fire people on that
25    platform?

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

99

1     A.  Yes.
2     Q.  He could have fired Frank Ruiz, Senior, if he
3     wanted to?
4     A.  Yes.
5     Q.  He could have fired Phil Wells if he wanted to?

SanchezEmilio

6    A.  Yes.

7    Q.  Or any of the other laborers on board?

8    A.  Yes.

9    Q.  Do you recall how you paid the laborers including

10   Phil Wells and Jamie Gilbert in connection with their

11   work on Ocean 66?

12   A.  I'd pay them on a day rate whatever work days

13   they work.  It would start out at 75 and it got up to

14   125 or something like that a day.

15   Q.  And it probably varied from one to another,

16   perhaps?

17   A.  Yeah.  It went from -- when it was out at ocean,

18   it went one rate and I think when it was -- they do

19   these special jobs, maybe a little higher.  But the one

20   that kept those records was Frank Ruiz and Phil Wells on

21   the particular job.  Frank Ruiz was in charge out at

22   the -- when the Ocean 66 was out on the Gulf of Mexico

23   and brought it all the way into Port of Lake Charles,

24   then everybody got off.

25              Then we would have special jobs of removing

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

100

1    equipment, so we would call Frank Ruiz and sometimes --

2    he was getting pretty old, he wouldn't go.  As happened

3    on the last one on the Jamie Gilbert incident, Frank

4    didn't want to go or couldn't go or whatever, he was

5    busy, so then he said Phil Wells, you know, get Phil

6    Wells to go.  And Phil Wells got his crew and they went

7    out there and did a specific job and got off.

Page 93

SanchezEmilio

8      Q.  And Phil Wells was then acting as the job foreman

9  or supervisor?

10     A.  Right.  Well, we considered him an independent

11  contractor.  We said go get your people and go get

12  equipment and get the job done.  We want these vessels,

13  our valves, and things that we had sold.

14     Q.  Did you have discussions with Phil Wells about

15  that?

16     A.  No.  I did not have discussions with Phil Wells.

17     Q.  Do you know if Richard Jaross did?

18     A.  I think he did, yes.  He had to hire him and tell

19  him what we wanted.

20     Q.  And so Phil Wells was out there as the foreman or

21  superintending that job pursuant to Richard Jaross's

22  direction and your authority?

23     A.  Yes.  And I would like to clarify, you speak --

24  you say foreman, he was not a foreman, because he was a

25  contractor with his people.

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

101

1      Q.  But he was the one supervising the job?

2      A.  That's right.  Yes, that would be correct.

3      Q.  And supervising the laborers there and what they

4  were doing?

5      A.  That is correct.

6      Q.  And he was your agent on board Ocean 66 to ensure

7  compliance with any applicable regulations and laws?

8      A.  Well, again, you mentioned agent.  He wasn't

9  really our agent.  He was supposed to comply with all
Page 94

SanchezEmilio

10    that as a contractor, just like any other contractor we

11    had.  Like Unifab who did work for us, we assumed that

12    they were complying with the law, OSHA and Coast Guard

13    and everything.  But we never specifically asked them.

14    We assumed they were complying with it.

15            We also had other contractors.  We would

16    hire a barge company to come up there and I assume they

17    complied with -- we assumed they complied with all the

18    regulations.

19    Q.  Okay.  Who was this last company?

20    A.  Well, I think we had a barge -- a little barge

21    company locally that moved the barge around or something

22    like that.

23    Q.  So this barge company and Unifab, when you're

24    employing them to conduct whatever it was they were

25    there to do, would they hire their own personnel to

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

102

1    accomplish the job?

2    A.  They had their own personnel to do the job.  None

3    of ours.  They never used any of our crew.

4    Q.  Okay.  And they paid -- and your crew consisting

5    of whom?

6    A.  Well, Phil Wells and his group.

7    Q.  Okay.

8    A.  Unifab never said I want that group to work with

9    me, not that I know of.

