SanchezEmilio

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

126

1  ineffective?

2    A.  Ineffective?

3    Q.  Yes, sir.

4    A.  Probably expiration of that date there.  Or maybe

5  it was extended.  I don't know if we renewed it.

6    Q.  Do you know why you didn't renew it?

7    A.  I don't know if I did or not -- did not renew it.

8    Q.  Well, but you know you've responded in this

9  lawsuit that no insurance --

10   A.  Yeah.  I didn't think I had accident insurance,

11  and I guess I did then from that particular policy.

12   Q.  Okay.  Well, will you undertake to determine

13  whether or not you ever renewed this policy and if there

14  was current insurance as of 12/31/01?

15   A.  I'm positive there was not.

16   Q.  Okay.  But you just indicated you don't know if

17  you renewed this.

18   A.  Well, but, see, when they got off the ship, it

19  would have been automatically canceled.  There would

20  have been no reason to have it on there, so --

21   Q.  Until they got back on the ship.

22   A.  Yeah.  But I know we didn't -- we didn't have any

23  accident policy, because, you know, we didn't consider

24  them to be employees then.  If there was a renewal, it

25  would be in that file.

SanchezEmilio

127

```
1              When was the expiration date on that one?
2     It's on the cover sheet there.
3        Q.  Well, I see this date.  I'm just --
4        A.  Okay.
5        Q.  Yeah.  Till February 19th, '01, that's what it
6     says.
7              Okay.  So whose determination was it that
8     there would be no bodily -- bodily injury insurance when
9     Jamie Gilbert, Phil Wells, and others returned to the
10    ship?
11       A.  I guess, Richard and I determined that we
12    didn't -- we weren't going to do that.
13       Q.  Okay.  Do you recall that discussion?
14       A.  No.
15       Q.  Do you know why you would not have done that?
16       A.  Because, you know, we felt they were independent
17    contractors like the rest of them.
18       Q.  What does that have to do with whether or not you
19    have insurance?
20       A.  Well, the independent contractor would have
21    insurance.  No different than when Unifab -- why would I
22    have insurance for Unifab's employees if they're doing
23    subcontract work or the barge company or the -- we had a
24    lot of people that did independent contract work for us.
25       Q.  Well, and this goes back to what we were
```

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

128

Page 119

SanchezEmilio

1   discussing earlier with regard to whether or not you
2   know that as a ship owner you had an obligation and
3   duties to comply with any statutes, regulations
4   requiring a safe workplace including supervision and
5   training of workers as the owner of the vessel,
6   irrespective of whether or not the person aboard the
7   vessel was an independent contractor or an employee.
8            So be that as it may, you're saying that
9   your determination not to have insurance was based upon
10  the fact that they were independent contractors and you
11  weren't responsible for them?
12    A.  Right.
13    Q.  Do you know whether -- I'm looking now at a
14  document that looks to be a survey completed by a man
15  named Martin Gee or Gee.  Are you familiar with that?
16    A.  Oh, I think that's -- that's a survey that was
17  done to make it be class ABS.
18    Q.  Meaning what?
19    A.  Meaning the requirements.  American Bureau of
20  Standards.
21    Q.  Uh-huh.
22    A.  And somehow or another, someone asked us to do
23  that and they go out and inspect it and they come up
24  with these recommendations of how to get it into ABS
25  class.  So this company is -- I think it's the ABS

1   people, because I think they sent us a bill.
2     Q.  Did Rig Ventures perform all of those tasks

SanchezEmilio

3    identified by Mr. Gee?

4        A.  No, I don't think we ever did.

5        Q.  Why not?

6        A.  Because we were not -- it wasn't necessary for us

7    to be ABS if we were going to scrap it or if it was

8    going to be sold, then the new buyer would get ABS

9    classification, depending on what you're -- because you

10   have -- as a driller is one ABS classification, as a

11   production rig, it's another ABS classification, which

12   it was a production rig.  If it's accommodation, it's

13   another classification.

14       Q.  Okay.

15       A.  So then the new buyer would get involved, well, I

16   want it for a driller, well, then they would do certain

17   recommendations.  I want it for accommodation, well, the

18   recommendations are less.

19       Q.  Were there any other reasons that Rig Ventures

20   did not perform these --

21       A.  No.  No.

22       Q.  Okay.  Do you know what date Rig Ventures became

23   owner of the vessel, the Ocean 66?

24       A.  The bill of sale.  Proof on delivery, bill of

25   sale.  That would have been signed July the 2nd of '01.

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

130

1        Q.  Okay.  And at that point in time, the vessel was

2    already moved more than a thousand yards, right?

3        A.  That's correct.

4        Q.  The executed bill of sale has been delivered to

Page 121

SanchezEmilio

5   you, correct?

6       A.   That is correct.

7       Q.   The wire transfer of 800,000 dollars had been

8   completed?

9       A.   Should have been, yeah.  I think within about

10  that time, yes, about the same time, within a couple of

11  days, something like that.

12      Q.   And do you have the protocol of delivery and

13  acceptance completed there?

14      A.   Yes.  It's here, right here.

15      Q.   May I see that?

16      A.   Sure.  Here's the bill of sale and here's the

17  protocol of delivery.

18      Q.   We're now looking in --

19           MR. WEBRE:  Luis, do you want to grab your

20  bank statements or your financials.

21      Q.   We're looking at Exhibit 2, protocol of delivery

22  and acceptance, twenty-three hundred hours, June 28th,

23  '01.  And this was signed by you and by -- does Enoch

24  Dawe from Murphy ring a bell?

25      A.   Vice president.  I don't know who he is, or

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

131

1   president.

2           THE REPORTER:  Can I get a spelling for

3   that?

4           MR. WEBRE:  E-n-o-c-h D-a-w-e.

5       A.   Can I show you something right there?

6       Q.   Yes, sir.
                    Page 122

SanchezEmilio

7       A.   If you'll step over here, I'll show you something

8    what I'm talking about.  I just noticed it.  See this

9    USA Labor?

10      Q.   Yes, sir.

11      A.   They -- this is how they report how many hours

12   they worked.

