SanchezEmilio

18    expressed.

19

20          Given under my hand and seal of office this

21    _____ day of _____, _____.

22

23          _____
            NOTARY PUBLIC IN AND FOR
24          THE STATE OF TEXAS

25


                A BETTER COURT REPORTING SERVICE, INC.
                        (512) 478-1989

                                                        169


 1                  CAUSE NO. 2002-11-4448-D

 2    JAMES DAVID GILBERT        )    IN THE DISTRICT COURT
                                 )
 3                               )
      VS.                        )    CAMERON COUNTY, TEXAS
 4                               )
                                 )
 5    RIG VENTURES INC.; EMILIO  )
      SANCHEZ and PHIL WELLS     )    103RD JUDICIAL DISTRICT
 6
                    REPORTER'S CERTIFICATION
 7                  DEPOSITION OF EMILIO SANCHEZ
                         JANUARY 28, 2004
 8
          I, Karen Geddes Piland, Certified Shorthand Reporter
 9    in and for the State of Texas, hereby certify to the
      following:
10
          That the witness, EMILIO SANCHEZ, was duly sworn by
11    the officer and that the transcript of the oral
      deposition is a true record of the testimony given by
12    the witness;

13        That the deposition transcript was submitted on
      February 13, 2004 to the witness or to the attorney for
14    the witness for examination, signature, and return to me
      by March 4, 2004;
15
          That the amount of time used by each party at the
16    deposition is as follows:

17        Scott D. Webre - 03:40
          Luis R. Hernandez -  00:00
18
          That pursuant to information given to the deposition
19    officer at the time said testimony was taken, the
                         Page 158

SanchezEmilio
following includes counsel for all parties of record:

20

    Scott D. Webre, Attorney for Plaintiff
21      James David Gilbert
    Luis R. Hernandez, Attorney for Defendants
22      Rig Ventures, Inc., Emilio Sanchez,
      and Phil Wells
23

    I further certify that I am neither counsel for,
24 related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
25 taken, and further that I am not financially or
otherwise interested in the outcome of the action.


      A BETTER COURT REPORTING SERVICE, INC.
          (512) 478-1989

                              170


1    Further certification requirements pursuant to Rule
203 of TRCP will be certified to after they have
2 occurred.

3    Certified to by me this 10th day of February, 2004.

4

5

6      KAREN GEDDES PILAND, Texas CSR 5627
      Expiration Date: 12/31/04
7      A Better Court Reporting Service, Inc.
      Firm Registration No. 6
8      P. O. Box 685229
      Austin, Texas 78768-5229
9      (512) 478-1989

10

11

12

13

14

15

16

17

18

19

20

21
            Page 159

SanchezEmilio

22

23

24

25

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

171

1       FURTHER CERTIFICATION UNDER RULE 203 T.R.C.P.

2

3       The original deposition was/was not returned to the

4    deposition officer on _____;

5       If returned, the attached Changes and Signature page

6    contains any changes and the reasons therefor;

7       If returned, the original deposition was delivered

8    to Scott D. Webre, Custodial Attorney;

9       That $_____ is the deposition officer's

10   charges to Scott D. Webre for preparing the original

11   deposition transcript and any copies of exhibits;

12      That the deposition was delivered in accordance with

13   Rule 203.3, and that a copy of this certificate was

14   served on all parties shown herein on and filed with the

15   Clerk.

16      Certified to by me this _____ day _____,

17   2004.

18

19

20   _____
     Karen Geddes Piland, Texas CSR 5627
21   Expiration Date:   12/31/04
     A Better Court Reporting Service, Inc.
22   Firm Registration No. 6
     P. O. Box 685229
23   Austin, Texas 78768-5229
                 Page 160

SanchezEmilio
(512) 478-1989

24

25

A BETTER COURT REPORTING SERVICE, INC.
(512) 478-1989

1   I, EMILIO SANCHEZ, have read the foregoing deposition

2   and hereby affix my signature that same is true and

3   correct, except as noted above.

4

5

6                            _____

7                            EMILIO SANCHEZ

8   THE STATE OF TEXAS

9   COUNTY OF CAMERON

10

11       Before me, MARIA TERES RAMOS____, on this day

12  personally appeared EMILIO SANCHEZ, known to me (or

13  proved to me under oath or through Dr.Lic.TX 0305889)

14  (description of identity card or other document)) to be

15  the person whose name is subscribed to the foregoing

16  instrument and acknowledged to me that they executed the

17  same for the purposes and consideration therein

18  expressed.

                    MARIA TERESA RAMOS
                    MY COMMISSION EXPIRES
                    November 12, 2005

19

20       Given under my hand and seal of office this

21  25th day of February___, 2004.

22

23  _____
    NOTARY PUBLIC IN AND FOR

24  THE STATE OF TEXAS

25

Sep 27 04 03:28p        Scott D. Webre            332-593-4159        p.3
Case 1:04-cv-00047   Document 42-7   Filed in TXSD on 09/27/2004   Page 6 of 40

