Sep 27 04 02:39p    Scott D. Webre        337-593-4159            p.33
Case 1:04-cv-00047    Document 42-8    Filed in TXSD on 09/27/2004    Page 1 of 40

31

1    Q.   See that labor was hired to perform the tasks

2    needed to get the legs up out of the ocean floor?

3    A.   Well, I didn't hire any labor for the rig.  I

4    didn't do any of that.

5    Q.   Did you hire Mr. Frank Ruiz?

6    A.   Yes.

7    Q.   Okay.  He's labor, right?

8    A.   He was a gentleman that has expertise in raising

9    rigs and then he hires his own people.  That's his

10   bailiwick.

11   Q.   Do you recall the first discussion you had with

12   Mr. Ruiz about the Ocean 66?

13   A.   I don't remember when it was.

14   Q.   I'm not asking you when it was.  Do you recall

15   that it was?

16   A.   Yes, I had a conversation with him, but I don't

17   recall.

18   Q.   What would have transpired then?  What do you

19   think you told him and he told you?

20   A.   The jack-up rig that the mat supported, that it's

21   been laid up for 15 years and we're going to go out and

22   see if we can get the systems working, and what our job

23   is to jack it up and see if we can move it from that

24   spot to some place onshore.

25   Q.   Did you thereafter go out there and kind of

1    survey what the job would require with Mr. Ruiz?

2        A.   I don't -- I believe I took a trip out with him

3    prior to starting the job, but I'd literally have to

4    check our helicopter records, the bills, to see if I

5    went and when I went, if I went.   I inspect some 40

6    ships a year and I -- it's trying to put the -- I know I

7    went out there one time and I believe I went out prior

8    to the job starting, made a quick inspection of the rig.

9        Q.   Do you generally make notes of the rig when you

10   make that quick inspection?

11       A.   Yes.

12       Q.   And those notes you would have delivered to, in

13   this case, Mr. Sanchez?

14       A.   Yes.

15       Q.   But you don't recall whether or not you and

16   Mr. Ruiz ever together examined or inspected the Ocean

17   66?

18       A.   I don't recall.

19       Q.   When you hired Mr. Ruiz to do what he does aboard

20   the Ocean 66, what did you know of Mr. Ruiz's

21   qualifications to perform this type of work?

22       A.   I've had 20 years experience, over 20 years

23   experience with him doing jack-ups, semi-submersibles,

24   salvage jobs, very successful.

25       Q.   Were you relying on him in any way to conduct

1    himself according to applicable safety regulations?

2       A.   Yes.

3       Q.   Did you and he ever discuss what safety

4    regulations might apply to a job to be performed aboard

5    Ocean 66?

6       A.   Talked about safety lines on the -- around the

7    rig, life jackets.  We're working over the water.  He's

8    been at sea a long time.  He knows a lot of the rules.

9    Make sure we have everything ventilated before you enter

10   it, get a gas -- I think we got a gas detector out to

11   him.  There was one on board, I believe.  I'm not sure.

12   And I asked him to make sure the lifeboat was working on

13   board the vessel, if they could drop it, which they did;

14   I believe they did.

15      Q.   Did y'all talk about qualifications of personnel

16   to operate machinery?

17      A.   No.  I left that up to him.  It was his decision.

18      Q.   Did you ever have any discussions with him or any

19   appreciation for Phil Wells' expertise in handling the

20   crane in question on the day in question when

21   Mr. Gilbert was injured?

22      A.   I don't recall.

23      Q.   As you sit here today, do you know what

24   Mr. Wells' qualifications and expertise pertaining to

25   crane operations is?

1       A.   Only what Mr. Phil Wells told us and that he's

2    been in the oil field for a long time and knows how to

3    operate all the equipment on a rig.

4       Q.   When did Mr. Wells tell you that?

5       A.   When we -- actually when he was hired to do the

6    job removing the excess equipment off the deck in Lake

7    Charles.

8       Q.   Did you meet with Mr. Wells to hire him for that

9    job?

10      A.   I don't remember.

11      Q.   Well, you indicated that that's when he told you

12   about his expertise in machinery operation.

13      A.   I remember having a conversation with him.   I

14   think it was on the phone.

15      Q.   Okay.   Did you have a conversation with him on

16   the phone prior to his going to do this job in December

17   of 2001?

18      A.   I believe so.

19      Q.   And what did you tell him during this phone

20   discussion?

21      A.   I just wanted to know whether he could do the job

22   or I was going to bring in Frank to do it.   He gave me

23   his background and said he was more than able to handle

24   it.   He's been on rigs all his life.   He knew what to

25   do.

Sep 27 04 02:41p     Scott D. Webre          337-593-4159        p.37
Case 1:04-cv-00047    Document 42-8    Filed in TXSD on 09/27/2004    Page 5 of 40

35

1    Q.  Did you verify what he was telling you?

2    A.  No.

3    Q.  Did you ask about any certifications or licenses

4  or training programs that he's ever undertaken or that

5  he has in connection with crane operation?

6    A.  I don't recall.

7    Q.  Is that something that you should have done?

8    A.  I don't know.

9    Q.  Why don't you know?

10   A.  These are subcontractors I handle.  I hire a lot

11  of subcontractors for the rig.  I don't go into their

12  degree of professionalism, because they hold them self

13  out to be professionals, and I usually have good results

14  with that.

15   Q.  So then you do know it's not inappropriate for

16  you not to inquire?  Is that what you are saying?

17   A.  It may have been appropriate, but we didn't need

18  to in this case, no more than hydraulic people we sent

19  out as subcontractors or people to do the fire

20  extinguishers.