10    Q.  And when Unifab brought its people out there to

11    do whatever they did, would you pay Unifab's people or

Page 95

SanchezEmilio

12    would you just pay Unifab?

13       A.   We'd pay Unifab.

14       Q.   Now, when you paid -- when Rig Ventures paid Phil

15    Wells and Jamie Gilbert and the other members of the

16    crew, you paid them on a day rate, correct?

17       A.   Right.  That's correct.

18       Q.   And that was pursuant to your discretion, right?

19    In other words, you told them, look, I'm paying you on a

20    day rate?

21       A.   Actually, I think it -- what it -- the way it

22    revolved is that Frank or Phil Wells would say I can get

23    these guys, it's going to cost us 110 dollars a day, and

24    we would agree, that's fine, go ahead.  Because there's

25    only three or four of them is all there was.

1       Q.   And then when you paid them -- what frequency

2    would you pay them?

3       A.   At the end of the work generally.  But except

4    when they were out at sea, I think I was advancing a

5    wife or a girlfriend some money on behalf of one of the

6    employees, depending on what Frank Ruiz would tell me.

7    Give the wife a thousand dollars, something like that.

8    So I would -- Frank would tell me and then they'd deduct

9    it from the settlement.

10       Q.   Sure.

11       A.   When Phil Wells -- I think we waited until the

12    end of the contract, then he would tell me how many days

13    he worked.  We didn't keep records of how many days they

Page 96

SanchezEmilio

14    worked.  Phil would keep all those records and then he
15    would tell me there was 19 days at 110, and he would
16    tell me what the rates were for all his employees.
17        Q.  When you say at the end of the contract, you mean
18    the end of the job, right?
19        A.  End of the job, right.  Because we had specific
20    jobs and then they'd finish and they'd get off.  Then
21    we'd have another job, they'd get on and get off.
22        Q.  You didn't have any written agreements with Frank
23    Ruiz, correct?
24        A.  No.
25        Q.  Junior or Senior?

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

104

1        A.  No, I did not.
2        Q.  Or Phil Wells?
3        A.  We did not.
4        Q.  Or Jamie Gilbert?
5        A.  I think Phil might have -- we might have had a
6    written agreement that he was an independent contractor,
7    at one point.  I'm not sure.
8        Q.  Okay.  Will you see if you can locate any such
9    documents?
10       A.  It might have been that he was with Esco, did
11   some work for Esco Marine as an independent contractor.
12   I'll have to look and see what we have on that.
13       Q.  Okay.  Who was responsible at Rig Ventures for
14   compliance with labor, wage and tax laws and
15   regulations?
                    Page 97

SanchezEmilio

16    A.  It would be the independent contractor that we

17  hired.  For the work that was done out there?

18    Q.  Yes, sir.

19    A.  That would be the independent contractors.  Like

20  Unifab had to comply with labor taxes, like the towing

21  company, Dolphin Towing had to comply with labor, like

22  USA Labor had to comply with their people.

23            Here's an example.  We hired -- I think it's

24  USA Labor and we asked for two welders and they sent two

25  welders out there and they were employees of USA Labor

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

105

1  and they deducted whatever they had to deduct and they

2  just billed us contract work.

3    Q.  Right.

4    A.  So there's an example of subcontracting with

5  people.  USA Labor and Phil Wells in my estimation was

6  the same thing, because they took care of their own

7  people that they hired or didn't hire.  I think it was

8  USA Labor.

9    Q.  Well, but one difference being that neither Phil

10  Wells nor Frank Ruiz, Senior, paid the members of the

11  crew, whereas Unifab and this barge company would pay

12  the members of their own crews.

13    A.  That would be correct, because when I -- they

14  would tell me.  Instead of me writing a check to Phil

15  Wells, he would ask can you write it to the other

16  people.  It didn't matter to me.  You count on his

17  instructions.  He would tell me the amount of days and

Page 98

SanchezEmilio

18  the amount of what he hired them on and he would

19  instruct me what to do.

20      Q.  Then did you and Phil Wells discuss who would

21  make any necessary tax contributions or anything like

22  that that may be required by IRS?