13      Q.   Uh-huh.

14      A.   And then they tell us how many hours they work

15   and then they invoice us.

16      Q.   Yes, sir.

17      A.   So that's similar to what Frank Ruiz did.

18           MR. WEBRE:  Objection, nonresponsive.

19           THE WITNESS:  Okay.

20      Q.   You agreed that the difference between how you

21   paid Unifab and how you paid -- scratch that.

22           May I have that back?

23      A.   Sure.  Uh-huh.

24      Q.   Did you ever resolve the account with Unifab?

25      A.   No.


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

132


1       Q.   No?  Have they sued you?

2       A.   They are threatening to.

3       Q.   Has Rig Ventures paid any amount on that account?

4       A.   We paid some out, but there's an outstanding

5    amount there.

6       Q.   Has a lien been placed on the Ocean 66?

7       A.   No, not as we speak.

8       Q.   How do you know?

SanchezEmilio

```
 9      A.  Because I'm in contact with them and we're
10   discussing the point, the point being that they were
11   paid to do a job by someone else and they went and did
12   the job, but they left a big hole at the bottom of our
13   rig and didn't repair it.  And we're arguing, well, how
14   do you expect us to sell the rig or to move the rig if
15   you leave a big hole in the bottom of it?
16      Q.  Okay.  What job did you employ Unifab to do?
17      A.  I didn't employ them.  There was a company
18   that -- when we sold this vessel where this Jamie got
19   hurt, S&K, I think, or one of the companies hired them
20   to remove all this equipment with a crane.
21      Q.  Wait.  Timeout.
22      A.  Okay.
23      Q.  You employed -- you hired one company that hired
24   -- that hired Unifab?
25      A.  No.  We sold the vessel equipment to -- to a
```

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

133

```
 1   company, I don't remember the name of the valve company,
 2   whatever it was, valves and vessels.
 3      Q.  What equipment?
 4      A.  Well, I have to look at the file.  It's on three.
 5   It should be item -- it should be on three.
 6              THE WITNESS:  Is that three?
 7              MR. HERNANDEZ:  Yes.
 8      A.  S&K.
 9      Q.  Okay.  You -- Rig Ventures employed S&K to
10   perform what service?
```

Page 124

SanchezEmilio

11    A.   No.  Rig Ventures didn't.  S&K bought some valves

12    and vessels from us.

13    Q.   Okay.  Okay.

14    A.   And then S&K hired Unifab to remove the stuff

15    from the rig and put on the truck.  They went in there

16    and did it, but they left a hole at the bottom and

17    Unifab never repaired the hole and we're arguing the

18    point, said, well, how can you charge us for anything?

19    Q.   Fair enough.  You don't need to tell me anything

20    more.  That's all I need to know about that.

21    A.   We have a large -- with Clayton, we have a large

22    thing on that.

23    Q.   Okay.  When was the last time you spoke with

24    Mr. Jaross?

25    A.   About two hours ago.

1    Q.   What did y'all discuss?

2    A.   We discussed some engines we have from a casino

3    ship that I bought in Tampa and we cut up here and he

4    sold the engines.  And we discussed I wanted him to be

5    here at 3 o'clock, not to forget.

6    Q.   Did you discuss the deposition at all?

7    A.   No.  Huh-uh.

8    Q.   Have you ever discussed the allegations in this

9    lawsuit with Mr. Jaross?

10    A.   Yes.  Yes.  Absolutely.

11    Q.   And what was the substance of those discussions?

12    A.   Well, that Jamie Gilbert, did he ever -- I asked

Page 125

SanchezEmilio

13  him, "Did you ever hire Jamie Gilbert?" And he said,
14  "No, I never" -- you know, we went over the Jamie
15  Gilbert. And he said he knew him from way back. He ran
16  into him -- when he went to see the rig out at the
17  ocean, he ran into him. Jamie Gilbert came up and said,
18  "Do you remember me?" and they recalled that -- he said,
19  "Yes. I know your family."
20        And I asked him, you know, how did you --
21  about Phil Wells. I was reconstructing or recollection
22  of the Phil Wells hiring, and then I said, "Did you ever
23  instruct Jamie Gilbert?" and he said, No. I never
24  talked to Jamie Gilbert. I always talked to Phil Wells
25  how they were doing on the job." And I don't recall him

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

135

1  going up there. I don't think he went up there
2  during -- where the job is. His job only took about ten
3  days, something like that.
4      Q.  How many times do you think you have spoken with
5  Mr. Jaross about the allegations in this lawsuit?
6      A.  Well, every time we'd get a request from you
7  sometimes I would call him and ask him questions about
8  it. At least ten times.
9      Q.  Have you ever met personally to discuss it?
10     A.  Maybe once. We'd generally do it over the phone.
11     Q.  Do you and -- aside from Dominion Shipping, do
12  you and Mr. Jaross co-own any corporations?
13     A.  Dominion is the only one that we co-own.
14     Q.  Do you and Mr. Jaross personally co-own any
Page 126

SanchezEmilio

15    assets?

16       A.  Might be a company called -- I don't recall.

17    Where are the tax returns?  This is 2002?  I don't know.

18    I'd have to look at my tax return, though.  My tax

19    return is not in there.  My personal -- oh, here it is.

20    Where is 2002?  Let me see.  Where is the list of all

21    the corporations?  Fort Caswell Properties we owned

22    together.

23       Q.  I'm sorry.  Can you say that again?

24       A.  Fort Caswell Properties.

25       Q.  What is Fort Caswell Properties?


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

136


1       A.  It's a real estate in Wilmington, North Carolina,

2    the big office building there.  That one has been

3    dissolved.

4       Q.  Okay.

5       A.  We owned that one at one time.  Dominion

6    Shipping, he owns 50.  That's it.

7       Q.  Other than those you have mentioned, y'all

8    owned -- y'all own no assets together?