169

```
 1                    CAUSE NO. 2002-11-4448-D

 2   JAMES DAVID GILBERT        )     IN THE DISTRICT COURT
                                )
 3                              )
     VS.                        )     CAMERON COUNTY, TEXAS
 4                              )
                                )
 5   RIG VENTURES INC.; EMILIO  )
     SANCHEZ and PHIL WELLS     )     103RD JUDICIAL DISTRICT
 6
                      REPORTER'S CERTIFICATION
 7                   DEPOSITION OF EMILIO SANCHEZ
                          JANUARY 28, 2004
 8
         I, Karen Geddes Piland, Certified Shorthand Reporter
 9   in and for the State of Texas, hereby certify to the
     following:
10
         That the witness, EMILIO SANCHEZ, was duly sworn by
11   the officer and that the transcript of the oral
     deposition is a true record of the testimony given by
12   the witness;

13       That the deposition transcript was submitted on
     February 13, 2004 to the witness or to the attorney for
14   the witness for examination, signature, and return to me
     by March 5, 2004;
15
         That the amount of time used by each party at the
16   deposition is as follows:

17       Scott D. Webre - 03:40
         Luis R. Hernandez -  00:00
18
         That pursuant to information given to the deposition
19   officer at the time said testimony was taken, the
     following includes counsel for all parties of record:
20
         Scott D. Webre, Attorney for Plaintiff
21           James David Gilbert
         Luis R. Hernandez, Attorney for Defendants
22           Rig Ventures, Inc., Emilio Sanchez,
             and Phil Wells
23
         I further certify that I am neither counsel for,
24   related to, nor employed by any of the parties or
     attorneys in the action in which this proceeding was
25   taken, and further that I am not financially or
     otherwise interested in the outcome of the action.
```

Sep 27 04 03:29p    Scott D. Webre            337-593-4159            p.4
Case 1:04-cv-00047    Document 42-7    Filed in TXSD on 09/27/2004    Page 7 of 40

170

1       Further certification requirements pursuant to Rule
203 of TRCP will be certified to after they have
2  occurred.

3       Certified to by me this 10th day of February, 2004.

4

5              *Karen Geddes Piland*
6       _____
        KAREN GEDDES PILAND, Texas CSR 5627
7       Expiration Date: 12/31/04
        A Better Court Reporting Service, Inc.
        Firm Registration No. 6
8       P. O. Box 685229
        Austin, Texas 78768-5229
9       (512) 478-1989

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sep 27 04 03:29p        Scott D. Webre              337-593-4159              p.5
Case 1:04-cv-00047    Document 42-7    Filed in TXSD on 09/27/2004    Page 8 of 40

171

1        FURTHER CERTIFICATION UNDER RULE 203 T.R.C.P.

2

3        The original deposition was/was not returned to the

4    deposition officer on ___March 3, 2004_____;

5        If returned, the attached Changes and Signature page

6    contains any changes and the reasons therefor;

7        If returned, the original deposition was delivered

8    to Scott D. Webre, Custodial Attorney;

9        That $___1,074.55___ is the deposition officer's

10   charges to Scott D. Webre for preparing the original

11   deposition transcript and any copies of exhibits;

12       That the deposition was delivered in accordance with

13   Rule 203.3, and that a copy of this certificate was

14   served on all parties shown herein on and filed with the

15   Clerk.

16       Certified to by me this __3rd__ day March_____,

17   2004.

18

19

20       Karen Geddes Piland
         _____
         Karen Geddes Piland, Texas CSR 5627
21       Expiration Date:   12/31/04
         A Better Court Reporting Service, Inc.
22       Firm Registration No. 6
         P. O. Box 685229
23       Austin, Texas 78768-5229
         (512) 478-1989

24

25

# ≡ NOBLE
# ≡ DENTON

2/19/01

Emilio:
Do we go by the
rest of our parts ok
get some ................
info .     Bj

FAX

**Noble Denton Marine, Inc.**
580 Westlake Park Blvd, Suite 7?
Houston, TX 77079, USA

Phone:   281-558-7180 ext. 300
Fax:     281-558-2098
Email:   mblythe@nobledenton.com

SEAT OF PAN
FIRST
NOBLE IFU
FAIL'

EXHIBIT
KCP 01-28-04
Sanchez

| Date: | 19ᵗʰ February 2001 | Job No.: | | Total Pages | 1 |
|---|---|---|---|---|---|
| To: | Rig Ventures INC | | | Fax No: | 910/ 254 0608 |
| Attn: | Richard Jaross/ Emilio Sanchez | | | | |
| CC: | | | | | |
| From: | MJB | | | | |
| Subject: | "Ocean 66" | | | | |

Many thanks your package on the above unit received February 19ᵗʰ. We have reviewed same and have the following initial comments:

1) In general the proposed approach is feasible.
2) We recommend that an attempt be made to calculate the force required to extract each spud from the seabed. Our company can perform this calculation given the appropriate geotechnical data – eg. site-specific bore hole results. Alternatively, we can "back calculate" the resistance from the pertinent Spud Diving Record Sheet ( see Operating Manual page F 16 ) if available.
3) If not already in place, it may be necessary to provide stops to arrest the vertical motion of the spuds at the top of their travel.
4) Details for the stopping-off of the chains between strokes needs to be properly considered.
5) Clearances between the cables and the holes cut into the leg caissons will need to be properly reviewed in order to prevent chafing.
6) Consideration should be given to providing low friction guides for the cable transition through the wall of the leg column. This could be in the form of sheaves, Teflon (PTFE) pads, or similar.
7) The local strength of the leg structure in resisting the cable guide reactions should be checked and suitable reinforcements designed as necessary. We can assist you in this area.
8) All pad-eyes, shackles, cables (including an allowance for the double bend at the guides), and chains should be properly sized for the design load.

We trust the above is of use and look forward to hearing from you in due course.

Best regards,

Michael J. Blythe · · VP, Marine Ops.