21   Q.  And who are those persons?

22   A.  They're in the book there.

23   Q.  Why don't you show me who those persons are.  Was

24  Young's Hydraulics one of them?

25   A.  Yeah.

1       Q.    Is Young's Hydraulics been in business for a

2   while?

3       A.    Yes.

4       Q.    They have a physical facility?

5       A.    Yes.

6       Q.    Probably have a phone number?

7       A.    Yeah.

8       Q.    Maybe an entry in a phone book?

9       A.    I assume so.

10      Q.    Generally hired by other persons in the industry

11  to provide hydraulic services and equipment?

12      A.    Yeah.

13      Q.    Generally recognized as leaders in the field in

14  Louisiana and providing those sorts of services?

15      A.    I don't know about that.

16      Q.    Do you know what Mr. Wells is doing now?

17      A.    Who?

18      Q.    Mr. Wells, Phil Wells.

19      A.    No.

20      Q.    Did you know when you -- and you did hire

21  Mr. Wells to go out there and perform this work in

22  December '01, correct?

23      A.    Yes.

24      Q.    And you did that without verifying what he told

25  you regarding his experience or expertise, correct?

1    A.  Well, I talked to Frank Ruiz, if I recall, and he

2   told me he's very knowledgeable about what he's doing in

3   the systems of the rig and is a good hand, good

4   management guy.  And I don't recall -- I think I heard

5   something else about somewhere else in the industry, so

6   I have to -- if I ever find my notes, I can tell you

7   that.  I don't have it.

8    Q.  Where would you typically keep those kind of

9   notes?

10    A.  I usually have it in a book like this, but I

11   don't -- I don't know where it is.  I have to --

12            Let me shut this off.

13    Q.  Do you know whether or not any regulations or

14   industry standards, API standards, ANSI standards --

15    A.  Persistent phone.  Excuse me.  I'm sorry.

16            MR. HERNANDEZ:  Can we go off the record for

17   a second.  Can we go off the record?

18            MR. WEBRE:  Yeah.  Sure.

19            (Off the record 4:27 p.m. to 4:30 p.m.)

20   BY MR. WEBRE:

21    Q.  Do you have a lawyer in connection with your

22   appearance here today?

23    A.  No.

24    Q.  Have you discussed this case with Mr. Sanchez's

25   lawyers?

1    A.  No.  Just briefly, but not anything -- the heart

2  of it.

3    Q.  But you have discussed the case with Mr. Fleming?

4    A.  Yes.

5    Q.  When did you do that?

6    A.  This morning.  This afternoon.

7    Q.  About how long did you talk to him?

8    A.  Ten minutes.

9    Q.  And what did y'all say?

10    A.  It's private.

11    Q.  Are you not going to answer the question?

12    A.  No.

13         MR. WEBRE:  Certify that question, please.

14    Q.  Mr. Fleming is not your lawyer, correct?

15    A.  Well, I don't know.  I -- I believe he represents

16  me also.

17         THE WITNESS:  Does he not?

18         MR. HERNANDEZ:  You're not a party to the

19  lawsuit.

20    A.  No.

21    Q.  The bottom line is you don't know whether he

22  represents you in connection with your appearance here

23  today; is that correct?

24    A.  No, I do not.

25    Q.  And you haven't paid him a retainer fee to

1    represent you here today?

2      A.   No.

3      Q.   And he's not here with us today?

4      A.   Right.

5      Q.   You were referring earlier, I believe, attempting

6    to analogize the relationship with -- or indicating that

7    just like you don't run background checks or try to

8    verify what has been told to you by other independent

9    contractors, so, too, do you not do that with regard to

10   Mr. Wells.  What other independent contractors did you

11   contact and eventually hire to perform services aboard

12   Ocean 66?

13     A.   We hired a diving company to work underneath.

14     Q.   What diving company was that?

15     A.   I don't recall the name right now after all these

16   years, but -- we had Extreme Pressure come out and do

17   all the fire extinguishers as a subcontractor.

18     Q.   And that's a company that has a physical

19   facility, right?

20     A.   I have no way of knowing that.

21     Q.   And where did you locate them?

22     A.   In the field, calling around and asking somebody

23   about who goes on board and checks fire extinguishers we

24   needed for Coast Guard and gave us their name.

25     Q.   Did that company provide the service they were

Sep 27 04 02:42p    Scott D. Webre        337-593-4159        P.42
Case 1:04-cv-00047   Document 42-8   Filed in TXSD on 09/27/2004   Page 10 of 40

40

1  asked to do?

2      A.  Yes.

3      Q.  Did they do so without incident?

4      A.  Yes.

5      Q.  Did they do so without complaint about conditions

6  existing aboard Ocean 66?

7      A.  I don't recall any.  The people we used for

8  underwater work was U.S. Underwater Services out at

9  Burleson, Texas, I believe.

10     Q.  Did you ever receive any complaints from any

11  person concerning the conditions aboard Ocean 66?

12     A.  Not that I recall.

13     Q.  Do you recall Mr. McCallum complaining about

14  conditions aboard Ocean 66?

15     A.  Yes, I do, correct.

16     Q.  What were the nature of his complaints?

17     A.  There wasn't a toilet to use.

18     Q.  Was that -- was that all?

19     A.  I don't know.  He had a whole bunch of other

20  complaints.  I don't recall them at this time.

21     Q.  Were any of his complaints pertaining to

22  workplace safety?

23     A.  I don't recall.

24     Q.  Is that the type of thing that if communicated to

25  you, you would forget?

1    A.   No, I would not forget it, but I don't recall.   I

2  recall him complaining there wasn't a proper working

3  toilet in the rig, so I brought out a portable toilet,

4  and there wasn't some tools he needed, but I don't

5  remember anything about safety he talked to me about.