23      A.  No, we did not.

24      Q.  Did y'all discuss who would issue form 1099s for

25  contract labor?

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

106

1       A.  No, we did not.

2       Q.  Do you know whether 1099s were ever issued to

3   Phil Wells or any other person?

4       A.  I don't think they were.  I'm not sure.  Norma

5   would have to -- I don't think they were, but Norma --

6   my daughter Norma Garza would have to answer that.

7       Q.  Do you know whether 1099s were ever issued to

8   Unifab?

9       A.  No.  I don't think so.

10      Q.  Or to the barge company?

11      A.  I don't think so.

12      Q.  Or to any person providing service to Rig

13  Ventures on an independent contractor basis?

14      A.  I don't think they were, but Norma would have to

15  answer that.

16      Q.  Would Norma also be the best person to comment on

17  accounts payable and receivable entries in balance

18  sheets, income statements?

19      A.  She might be able to tell you how those things

Page 99

SanchezEmilio

20    went, but I might have instructed her how to do those

21    entries, specific entries of what she does.  She

22    probably would tell you what -- be able to tell you on

23    that more precise.

24        Q.  Did you ever pay -- personally, did Emilio

25    Sanchez ever pay Richard Jaross in connection with work

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

107

1    performed on Ocean 66?

2        A.  Looking at the income, I think I did pay him in

3    2001, looking at the --

4        Q.  No.  I'm speaking of you personally, not Rig

5    Ventures.

6        A.  Oh, no.  No.  No.  Absolutely not.  It's always

7    through corporations.

8        Q.  Why was that?

9        A.  Because he didn't do work for me.  He did it for

10    the corporation.

11        Q.  Has Rig Ventures ever loaned money to Dominion

12    Shipping?

13        A.  Yes.

14        Q.  Can you show me that --

15        A.  No, I don't.  I don't -- I guess not.  It doesn't

16    show on here.

17        Q.  Do you have a recollection of --

18        A.  Let me see.  There's 2002.

19            THE WITNESS:  Is two thousand -- do we have

20    2002 Quick Book?  Does it show Dominion on the

21    receivable?  On the receivable.  Got the receivable?
Page 100

SanchezEmilio

22  There should be a receivable.

23          MR. HERNANDEZ:  That's 2002.

24          THE WITNESS:  Oh, this is both, actually.

25  Let me see.  No.  That's this -- I need -- Can I see it?


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

108


1           MR. HERNANDEZ:  It's 2000.

2           THE WITNESS:  Okay.  All right.  Okay.

3    A.  It does look like they did loan Dominion

4    Shipping.  Yeah.

5    Q.  Will you look at the Rig Ventures balance sheet

6    as of December 31, '02, and if this is something that

7    Ms. Garza needs to comment on, then just tell me.  But

8    can you tell me why there was an increase of 685,000 or

9    thereabouts in the liabilities and equity portion,

10   long-term liabilities due to Emilio Sanchez, there was

11   an approximate 685,000 dollar increase from year '01 to

12   '02.

13   A.  She'll have to explain that, because I imagine

14   it's because we collapsed Esco -- I mean, we collapsed

15   Sanco and Saber, and it might have been as a result of

16   that.  She'll have to explain that.

17   Q.  Did you ever attempt to -- as president of Rig

18   Ventures, when you felt it necessary to borrow money,

19   did you compare the terms and conditions of the note

20   required by you, this installment note we looked at

21   earlier, the revolving promissory note, and the interest

22   rates that you could get from a bank, say Coastal or

23   Texas State Bank, compared to what you were charging,
                    Page 101

SanchezEmilio

24    Emilio Sanchez was charging Rig Ventures?

25        A.  Did I ever look at that?

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

109

1        Q.  Yes, sir.

2        A.  Not really.

3        Q.  Why not?

4        A.  Well, I mean, first of all, maybe it's because

5    the bank would not lend me any more money and I had to

6    borrow from myself or other companies, my companies, to

7    do that, and the interest that was charged, I don't even

8    know what it was.  Maybe it was in line with the bank.