9       A.  No.  They are all in corporations.

10       Q.  And have we discussed all of those corporations?

11       A.  Yes.  Uh-huh.

12       Q.  Dominion Shipping and that real estate?

13       A.  Right.  Fort Casuals.  Whatever is on my tax

14    return.  You can see how many I have.

15       Q.  How did the Ocean 66 opportunity become known to

16    you?

Page 127

SanchezEmilio

17    A.  A fellow, another broker that we have by the name

18    of Ron Horton called me and told me that Murphy was

19    looking for somebody to move the Ocean 66.  And since I

20    had done one with him before, Ocean Liberty, I called

21    Larry Dorsey and Murphy up in New Orleans and we started

22    negotiating and got it done.

23    Q.  Was Mr. Jaross involved in those discussions at

24    that point?

25    A.  Sometime along the way, yeah, he would get

1    involved with it.  He got involved with it because of

2    the technical end of -- his recommendations of moving

3    the rig.  And we had to look at the rig and I was going

4    to go look it and he was going to go look at it.

5    Q.  So, then, is it fair to say that Mr. Jaross was

6    involved from the outset?

7    A.  Yeah.  Uh-huh.  Yeah, immediately of when I knew

8    about it.  And then he went to Singapore and ran into

9    Jerry McCallum who said he was -- could move the rig

10   because he had a lot of experience and all that, and

11   talked us into 25 percent and then he went out there and

12   we had to -- didn't work out.

13   Q.  Did you and Mr. Jaross have any discussions at

14   the outset of this project as to the potential

15   profitability of the salvage and sale --

16   A.  Yes.

17   Q.  -- of Ocean 66?

18   A.  Yes, we did.

SanchezEmilio

19     Q.  Do you recall the -- do you recall what you

20  discussed?

21     A.  Well, we would -- we always buy -- everything we

22  buy, we'd buy it on scrap value.

23     Q.  On scrap value?

24     A.  To scrap it.

25     Q.  Kind of assuming the worst?

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

138

1     A.  Yes.

2     Q.  Okay.

3     A.  Or else we don't buy it.  And then the upside is

4  we can sell it -- re-sell it.

5     Q.  Okay.  And what was your anticipated scrap value

6  on this?

7     A.  Well, the scrap value would -- would have been --

8  we would have made about 100,000 dollars, something like

9  that, out of memory, selling equipment and scrapping it.

10     Q.  Did Mr. Jaross assist you in making those

11  determinations?

12     A.  Yes.  Yes.  He's familiar with the values of

13  certain things.

14     Q.  Did y'all ever reduce these calculations and

15  estimations to writing?

16     A.  I don't recall we did.

17     Q.  Would those documents be kept anywhere other than

18  these three you've brought today, these three file

19  folders?

20     A.  They should be in that -- in the folders here, if

Page 129

SanchezEmilio

21    there's any calculations there.

22        Q.  Might they also be in the Richard Jaross file?

23        A.  He could possibly have them.  But, see, there's

24    so many unknowns on this thing.  We didn't know the

25    value of the production equipment when we're selling it,

1    because they were -- a lot of them was sold by this

2    company that's our exclusive representative.  VenueBid

3    did a lot of the sales, so we don't know exactly the

4    value of the mud pumps or the condition of the mud pumps

5    and getting them off and the cost.

6        Q.  Is your agreement with VenueBid an exclusive one?

7        A.  Yes.

8        Q.  So you cannot attempt to sell it?

9        A.  I can sell it.  They still get 10 percent.

10       Q.  And that's the agreement, they get 10 percent of

11    gross?

12       A.  Of gross, yes, that's correct.

13       Q.  For the Ocean 66 job, who actually did the

14    initial discussions and hiring of Frank Ruiz, Senior?

15       A.  Richard Jaross.

16       Q.  Do you know when that occurred?

17       A.  Right after we inspected the rig and we accepted

18    to do the job.

19       Q.  And did Mr. Jaross have those discussions and

20    hire Mr. Ruiz pursuant to your authority and direction?

21       A.  Yes, he did.

22       Q.  And presumably he made the recommendation to you,

SanchezEmilio

23    that is, Frank Ruiz, Senior, that would be hired to

24    perform the job?

25        A.  Yes.  That's correct.

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

140

1        Q.  So had either one of you disagreed with hiring

2    Frank Ruiz, Senior, Frank Ruiz, Senior, wouldn't have

3    been hired?

4        A.  Yeah, I would say so.  But I wasn't going to

5    disagree with him.  I had known Frank.  He's done a lot

6    of rigs for us, so there was no reason -- why wouldn't I

7    go along with him?

8        Q.  Sure.  But had you not wanted to go along with

9    it --

10        A.  I think Richard would have gone along with it.

11    It didn't reach that point, so I don't know.  I would be

12    speculating.  If I had some hang-up with it, I'm sure he

13    would have said, well, we'll find somebody else.

14        Q.  Is that -- the same can be said with regard to

15    making Phil Wells the foreman of the job at a point in

16    time?

17        A.  If I had -- yes, that would be the same thing.

18    If I had a massive objection to it, then he probably

19    would have said, we'll find somebody else.  But I

20    didn't, because he was the most familiar with it.  I

21    wanted to find somebody that --

22        Q.  Was it Richard Jaross that would arrange for the

23    sale of salvaged items?

24        A.  Him and VenueBid.  That other company VenueBid
Page 131

SanchezEmilio

25    would find customers for it too.

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

141

1        Q.  Would Mr. Jaross provide the instructions to

2    Mr. Ruiz or Mr. Wells or whoever might be the

3    superintendent at the time to remove a certain item and

4    have it available for transport on a certain date?

5        A.  Yes, he would.

6        Q.  Those aren't determinations made by Frank Ruiz or

7    Phil Wells, right?

8        A.  How to do it they are.  They go out there and do

9    the job.  But we just tell them we want the mud pumps

10   off.  And how they get them off, well, they generally do

11   it.  We want the rig up.  Well, they'll get up and jump

12   wires and pumps and heat up motors and things.  We don't

13   get in there and tell them how to do it.  They know how

14   to do it.