1

CAUSE NO. 2002-11-4448-D

| JAMES DAVID GILBERT | ) | IN THE DISTRICT COURT |
|---|---|---|
| | ) | |
| | ) | |
| VS. | ) | CAMERON COUNTY, TEXAS |
| | ) | |
| | ) | |
| RIG VENTURES, INC.; EMILIO | ) | |
| SANCHEZ and PHIL WELLS | ) | 103RD JUDICIAL DISTRICT |

<u>**ORAL AND VIDEOTAPED DEPOSITION OF RICHARD JAROSS**</u>

# ORIGINAL

JANUARY 28, 2004                          BROWNSVILLE, TEXAS

~~~~~~~A Better Court Reporting Service, Inc.~~~~~~~~

TRESSA GRANGER, PRESIDENT

Certified Shorthand Reporters
P.O. BOX 685229, AUSTIN, TEXAS 78768-5229
1-800-478-1989, 1-512-478-2968 (FAX)

CAUSE NO. 2002-11-4448-D

JAMES DAVID GILBERT          )     IN THE DISTRICT COURT
                             )
                             )
VS.                          )     CAMERON COUNTY, TEXAS
                             )
                             )
RIG VENTURES, INC.; EMILIO   )
SANCHEZ and PHIL WELLS       )     103RD JUDICIAL DISTRICT

----------------------------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

RICHARD JAROSS

JANUARY 28, 2004

----------------------------------------------------------------

ORAL DEPOSITION OF RICHARD JAROSS, produced as a

witness duly sworn by me at the instance of the

Plaintiff James David Gilbert, taken in the above-styled

and numbered cause on the 28th day of January 2004, from

3:48 p.m. to 5:44 p.m., before Karen Geddes Piland,

Certified Shorthand Reporter No. 5627, in and for the

State of Texas, at the offices of Fleming & Hernandez,

P.C, 1650 Paredes Line Road, Suite 102, Brownsville,

Texas, pursuant to the Texas Rules of Civil Procedure

(and the provisions stated on the record or attached

hereto).

2

```
 1              A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF JAMES DAVID GILBERT:

 4           Mr. Scott D. Webre
             Attorney at Law
 5           556 Jefferson Street
             Jefferson Towers, Suite 200
 6           Lafayette, Louisiana 70501

 7   FOR THE DEFENDANTS RIG VENTURES INC., EMILIO SANCHEZ,
     AND PHIL WELLS:
 8
             Mr. Luis R. Hernandez
 9           Attorney at Law
             FLEMING & HERNANDEZ, P.C.
10           1650 Paredes Line Road, Ste. 102
             Brownsville, Texas 78521
11