6    Q.   What type of portable toilet did you bring to the

7  rig?

8    A.   Just a portable toilet.   Brought in a portable

9  toilet.

10    Q.   Where would they dispose of the human waste?

11    A.   It's contained in -- self-contained.

12    Q.   Until it's full?

13    A.   It's full.   When it was full, then we'd take it

14  in and exchange it.

15    Q.   So you're saying human waste was not dumped

16  overboard?

17    A.   No.

18    Q.   Never?

19    A.   No.   Not from our rig.   Not from the portable

20  toilet.   I can't account for what the men did out there,

21  no.

22    Q.   And that would be inappropriate?

23    A.   Yes.

24    Q.   Are you aware of any regulations requiring or

25  putting a duty upon the owner of a vessel to provide a

1    safe workplace?

2        A.   Yes.

3        Q.   Where would those regulations be found?

4        A.   The Coast Guard has a set of regulations

5    concerning safety.

6        Q.   Does a safe workplace in your experience entail

7    adequately trained and supervised personnel?

8        A.   Yes.

9        Q.   And without adequately trained and supervised

10   personnel, there is an unacceptable risk of danger to

11   members of the crew?

12       A.   Could be.

13       Q.   Could be and is, correct?

14       A.   According to what the job task is, but most of

15   the people that went offshore here had experience

16   working at sea doing things, so they were trained in

17   what they were supposed to do.

18            MR. WEBRE:  Objection, nonresponsive.

19       Q.   My question to you is inexperienced, untrained,

20   or unsupervised personnel create an unacceptable risk of

21   danger to members of the crew, correct?

22       A.   If that situation exists, yes.

23       Q.   Do you know -- and I asked you this before, but I

24   want to start the line of questions again.  Do you know

25   what standards or regulations apply in connection with

1    the -- in connection with crane operators aboard an

2    ocean -- a vessel like the Ocean 66?

3        A.   Not off hand, no.

4        Q.   And that crane in question, the one that

5    Mr. Wells was operating when Jamie Gilbert was injured,

6    is a fixed part of the platform, correct?

7        A.   That's correct.

8        Q.   It's part of the vessel?

9        A.   That's correct.

10       Q.   It's not a piece of equipment that -- scratch

11   that.

12            Do you know whether the maintenance log on

13   that crane was current?

14       A.   No.

15       Q.   Do you know the maintenance history on it?

16       A.   No.

17       Q.   Did you ever know the maintenance history?

18       A.   No.

19       Q.   Did you ever ask about the maintenance history?

20       A.   No.

21       Q.   Why not?

22       A.   Because we're taking a rig that's been shut down

23   for 15 years and activating it, and it's a salvage job.

24   We go on a lot of ships that don't have equipment or

25   records or anything and we have to activate things to

Sep 27 04 02:43p       Scott D. Webre        337-593-4159        P.46
Case 1:04-cv-00047   Document 42-8   Filed in TXSD on 09/27/2004   Page 14 of 40

44

1   get it salvaged and get it ashore safely.

2       Q.   Okay.  Did you then undertake an operational test

3   or direct that one be done with regard to the crane in

4   question?

5       A.   It was up to Frank Ruiz operating there to make

6   sure the machinery was safe to operate.  I wouldn't have

7   undertaken that myself.

8       Q.   You were relying upon Mr. Ruiz -- Ruiz to ensure

9   that that crane was safe to operate?

10      A.   Yes.

11      Q.   Likewise, you were relying on Mr. Ruiz to see

12  that his person -- personnel or the personnel, members

13  of the crew of the Ocean 66, were adequately trained and

14  supervised?

15      A.   Yes.

16      Q.   And when you sent Mr. Wells in December of '01 to

17  perform -- or excuse me.  You were relying on Mr. Wells

18  to ensure that those things were done, correct?

19      A.   Yes.  The vessel then was tied up at a dock in

20  Lake Charles.

21      Q.   Well, it wasn't actually tied up.

22      A.   Well, it was sitting there on the bottom.  It's

23  fixed.

24      Q.   You know that when maintenance logs on equipment,

25  such as the crane aboard Ocean 66, they would typically

1  stay aboard the vessel, right?  Just because 15 years

2  has passed, doesn't mean those maintenance logs are

3  unaccessible or somehow completely irrelevant, correct?

4    A.  Could be, yes.

5    Q.  Could be what?

6    A.  I assume you're not asking me a question.  I

7  assume they'd be on a -- on a vessel.  Sometimes we

8  don't find them on vessels.

9    Q.  Do you ever look for them?

10   A.  Only sometimes in the way of lifeboats.  I

11  wouldn't have looked for the crane.  It wasn't out

12  there.

13   Q.  Did you ever look for the maintenance logs for

14  the crane in question in this case?

15   A.  No.

16   Q.  Do you know whether there was any drug use aboard

17  Ocean 66?

18   A.  I don't know of any.

19   Q.  Did you ever ask Frank Ruiz about that?

20   A.  No.

21   Q.  What about alcohol intake?

22   A.  We had an incident, one man having a bottle

23  brought out.  I heard about it.  Frank called me about

24  it.  They destroyed the bottle.  I don't know of

25  anything beyond that.

Sep 27 04 02:43p     Scott D. Webre          337-593-4159        p.48
Case 1:04-cv-00047   Document 42-8   Filed in TXSD on 09/27/2004   Page 16 of 40

46

1    Q.  You would agree that either -- scratch that.

2         Mr. Sanchez testified that had you been

3    aboard Ocean 66 and observed practices by personnel that

4    you were uncomfortable with, you could have terminated

5    that person, fired that person.  Do you agree with that?