9    I couldn't tell you right now.

10        Q.  And because you didn't shop that around because

11    you didn't check that with Coastal Bank, you really

12    don't know?

13        A.  Right.  I don't know what it was, because, you

14    know, you have your floating interest that was -- might

15    have been 8 and a half percent two years ago or 9, it's

16    now down to 6 or 5.75 or whatever.

17        Q.  And, likewise, because you never applied for that

18    loan with Coastal or any other bank --

19        A.  That's right.  I would borrow -- I would be able

20    to fund myself from -- other corporations would lend to

21    this corporation.

22        Q.  Let me finish my question, please.  Because you

23    never made that loan application with a bank on behalf

24    of Rig Ventures, you don't know whether they would have

25    loaned that money to Rig Ventures, correct?

Page 102

SanchezEmilio

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

110

1    A.  I knew that they probably would not because I was

2    probably pretty well up on leverage on everything I had.

3    Q.  Well, if you had the money to loan Rig Ventures

4    to begin with, wouldn't it be a safe bet that that money

5    could be used as collateral to guarantee the payment of

6    that loan?

7    A.  Possibly.  Possibly, yes.

8    Q.  Did you prepare the 2002 tax return for Rig

9    Ventures?  And the reason I ask is it seems like I have

10   one copy that says self-prepared and another one that

11   was prepared by your accountant.  Do you know?

12   A.  I don't think I ever prepared any of that, to be

13   frank with you.  Oh, here it is.

14          MR. HERNANDEZ:  One of them is an amended

15   one to the right -- to the top right of that corner --

16          THE WITNESS:  Oh, here I see that myself.

17          MR. HERNANDEZ -- is amended.

18   Q.  Do you know why this amended return was filed?

19          THE WITNESS:  Where does it show amended?

20          MR. HERNANDEZ:  It shows amended right over

21   here, right here (indicating).

22   A.  Oh, I do not know.  I do not know why that was

23   amended.

24   Q.  Well, you signed that just a little more than a

25   month ago, right?

A BETTER COURT REPORTING SERVICE, INC.
Page 103

SanchezEmilio
(512) 478-1989

111

```
 1      A.  Yeah.  That was amended.  I don't know why they
 2   amended it.  If we amended them, I don't know.  My
 3   daughter would be able to tell you that.  Because
 4   basically it shows the same loss.
 5      Q.  And it doesn't look like Rig Ventures ever loaned
 6   money to Richard Jaross; is that correct?
 7      A.  I don't think it's -- I don't think I ever lent
 8   him money from Rig Ventures, no.
 9      Q.  Or did Richard Jaross loan money to Rig Ventures?
10      A.  Never.  Never.
11      Q.  Who was -- who is Sanco?
12      A.  Sanco is another company I had.  It's Sanco
13   International, and that company has been dissolved.  And
14   it's a company that I had for many years that I would
15   buy ships with it or offshore rigs and sell them, and
16   then there was no more activity on that one and Saber,
17   so we just collapsed them.
18      Q.  What happened to the assets of those
19   corporations?
20      A.  It went to me personally.  It all went -- it
21   comes back to me.
22      Q.  Do you recall what you -- what the net value of
23   assets was that you recovered from those corporations?
24      A.  I don't remember.  I don't know that.
25      Q.  Is it more or less than 100,000 dollars?
```

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

112

Page 104

SanchezEmilio

1    A.  Oh, it should be more than that, yeah.

2    Q.  More or less than 500?

3    A.  I don't recall.  I'd be guessing.

4    Q.  Okay.  The December '01 balance sheet for Rig

5    Ventures reflects a entry of 14,000 dollars note payable

6    First Union?

7    A.  Uh-huh.  That's a credit card.

8    Q.  Okay.  So that should really be in current

9    liabilities, correct?

10   A.  I would think so, yeah.  Probably miscategorized

11   it.