15               MR. WEBRE:  Objection, nonresponsive.

16       Q.  Did you ever personally have conversations with

17   Frank Ruiz, Senior, regarding what was going on with the

18   Ocean 66 job?

19       A.  I think I did.

20       Q.  Do you recall what y'all discussed?

21       A.  How it was going.  How it -- what are you -- how

22   are you doing?

23       Q.  Okay.

24       A.  Have you got the spuds up?

25               Yes.

Page 132

SanchezEmilio

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

142

1          How many you got up?

2          One.

3          When are you going to finish the job?

4          But nothing in detail.

5     Q.  Why don't you tell the jury what the spuds are.

6     A.  Spuds are in the jack-up rig.  Those are things

7  that anchor into the mud to keep the rig from moving.

8  And you've got to pick them up and that was why would we

9  couldn't move it faster, because they're buried about 20

10  feet in the mud, so you've got to jack them up inside

11  the columns of the rig.  And the jacking system was

12  ancient, an older rig, and so they had to do a lot of

13  adaptation to it to get it out.

14    Q.  Did you ever have any discussions with Phil

15  Wells?

16    A.  No.

17    Q.  Have you spoken with Phil Wells since you've been

18  sued in this lawsuit?

19    A.  Yes.

20    Q.  About how many times?

21    A.  Maybe twice.

22    Q.  What did y'all talk about?

23    A.  About I wanted him to be available for

24  deposition.

25    Q.  When was the last time you spoke to him?

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

SanchezEmilio

143

1    A.   About two months ago.

2    Q.   What did Mr. Wells tell you regarding his

3    availability for deposition?

4    A.   He said he had changed jobs.  He was working for

5    six days on and two days off for a milk delivery truck,

6    delivering milk or something like that.

7    Q.   In San Angelo, Texas?

8    A.   Right.  In the San Angelo area, Snyder.

9    Q.   Snyder, maybe?

10   A.   Something like that, yeah.  I don't recall

11   exactly.

12   Q.   As far as you know, is he still there?

13   A.   I think he is, uh-huh.

14   Q.   Do you have his residential address?

15   A.   No, I do not.

16   Q.   Do you have his home phone number?

17   A.   No, I do not.

18   Q.   How did you contact him?

19   A.   I had a cell phone that I -- it's around

20   somewhere, that I would contact him with.

21   Q.   Is it written on the cover of that file?

22   A.   This is one cell phone.  This may not be current.

23   Q.   What is that number, please?

24   A.   (325)277-4716.

25   Q.   What did Mr. Wells tell you, if anything,

SanchezEmilio

1    regarding the incident in which Mr. Gilbert was injured?

2       A.  Well, he said that -- I don't recall the -- as I

3    go into it, I'm beginning to learn, because I wasn't

4    there and I don't have exactly the picture of the

5    physical part of it.  But he said that Jamie grabbed --

6    jumped and grabbed the thing and swung and they swung

7    him out and he slipped.  And that's about the only

8    details I understood of -- I didn't get into it too

9    much, because I didn't understand it like I understand

10   it now.  I couldn't picture physically what was

11   happening.

12      Q.  Do you intend to express any opinions at the

13   trial of this case regarding how the incident occurred

14   and who was at fault?

15      A.  No, I can't.

16      Q.  So you're not going to render any opinion about

17   who was at fault?

18      A.  Well, based on what I'm seeing, I can render an

19   opinion, but --

20      Q.  Okay.  And what's that opinion?

21      A.  My opinion is that Jamie should not have grabbed

22   the tube when it was being pulled away, if it was being

23   pulled away.  Because he was standing on a pipe, about

24   an eight-inch pipe, and if he had already strapped the

25   nylon strap to it, he should have let go if they were

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

145

1    pulling it away and just stepped down, because there was

2    another level below him on the pipe.  The pipe is eight

Page 135

SanchezEmilio

3   inches, and there was about four inches between the

4   floor and the pipe, and then eight inches, he could have

5   just stepped off like that. Why did he jump and grab it

6   when it was being removed away?

7      Q.  So it's your understanding that Mr. Gilbert had

8   an opportunity to simply step down from the pipe?

9      A.  Step down and stand on the deck.

10     Q.  But instead, he chose to jump at the pipe?

11     A.  And grabbed it and then I understand they pulled

12  it away, and we can understand that. But it pulled

13  away, he said, and then with the gloves he slipped and

14  went into another level down, is my understanding of

15  what happened.

16     Q.  Do you have any understanding regarding the

17  operation of the crane during this period of time?

18     A.  No, I don't. Phil Wells -- I only know that Phil

19  Wells was the operator.

20     Q.  Do you know Mr. Wells' qualifications to operate

21  a train -- a crane? Excuse me.

22     A.  Other than he's operated over the time it was out

23  there, him and Frank, and operated it satisfactorily.

24  That's all I know.

25     Q.  How do you know he operated it satisfactorily?

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

146

1      A.  Because I've never heard of any problems.

2      Q.  And so that means to you he operated it

3   satisfactorily?

4      A.  Well, they didn't drop any loads, they didn't

Page 136

SanchezEmilio

5  drop any people, they -- you know, they operated quite a

6  bit on the crane and nothing ever happened.

7     Q.  Do you know --

8     A.  I'm assuming that nothing -- it was operated

9  properly.  I don't think they'd have operated it again

10  at the -- Jamie Gilbert if they had problems before.

11  I'm assuming that.

12          MR. WEBRE:  Objection, nonresponsive.

13     Q.  Do you know the repair history or work history or

14  log on that crane?

15     A.  No, I do not.

16     Q.  Do you know whether one exists?

17     A.  I do not.

18     Q.  Do you know Mr. Wells' training or qualifications

19  or experience, other than what you've just described in

20  connection with the operation of a crane?