12   ALSO PRESENT:

13           Mr. Hector Zapata, Videographer

14

15

16

17

18

19

20

21

22

23

24

25
```

Sep 27 04 02:32p          Scott D. Webre               337-593-4159          p.5
Case 1:04-cv-00047    Document 42-7    Filed in TXSD on 09/27/2004    Page 13 of 40

3

INDEX

                                                         PAGE
Appearances....................................
                                                          2
Stipulations (To follow last page of deposition)

EXAMINATION OF RICHARD JAROSS
DATE:  JANUARY 28, 2004


EXAMINATION INDEX

By Mr. Webre...................................   4

Signature and Changes..........................  78
Reporter's Certificate.........................  80


EXHIBITS

                                                 PAGE
NO.           DESCRIPTION                       MARKED

1      "Ocean 66 - Accounts Payable"
       Richard Jaross - Workbook...........   61




CERTIFIED QUESTION

NO.                                        PAGE/LINE
1  .....................................    38/9




REQUESTED INFORMATION

NO.    DESCRIPTION                          PAGE

1      Records reflecting whether Mr.Jaross
       billed Rig Ventures as Richard Jaross
       or Mystic Shipping. ................   72

4

1                        RICHARD JAROSS,

2    having been first duly sworn, testified as follows:

3                         EXAMINATION

4    BY MR. WEBRE:

5       Q.  Good afternoon, Mr. Jaross.  My name is Scott

6    Webre.  I represent Jamie Gilbert in the lawsuit filed

7    here in Cameron County concerning injuries he sustained

8    aboard the Ocean 66.  Are you aware of that?

9       A.  Yes.

10      Q.  Are you familiar with the injuries Mr. Gilbert

11   suffered aboard the Ocean 66?

12      A.  Yes.

13      Q.  Are you familiar with the allegations in the

14   Plaintiff's lawsuit against Rig Ventures, Incorporated,

15   and Emilio Sanchez?

16      A.  Yes.

17      Q.  How were you aware of those allegations?

18      A.  I believe I read the lawsuit quite a while ago.

19      Q.  Who provided you a copy of the lawsuit?

20      A.  Mr. Sanchez.

21      Q.  When was that?

22      A.  I don't remember.

23      Q.  Have you ever given a deposition before?

24      A.  Yes.

25      Q.  In what context?

1    A.   Various other lawsuits I'm involved in.

2    Q.   Okay.  Have you ever been involved as a defendant

3  in a personal injury lawsuit?

4    A.   No.

5    Q.   Have you ever been involved as a plaintiff in a

6  personal injury lawsuit?

7    A.   No.

8    Q.   So what types of lawsuits have you been involved

9  in?

10    A.   Civil, commercial things.

11    Q.   Contract disputes?

12    A.   Yes.

13    Q.   Have those been where you were personally a

14  party, or a corporation in which you may be a principal

15  as a party?

16    A.   Both.

17    Q.   Okay.  When was the most recent such lawsuit?

18    A.   Been nine, ten years ago.

19    Q.   And what state was that lawsuit?

20    A.   I think in New York.

21    Q.   What county?

22    A.   I don't remember.  New York City.

23    Q.   So having provided or given a deposition before,

24  you understand you're under oath and this testimony

25  you're giving here today can be shown by videotape which

Sep 27 04 02:33p    Scott D. Webre         337-593-4159         p.8
Case 1:04-cv-00047    Document 42-7    Filed in TXSD on 09/27/2004    Page 16 of 40

6

1   you see is being taken today or actually be read into

2   the record to the judge and jury just as though you were

3   sitting in that witness stand giving live testimony.  Do

4   you understand that?

5      A.  Yes.

6      Q.  Is there any reason that you cannot concentrate

7   or otherwise understand my questions and give

8   articulate, intelligent answers today?

9      A.  Not that I know.

10      Q.  You're not under any medication or really sleepy

11   or anything like that?

12      A.  No.

13      Q.  If I ask a confusing question or one that you

14   believe is misleading or vague or anything about the

15   question you don't like, will you tell me you don't like

16   the question and ask me to rephrase it?

17      A.  Yes.

18      Q.  I'd also ask that before you start an answer you

19   allow me to finish my question and I'll return the favor

20   by allowing you to finish your answer before I start the

21   next question.  Okay?

22      A.  Yes.

23      Q.  Any affirmative answers, please provide a yes;

24   any negative, say no.  Head nods and shakes don't work

25   very well for the court reporter.  Okay?

Sep 27 04 02:33p    Scott D. Webre    337-593-4159    p.9
Case 1:04-cv-00047    Document 42-7    Filed in TXSD on 09/27/2004    Page 17 of 40

7

1    A.   Okay.

2    Q.   I want to talk first about your educational

3    background.  Why don't you tell the jury where you went

4    to school and how far you went in school.

5    A.   I graduated Hillcrest High School in Dallas in

6    1958, and I graduated University of Texas, got a BBA in

7    business in 1964, something like that.

8    Q.   Any postgraduate education?

9    A.   No.

10   Q.   Have you undergone any training of any kind in

11   any trade or occupation, formal training?

12   A.   I've taken training courses in electronics, taken

13   training courses in safety courses over the years.

14   Q.   What type of safety courses?

15   A.   Aboard ships so far as safety programs where

16   you're using ship cutting, things of that nature.

17   Q.   When was the last time you took such a training

18   course?

19   A.   A long time ago.  In the early '80s.

20   Q.   About how many hours of those type of courses did

21   you take?

22   A.   I don't remember.

23   Q.   Do you recall who sponsored the courses?

24   A.   I think it was the Scrap Institute at the time.

25   Q.   Do you still have certificates indicating you

Sep 27 04 02:33p    Scott D. Webre    337-593-4159    p.10
Case 1:04-cv-00047    Document 42-7    Filed in TXSD on 09/27/2004    Page 18 of 40

8

1    went to these courses?

2        A.    I don't know.

3        Q.    Do you have any documents evidencing what those

4    courses might have been and when you took them?

5        A.    No.

6        Q.    Can you tell the jury or the judge anything more