6    A.  Yes.

7    Q.  Likewise, if you saw someone doing something in a

8    way that you felt was inappropriate, you could direct

9    that person, no, don't do it that way, do it this way,

10   correct?

11   A.  That's correct.

12   Q.  You would agree that your consulting agreement

13   with Mr. -- or with Rig Ventures -- I mean, you and Rig

14   Ventures both had a common goal, right, and that was to

15   salvage the Ocean 66, correct?

16   A.  Yes.

17   Q.  And should the two of you successfully and

18   profitably complete that common goal, you would then

19   share in the profits, correct?

20   A.  Well, I didn't get a share of the profits.  I

21   would get a bonus or I'd get a -- worked out a

22   negotiated thing with Emilio.

23   Q.  Well, your fee only comes if and when the project

24   becomes profitable?

25   A.  That's correct.

Sep 27 04 02:44p     Scott D. Webre          337-593-4159        P.49
Case 1:04-cv-00047    Document 42-8    Filed in TXSD on 09/27/2004    Page 17 of 40

47

1      Q.  And Mr. Sanchez testified, and I believe the

2    records pretty fairly reflect, that you were the one,

3    you were the person coordinating the provision of

4    necessary equipment, supplies, materials, and services

5    to be performed aboard Ocean 66.  Do you agree with

6    that?

7      A.  Yes.

8      Q.  And Rig Ventures directed and authorized you to

9    go and do that as part of your services provided to Rig

10   Ventures?

11     A.  Yes.

12     Q.  And pursuant to that authority, you, in fact,

13   negotiated agreements and authorized expenditures for

14   materials, equipment, and labor aboard Ocean 66?

15     A.  Yes.

16     Q.  Other than a consulting fee or expense

17   reimbursement, did you at any time receive any funds

18   from Rig Ventures?

19     A.  I'd have to check the records.  I couldn't

20   recall.

21     Q.  Well, let me limit it to Ocean 66.  Can you

22   answer it then?

23     A.  Yes, I received funds.  Yes.

24     Q.  You did receive funds from Ocean 66?

25     A.  Yes.

Sep 27 04 02:44p    Scott D. Webre       337-593-4159        p.50
Case 1:04-cv-00047   Document 42-8   Filed in TXSD on 09/27/2004   Page 18 of 40

48

1    Q.  And was that part of the Mystic Shipping?

2    A.  I'd have to look at the records.  I recall it's

3  Mystic Shipping, but I have to look at our records.

4    Q.  What records do you need?

5    A.  I'd either have to ask Mr. Sanchez for the

6  accounting records of his disbursements or go back and

7  try to find my records for Mystic Shipping.

8    Q.  Did you assist Mr. Sanchez at the outset of the

9  project in trying to get a rough idea of the likely

10  profitability of the Ocean 66?  Do you remember putting

11  together some rough numbers?

12    A.  Yes.

13    Q.  What was your estimation at that point in time as

14  to whether y'all could make that a profitable venture?

15    A.  I don't recall at this time what those numbers

16  are.

17    Q.  Did you see it then as a salvage operation or as

18  a ship-breaking operation?

19    A.  Strictly salvage.

20    Q.  So you felt that y'all would put this rig back

21  into service one day or sell it to someone that would?

22    A.  I think that was our idea at the time.  I can't

23  say I didn't look at a scrap alternative, but I don't

24  have that paper right now.

25    Q.  When did Esco Marine adopt its safety and health

1    plan?

2        A.   At least four or five years ago.

3        Q.   Does Esco Marine have an -- other than the

4    consultant you mentioned, do y'all have, or does it

5    have, Esco Marine have, an employee that oversees

6    regulatory compliance?

7        A.   Yes.

8        Q.   Who is that person?

9        A.   C. J. Meyer.

10        Q.   What is that person's background?

11        A.   He's got various training courses in safety,

12    environmental, he's got a 15, 20-year background.

13        Q.   And how long has he been with Esco Marine?

14        A.   Maybe about two years.

15        Q.   And you would use Mr. Meyer to inform or advise

16    of potential safety violations or unsafe work practices?

17        A.   Right.   That's correct.

18        Q.   Were you aware of a -- were you aware of a faulty

19    clutch with the brake with the crane in question?

20        A.   No.

21        Q.   You weren't aware that the clutch was

22    malfunctioning?

23        A.   No.

24        Q.   At any point in time?

25        A.   Not that I recall, no.

1        Q.  Is that something that you would have been --

2   that you would have wanted to have been made aware of?

3        A.  Yes.

4        Q.  Who would you have expected to tell you that?

5        A.  Frank Ruiz.

6        Q.  And what would you have likely done in response

7   to that knowledge?

8        A.  I would have asked him to fix it.

9        Q.  You would have asked him to fix it, or you would

10  have sought the assistance of someone familiar with

11  crane clutch jobs?

12       A.  Frank's very knowledgeable and Frank -- in clutch

13  jobs in cranes offshore, but if he needed help any time,

14  I would hire him somebody, I'm sure, to help him.

15       Q.  Do you know what licenses or certifications

16  Mr. Ruiz has?

17       A.  25 years of experience in the field.

18       Q.  Does he have a ship captain license or --

19       A.  I don't know.

20       Q.  -- a rig master license?

21       A.  I don't know.

22       Q.  Do you know if he has any license or

23  certification awarded or granted by OSHA or Coast Guard

24  or any overseeing body of the ship-breaking or oil field

25  industries?