12   Q.  Is there just happenstance that there's an even

13   14,000 and zero cents on that credit card?

14   A.  Must have been exactly.  Must have been exactly.

15   Q.  Do you recall that, you know, what account that

16   may have been used to pay?

17   A.  Probably one of the towing expenses or just

18   general expenses of Rig Ventures borrowed to pay

19   something on.

20   Q.  What is -- in the equity portion of this balance

21   sheet, what's the "AAA," if you know?

22   A.  I don't know.

23        MR. HERNANDEZ:  It's the retained earnings

24   of subchapter S's.

25        THE WITNESS:  Is it?


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

113


1        MR. WEBRE:  Is it?
Page 105

SanchezEmilio

2            MR. HERNANDEZ:  Accumulated adjusted
3    account, I think.
4            THE WITNESS:  Is that what it is?  Yeah, I
5    think that's right.
6            MR. HERNANDEZ:  And I think that's what the
7    subchapter S, the 1120-S's have them.
8       Q.  Did you ever board the Ocean 66?
9       A.  No.
10      Q.  Have you ever seen it?
11      A.  No.
12      Q.  Going to the P&L Rig Ventures statement for
13   December '01, Ocean 66 income of 837,500.
14      A.  Uh-huh.  Yes.
15      Q.  I recall that the amount paid Rig Ventures by
16   Murphy Oil, the seller of the vessel, was 800,000
17   dollars.
18      A.  Right.
19      Q.  What's the thirty-seven five?
20      A.  I don't know if they gave us some extra money
21   because of certain things or if it was a sale that was
22   put in there when it should have been a separate item.
23   I'm not sure.  800 is what the contract was for.
24      Q.  Do you believe your daughter Ms. Garza would --
25      A.  It's possible.  Or maybe they sent us eight --

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

114

1    maybe they sent us eight hundred thirty-six seven
2    thousand dollars, Murphy.  I couldn't tell you.  I know
3    the contract was 800, but it might have been that we did
                        Page 106

SanchezEmilio
4   some extra work or --
5      Q.  Do you know -- turning to the balance sheet as of
6   '02, December 31, '02, the Ocean 66 is shown as valued
7   at 225,749?
8      A.  Yeah.
9      Q.  Do you know where that comes from?
10     A.  That would come from the expenses we paid out
11  against the income we received.  In other words, it cost
12  us 500,000 dollars to get the ship to Lake Charles and
13  they paid us 800,000.  So that's a cost we have.
14     Q.  Is the --
15     A.  Or vice versa, actually.
16     Q.  Is the value of the Ocean 66 potential sales
17  value, sales amount, is that represented anywhere in
18  this balance sheet?
19     A.  No.
20     Q.  Why not?
21     A.  Because you -- I do it on cost.  We do it on
22  accrual cost basis instead of -- how would -- what do
23  you call it?  I would have to bring this up to whatever
24  the value is.  I don't know what the value is.  It could
25  be 225, it could be a million.  But we just don't play

1   with the real estate hypothetical numbers out there.
2      Q.  Okay.  The P&L statement, December '02, shows bad
3   debt of 946,931 dollars --
4      A.  Okay.  That --
5      Q.  -- and 70 cents.

SanchezEmilio

6     A.  That would probably be the Feffer -- Feffer Bomar

7   write-off.

8     Q.  Well, the current assets loaned of Mr. Feffer on

9   your '01 statement --

10    A.  Then I'm going to have to backtrack and you're --

11  Norma is going to have to explain that.  I better not

12  guess on that.

13    Q.  Okay.  Do you know what the other income of

14  69,500 represents on the --

15    A.  It was the sale of one of the -- I think it was

16  the sale of this -- accident vessel, things we sold.

17  They were removed when Jamie Gilbert was hurt.  It might

18  have been that sale.

19    Q.  The mud pumps?

20    A.  Yeah.  It wasn't mud pumps.  I think it was

21  valves and stuff.  The mud pumps, if you look at '01, it

22  will show mud pumps on that one.  You know, I think in

23  looking at it, that's probably what you coded one of the

24  mud pumps.  I think it was two mud pumps.