21     A.  I do not.

22     Q.  Do you know whether prior to this job he had any

23  experience operating a crane of this type?

24     A.  I do not.

25     Q.  Do you know Mr. Wells' experience in connection

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

147

1  with operating any heavy machinery?

2     A.  No, I do not.

3     Q.  Or education or training or qualifications?

4     A.  I do not.

5     Q.  Do you know whether Mr. Ruiz, Frank Ruiz, Senior,

6  ever sought to learn those things concerning Mr. Wells'

SanchezEmilio

7    ability to operate a crane?

8       A.  I do not.

9       Q.  When is the last time you personally visited with

10   Mr. Jaross?

11      A.  Personally visited?

12      Q.  Yes, sir.

13      A.  Yesterday.

14      Q.  Yesterday.  Did y'all have dinner last night?

15      A.  No.  We went -- I went to the office for about 30

16   minutes to sign some papers on Esco Marine on the

17   bank -- the bank, a resolution in the bank signature

18   cards, and visited with him about 15 minutes and then

19   left.

20      Q.  Did y'all discuss these depositions at all?

21      A.  No.  First of all, I thought it was tomorrow,

22   so --

23      Q.  Are you -- have you been recently or at any time

24   in the past, appointed to the Federal Reserve Board?

25      A.  No.

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

148

1       Q.  Were you considered for that position, to your

2    knowledge?

3       A.  Not that I know of.

4       Q.  Up in Dallas?

5       A.  I know where it is.  No.  I don't know whether I

6    was considered or not.  I doubt it.

7       Q.  Did Rig Ventures have any agreement with

8    Mr. Jaross that on completion of -- say on the sale of

Page 138

SanchezEmilio

9   Ocean 66 he would receive any specific portion of the

10   proceeds?

11      A.  Specific, no.  Because we didn't know what the

12   income was going to be, if we made no money or we made a

13   lot of money, relative, there was no percentage, there

14   was no discussing.

15      Q.  But there was just the general understanding that

16   if we sell it and we enjoy a profit, then you'll be paid

17   a consultant fee accordingly?

18      A.  Consultant fees, or all the time you spent on it,

19   catch up.

20            MR. WEBRE:  Why don't we take a break.  I

21   need to spend time with these documents just to see if

22   there is anything I need to talk to him about and

23   hopefully we can wrap this up.

24            (Recess 2:47 p.m. to 2:59 p.m.)

25            (Exhibit Nos. 7 through 10 marked)


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

149


1   BY MR. WEBRE:

2      Q.  I'm handing you what's been marked Exhibit 7 and

3   looks to be -- well, you tell me what it is.

4      A.  That's a memo from Richard to me.  I guess we

5   were selling these Solar Centaurs.  I think we did sell

6   the Solar Centaurs.  And up here he's just notifying me

7   of them.  I don't know what we -- evidently he was

8   telling me, they're vacant, we're going to sell them, or

9   something like that.  He just listed some equipment.  I

10   don't know exactly what it was.  Probably we were going

Page 139

SanchezEmilio

11   to sell them.

12      Q.  And have we agreed that I'll be able to discuss

13   with Norma or whomever what amounts were paid, if any,

14   to Mystic?

15      A.  Yes.  I think she would have that.  She just

16   called me from Washington.  She's in Washington.

17      Q.  D.C.?

18      A.  Yeah.  She just arrived and left me a message.

19      Q.  I bet she's cold.

20      A.  She said it was crispy and nice, though.

21      Q.  I'm showing you what's marked Exhibit 8.  Ocean

22   66 -- what does it say?

23      A.  Work outline.

24      Q.  Who created that?

25      A.  That was Richard.

1       Q.  And he created that for what purpose?

2       A.  I imagine to send -- let me see the date.  That

3    would have been sent to -- to Murphy.

4       Q.  So is that the plan that we had seen referenced

5    in the memorandum?

6       A.  I would imagine so.  That's -- I would imagine

7    so.  It could have been to Frank Ruiz.

8       Q.  Do you recognize that 910 number?

9       A.  Yeah.  That's -- that's Wilmington.

10      Q.  Okay.  So that's coming from Richard up in --

11      A.  Wilmington to somebody.  It must have come to me

12   or a copy to me of what he sent somebody else or gave to

SanchezEmilio
13    Frank.

14        Q.  Does Rig Ventures maintain an office in

15    Wilmington, North Carolina?

16        A.  No.  Huh-uh.  No.

17        Q.  Does Rig Ventures provide to Mr. Jaross its

18    letterhead or anything of that nature in order for him

19    to write letters or memos bearing --

20        A.  Yeah.  They -- on the computer they have Rig

21    Ventures thing and they write letters on behalf of Rig

22    Ventures.  This could have been -- this looks like it

23    would have gone to Frank Ruiz or to -- might have gone

24    to what you call it?  Murphy.  That was the work

25    outline.


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

151


1        Q.  I'm showing you what's marked as Exhibit 9.

2        A.  That's from Noble Denton, the surveyors.

3        Q.  Who were the handwritten notations at the top

4    made by?

5        A.  That's Richard.

6        Q.  And then you responded?

7        A.  I said "seat of the pants."

8        Q.  Okay.  Why don't you read those notations for the

9    jury, please.

10        A.  "Do we go by the seat of our pants or get some

11    consulting information."  Because Noble Denton wanted a

12    lot of money to do --

13        Q.  Timeout.  Just continue reading the handwritten

14    notation, please.

Page 141

SanchezEmilio

15    A.  Mine over here in the right?

16    Q.  Yes, sir.

17    A.  The seat of the pants, "First Noble if we fail."

18    If we can't do it, we'll get Noble to give us a

19    recommendation.

20    Q.  What did you mean by seat of the pants?

21    A.  That means let us do it.  This is what they

22    recommended we do, and we said, no, let Frank do it and

23    if we can't do it, then we'll go back to Noble and say,

24    okay, what -- how do we -- how should we do it?  And the

25    results were right that we were by the seat of the

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

152

1    pants, because we got the job done without Noble's

2    recommendations.