7    about the substance of what those courses entailed?

8        A.    Not at this time.  They were quite a few years

9    ago.

10       Q.    Do you think that at some point in the future you

11   will be able to provide that answer, whereas today you

12   can't?

13       A.    I don't think I have those records from before.

14       Q.    And you don't have any specific recollection of

15   what you learned in those courses?

16       A.    I'd have to review.  I don't even know where I

17   would be able to find records right now, if we're going

18   back that many years.  I remember taking the courses.

19       Q.    Okay.  I understand you don't have the records.

20   What I'm asking is do you have any specific recollection

21   of the substance of those courses and what you learned

22   in those courses?

23       A.    It would be unfair to try to think.  I don't

24   remember.  I don't remember.  There's too many other --

25   not courses, but things I've read over the years and

---

Sep 27 04 02:34p    Scott D. Webre           337-593-4159        p.11
Case 1:04-cv-00047   Document 42-7   Filed in TXSD on 09/27/2004   Page 19 of 40

9

1    it -- that would be combined into that, so I don't

2    remember.

3        Q.  Are these things you've read over the years just

4    on your own curiosity, or something that was assigned to

5    you by an employer or some other person?

6        A.  Well, just in the ship-breaking business we keep

7    track, at least through my safety people and things like

8    that what's going on in the industry so far as rules and

9    regulations.

10       Q.  What do you mean when you refer to your safety

11   people?

12       A.  Well, I'm in the ship-breaking business here now

13   and I have a safety engineer that works in the yard and

14   he reviewed safety programs and things of that nature.

15       Q.  Was your safety engineer involved with the

16   project of the Ocean 66?

17       A.  No.

18       Q.  Did you employ or consult with any safety

19   engineer or safety expert concerning operations aboard

20   Ocean 66?

21       A.  No.

22       Q.  So any decisions you made regarding safety

23   protocol or safety measures to be taken or not, aboard

24   Ocean 66, were based upon your own experience, education

25   and expertise?

Sep 27 04 02:34p       Scott D. Webre           337-593-4159          p.12
Case 1:04-cv-00047    Document 42-7    Filed in TXSD on 09/27/2004    Page 20 of 40

10

1    A.   Yes.

2    Q.   Do you possess any licenses or certifications

3    pertaining to the issues of workplace safety?

4    A.   No.

5    Q.   To ship-breaking?

6    A.   No.

7    Q.   To the oil field industry?

8    A.   No.

9    Q.   Any licenses, certifications or -- or any

10   licenses or certifications that would -- whatever kind,

11   you believe it's important for us to consider in

12   connection with your expertise to perform salvage

13   operations on Ocean 66?

14   A.   No.

15   Q.   Do you intend to offer yourself as an expert in

16   the area of oil field salvage operations -- operations

17   or ship-breaking at the time of trial in this case?

18   A.   No.

19   Q.   Are you a member of any associations or trade

20   organizations?

21   A.   No.

22   Q.   No ship-breaking organizations or associations

23   you are a member of now?

24   A.   No.

25   Q.   How about in the future -- or in the past,

Sep 27 04 02:34p     Scott D. Webre          337-593-4159          p.13
Case 1:04-cv-00047   Document 42-7   Filed in TXSD on 09/27/2004   Page 21 of 40

11

1  rather?

2      A.   Institute of Scrap.

3      Q.   And when did you cease membership with them?

4      A.   I don't recall.

5      Q.   Was it in the last five years?

6      A.   More than that.

7      Q.   Does the Institute of Scrap publish or

8  promulgate, that you know of, any policies, procedures

9  or standards pertaining to safety of operations in

10 ship-breaking and salvage?

11     A.   They have a safety program for scrap yard

12 operations and we followed that, but I don't recall if

13 it went over to ship-breaking.

14     Q.   You say "we followed that."  Who followed that?

15     A.   Our industry.

16     Q.   Okay.  Do you still follow that today?

17     A.   Yes.

18     Q.   Do you have a copy of those policies in your

19 office or anywhere?

20     A.   Yes.

21     Q.   If I were to -- if I wanted to obtain a copy of

22 those policies, where would I get it?

23     A.   You would have to subpoena for them.

24     Q.   From whom?

25     A.   Esco Marine.

1    Q.   And what would they be called specifically?

2    A.   The safety and health plan for Esco Marine.

3    Q.   And are these -- is this safety and health plan,

4    is it derived from the standards of the Institute of

5    Scrap that you mentioned before?

6    A.   No.

7    Q.   So this is something completely different?

8    A.   Yes.

9    Q.   Does it attempt to address OSHA or Coast Guard

10   regulations in any way?

11   A.   Yes.

12   Q.   Do you consider yourself knowledgeable concerning

13   OSHA and Coast Guard regulations as they apply to

14   ship-breaking and salvage?

15   A.   To a degree.

16   Q.   To what degree?

17   A.   Enough to manage a company.  I have an expert

18   that follows that on a daily basis.

19   Q.   And what company do you manage in this

20   connection?

21   A.   Esco Marine.

22   Q.   Are you an employee of Esco Marine?

23   A.   Yes.

24   Q.   You are an employee of Esco Marine?

25   A.   Yes.

Sep 27 04 02:35p    Scott D. Webre       337-593-4159      p.15
Case 1:04-cv-00047    Document 42-7    Filed in TXSD on 09/27/2004    Page 23 of 40

13

1    Q.   When did you purchase Esco Marine?

2    A.   About six weeks ago.

3    Q.   And you purchased that company from Mr. Emilio

4  Sanchez?

5    A.   Right.

6    Q.   And you are a 50 percent owner in that company?

7    A.   My wife is.

8    Q.   Your wife is.  And are you a shareholder at all

9  in the company?

10   A.   No.

11   Q.   You're strictly an employee?

12   A.   Uh-huh.  Yes.

13   Q.   Are you an officer?

14   A.   Yes.

15   Q.   What office do you hold?

16   A.   President.

17   Q.   Are you a director?

18   A.   No.

19   Q.   How many directors are on the board?

20   A.   There's one director right now.