Sep 27 04 02:45p    Scott D. Webre         337-593-4159        p.53
Case 1:04-cv-00047   Document 42-8   Filed in TXSD on 09/27/2004   Page 21 of 40

51

A.  I do not know.

Q.  Did you ever contact the hospital in Lake Charles to which Mr. Jamie Gilbert was brought?

A.  I don't recall.  I think my secretary did.

Q.  At your direction?

A.  I don't recall.

Q.  What's that person's name?

A.  Louise Max.

Q.  Did she have a relative that was also a member of the crew at one point in time?

A.  Yes.  Michael Max.

Q.  What do you think and why would you have told her to contact the hospital?

A.  I don't know if I did or not or where I was at the time, but I'm sure she would have checked to see how he was.  I remember her calling.

Q.  And you never visited Mr. Gilbert in the hospital, did you?

A.  No.

Q.  Were you involved in any way with the procurement of insurance, comprehensive, general liability, or other insurance, for the Ocean 66?

A.  Yes.

Q.  In what way?

A.  I secured insurance for it.  I don't know if it's

1    P and I or towing or a whole policy.  I don't recall.

2    It's in the book here.

3        Q.   It was the policy required by Murphy?

4        A.   Right.

5        Q.   Tell the jury about your personal history with

6    Mr. Gilbert.

7        A.   With Mr. Gilbert?

8        Q.   Yes, sir.

9        A.   I -- my parents knew Jamie Gilbert's parents and

10   I met Jamie Gilbert when he was a little boy, probably

11   four or five years old.  I never saw or talked to him

12   since all that time until I met him out on the rig, and

13   I was quite surprised.  They introduced me as friend I

14   knew.  I wouldn't have recognized him, but they told me

15   his name and I remembered the name.  I had no personal

16   relationship with him otherwise.

17       Q.   Do you know whether any other person from Rig

18   Ventures, or for that matter, Tex-Mex Cold Storage, ever

19   contacted Lake Charles Memorial Hospital?

20       A.   I don't know.

21       Q.   Is the phone number (910)254-0200 familiar to

22   you?

23       A.   That's our office phone number in Wilmington,

24   North Carolina.

25       Q.   Do you know someone named Jeff Henderson?

Sep 27 04 02:45p    Scott D. Webre        337-593-4159        P.55
Case 1:04-cv-00047    Document 42-8    Filed in TXSD on 09/27/2004    Page 23 of 40

53

1    A.  I don't recall.

2    Q.  Were you aware -- I mean, Mr. Gilbert was not an

3    employee of Tex-Mex Cold Storage, was he?

4    A.  No.

5    Q.  You know that?

6    A.  Yes.  Not to my personal knowledge.  I don't have

7    any idea if he was.  I don't believe so.

8    Q.  Well, certainly no one ever told you that he was,

9    correct?

10   A.  Yes.

11   Q.  Do you know why that would have been -- scratch

12   that.

13           The Ocean 66 did not have a motor, correct,

14   a motor to make it move?

15   A.  No.

16   Q.  If it were to move, it had to be towed?

17   A.  That's correct.

18   Q.  Was that always the case or was the motor just

19   not operational?

20   A.  I don't believe this had a motor driving it.

21   Some jack-up rigs do have an engine to drive it.

22   Q.  Did you have any contact with the Coast Guard

23   pertaining to the Ocean 66?

24   A.  Most likely our office would, yes.

25   Q.  For what purpose?

54

1    A.   For getting permission to come into Port Lake

2  Charles, notifying them we're under movement.

3    Q.   What about prior to that time?

4    A.   Coast Guard -- I don't recall.  They may have

5  come out to the rig, but I don't recall.

6    Q.   What Coast Guard regulations as an ocean going

7  vessel would Ocean 66 have to meet?

8    A.   Safe manning, you'd have to have a radio, an

9  E-PERP on it, have to have a lifeboat, life jackets.

10   Q.   Is that it?

11   A.   Whatever the regulations are.  I mean, I believe

12 that would be the main part of it.  It's according to

13 whether it's a dead ship tow.  If it's a dead ship tow,

14 it doesn't have to have a radio station, so --

15   Q.   Do all these same regulations apply once it's

16 stationary in the Port of Lake Charles?

17   A.   No, I don't believe so.

18   Q.   Does it then become under the jurisdiction of

19 OSHA regulations, or do you know?

20   A.   I don't know.  I'd imagine if you're working in

21 U.S. territory waters, it would become under OSHA, if

22 you're doing ship board work on something that's

23 stationary.

24   Q.   Did you and Mr. Sanchez ever discuss OSHA or

25 Coast Guard regulations as they may apply to the Ocean

Sep 27 04 02:46p    Scott D. Webre                337-593-4159        p.57
Case 1:04-cv-00047   Document 42-8   Filed in TXSD on 09/27/2004   Page 25 of 40

55

1    66 and the salvage of the Ocean 66?

2       A.   I don't recall.

3       Q.   Do you know whether or not Mr. Sanchez and Rig

4    Ventures were relying upon you for compliance with

5    applicable OSHA and/or Coast Guard regulations?

6       A.   Yes, he would have relied on me.

7       Q.   And, in turn, I think you testified that you were

8    relying on Mr. Ruiz in that regard?

9       A.   Yes.

10      Q.   Is that right?

11      A.   Yes.

12      Q.   Did you inform Mr. Sanchez and Rig Ventures that

13   you were relying on Mr. Ruiz to fulfill your obligations

14   to Rig Ventures?

15      A.   I don't recall any specific conversations.

16      Q.   Is that something that you think you should have

17   informed Rig Ventures?

18      A.   I might have.  I don't recall it.

19      Q.   Whether or not you did, is it something that you

20   should have?

21      A.   Yes.

22      Q.   I mean, if you were president of a corporation

23   and you had relied upon a consultant to perform a task

24   and that consultant relies on another to perform that

25   task, you want to know that the duty has been assigned

Sep 27 04 02:46p    Scott D. Webre         337-593-4159        p.58
Case 1:04-cv-00047   Document 42-8   Filed in TXSD on 09/27/2004   Page 26 of 40

56

1   further down the chain, correct?