25    Q.  Now, we spoke -- I asked you before what, you


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

116


1   know -- how you would be paid by Rig Ventures, it's

2   basically in equity or debt repayment or interest,

3   correct?  And you said you never took any equity.

4     A.  That's correct.

5     Q.  So that would leave only interest payments on

6   loans and then principal and repayments on loans?

7     A.  Or sale of equipment and me withdraw money for

Page 108

SanchezEmilio

8  what was owed to me.  If we sold -- you know, the -- the

9  Ocean 66 for 500,000 dollars and our cost is only 225,

10  then I could get money -- when the sale was made, that's

11  where I could get it from, distribution of profits.

12      Q.  And how would that -- how would the amount of

13  distribution of profits be determined?

14      A.  I would determine that.  I'd either leave

15  everything in there or take it all out.  Or I could pay

16  me back.  Let's say 300,000 was left over, I could pay

17  me back money that was owed to me of one million

18  dollars.

19      Q.  Amounts that were owed to you pursuant to loans

20  you made?

21      A.  Yes.  Right.  From this balance sheet of '02.

22      Q.  Okay.  But as we sit here today, you've not taken

23  any money out of Rig Ventures pursuant to the Ocean 66

24  project?

25      A.  I have not taken any money out of Rig Ventures

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

117

1  pursuant to the project.  The only thing I could think

2  of is that if I ever did, it would come out of money

3  that is owed to me, but I don't think I ever did.

4      Q.  And we need to talk to Norma to see that and get

5  that --

6      A.  You have to ask her that specific question,

7  because she'll have to look it up.

8      Q.  Okay.

9      A.  She's not going to remember off the top of her

Page 109

SanchezEmilio
10    head all these things we need to ask her.

11        Q.  But other than those three sources of moneys to

12    you from Rig Ventures, there are none, correct?

13        A.  There are none, no.

14        Q.  It's either debt repayment, interest on debt, or

15    taking an equity amount?

16        A.  Right.  For instance, if we did not owe any other

17    liabilities, then I would choose to take it all out or

18    leave it in there or pay the bank or not pay the bank,

19    or whatever, you know.  See, because Rig Ventures owes

20    Tex-Mex Cold Storage 85,000 dollars.

21        Q.  When was that money loaned?

22        A.  Over a long period of time, two years.  Rig

23    Ventures needed money, Tex-Mex would loan it money.

24        Q.  Is that pursuant to a promissory note of the type

25    that --

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

118

1        A.  I think it's probably in there, yes.

2        Q.  Do you know what the terms of that agreement are

3    in connection with the interest rates to be paid?

4        A.  It would be standard like the other one you saw.

5        Q.  Okay.  I'd like to turn now to the memorandum of

6    agreement between Murphy and Rig Ventures.  Do you have

7    a copy of that?

8        A.  No, not handy.

9        Q.  Let me show you a copy of it.

10        A.  All right.  Uh-huh.

11        Q.  Was an agreement entered subsequent to this,

Page 110

SanchezEmilio
12  pertaining to the purchase of the Ocean 66?

13      A.  No.  I think this is the only agreement that was

14  ever entered into.

15      Q.  Is it customary in the salvage business to be

16  paid to take something?

17      A.  Not customary, but it happens all the time.

18      Q.  Why -- why was it done in this case?

19      A.  Because Murphy -- I had done another one for

20  Murphy called the Ocean Liberty, and they were happy

21  with what we did.  We removed it and -- from where it

22  was, because they didn't want to remove it.  And I would

23  ask them, why don't you remove it?  And they said, Well,

24  we don't have the expertise you have to remove these

25  things.  And I said, Well, you've got jack-ups all over

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

119

1   the place.  He said, well, it's an older rig and it had

2   some special stuff on it that they didn't have people to

3   do it.  So that's why they said, well, we negotiated

4   that if -- we'll remove it, they'd pay me 800,000

5   dollars and I can keep the rig.