3    Q.  Are you familiar with the colloquialism or phrase

4    "by the seat of your pants"?

5    A.  Yeah.

6    Q.  I'm showing you what's been marked Exhibit 10.

7    Turn to the second page of that, if you will.

8             Whose handwriting is that?

9    A.  That would have been from my office at Tex-Mex --

10   Tex-Mex, probably Alex, one of my people, to give me the

11   bill that pertained to that.  It was invoicing Tex-Mex

12   and I would pay it from Rig Ventures.

13   Q.  Doesn't it say, though, there to pay from your

14   personal account?

15   A.  They're confused there, because I don't pay out

16   of my personal account.  I paid out of Rig Ventures, and

Page 142

SanchezEmilio

17    I bet you money on that date, there will probably be a

18    check for that amount.  It was for a pump that came in

19    and Tex-Mex paid it and then they re-billed Rig

20    Ventures.

21       Q.  Pump that came in -- a new pump to go aboard the

22    Ocean 66?

23       A.  Probably to go on -- we used a pump to do

24    something on the Ocean 66.

25       Q.  Okay.  And you're pretty clear that that payment

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

153

1    would have been from Rig Ventures and not from your

2    account?

3       A.  I'm positive.

4       Q.  And had it been from your account that certainly

5    would have been --

6       A.  It had been an error.  Uh-huh.  It was a company.

7    That was not in my personal.  That was a company thing.

8    That might have even been from Esco.  I don't know.

9    They get them confused sometimes.

10       Q.  Sometimes it gets difficult to distinguish --

11       A.  No.  This would have been -- this would have been

12    for Ocean 66.

13       Q.  How was Esco involved in the Ocean 66 project?

14       A.  It wasn't.

15       Q.  It wasn't?

16       A.  No.

17       Q.  Never?

18       A.  No.

Page 143

SanchezEmilio

19    Q.  Did nothing?

20    A.  Huh-uh.

21    Q.  No services?

22    A.  Not that I know of.  Not that I --

23    Q.  What did Global Marine Transport provide?

24    A.  They are a brokerage for towing services.

25    Q.  I'm showing you a document that's got a header on

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

154

1    it entitled "Franklin S. Skinner Marine Surveying and

2    Consulting."

3    A.  Uh-huh.  Right.

4    Q.  Invoice dated June 29, 2001.

5    A.  That's correct.

6    Q.  Handwriting on the bottom.  First of all, up

7    here, the first handwriting on it shows "Ocean 66 tow"

8    and then "Okay by R. Jaross."

9    A.  Yeah.  Richard okayed that.

10    Q.  So he was approving the -- he was approving

11    incurring this obligation referenced by this invoice?

12    A.  That's correct.

13    Q.  Why did you sign there at the bottom?

14    A.  Because if you look at the top, you see that

15    "GG"?

16    Q.  Yes, sir.

17    A.  That's an employee at Coastal Bank and I just

18    faxed her this information and she preferred a wire

19    transfer and I had to sign it or else she wouldn't do

20    it.  And then I'm asking her to charge Rig Ventures'

Page 144

SanchezEmilio
21  account.  Do you follow me?

22     Q.  Yes, sir.

23     A.  That's why I signed it.

24     Q.  Is this your handwriting where it says "Charge

25  Rig Ventures"?

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

155

1     A.  Yes.  Yes.

2     Q.  You're kind of like me.  You handwrite one way

3  and sign something completely different.

4     A.  I've gotten used to printing.

5     Q.  Go ahead and hold on to that, because we're going

6  look at some others.

7          Turn the page.  The company represented --

8  and this is a document entitled "Kevin Gros Consulting

9  and Marine Services."  It's a charter agreement dated

10  7 -- /8, I think, '01.

11     A.  08/01, something like that.

12     Q.  Who is the company representative on behalf of

13  ventures, the bottom?

14     A.  I don't know.  It's to Global Marine.  Maybe

15  Gearhart Business signed it.  Yeah, Gearhart Business

16  seems to have signed that on our behalf.  That's a

17  broker, Global Marine Transport.

18     Q.  Who is Gerald Visser?

19     A.  He's a broker.  Or he owns Global Marine

20  Transport and he's our broker that gets towing contracts

21  for us.  Yeah, he -- looks like he signed it on our

22  behalf.  Yeah, on behalf.  He signed it on behalf of Rig

Page 145

SanchezEmilio
23  Ventures.  That's what it is.

24      Q.  Was Mr. Jaross the person coordinating with

25  Young's Hydraulics for the various items and services

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

156

1  they provided?

2      A.  Yes.  Uh-huh.

3      Q.  And he was the one approving the various

4  expenditures?

5      A.  That's correct.  I would send it to him and he

6  would put his okay on it.

7      Q.  And we can go through all of these, but I'd

8  really rather not.  Is that generally true with regard

9  to the expenses for equipment, supplies, materials and

10  services aboard Ocean 66, that Mr. Jaross would okay the

11  expenditure and then you would authorize the payment?

12      A.  That is correct.  Those are the sheets they'd

13  send me and I'd pay them.

14      Q.  Turning about five or six pages, there's an

15  invoice from Aqua Air Industries, and perhaps it's more

16  than that.

17          MR. HERNANDEZ:  Do you have a Bates stamp on

18  the bottom?

19          MR. WEBRE:  Yeah, but it's like it was out

20  of -- you know what, all of these are Bates stamped.

21  Why don't you let me have mine back and we'll just --

22          THE WITNESS:  You won't believe it, but

23  there's not a 43 in here.  Forty -- oh, okay.  Excuse

24  me.  Okay.

Page 146

SanchezEmilio
25    Q.  This document is Bates numbered 61?


A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

157


1    A.  Yeah.  I remember that.

2    Q.  -- 500 --

3    A.  Burning bar.  Yeah.  That's some stuff we bought

4    to go out there, and burning bar there for underwater

5    burning.