21   Q.   Who is that person?

22   A.   Andy Levy.

23   Q.   Who is Andy Levy?

24   A.   He's one of the shareholders in the company.

25   Q.   How many shareholders are in the company?

Sep 27 04 02:35p    Scott D. Webre         337-593-4159        p.16
Case 1:04-cv-00047    Document 42-7    Filed in TXSD on 09/27/2004    Page 24 of 40

14

1    A.   There's two shareholders.

2    Q.   And Esco Marine is involved in ship-breaking and

3    salvage, correct?

4    A.   Yes.

5    Q.   Anything else?

6    A.   No.   That's all.

7    Q.   Is Esco Marine involved in any way with the

8    salvage or ship-breaking of Ocean 66?

9    A.   No.

10    Q.   For the benefit of those of us not involved in

11    ship-breaking, why don't you tell us what ship-breaking

12    is.

13    A.   It's the taking of a vessel, a ship, and reducing

14    it down to marketable items such as scrap, copper,

15    reusables and things like that.

16    Q.   So it's showing up with a cutting torch and

17    cutting it up?

18    A.   Completely recycling it.

19    Q.   Then it's not fair to -- or is it fair to

20    characterize the job of the Ocean 66 as ship-breaking?

21    A.   No.

22    Q.   How would you characterize that job?

23    A.   It was a salvage job.

24    Q.   When was the last contact you had with any

25    perspective purchaser of the Ocean 66?

1    A.   I haven't had any contact with anybody.

2    Q.   At any point in time?

3    A.   I've -- I don't talk to anybody directly.

4  Mr. Sanchez does that.

5    Q.   Have you spoken with anyone from -- was it

6  VenueBid?  Is that right?

7    A.   VenueBid, yes.

8    Q.   Have you spoken with anyone from VenueBid

9  regarding the Ocean 66?

10   A.   I didn't speak to him about that, even though

11  he's handling it.  I speak -- I spoke to him about some

12  mud pumps or something, some other unrelated item.

13   Q.   When was the last time you spoke with Mr. Sanchez

14  aside from the moments just before the deposition?

15   A.   I spoke to him yesterday.

16   Q.   What did y'all talk about?

17   A.   I don't remember.  I don't remember.

18   Q.   When was the last time you spoke with Mr. Sanchez

19  regarding the allegations in this suit?

20   A.   It might have been several weeks ago.

21   Q.   What was the content of that discussion?

22   A.   A week ago, I believe.  Just that I got a

23  subpoena and, you know, discussed what records I had,

24  and that was the extent of it.

25   Q.   Did y'all at any time discuss who you thought was

Sep 27 04 02:35p       Scott D. Webre          337-593-4159            p.18
Case 1:04-cv-00047    Document 42-7    Filed in TXSD on 09/27/2004    Page 26 of 40

16

1  at fault in Jamie's injuries, what might have been done

2  to prevent the injuries, what caused the injuries, the

3  accident and so forth, at any time?

4      A.  Yes, we discussed that.

5      Q.  What is your opinion, if any, regarding the cause

6  of the injury?

7      A.  I think it's negligence from Jamie Gilbert's

8  viewpoint.

9      Q.  That's based upon what?

10     A.  That he could have gotten off the object, as I

11  understand the accident, and easily stepped off of it.

12  He didn't have to jump like a wild man out on a pipe and

13  danger himself like he did.

14          MR. WEBRE:  Objection, nonresponsive.

15     Q.  It's your understanding that he could easily have

16  stepped off of the pipe, but he voluntarily chose to

17  jump at the pipe instead of stepping safely and easily

18  to the deck below?

19     A.  That's correct.

20     Q.  Is your position based upon anything else?

21     A.  No.  Only from third-party comments on it.

22     Q.  Okay.  So if the jury decides that Mr. Gilbert

23  did not have the option of safely and easily stepping to

24  the deck below, would your opinion change?

25     A.  No.

1    Q.   So then your opinion and your position that it's

2  Jamie Gilbert's fault is based upon something other than

3  the fact that you believe he could have safely and

4  easily stepped to the deck below?

5    A.   Yes.

6    Q.   And what is that?

7    A.   That's from the way it was presented to me that

8  he had more than enough ample space to step off the

9  object he was on.  In fact, he was three feet away or so

10 from the edge.  He could have stepped off or he could

11 have jumped down to the next level which is about four

12 feet below.

13   Q.   The way it was presented to you by whom?

14   A.   Phil Wells.

15   Q.   When?

16   A.   Shortly after the accident.

17   Q.   What did Wells tell you?

18   A.   Exactly that.

19   Q.   Exactly what?

20   A.   He said he was moving a pipe and -- on a cable.

21 He -- and for some reason, this guy jumped forward, not

22 -- instead of stepping back, and jumped out onto the

23 pipe, you know, jumped out and grabbed a hold of it and

24 slipped off and fell down to the lower deck after the

25 pipe had swung out.

Sep 27 04 02:36p    Scott D. Webre         337-593-4159        p.20
Case 1:04-cv-00047   Document 42-7   Filed in TXSD on 09/27/2004   Page 28 of 40

18

1   Q.   So Mr. Wells indicated to you that he was moving

2   the pipe at the time it happened?

3   A.   I don't remember.

4           MR. WEBRE:   Read back his previous answer.

5           (Requested portion was read.)

6   Q.   Okay.  You testified just moments ago that he was

7   moving a pipe on a cable --

8   A.   Uh-huh.

9   Q.   -- and now you're indicating that you don't know

10  if he said that or not?

11  A.   Well, I'm trying to get the context.  He was in

12  the act of moving the pipe and it's my understanding

13  that he jumped out at the pipe and then grabbed a hold

14  of it while Mr. Wells was moving it.  I don't know it

15  was moving at the moment that he was -- jumped out or it

16  stopped at that moment or not.  I don't know the answer

17  to that question.

18  Q.   Have you ever spoken with Jamie Gilbert about the

19  incident?

20  A.   Yes.

21  Q.   What did Jamie tell you?

22  A.   He felt that the operator did this on purpose to

23  hurt him, which I felt was unbelievable.

24  Q.   Did you speak with Dennis Macy concerning the

25  incident?

1    A.   No.

2    Q.   Did you speak with Frank Ruiz, Junior, concerning

3  the incident?

4    A.   I don't recall.