2       A.   Yes.

3       Q.   And you don't know what, if any, OSHA or Coast

4   Guard regulations that may require a safe workplace,

5   including adequate supervision and training of

6   personnel, may apply back to the owner of the vessel,

7   correct?

8       A.   There's a lot of regulations when you're out at

9   sea.  You have to have safe life jackets, you have to

10   have a radio, you have to have -- you can't enter tanks

11   without making sure they're gas-free.  There's --

12   equipment must be checked to see if it's safe.  You

13   know, there's a lot of things you have to do.

14       Q.   What about adequate supervision and training and

15   qualifications of personnel?

16       A.   The people should be qualified.

17       Q.   And that is a nondelegable duty of the owner of

18   the vessel, irrespective of whether that person is an

19   independent contractor or an employee, correct?

20       A.   I assume so.

21       Q.   And at the time Jamie Gilbert was injured, Rig

22   Ventures was the owner of the vessel, right?

23       A.   Yes.

24       Q.   And so all this discussion about whether Phil

25   Wells is an independent contractor or an employee

Sep 27 04 02:46p     Scott D. Webre          337-593-4159          p.59
Case 1:04-cv-00047   Document 42-8   Filed in TXSD on 09/27/2004   Page 27 of 40

57

1   doesn't make a hill of beans if the ship owner has a

2   nondelegable duty to ensure personnel have adequate

3   qualifications, training, and supervision?

4       A.   We put that responsibility on Mr. Phil Wells.  He

5   hired his people.  We did not have anything to do with

6   the hiring of any of those people and he was experienced

7   in the oil field industry and was supposed to see that

8   his people were qualified to do the work.

9       Q.   But didn't you earlier testify that that duty is

10  the duty of the ship owner?

11      A.   The ship owner should see that it has proper

12  safety equipment on board.

13      Q.   The ship owner should also ensure that personnel

14  aboard the ship have adequate training, supervision, and

15  experience and qualifications, right?

16      A.   We hire a man to manage the job and he hires his

17  own people as a subcontractor.  We have him ensure that

18  he has the proper people.  In the years' experience in

19  working with Mr. Ruiz, he's already -- always performed

20  that way.

21          MR. WEBRE:  Objection, nonresponsive.

22      Q.   Can I see your documents again, please?

23      A.   (Witness complies.)

24      Q.   You have had countless opportunities in the past,

25  I'm sure, to employ companies on a contract basis to

Sep 27 04 02:47p       Scott D. Webre          337-593-4159         p.60
    Case 1:04-cv-00047     Document 42-8     Filed in TXSD on 09/27/2004     Page 28 of 40

                                                                               58

1  perform services for a company you've been involved

2  with, correct?

3      A.   Yes.

4      Q.   And it's your experience in that regard that the

5  company you employ has its laborers who may be employees

6  or independent contractors, you then pay the company

7  you've hired, correct?

8      A.   Every arrangement has a different setup.   I

9  don't -- sometimes --

10     Q.   You pay the company that you've hired and they

11 pay their staff to perform the work, correct?

12     A.   Sometimes we've hired companies that paid other

13 individuals, you know, that got -- facilitate money.

14     Q.   Have you ever had a situation in which you hire a

15 company who then hires other people to perform that work

16 in conjunction with them?   Okay.   You hire company "A,"

17 company "A" has a staff or otherwise hires independent

18 contractors, all of whom together with company "A"

19 perform the task you hired company "A" to perform, and

20 then you, your company, pays the staff or the

21 independent contractors employed by company "A," have

22 you ever had that happen?

23     A.   I don't recall.   Every time we've done

24 transactions, different arrangements are made.   I don't

25 recall one from the other.

Sep 27 04 02:47p     Scott D. Webre          337-593-4159          P.61
Case 1:04-cv-00047    Document 42-8    Filed in TXSD on 09/27/2004    Page 29 of 40

59

1    Q.  You would agree with me, however, that the

2    standard practice is that you contract with company "A,"

3    who then accomplishes its task for which it was hired to

4    perform however they see fit, and you then pay company

5    "A," turnkey, you pay them or --

6    A.  I've recalled a lot of times I've hired people

7    out in the field and then also paid for other services

8    they were hiring under our contract.  We've wired money

9    for diesel, we've wired money for other people working.

10   You know, it's different arrangements out in the salvage

11   job.  It's not always standard.

12   Q.  There's something about salvage jobs that is

13   unique to the salvage industry in the sense or in the

14   context of how contractors are hired to perform work?

15   A.  Different arrangements.  I mean, I -- every

16   transaction is a different setup.

17        MR. WEBRE:  Objection, nonresponsive.

18   Q.  My question to you is there something unique

19   about the salvage industry as compared to the oil field

20   industry, the construction industry, any industry

21   requiring heavy labor, or for that matter -- well, let's

22   just leave it at that.  Anything unique about salvage

23   regarding how independent contractors are hired and paid

24   to perform a job?

25   A.  I would think it would be the same as a lot of

1    other industries.

2      Q.   I want to talk a bit about your -- how did you

3    first get into ship-breaking?

4      A.   I started with a company called Luria Brothers,

5    Ogden Corporation.

6      Q.   Will you spell that please?

7      A.   Luria, L-u-r-i-a, Ogden Corporation, Ogden

8    Metals.

9      Q.   And in what capacity were you working for them?

10     A.   I was head of the plant dismantling, taking

11   plants down, things of that nature, and then we went

12   into the ship-breaking business in Brownsville, Texas.

13     Q.   When was that?

14     A.   1968, I believe.

15     Q.   And have you been engaged in ship-breaking since

16   then?