6           It's -- in salvage it's not completely

7   unusual, but it -- we generally pay very little for

8   ships that we salvage, going to be salvaged.

9       Q.  Do you know whether or not the Ocean 66, when you

10  took possession of it, when Rig Ventures took possession

11  of it, had all necessary Coast Guard certifications?

12      A.  Yes.

13      Q.  It did?

Page 111

SanchezEmilio

14    A.  By Murphy Oil.

15    Q.  And did they deliver copies of those

16    certifications and inspection reports?

17             THE WITNESS:  Not signed.  But it's not

18    signed.

19    A.  What's that?

20    Q.  Did they deliver --

21    A.  No.  It wasn't necessary.  We just knew that they

22    complied, because the Coast Guard -- we were in contact

23    with the Coast Guard on all the things we were doing out

24    there and they were up -- current on everything they

25    were doing.


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

120


1     Q.  Were you in contact with them personally?

2     A.  No.  Richard was.  Richard generally was.  I

3     think I did a little bit of contact with Larry Dorsey

4     who finally ended up signing that thing.

5     Q.  Did your -- did Rig Ventures provide a plan of

6     execution to Murphy Oil?

7     A.  I think we provided a -- how we were going to do

8     it, yes, what we were going to do.  I think it's in the

9     file there that we wrote them a letter and said this is

10    the way we're going to do it and they agreed to the

11    plan.

12    Q.  Did they agree in writing or --

13    A.  I think it was in writing, yeah.

14             MR. HERNANDEZ:  Protocol of delivery.

15             THE WITNESS:  Well, that's when -- when we

Page 112

SanchezEmilio

16  received it and the bill of sale is in there and

17  everything.  But before that, I think we supplied them

18  with the plan of how we were going to do it.

19          MR. WEBRE:  Luis, did you find the protocol

20  of delivery?

21          THE WITNESS:  Yeah, it's in there.

22          MR. HERNANDEZ:  The protocol of delivery.

23          THE WITNESS:  That's when we accept the rig

24  from them when it was 1,000 feet off and along with the

25  bill of sale we sent them.


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

121


1           MR. WEBRE:  Okay.

2           THE WITNESS:  Yeah, you saw it right there.

3           MR. HERNANDEZ:  Uh-huh.

4       Q.  Okay.  I want to turn to Section 9 of the

5   memorandum of agreement.

6       A.  Okay.

7       Q.  Did Rig Ventures obtain the insurance referenced

8   in Section 9-A?

9       A.  Yes, we did.  Yes.

10      Q.  How long was that insurance in effect?

11      A.  I think until the rig landed in port -- in --

12      Q.  Lake Charles?

13      A.  Lake Charles, yeah.

14      Q.  Do you have a copy of that insurance agreement?

15      A.  I think it's in the file there, yes.

16      Q.  Was that comprehensive general liability

17  insurance?  Did it extend to and cover losses arising

Page 113

SanchezEmilio

18  out of bodily injury?

19      A.  No.  I think it just covered liability, not

20  bodily injury.

21              Gary Ferrazzano, DeWitt Stern.

22              THE REPORTER:  Excuse me?

23      Q.  Did -- did Murphy Oil approve the insurance

24  contract as being compliant with Section 9-A?

25      A.  Absolutely.  They did not -- they would not do it

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

122

1   till we furnished to them.

2       Q.  And was the excess liability policy also

3   purchased?

4       A.  Yes.  We had to comply with everything that they

5   required.

6       Q.  And is the excess policy contained in these

7   documents we have here today?

8       A.  Yes.  It should be in this file here.

9       Q.  Will you find for me the primary insurance policy

10  or the comprehensive general liability insurance policy

11  and the excess liability policy, please.

12              MR. HERNANDEZ:  Can we go off the record?

13              MR. WEBRE:  Sure.

14              (Off the record 1:59 p.m. to 2:08 p.m.)