6    Q.  Whose Visa is that down at the bottom?

7    A.  I don't know.

8    Q.  Do you have your personal Visa in your wallet?

9    A.  Yeah.

10    Q.  Will you look at it?

11    A.  Does it have a number on it?  Does it have a

12    number on it?

13    Q.  Yes, sir, it does.  The number is 4032.

14    A.  Doesn't sound like mine.

15    Q.  1000-0906-7747.

16    A.  No.  It doesn't sound like mine, unless I had

17    another one.  I think that was my previous Visa I had.

18    Yeah, that sounds like mine.  I lost my Visa and they

19    gave me a new number, so I can't tell.

20    Q.  Now, is this your personal Visa?

21    A.  Yeah.

22    Q.  Why would you put that on your personal Visa?

23    A.  Because I didn't have a company Visa, and then

24    they would reimburse me.

25    Q.  And you're pretty sure you obtained reimbursement


Page 147

SanchezEmilio
A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

158

1    for that expense?

2        A.  I'm pretty sure.  I always did.

3        Q.  Was that a frequent occurrence where --

4        A.  No.

5        Q.  -- you would advance an expense?

6        A.  No.  The reason is that these people -- I

7    couldn't wire the money, we needed it right quick, and

8    so for convenience sake, I'd say, well, just charge it

9    to my Visa.  Then when it would come in, I'd either

10   write a check directly to Visa from Rig Ventures and

11   pay -- and then pay my personal, or they would invoice

12   me, I'd take it out of there.

13       Q.  To your knowledge, are there any other vendors in

14   connection with materials, service, equipment provided

15   to Rig Ventures for Ocean 66 that have not been paid?

16       A.  There's an insurance from Gary Ferrazzano which

17   is insurance that hasn't been paid, there's Unifab, and

18   some taxes, 4,000 dollars, just came in.  Might be just

19   about -- that's the bulk of it.

20       Q.  Pursuant to any of those debts, do you know

21   whether or not a lien has been placed on Ocean 66?

22       A.  No lien has been placed on Ocean 66.

23       Q.  And is Rig Ventures engaged in the process of

24   trying to compromise or otherwise pay those debts?

25       A.  Well, we're trying -- we're disputing that Unifab

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

159

Page 148

SanchezEmilio

1   one and we're not disputing the insurance and we're not

2   disputing the taxes.

3       Q.  Okay.  Turn to Bates number 6150049, please.

4       A.  What is that one?

5       Q.  A Dolphin Towing invoice.

6       A.  Yeah.  Dolphin Towing.  They're the ones that

7   towed the boat.

8       Q.  Why was that sent to Rig Ventures and Esco Marine

9   both?

10      A.  I don't know.

11      Q.  Do you know whether Esco paid any portion of this

12  bill?

13      A.  No, they did not.  Rig Ventures is the only one

14  that paid.  That has nothing to do -- Esco doesn't have

15  anything to do with this.  That was just a mistake.

16      Q.  And is the same true for --

17      A.  50.

18      Q.  -- the following page?

19      A.  Yeah.

20      Q.  Okay.  Turn to 6150054, please.

21      A.  Okay.

22      Q.  Whose writing is that at the bottom?

23      A.  That's mine.

24      Q.  Why was -- it indicates there a check 2476 Esco.

25      A.  I don't know why that would be like that.  I

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

160

1   don't know why Esco would be paying this bill when it
                    Page 149

SanchezEmilio

2   was from J.B. McCallum.  I don't know whether -- if Esco

3   paid it because they had money and was reimbursed.  I

4   can't tell you.  In other words, it might have been an

5   error, because all the rest of the bills are Rig

6   Ventures.

7       Q.  Look at document number 6150067, please.

8       A.  Uh-huh.

9       Q.  Can you tell us what that document is?

10      A.  That's from Gary Ferrazzano, which is Franklin --

11  he was working for Franklin and Son, and that was for

12  the -- what we call the COFR, which was the pollution

13  insurance, I believe.  I believe that was for the COFR.

14  I sent it to the -- you have to send it to the Coast

15  Guard to make sure you have insurance.

16      Q.  Look at 6150059, please.

17      A.  5-9?

18      Q.  Yes, sir.  Whose handwriting is that?

19      A.  That's mine.

20      Q.  And from what source did you obtain the

21  information?

22      A.  That was from Phil Wells.

23      Q.  You think you did that by a phone call or --

24      A.  No.  I'm pretty sure he might have come in.

25      Q.  And as he told you this, you wrote it down?

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

161

1       A.  Yeah.  As he told me the days and the amounts, I

2   wrote it down and made a settlement sheet.  This was for

3   cleanup.  He went out there and cleaned the thing up.

Page 150

SanchezEmilio

4    Q.  Did you ever -- have you spoken with Jamie

5    Gilbert since the accident?

6    A.  No.

7    Q.  You never saw him in the hospital or anywhere

8    else?

9    A.  No.

10    Q.  Have you seen photographs of his injuries?

11    A.  Yes.

12    Q.  Is it your position that Rig Ventures, nor you,

13    bear any portion of responsibility in connection with

14    what's happened to Mr. Gilbert?

15    A.  That's our position.

16    Q.  And that's based upon your understanding of the

17    facts, has that been communicated to you?

18    A.  That's right.

19    Q.  Have you read Mr. Gilbert's deposition?

20    A.  I think I have, yes.

21    Q.  When do you think you did that?

22    A.  That's been about three months ago, something

23    like that.

24            THE WITNESS:  Longer than that?  Have I read

25    it or --

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

162

1            MR. HERNANDEZ.  Yes.

2    A.  Yeah, I think I have.

3    Q.  What do you recall from his deposition?

4    A.  I don't -- I don't remember any outstanding

5    points on it, because I didn't know -- I didn't know the

Page 151

SanchezEmilio

6  physical layout at that time I read it, until later on I

7  began to see it, when I --

8      Q.  And where did you gain an understanding of the

9  physical layout?