5    Q.   So your position that it's Jamie Gilbert's fault

6  is based upon your belief of Mr. Wells' account and

7  disbelief in Mr. Gilbert's?

8    A.   Yes.  I don't recall.  I mean, I may have talked

9  to Junior.  I don't remember.  I may have --

10   Q.   Frank Ruiz, Junior?

11   A.   Yes, I may have.  It's been quite a while ago.

12   Q.   What is your agreement with Rig Ventures

13 concerning payment for your services provided in

14 conjunction with the Ocean 66 salvage?

15   A.   I was to get a fee out of it.  When we got done

16 with all the expenses, Mr. Sanchez paid me a fee.  We

17 negotiated a fee at the time.

18   Q.   Did y'all ever arrive at a fee certain?

19   A.   I believe so.  I know I tried to look for the

20 records for that, but I think it was a hundred and a

21 half or a hundred and a quarter or something of that

22 nature, but I have to look.

23   Q.   Was this pursuant to discussions y'all had or

24 writings you exchanged?

25   A.   No.  Discussions.

1    Q.  When did those discussions occur?

2    A.  When the rig was finally floated free and was on

3 its way to Morgan City -- or Lake Charles.  Excuse me.

4 Lake Charles.

5    Q.  Were they discussions in person or by phone?

6    A.  By phone.

7    Q.  Were you in North Carolina at the time?

8    A.  Yes.

9    Q.  How many times did you visit the Ocean 66

10 offshore?

11    A.  I believe once.

12    Q.  For what purpose?

13    A.  Just to see how they were doing, see how the

14 operation was going on.

15    Q.  How long did you stay?

16    A.  Four or five hours, and I caught a helicopter

17 back.

18    Q.  What other projects have you worked on in

19 conjunction with Rig Ventures or Mr. Sanchez?

20    A.  We've done -- we've done a Russian rig we moved.

21 We've got -- I don't have all the names of all the rigs.

22 We've done about eight or nine rigs.

23    Q.  Over the past how many years?

24    A.  Over the last 15 years, maybe.

25    Q.  Has the agreement always been the same with

Sep 27 04 02:37p       Scott D. Webre        337-593-4159        P.23
Case 1:04-cv-00047    Document 42-7    Filed in TXSD on 09/27/2004    Page 31 of 40

21

1   Mr. Sanchez that at conclusion of the operation or the

2   project, you would be paid a fee -- a fee in relation to

3   what the profit at the end of the job was?

4       A.   Yes.

5       Q.   And that determination of the amount of the fee

6   was something that you and he would discuss on a

7   case-by-case basis?

8       A.   Yes.

9       Q.   You never had any sort of agreement whereby, for

10  instance, you would receive 30 percent of net profit or

11  any -- you know, X percent of net profit; is that

12  correct?

13      A.   I don't recall.

14      Q.   You never had any written agreement with

15  Mr. Sanchez or with Rig Ventures?

16      A.   I may have had an agreement, but I don't recall

17  what that was.

18      Q.   Why does Esco Marine have a safety and health

19  plan?

20      A.   It's required cutting ships in the yard in the

21  United States, for the government.

22      Q.   And that safety and health plan pertains to what

23  specifically?

24      A.   For all aspects of the business.

25      Q.   So a safe workplace?

1      A.   Uh-huh.

2      Q.   Supervision and training of laborers?

3      A.   Right.

4      Q.   Were you aware of the fact that Rig Ventures had

5   no such plan?

6      A.   We didn't have any employees.

7            MR. WEBRE:   Objection, nonresponsive.

8      Q.   Were you aware of the fact that Rig Ventures had

9   no such plan?

10      A.   I'm not aware if they had one or not.

11      Q.   Do you and Mr. Sanchez see each other socially?

12   Are you friends?

13      A.   We're very good friends.

14      Q.   Do your families get together?

15      A.   No, not -- we haven't gotten together for many

16   years.

17      Q.   Do you and Mr. Sanchez get together when you can?

18      A.   We have lunch occasionally, yes.

19      Q.   About how many times do you think you have spoken

20   with Mr. Sanchez concerning the allegations in this

21   suit?

22      A.   I don't recall.  Maybe -- no, I can't recall.

23      Q.   More than ten?

24      A.   Probably not.

25      Q.   More than five?

1     A.   I don't recall.

2     Q.   Is your position that Jamie Gilbert was the cause

3   of the incident based only upon what you learned from

4   Phil Wells?

5     A.   Yes.

6     Q.   Do you have any notes or other documents or

7   writings or statements or anything of the kind

8   reflecting what Phil Wells told you?

9     A.   No.

10     Q.   Or what you told him?

11     A.   No.

12     Q.   You never sent him a letter, right?

13     A.   I don't recall.

14     Q.   Did he ever send you a letter?

15     A.   I don't recall.  I mean, if it would be in

16   Mr. Sanchez's files.  I don't -- this is all I found is

17   what's in this book.

18     Q.   What documents did you bring with you today?

19     A.   This the -- just the only book I had in the files

20   right now.  We moved our office.  I didn't find any

21   more.

22     Q.   And these documents you brought in response to my

23   subpoena to you, correct?

24     A.   Right.

25     Q.   Did you take this picture, this photograph of the

Sep 27 04 02:38p     Scott D. Webre          337-593-4159        p.26
Case 1:04-cv-00047   Document 42-7   Filed in TXSD on 09/27/2004   Page 34 of 40

24

1   Ocean 66?

2       A.  I could have.  I don't know.

3       Q.  Do you recall the first time you saw the Ocean

4   66?

5       A.  When I went out by helicopter.

6       Q.  Prior to the memorandum of agreement entered

7   between Murphy and Rig Ventures?

8       A.  I wasn't out there then -- no?  I have to correct

9   that.  I don't -- I may have gone out the first time we

10  started the contract.  I don't -- I may have gone out

11  the first time.  I'd have to ask Mr. Sanchez to check

12  the helicopter records.

13      Q.  Do you recall the first time Mr. Sanchez spoke to

14  you about the Ocean 66?

15      A.  I actually spoke to him the first time when I was

16  out in Singapore.  I heard it was coming on the market

17  and I called him and he followed it up and got a

18  contract put together on it.

19      Q.  I'm showing you a document with handwriting on