17     A.   Almost continuously in one form or another.

18     Q.   Have you ever been a laborer in the ship-breaking

19   industry?

20     A.   No.

21     Q.   So you have always been in an administrative or

22   an oversight or a supervisorial role, but not on the

23   deck, so to speak, doing the cutting and the welding and

24   the moving of heavy equipment?

25     A.   That's correct.

Sep 27 04 02:48p     Scott D. Webre        337-593-4159     p.63
Case 1:04-cv-00047    Document 42-8    Filed in TXSD on 09/27/2004    Page 31 of 40

61

1      Q.  I'm showing you a document entitled "Fax Cover

2   Sheet," faxed July 3rd, 2001, to Mr. Sanchez.  This

3   comes from the binder, which I would like to attach as

4   Exhibit A -- or Exhibit 1 to your deposition, and you'll

5   get the original back.

6           Can you identify and describe the content of

7   that document for the jury, please.

8           (Exhibit No. 1 marked)

9      A.  This is a -- let's see what that is.  Looks like

10  the guys that came out to do the diving on the rig.  It

11  says -- it has no company name underneath.  That's what

12  I'm -- only assuming that.

13     Q.  What document would you need, if anything, to

14  help you understand what that document pertains to?

15     A.  U.S. Divers billing to see if it matches up.

16     Q.  Wasn't that in this document here?

17     A.  This doesn't have an invoice number on it.  This

18  matches up to the underwater, right here, this document

19  here.

20     Q.  Thank you.

21     A.  Okay.

22           MR. WEBRE:  Off the record, please.

23           (Off the record 5:10 p.m. to 5:13 p.m.)

24  BY MR. WEBRE:

25     Q.  Did you ever contact OSHA after the incident with

1  Mr. Gilbert?

2      A.  No, not that I recall.

3      Q.  Do you believe that's something you should have

4  done?

5      A.  I don't know.

6      Q.  Why don't you know?

7      A.  I -- I don't know.

8      Q.  Someone with your education and experience in

9  ship-breaking and salvage, is this something you should

10 know?

11     A.  In the scrap yard we would -- we reported to

12 OSHA.  We would have had a formal report done.

13     Q.  What's different about it being aboard the Ocean

14 66?

15     A.  He wasn't an employee of ours.  I would think it

16 would be Mr. Phil Wells -- Phil's responsibility.

17     Q.  You think the requirement to report to OSHA is

18 the responsibility of a contractor, over and above the

19 responsibility of the owner of the premises on which the

20 accident occurred?

21     A.  I don't know the specific law for a rig off --

22 you know, on the water like that.  I don't know.

23     Q.  Did you ever make an effort to find out?

24     A.  No.

25     Q.  Is that something you should have done?

1    A.  I don't know.

2    Q.  Did you ever discuss with Mr. Sanchez whether or

3    not reporting this to OSHA was something y'all should

4    have done?

5    A.  No, because I -- we didn't consider him our

6    employee.

7              MR. WEBRE:  Objection, nonresponsive to

8    everything after "no."

9    Q.  My question to you is -- scratch that.

10             The bottom line is you didn't know and you

11   don't know today, what requirement, if any, there is to

12   report a serious injury -- what requirement of the ship

13   owner there is to report serious injury of personnel

14   aboard their vessel?

15   A.  I don't know specifically.  My understanding is

16   that if it's not my employee, I don't have to report it.

17   Q.  That understanding is based upon what?

18   A.  Just working offshore.

19   Q.  What work offshore have you performed?

20   A.  Numerous salvage jobs.

21   Q.  In the same type of role that you had here with

22   Ocean 66?

23   A.  Yes.

24   Q.  And you've indicated that you spent -- you went

25   aboard Ocean 66 when it was on the outer continental

1   shelf how many times?

2       A.   Possibly twice.  I know of once.

3       Q.   And how many times in Lake Charles port?

4       A.   Twice.

5       Q.   So your experience offshore in connection with

6   this job is like a total of eight hours offshore?

7       A.   That's correct.

8       Q.   So your understanding as to what OSHA or Coast

9   Guard may require, for that matter -- did you report the

10  injury to Coast Guard?

11      A.   No.

12      Q.   Why not?

13      A.   I don't know if we had to legally do that.

14      Q.   Did you undertake to learn whether you had a

15  legal duty to do that?

16      A.   Excuse me?

17      Q.   Did you try to learn whether you had a legal duty

18  to do that?

19      A.   No.

20      Q.   Did you direct Mr. Ruiz to commence towing of the

21  Ocean 66 at nighttime?

22      A.   I don't recall if it was nighttime or daytime.

23  Whenever the rig came up, it needed to start moving.

24      Q.   Irrespective of whether it's dark or light?

25      A.   If it was dark, it would have had all the proper

1  running lights on.

2      Q.  You know that?

3      A.  Yes.

4      Q.  Do you know whether Murphy had a different

5  understanding as to whether the rig should be moved

6  during the dark or the night -- or the day, nighttime or

7  daytime?

8      A.  I don't recall anything that would have kept us

9  from moving if it was daytime or nighttime with Murphy

10  Oil, or at Murphy at all.  I recall the contract said to

11  pull the rig one thousand yards away from its present

12  location.  That was the contract.  I don't think it said

13  day or night.  And when the rig came up, it was ready to

14  go.  It couldn't stay there.  You had to move with it.

15      Q.  Once the spuds are out of the mud --

16      A.  You had a big object on the move.

17      Q.  You weren't physically present for the move, were

18  you?

19      A.  No.

20      Q.  Nor were you physically present to receive it in

21  Lake Charles?

22      A.  No.

23      Q.  Has Dolphin Towing been paid in full, to your

24  knowledge?