15  BY MR. WEBRE:

16      Q.  I'm looking at a document contained within

17  Exhibit 1, entitled "Certification of Liability

18  Insurance," and it indicates what coverages were in

19  force, it's dated 10/19/2000, but this doesn't contain

Page 114

SanchezEmilio

20   the actual insurance policy.  Do you know where the
21   actual policy would be?
22      A.  I don't know where it is.  It doesn't have the
23   coverage sheet?
24      Q.  Yes.  It's what I would call a dec sheet,
25   declaration page.

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

123

1      A.  The actual policy is either in Richard Jaross's
2   file or it may be in that file.  It should be right
3   after that, though.  It should be right after that,
4   because it's chronologically.
5      Q.  Yes, sir.
6      A.  But I don't -- it may be Richard has that policy.
7      Q.  I'm also looking at a document, a fax message to
8   Mr. Gary Ferrazzano.
9      A.  That's the insurance person.
10     Q.  And it's from Richard Jaross.  It indicates, "We
11  feel the coverage quoted is too little at a hundred
12  thousand per person.  What would it cost to get this
13  increased to 500?"
14     A.  Right.
15     Q.  Do you recall that?
16     A.  It just refreshed my memory when I glanced
17  through that, right.
18     Q.  So do you think now that perhaps there was at one
19  time a policy of insurance covering bodily injury?
20     A.  I don't know.  I don't know.  I don't recall.
21     Q.  Who would be the best person to ask about that or
Page 115

SanchezEmilio

22  where should we go?

23      A.  Richard wouldn't remember.  I don't think he

24  would remember.

25      Q.  You said you don't think Richard would remember?


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

124


1      A.  I don't -- I don't know if he'll remember like

2   me.  It's been three years, four years.

3      Q.  And now I'm looking at a fax memo from

4   Mr. Ferrazzano to Emilio Sanchez, Senior, at Esco Marine

5   talking about bodily injury coverage.  It says, "This

6   cover would not respond to claims other than death, loss

7   of one or both eyes."

8      A.  Let me see that.  That may be filed wrong.  If

9   it's Esco Marine, it probably doesn't pertain to this.

10      Q.  Well, it does.

11      A.  Okay.  It addresses Esco Marine, yeah.

12      Q.  So does that refresh your memory as to whether or

13  not a policy was in existence covering bodily injury?

14      A.  I don't know if this policy was ever issued.

15      Q.  And neither do I.  That's why I'm asking.

16      A.  I'm not sure.  I'm not sure.

17      Q.  Fair enough.  Will you attempt to discover that?

18      A.  Yeah.

19      Q.  Do you know whether Ocean 66 was in compliance

20  with the Coast Guard regulations when Rig Ventures was

21  conducting salvage operations aboard?

22      A.  Yes.

23      Q.  It was?

Page 116

SanchezEmilio
24    A.  See, Murphy still owned it then.  We didn't take

25  title until we got out of there.


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

125


1     Q.  Okay.

2     A.  So they were in compliance with that.

3     Q.  Did Murphy know that the bathroom facilities or

4   toileting operations were not operational?

5     A.  I think they probably were aware of that.

6     Q.  Do you know whether it complies with Coast Guard

7   regulations to dump bodily waste over the side?

8     A.  Obviously not.  That would be a -- that would be

9   a violation, I would think.

10    Q.  And do you know whether that was being done on --

11    A.  I don't think so.  I don't know.  We had paid for

12  some toilets to go out there.  We took it out there.

13    Q.  But you don't know as you sit here today?

14    A.  No, I do not know.

15    Q.  Okay.  I may have found the insurance policy.

16    A.  It should have been in there if I have it.

17  That's probably it there.

18    Q.  I'm showing you a document contained within

19  Exhibit 1, correspondence from Dewitt Stern Imperatore,

20  Limited, December 19, 2000, and attaching to it a policy

21  of insurance.  Does that look like the policy that was

22  in force and effect pursuant to the memorandum of

23  agreement between Murphy and Rig Ventures?

24    A.  Yes, it does.

25    Q.  Okay.  Do you know when this policy became

Page 117