10     A.  When I saw the pictures that were brought back

11  from the inspection.

12     Q.  When did you first see those?

13     A.  I saw those -- about -- right after they came

14  back I saw some pictures, whenever that day was.  I

15  don't remember the day.

16     Q.  Rig Ventures maintains no type of personnel file

17  regarding Mr. Wells, Mr. Ruiz, Mr. Gilbert, correct?

18     A.  No.  We don't have any personnel files.

19     Q.  Subsequent to the incident, did you make any

20  notations regarding the occurrence or what you've

21  learned or --

22     A.  None.

23     Q.  -- about any conversations you've had with any

24  person?

25     A.  None.

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

163

1      Q.  And just to be perfectly clear, no written

2  agreement of any kind exists between you and Richard

3  Jaross?

4      A.  No written agreement.

5      Q.  Likewise, between Rig Ventures and Richard

6  Jaross?

7      A.  None.

Page 152

SanchezEmilio

8    Q.  There's been no scrap metal sold from the Ocean
9  66, has there?
10    A.  There was some scrap laying around on the dock
11  and I think we did sell very little.
12    Q.  A little --
13    A.  That was -- when they removed the vessel, there
14  was some scrap that accumulated there.
15    Q.  When is the last time operations were conducted
16  on the Ocean 66?
17    A.  The Jamie Gilbert incident when they finished up
18  three or four days after that, or five days, whatever it
19  took.
20    Q.  Was it just coincidental that that was the last
21  thing y'all had to do or --
22    A.  Yeah.  There was nothing out -- we sold all the
23  equipment.  And we couldn't move it, because there was a
24  hole in the bottom.
25    Q.  Didn't you tell me you do have a personal income

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

164

1  statement and balance sheet, correct?
2    A.  Yeah.  Financial statement, right.  Uh-huh.
3    Q.  Any reason you haven't produced those thus far?
4        THE WITNESS:  Were they requested?
5        MR. HERNANDEZ:  Yeah.
6    A.  They were requested.  I may have overlooked them,
7  but can I question why you need those?
8    Q.  No.
9    A.  No.  You can't.
           Page 153

SanchezEmilio

10      Q.   No, sir.

11      A.   I can't ask?

12      Q.   Well, you can ask, but I don't have to answer.

13      A.   Well, if it was requested, it's probably an

14   oversight.  I thought -- I thought --

15      Q.   Well, it's been --

16      A.   Very possibly I thought that it referred to the

17   tax returns.  You want the financial statements?

18      Q.   Yes, sir.

19      A.   Well, we'll find it.  We'll furnish it.

20      Q.   Do you have a shareholder agreement of any kind

21   between you and Rig Ventures?

22      A.   No.  There's no -- other than bylaws, no, none.

23      Q.   Is there a single ledger or document that would

24   show equity payments to you from Rig Ventures and

25   payments by you to capitalize or otherwise provide

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

165

1   equity to Rig Ventures?

2      A.   There should be some deposits or transferred

3   moneys such as that.

4      Q.   But a ledger, a single document that would show

5   an account register?

6      A.   I think you'd have to ask Norma Garza what she

7   has on that.

8                MR. WEBRE:  Off the record.

9                (Off the record briefly)

10   BY MR. WEBRE:

11      Q.   Did you and Mr. Jaross communicate by e-mail?
                          Page 154

SanchezEmilio

12    A.  Only when he forwards me stuff that I should know

13    about or I forward him stuff.  But his actual

14    communications, no.  We talk on the phone.  He's in town

15    here, I'm in town, or I go -- I'm by his office.

16    Q.  Well, but in 2000, 2001 he wasn't in town.

17    A.  Oh, no.  No.  No.  We didn't communicate by

18    e-mail.

19    Q.  You did not?

20    A.  No.  I didn't start using e-mail myself until

21    about six months ago.

22    Q.  Pretty neat thing, isn't it?

23    A.  Yeah, it turned out.  My daughter Norma finally

24    made me do it.

25    Q.  We've spoken a little bit about your position

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

166

1    that Mr. Jaross, while he would direct what to do and

2    when to do it, he wouldn't actually be looking over

3    anyone's shoulder and telling them how to do it.

4    A.  I never saw him do that, no.

5    Q.  Would you agree with me, though, that if aboard

6    the Ocean 66, he would certainly have the right to stop

7    someone from doing something in a way he wasn't pleased

8    with or to direct something be done in a way he thought

9    it needed to be done?

10    A.  I would assume he -- yeah, I would think he had

11    that authority.  I was given authority to do that.  When

12    a subcontractor is not doing what you want him to do,

13    you have the right to discharge him.

Page 155

SanchezEmilio

14    Q.  And to tell them how to do it?

15    A.  Or -- yeah, if he doesn't follow the directions,

16    then you -- he's not doing what you want him to do, then

17    you discharge him.

18          MR. WEBRE:  That's all the questions I have

19    for now.  Reserve any right for further questions based

20    on the need.

21          MR. HERNANDEZ:  We reserve all our questions

22    until the time of trial.

23          (Deposition concluded at 3:28 p.m.)

24

25

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

167

1                    CHANGES AND SIGNATURE

2    PAGE    LINE    CHANGE              REASON

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

Page 156

SanchezEmilio

16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

168

1   I, EMILIO SANCHEZ, have read the foregoing deposition
2   and hereby affix my signature that same is true and
3   correct, except as noted above.
4
5
6           _____
7                   EMILIO SANCHEZ
8   THE STATE OF TEXAS
9   COUNTY OF _____)
10
11       Before me, _____, on this day
12  personally appeared EMILIO SANCHEZ, known to me (or
13  proved to me under oath or through _____)
14  (description of identity card or other document)) to be
15  the person whose name is subscribed to the foregoing
16  instrument and acknowledged to me that they executed the
17  same for the purposes and consideration therein
                    Page 157