20  it, it's on a page with Esco Marine letterhead, and it

21  looks like it was faxed from Emilio Sanchez.  It's got a

22  total figure at the bottom.  At the top it says "pending

23  bill," the total of 442,210 dollars and 42 cents.  Can

24  you tell us what that is, please?

25      A.  Yeah.  These are bills that were outstanding on

1    the Ocean 66.

2        Q.   Outstanding and unpaid?

3        A.   I don't know.

4        Q.   Does that look to you to be maybe a sum total of

5    the expenses that were incurred in connection with the

6    salvage of Ocean 66?

7        A.   No.  I recall the expenses to be a lot more than

8    this.

9        Q.   Do you know what the total expenses were?

10       A.   I thought they were close to a million dollars,

11   but I don't know.  Mr. Sanchez has the accounting.  I

12   would be guessing.

13       Q.   Do you share any assets with Mr. Sanchez, a

14   house, a lake house, a beach house?

15       A.   No.

16       Q.   What was your agreement with Rig Ventures

17   regarding the expenses you would personally incur in

18   connection with the consulting or work you were

19   performing regarding the Ocean 66?

20       A.   To be reimbursed.

21       Q.   How frequently would you submit requests for

22   reimbursement?

23       A.   On a regular basis.

24       Q.   In writing?

25       A.   Yes.

26

1    Q.  Paid to whom?

2    A.  Paid to Richard Jaross or to Mystic Shipping and

3  Trading.

4    Q.  What was Mystic Shipping and Trading's

5  involvement with the salvage of Ocean 66?

6    A.  We did some of the work through the Mystic

7  Shipping and Trading.

8    Q.  What's Mystic Shipping and Trading's business?

9    A.  Just buying and selling ships.

10   Q.  The same thing as Rig Ventures?

11   A.  Yes.

12   Q.  What specific services did Mystic Shipping and

13  Trading provide to Rig Ventures, to the Ocean 66?

14   A.  Consulting.  Just Consulting.

15   Q.  And that consulting was through you?

16   A.  Yes.

17   Q.  Are you the sole shareholder of Mystic Shipping?

18   A.  I'd have to check the records to see whether I am

19  or not.

20   Q.  Are you a shareholder of Mystic Shipping?

21   A.  I believe I am, yes.

22   Q.  Is it a company that you formed?

23   A.  No.

24   Q.  Who formed the company?

25   A.  A fellow named Jonathan Feffer in New York.

Sep 27 04 02:38p      Scott D. Webre        337-593-4159           p.29
Case 1:04-cv-00047    Document 42-7    Filed in TXSD on 09/27/2004    Page 37 of 40

27

1      Q.  When did you first introduce Mr. Feffer to -- I'm

2  sorry.  How do you spell his name?

3      A.  F-e-f-f-e-r.

4      Q.  When did you first introduce Mr. Feffer to

5  Mr. Sanchez?

6      A.  Could be 15, 18 years ago, maybe longer.  Could

7  even be back in the '70s.

8      Q.  To your knowledge, what's the professional

9  relationship between Mr. Feffer and Rig Ventures?

10     A.  I don't believe Mr. Feffer did any work for Rig

11  Ventures.

12     Q.  Do you know whether he had any transactions with

13  Rig Ventures?

14     A.  I don't believe he did.

15     Q.  Do you know whether Rig Ventures ever loaned

16  Mr. Feffer money?

17     A.  I don't know.

18     Q.  Do you know whether Mr. Feffer ever loaned Rig

19  Ventures money?

20     A.  I don't know.

21     Q.  Are you familiar with any of the companies that

22  Mr. Feffer operates under?

23     A.  Not offhand, no.

24     Q.  Are you familiar with the company Bomar, Limited?

25     A.  Bomar?

1    Q.   Yes, sir.

2    A.   Yes.

3    Q.   What does Bomar do?

4    A.   It's a company I traded ships with in New York.

5    Q.   What do you mean you traded ships with?

6    A.   We had a joint venture agreement.

7    Q.   You were a joint venturer with Bomar?

8    A.   Yes.

9    Q.   Or was Mystic River -- or Mystic Shipping?

10   A.   No.  No.

11   Q.   It was you personally?

12   A.   No, it wasn't me personally.  It was a company

13   called American General Resources, another company I

14   had.

15   Q.   Had a joint venture with Bomar --

16   A.   Right.

17   Q.   -- for the salvage of ships?

18   A.   Yes.

19   Q.   Specific ships?

20   A.   Well, we'd target a ship and then we'd do a

21   transaction with it.

22   Q.   When was the last transaction in that regard?

23   A.   Had to be 10, 12 years ago.

24   Q.   Did Rig Ventures loan any money in connection

25   with those activities?

1      A.   I don't recall.

2      Q.   Has Rig Ventures ever loaned you money?

3      A.   Yes.

4      Q.   How much?

5      A.   I don't know.

6      Q.   When?

7      A.   I don't know.

8      Q.   At what rate?

9      A.   I don't know.  I mean, we've been -- I wouldn't

10   call it a loan; an advance on commissions and the

11   commissions were earned, so I don't believe I owe any

12   money to Rig Ventures.

13     Q.   Have you ever entered a written promissory note

14   with Rig Ventures either as the lender or borrower?

15     A.   I don't believe so.

16     Q.   Do you have any interest in Saber Steel?

17     A.   No.

18     Q.   Sanship?

19     A.   No.

20     Q.   Tex-Mex Cold Storage?

21     A.   No.

22     Q.   Sanco International?

23     A.   No.

24     Q.   And by that, of course, I meant ownership

25   interest.

1       A.   No.

2       Q.   Were you loaned money or loaned money to any of

3    those entities?

4       A.   Not that I recall.

5       Q.   Do you have any unpaid or unreimbursed expenses

6    regarding the Ocean 66?

7       A.   Not that I recall.

8       Q.   Do you have any ongoing contact with

9    Mr. McCallum?

10      A.   Who?

11      Q.   I think it's Jerry McCallum, who was initially --

12      A.   Oh, the guy that introduced us to the deal

13   originally in Singapore.  No.

14      Q.   Had you ever worked with Mr. McCallum prior to

15   the Ocean 66 project?

16      A.   No.

17      Q.   What was your understanding of your role in

18   connection with the operations aboard Ocean 66?

19      A.   I was to consult and give advice on getting the

20   rig jacked up where I could, seeing that supplies and

21   other things were brought in that we needed, logistical

22   support.

23      Q.   See that all the necessary services were

24   provided?

25      A.   Right.