25      A.  Yes.

Sep 27 04 02:49p     Scott D. Webre        337-593-4159        P.68
Case 1:04-cv-00047    Document 42-8    Filed in TXSD on 09/27/2004    Page 36 of 40

66

1    Q.  Did you negotiate -- well, did you originally

2    arrange to hire Dolphin Towing?

3    A.  Yes.

4    Q.  And you authorized those expenditures?

5    A.  Yes.

6    Q.  What did Extreme Pressure do for y'all?

7    A.  Fire extinguisher, safety equipment on board.

8    Q.  Again, that's something you arranged for?

9    A.  Yes.

10   Q.  You authorized the expenditure?

11   A.  Yes.  And I believe that was in connection with a

12   Coast Guard inspection.

13   Q.  Is this the entirety of records that you have

14   pertaining to Ocean 66?

15   A.  No.  I may have other records.  I could not

16   locate them.  I just moved my offices.

17   Q.  Where would you guess those records are located?

18   A.  I have a bunch of other boxes I started going

19   through that are here and I have some boxes still up in

20   Wilmington I'm moving down in a week or two.  But I

21   don't know if that's -- if I have any other records.  I

22   have to look.

23   Q.  Would you agree with me not to undertake

24   destruction of any records pertaining to Ocean 66?

25   A.  I wouldn't do that.

1    Q.  You won't do that?

2    A.  No, I would not.

3    Q.  So then you may start destroying records

4  pertaining to Ocean 66 knowing that there's ongoing

5  litigation?

6    A.  I would not do that.

7    Q.  Oh, you would not do that?

8    A.  I would not destroy any records.  There's no

9  reason to.

10         MR. HERNANDEZ:  He was saying he wouldn't do

11  the act, not that he wouldn't agree with you.

12         MR. WEBRE:  Yeah.  We misunderstood each

13  other.

14    Q.  I asked you before, but I just wanted to be clear

15  about this.  You think you may have asked your secretary

16  to contact Lake Charles Memorial Hospital, but you don't

17  recall for certain; is that correct?

18    A.  No.  I'm for certain that she contacted them.  I

19  don't recall if I asked her.

20    Q.  Would she have -- is that the kind of thing she

21  would do without you asking her?

22    A.  Yes.

23    Q.  Do you know what -- excuse me.  Do you know what

24  Mr. Gilbert's qualifications were to become a member of

25  that crew?

1       A.   I do not know.

2       Q.   Do you know what the qualifications of your

3   secretary's son was?

4       A.   He's worked for years and years offshore on

5   vessels.  He does very good work.

6       Q.   Do you and Mr. Sanchez communicate via e-mail?

7       A.   Yes.

8       Q.   Frequently?

9       A.   Yes.

10       Q.   Do y'all type in messages or is it just sending

11   documents, or what?

12       A.   Sending documents.

13       Q.   Do you ever type messages?

14       A.   Not really, no.  We don't communicate like that.

15       Q.   Did you prepare this document I'm showing you?

16   It's Exhibit 8 to Mr. Sanchez's deposition.

17       A.   My secretary typed this.  I wrote it out.

18       Q.   Did someone ask you to prepare that document?

19       A.   I don't recall.

20       Q.   Why did you prepare that document?

21       A.   Excuse me?

22       Q.   Why did you prepare the document?

23       A.   It's a good course of business to outline the

24   work that was going to be done.

25       Q.   Okay.  And who was that document provided to, if

Sep 27 04 02:50p        Scott D. Webre              337-593-4159
        Case 1:04-cv-00047    Document 42-8    Filed in TXSD on 09/27/2004    Page 39 of 40        P. 71

                                                                        69

1    anyone?

2        A.   Probably to Frank Ruiz and probably to

3    Mr. Sanchez.

4        Q.   You think it was provided to Murphy?

5        A.   Could be.  Could be the outline of the work we

6    would have made a original proposal.

7        Q.   Do you recall a plan of salvage or anything of

8    that kind provided to Murphy?

9        A.   I think, I believe, I wrote up one at the

10   beginning.

11       Q.   Have you seen that document recently?

12       A.   No.

13       Q.   Do you recall discussions or voicing your

14   concerns in writing or orally that 100,000 dollars per

15   person for bodily injury was inadequate to cover the

16   members of the crew?

17       A.   I don't remember.

18       Q.   You don't remember that?

19       A.   No.

20       Q.   Where you suggested and requested a quote for 500

21   per person?

22       A.   I don't remember.  I have to look at the

23   documents.

24       Q.   Document management, I'll tell you.

25       A.   This, I believe, looks like the work outline to

1    the hydraulic company.

2              MR. WEBRE:  Okay.  Off the record.

3              (Off the record 5:26 p.m. to 5:30 p.m.)

4    BY MR. WEBRE:

5    Q.  Did you prepare what the memorandum of agreement

6    calls a plan of execution to safely move the Ocean 66?

7    A.  I recall doing that, yes.

8    Q.  Do you know where that document is today?

9    A.  No.

10             MR. WEBRE:  Luis, do you recall where that

11   bill of sale was?

12             MR. HERNANDEZ:  Give me a second.  It's

13   probably in here.  No.  That's the wrong one.  Let me

14   see number 1.

15             MR. WEBRE:  Off the record.

16             (Off the record 5:30 p.m. to 5:36 p.m.)

17   BY MR. WEBRE:

18   Q.  Do you know whether the lawsuit brought by

19   Dolphin Towing was ever resolved?

20   A.  Yes.

21   Q.  It was?

22   A.  Yes.

23   Q.  And that entire bill has been paid?

24   A.  Yes.

25   Q.  Do you have any estimation at all what volume of