Sep 27 04 02:50p        Scott D. Webre        337-593-4159        p.73
Case 1:04-cv-00047    Document 42-9    Filed in TXSD on 09/27/2004    Page 1 of 40

71

1  business and what payments were made to Mystic Shipping

2  from Rig Ventures in connection with the Ocean 66

3  salvage?

4     A.  No.

5     Q.  You don't know if it's 5,000 dollars or 200,000

6  dollars?

7     A.  I don't know.

8     Q.  Do you think it's more than 5,000?

9     A.  Yes.

10     Q.  Do you think it's less than 20?

11     A.  No.  It's more than 20,000.

12     Q.  Do you think it's more than 50?

13     A.  I cannot testify what it is.  I have to check the

14  invoicing and moneys received.

15     Q.  Those invoices aren't contained --

16     A.  No.

17     Q.  -- in your notebook?

18           All of those services were strictly

19  consulting?

20     A.  Yes.

21     Q.  So when we spoke earlier about -- was that

22  pursuant to a written agreement?

23     A.  No.  I don't believe.  I don't believe so.

24     Q.  When we spoke earlier of the fact that you

25  haven't received any moneys for consulting from Rig

1  Ventures, that's true with regard to Richard Jaross, but

2  not true with regard to Mystic, correct?

3      A.  I'd have to check the records and we'll provide

4  those for you.  We will provide those for you.  I don't

5  know whether I billed as Richard Jaross or I billed as

6  Mystic.

7      Q.  Will you provide those records reflecting that,

8  attach them to your deposition when it's sent to you by

9  this court reporter?

10      A.  Yes.

11      Q.  How would you make the determination between when

12  you're going to provide services to Rig Ventures through

13  Mystic Shipping versus Richard Jaross as an individual?

14      A.  Some charges were for office, secretarial, and

15  things we did through Mystic, and the others were for my

16  own personal services.

17      Q.  What kind of office and secretarial charges could

18  Mystic pass on to Rig Ventures?

19      A.  We did -- following the track of towing

20  agreements, things of this nature, type up the salvage

21  plan, correspondence back and forth.

22      Q.  Okay.  And you believe Mystic submitted invoices

23  for any work they performed?

24      A.  Yes.

25      Q.  That would certainly be your custom and practice?

1      A.   Yes.

2      Q.   Custom and practice of Mystic Shipping?

3      A.   Yes.

4      Q.   Do you know if Rig Ventures or any person

5   notified Murphy seven days prior to the movement of

6   Ocean 66?

7      A.   No.

8      Q.   You don't know?

9      A.   We did not.

10     Q.   You did not.  Why did you not?

11     A.   Because they told me the rig was not coming up

12  for another week and we were planning to notify them I

13  think Monday.  We were trying to get things together and

14  all of a sudden, the rig came up and there was another

15  rig nearby, and it was determined it was the best safety

16  of the rig to move.

17     Q.   Do you know what the seas were approximately at

18  the time the rig came up?

19     A.   Moderate seas.

20     Q.   Two to three?

21     A.   Something in that nature.

22     Q.   How quickly was it that you were able to get

23  towing to the location?

24     A.   I had a tug coming out already.  It was out on

25  the sea and getting ready.  Murphy would have been happy

Sep 27 04 02:51p    Scott D. Webre        337-593-4159    p.76
Case 1:04-cv-00047    Document 42-9    Filed in TXSD on 09/27/2004    Page 4 of 40

74

1    if I gave them a two-day notice, whether it was seven

2    days or not, because they wanted the rig moved.  They

3    were getting impatient and wanted it out of there.

4              MR. WEBRE:  Objection, nonresponsive.

5      Q.  Do you know of any specific future plans

6    regarding the Ocean 66?

7      A.  No.  It's being offered as a production platform

8    or -- but I don't know of any specific plans right now.

9      Q.  Certainly scrapping it as iron is not part of the

10   plan?

11     A.  No.

12     Q.  What about the Pan Producer?  Is the Pan Producer

13   still owned by Rig Ventures, to your knowledge?

14     A.  No.  It was sold.

15     Q.  Who did you sell it to?

16     A.  I don't -- you'd have to ask Mr. Sanchez.  Some

17   Indonesian company, I believe.

18     Q.  Were you involved in the scrap of the USS Yukon?

19     A.  Yukon?

20     Q.  Or the ship-breaking --

21     A.  Yes.

22     Q.  -- of the Yukon?

23     A.  Yes.

24     Q.  And the Iwajima?

25     A.  Yes.

1    Q.   And the Dewey?

2    A.   The Dewey?

3    Q.   The USS Dewey?

4    A.   I don't recall the name right now, but it could

5    be.  I don't know.

6    Q.   In connection with either the Yukon or the

7    Iwajima, do you know whether there were any injuries

8    resulting in lawsuits brought against any person?

9    A.   I don't believe there was any, no.

10    Q.   Do you recall an incident with a worker falling

11    and badly breaking his pelvis?

12    A.   On what ship?

13    Q.   I believe the Iwajima.  I'm not sure.

14    A.   While it was ownership of one of Mr. Sanchez's

15    companies?

16    Q.   I'm not sure when it was.  I'm just asking you if

17    you are familiar with an incident --

18    A.   That ship was sold to International

19    Ship-Breaking.  They had an accident on several of their

20    ships, but that would have been not anything to do with

21    us.  The title passed.

22    Q.   What is your current address?

23    A.   74 Lakeshore Drive.

24    Q.   And is Brownsville your home now?

25    A.   Yes.

1      Q.   When did you move to Brownsville?

2      A.   About eight months, nine months ago.

3      Q.   And do you work out of your Esco Marine office?

4      A.   Yes.

5      Q.   Basically all of the salvage operations you

6   conduct now are out of the Esco Marine office?

7      A.   Yes.

8      Q.   Does Mystic Shipping have a separate office?

9      A.   We don't -- Mystic Shipping, we don't use it

10   anymore.

11      Q.   So all of your salvage is out of Esco Marine?

12      A.   Right.

13      Q.   The salvage of the job in Corpus right now?

14      A.   Yes.

15      Q.   For the Navy?

16      A.   Yes.

17      Q.   What is the name of that vessel?

18      A.   Orinskouny.

19      Q.   I'm sorry?

20      A.   The Orinskouny.

21      Q.   And is it set for breaking or --

22      A.   No.  For sinking.

23      Q.   For sinking.  To make a reef?

24      A.   Yes.

25      Q.   Where?

1      A.   We hope off of Corpus, but the government hasn't

2  told anybody yet.   That's an interesting project.

3      Q.   Bring a little dive business into the area.

4      A.   Yes.

5           MR. WEBRE:   That's all the questions I have

6  at this time.

7           MR. HERNANDEZ:   I have no questions for this

8  witness.   I reserve all mine for time of trial.

9           (Deposition concluded at 5:44 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25           CHANGES AND SIGNATURE

Mar 10 04 10:42a   louile max              956831k 23        p.1

Mar 09 04 04:33p   TEXASDOCKS              3618844034        p.1

MAR-09-2004 TUE 04:03 PM  EMILIO SANCHEZ     9568313142        P. 02

1   and hereby affix my signature that same is true and

2   correct, except as noted above.

3

4

5                              *Richard Jaross*

6                       RICHARD JAROSS

7   THE STATE OF TEXAS

8   COUNTY OF *Nueces*  )

9

10       Before me, *Richard Jaross*, on this day

11  personally appeared RICHARD JAROSS, known to me (or

12  proved to me under oath or through _____)

13  (description of identity card or other document)) to be

14  the person whose name is subscribed to the foregoing

15  instrument and acknowledged to me that they executed th

16  same for the purposes and consideration therein

17  expressed.

18

19       Given under my hand and seal of office this

20  9th day of *March*, 2004.

21

22                         *Janette K Dunn*

23                   NOTARY PUBLIC IN AND FOR
                     THE STATE OF TEXAS

24                        *Janette K. Dunn*

25                   CAUSE NO. 2002-11-4448-D

JANETTE K. DUNN
Notary Public
STATE OF TEXAS
My Comm. Exp. 08-03-2004

A BETTER COURT REPORTING SERVICE, INC.
(512)478-1989

Sep 27 04 02:52p    Scott D. Webre        337-593-4159        p.81
Case 1:04-cv-00047    Document 42-9    Filed in TXSD on 09/27/2004    Page 9 of 40

80

| | |
|---|---|
| 1 | JAMES DAVID GILBERT          )    IN THE DISTRICT COURT |

JAMES DAVID GILBERT          )    IN THE DISTRICT COURT
                             )
VS.                          )    CAMERON COUNTY, TEXAS
                             )
                             )
RIG VENTURES INC.; EMILIO    )
SANCHEZ and PHIL WELLS       )    103RD JUDICIAL DISTRICT

REPORTER'S CERTIFICATION
DEPOSITION OF RICHARD JAROSS
JANUARY 28, 2004

I, Karen Geddes Piland, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, RICHARD JAROSS, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on February 13th 2004 to the witness or to the attorney for the witness for examination, signature, and return to me by March 4, 2004;

That the amount of time used by each party at the deposition is as follows:

Scott D. Webre - 01:41
Luis R. Hernandez -  00:00

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Scott D. Webre, Attorney for Plaintiff
     James David Gilbert
Luis R. Hernandez, Attorney for Defendants
     Rig Ventures, Inc., Emilio Sanchez,
     and Phil Wells

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

1       Further certification requirements pursuant to Rule
203 of TRCP will be certified to after they have
2   occurred.

3       Certified to by me this 10th day of February, 2004.

4

5                    *Karen Geddes Piland*
6       KAREN GEDDES PILAND, Texas CSR 5627
        Expiration Date: 12/31/04
7       A Better Court Reporting Service, Inc.
        Firm Registration No. 6
8       P. O. Box 685229
        Austin, Texas 78768-5229
9       (512) 478-1989

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sep 27 04 02:53p     Scott D. Webre                337-593-4159          p.83
Case 1:04-cv-00047    Document 42-9    Filed in TXSD on 09/27/2004    Page 11 of 40

82

1          FURTHER CERTIFICATION UNDER RULE 203 T.R.C.P.

2

3      The original deposition was/was not returned to the

4   deposition officer on ___3|16|04_____;

5      If returned, the attached Changes and Signature page

6   contains any changes and the reasons therefor;

7      If returned, the original deposition was delivered

8   to Scott D. Webre, Custodial Attorney;

9      That $____492.35____ is the deposition officer's

10  charges to Scott D. Webre for preparing the original

11  deposition transcript and any copies of exhibits;

12     That the deposition was delivered in accordance with

13  Rule 203.3, and that a copy of this certificate was

14  served on all parties shown herein on and filed with the

15  Clerk.

16     Certified to by me this 15th day March_____,

17  2004.

18

19

20     _Karen Geddes Piland_____
       Karen Geddes Piland, Texas CSR 5627

21     Expiration Date:   12/31/04
       A Better Court Reporting Service, Inc.

22     Firm Registration No. 6
       P. O. Box 685229

23     Austin, Texas 78768-5229
       (512) 478-1989

24

25

Sep 27 04 03:04p        Scott D. Webre        337-593-4159        p.11
Case 1:04-cv-00047    Document 42-9    Filed in TXSD on 09/27/2004    Page 12 of 40

Oct-03-00 09:56A                                    .                P.02

# RIG VENTURES INC.
## MURPHY EXPLORATION & PRODUCTION COMPANY

### *OCEAN 66:*
Located at Ship Shoal 134 "B"

### PLAN FOR REMOVAL

Rig Ventures Inc. (RVI) plans to use 8-10 personnel to activate the jacking system, rebuild components where necessary, test the system and then commence jack-down procedures for the OCEAN 66. The operation will be organized as follows:

1. Preliminary:

    a) Rig inspection by our technical team. Detail work lists and assign job tasks.

    b) Safety overview of both rig and personnel.

        (1) Fire Fighting
        (2) Evaluation Procedures
        (3) Safety Programs
        (4) Life Saving Equipment
        (5) Competent Person for gas-freeing
            areas to be worked in.

    c) Underwater Inspection:

    Even in view of recent Aquatic Inc. 2/24/00 underwater inspection, RVI will have a diver inspection made of present rig condition and mat survey to ensure no major changes have occurred in the rig's structure or mats bottom profile.

1 of 4.

Sep 27 04 03:04p       Scott D. Webre       337-593-4159       P.12
Case 1:04-cv-00047   Document 42-9   Filed in TXSD on 09/27/2004   Page 13 of 40

Oct-03-00 09:56A                                                   P.03

-2-

2. Activation of Rig & Jacking System:

a) Cummins 500 K Diesel generator to be checked, radiator core replaced or repaired and generator put on line.

b) Main generator, Fairbanks-Morse units to be activated, generator and electrical panels to be meg-ohm. If readings are low then heat lamps would be applied as required.

All the above units would first be electro-cleaned and blown clean with air.

Units to be put on line but if units cannot be put on line, RVI would bring out to the rig portable DC generators of enough KW to run hydraulic pumps and related systems.

c) When adequate DC & AC electrical has been established, we would begin centrifuging the hydraulic oil in order to flush out any water, trash or rust from all hydraulic lines.

Valves & regulators will be rebuilt and any hydraulic piping will be replaced as necessary.

All locking device cylinder rams will be rebuilt or replaced.

The complete system will then be checked and tested to 3000 PSI.

Vessel's air compressor will be activated and put on line.

d) Air will be hooked up and tested to be introduced under the mat.

2 of 4.

Sep 27 04 03:04p       Scott D. Webre       337-593-4159       p.13
Case 1:04-cv-00047    Document 42-9    Filed in TXSD on 09/27/2004    Page 14 of 40

Oct-03-00 09:56A                                                    P.04

-3-

e) The pump room will be activated, manifolds will be checked and pump motor meg-ohm, heat lamps applied if required or electrical motors replaced if it cannot be brought up to operational level.

f) The spuds will be tested. Valves will be located for directing high pressure water if necessary to lift spuds.

If Neoprene O-Rings are excessively leaking (which is expected), the required O-Rings will be ordered and replaced.

An alternative plan will be worked out in case spuds have to be lifted using a winch and tripod on top of leg assembly.

Note: If any of the above systems are not reparable, RVI has made arrangements to lease portable auxiliary hydraulic power packs, generators, etc.

3. Rig jacking-down procedures will be closely followed according to the OCEAN 66 Rig Manuel presently on board vessel. It will be redundant to recite those procedures in this outline.

Weather would be checked prior to commencing jack-down and tugs would be ordered.

Noble Denton would be on board to review all procedures on behalf of RVI underwriters.

Upon the vessel being safely jacked-down the hull tested for any leaks, the mat then would be de-ballasted and jacking-up of the mat would commence .

When mat and hull are pulled up into towing position the rig would be towed either to Sabine Pass or the RVI yard at the Port of Brownsville, Brownsville, Texas.

3 of 4.

-4-

4. Crew: Rig Master will be Jerry McCallum of J. D. McCallum Co.

Jerry has over 40 years of experience in the offshore rig industry and has jacked up or down many rigs of this same design.

The balance of our crew will have 25 or more years of experience each in this type of rig work.

4 of 4.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| JAMES DAVID GILBERT | § | |
|      Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-04-047 |
| | § | |
| RIG VENTURES, INC.; EMILIO SANCHEZ; | § | |
| PHIL WELLS; RICHARD JAROSS; and | § | |
| MODU "OCEAN 66" | § | |
|      Defendants. | § | |

**DEFENDANT RIG VENTURES, INC.'S RESPONSES TO**
**PLAINTIFF'S THIRD REQUEST FOR ADMISSION**

TO:   JAMES DAVID GILBERT, Plaintiff,
      by and through his Attorney-of-record,

      Scott D. Webre
      ATTORNEY AT LAW
      556 Jefferson Street
      Jefferson Towers, Suite 200
      Lafayette, Louisiana 70501.

NOW COMES, Defendant **RIG VENTURES, INC.** and submits the following

Responses to Plaintiff's Third Request for Admission.

DATED: August __13__, 2004.

                Respectfully submitted,

                **FLEMING & HERNANDEZ, P.C.**
                1650 Paredes Line Road, Suite 102
                Brownsville, Texas 78521
                Telephone:  (956) 982-4404
                Telecopier:  (956) 982-0943

**ATTORNEYS FOR DEFENDANTS,**
**RIG VENTURES, INC., EMILIO SANCHEZ,**
**PHIL WELLS, RICHARD JAROSS**      By: _____
**and MODU "OCEAN 66".**
                Luis R. Hernandez
                State Bar of Texas No. 09518900

## CERTIFICATE OF SERVICE

I, Luis R. Hernandez, hereby certify that the foregoing **DEFENDANT RIG VENTURES,**

**INC.'S RESPONSES TO PLAINTIFF'S THIRD REQUEST FOR ADMISSION** were mailed on August

_13_ , 2004 by Certified United States Mail, Return Receipt Requested to the

following Counsel-of-record:

    **COUNSEL FOR PLAINTIFF,**
    **JAMES DAVID GILBERT:**
    Scott D. Webre
    ATTORNEY AT LAW
    556 Jefferson Street
    Jefferson Towers, Suite 200
    Lafayette, Louisiana 70501
    (Certified United States Mail, R.R.R., #7003 1680 0006 5137 6878)

    **CO-COUNSEL FOR PLAINTIFF,**
    **JAMES DAVID GILBERT:**
    Ryan Krebs, M.D., J.D.
    6601 Vaught Ranch Road, Suite 100
    Austin, Texas 78730
    (Certified United States Mail, R.R.R., #7003 1680 0006 5137 6885)

    **CO-COUNSEL FOR PLAINTIFF,**
    **JAMES DAVID GILBERT:**
    Frank Costilla
    THE LAW OFFICES OF FRANK COSTILLA, L.P.
    5 East Elizabeth Street
    Brownsville, Texas 78520
    (Certified United States Mail, R.R.R., #7003 1680 0006 5137 6892)

                              Luis R. Hernandez

**Defendant Rig Ventures, Inc.'s Responses to**
**Plaintiff's Third Request for Admission**

*Defendant objects to these Request for Admissions as they are improper use of Request for Admissions. The purpose of (FRCP 36a) is to narrow the issues for trial to those which are generally contested. <u>United Coal Cos. v. Powell Constr. Co.</u>, 839 F.2d 958, 967 (3d Cir.1988).*

Request for Admission 1.        Admit or deny that Rig Ventures, Inc. employed James David Gilbert on December 31, 2001?

   **Admit.**

Request for Admission 2.        Admit or deny that Rig Ventures, Inc. employed Phil Wells on December 31, 2001?

   **Admit.**

Request for Admission 3:        Admit or deny that OCEAN 66 was not covered by a certificate of inspection at the time of the incident giving rise to this suit.

   **Deny.**

Request for Admission 4:        Admit for deny that Rig Ventures, Inc. did not conduct or provide for any training of Phil Wells.

   **Deny.**

Request for Admission 5:        Admit or deny that Rig Ventures, Inc. did not conduct or provide for any training of Phil Wells in the operation of cranes.

   **Deny.**

Request for Admission 6:        Admit or Deny that Rig Ventures, Inc. did not confirm that Phil Wells had any training in the operation of cranes.

   **Deny.**



# VESSEL CUSTODIAL AGREEMENT

THIS AGREEMENT is entered into this day of July 2001, by and between Rig Ventures, Inc., with a place of business in Brownsville, Texas, (hereinafter called the "Owner") and Unifab International West, LLC in Lake Charles (hereinafter referred to as "Contractor"). The foregoing are collectively referred to herein as the "Parties" and individually as a "Party".

## WITNESSETH

In consideration of the mutual covenants herein contained and of the payments hereinafter provided to be made by Owner to Contractor, the Parties hereto agree as follows:

## I. GENERAL SCOPE OF WORK

Contractor agrees to allow the Vessel "Ocean 66" (hereinafter referred to as the "Vessel") currently in the care and custody of Owner to berth at Contractor's Lake Charles Facility for the following considerations:

1. Contractor will assess a docking fee of $300.00/per day for the berthing of the Vessel.

2. This docking fee will be waived under the following conditions:

   A. Owner enters into a work agreement with Contractor to perform significant work on the Vessel (repairs and/or modifications) within 90 days of the arrival date of the vessel "Ocean 66".

   B. Owner assigns this AGREEMENT or transfers ownership of the vessel to a third party and the third party contracts with Contractor to perform work on the vessel (repairs or modifications) within 90 days of the arrival date of the Vessel.

3. Should Owner elect to perform work on the vessel using Contractor labor, facilities and equipment, the attached rate sheet will be the basis for compensation (Reference Exhibit A - Unifab 2001 Rig Rates). For work that may be explicitly defined, Owner may request Lump Sum pricing from Contractor.

4. Should the vessel be sitting idle (no work being performed) at Contractor's dockside and Contractor notifies Owner of the need for dock space as a result of Contractor's on going business activity, Contractor will temporarily relocate the vessel to another near-by location and return it to its berth at Owner's expense.

5. Should Owner require the lowering of the mast for the purposes of jacking the hull out of the water, for maintenance, inspection, or construction purposes, it may be necessary to place the rig approximately 150' away from Contractor's bulkhead to a level bottom. This may necessitate the use of "spacer" and/or "access" barges to provide suitable access to the vessel. These barges would be billed to Owner in accordance with the provisions of the Rig Rate schedule (in this case Cost plus 10%).

6. Owner and Contractor will take reasonable steps to assure protection of the vessel but Contractor will not be liable for damage to the vessel to any party for acts of Force Majeure.

## II. PAYMENT TO CONTRACTOR AND AUDITING RIGHTS

In accordance with this Agreement, Owner agrees to pay Contractor for the performance of the Work, including any additions, deletions or revisions thereto, on the following basis:

A. **Fixed Price and Unit Rate Work Items.** Contractor shall submit an Invoice to Owner for all Fixed Price or Unit Rate work each month commencing thirty (30) days after the execution of this Agreement (with exception of the docking fee). Each monthly invoice shall cover the work completed since the last monthly invoice. Each monthly Invoice shall be payable within thirty (30) days of the receipt of the Invoice.

B. **Time and Material Work Items.** Invoices for Work performed on a Time and Material basis in accordance with the rates presented in Exhibit A shall be submitted to Owner every seven (7) days after the delivery of the Vessel to the Contractor. Contractor is to prepare daily time sheets for Owner review and/or approval. The amount invoiced for shall be payable within (30) days of Invoice.

## III. INDEPENDENT CONTRACTOR, INDEMNITY AND LIABILITY PROVISIONS

It is understood that Contractor is an independent contractor as to all Work performed hereunder and that the detailed manner and method of doing the Work and the areas of the Vessel where

member of the Contractor Group or the unseaworthiness of any vessel owned operated or chartered by any member of the Contractor Group, to the extent such claims were caused by the negligence or other legal liability of any member of the Contractor Group. As used herein, a Third Party is any person or entity not included in either the Owner Group or the Contractor Group.

### C. POLLUTION

Notwithstanding anything to the contrary herein, Contractor shall release, defend indemnify and hold the Owner Group harmless from and against all claims, demands, suits, causes of action, damages, natural resources damage assessments, response, clean up, containment or disposal expenses and other liabilities, including, but not limited to attorney's fees and the costs of litigation or administrative proceedings but excluding any claim covered by Section [4.2(A)(1) or 4.2(B)(1)] (the "claims"), arising from any spill, discharge, Escape, release of or exposure to any waste, rubbish, petroleum, chemical or hazardous substance, whether solid, liquid or gas, originating from any equipment, facility or property of the Contractor Group, or from the handling, removal, transportation or disposal thereof, except to the extent such claims may have resulted from the negligence of a member of the Owner Group.

### 2. OWNER IDEMNIFICATION

#### A. OWNER PERSONNEL AND PROPERTY

Owner shall release, defend, indemnify, and hold the Contractor Group harmless from and against all liability, claims, losses, damages, punitive damages, costs, expenses, attorney's fees, demands, suits and causes of action of every kind and character (the "claims"), arising in favor of any officer, director or employee of the Owner Group on account of personal injury or death or damage to property owned by any member of the Owner Group in anyway incident to or in connection with or arising out of or under this is Agreement, regardless of the sole, joint or concurrent negligence, negligence per se, gross negligence, statutory fault, or strict liability of any member of the Contractor Group or the unseaworthiness of any vessel owned operated or chartered by any member of the

Contractor Group that may have caused or contributed to the claims, to the extent such indemnity obligations are not prohibited by applicable law.

### B. THIRD PARTIES

Owner shall release, defend, indemnify, and hold the Contractor Group harmless from and against all liability, claims, losses, damages, punitive damages, costs, expenses, attorneys' fees, demands, suits and causes of action of every kind and character (the "claims"), arising in favor of any Third Party on account of personal injury or death and/or damages to Third party property in any way incident to or in connection with or arising out of or under this Agreement resulting from the joint or concurrent negligence, negligence *per se*, gross negligence, statutory fault, or strict liability of any member of the Owner Group or the unseaworthiness of the Vessel or any vessel owned, operated or chartered by any member of the Owner Group, to the extent such claims were caused by the negligence or other legal liability of any member of the Owner Group. As used herein, a Third Party is any person or entity not included in either the Owner Group or the Contractor Group.

### C. POLLUTION

Notwithstanding anything to the contrary herein, Owner shall release, defend, indemnify and hold the Contractor Group harmless from and against all claims, demands, suits, causes of action, damages, natural resource damage assessments, response, clean up, containment or disposal expenses and other liabilities, including, but not limited to attorney's fees and the costs of litigation or administrative proceedings but excluding any claim covered by Section [4.2(A)(1) or 4.2(B)(1)] (the "claims"), arising from any spill, discharge, escape, release of or exposure to any waste, rubbish, petroleum, chemical or hazardous substance, whether solid, liquid or gas, originating from any equipment or property of the Owner Group, including the Vessel, or from the handling, removal, transportation or disposal thereof, except to the extent such claims may have resulted from the negligence of a member of the Contractor Group.

3.  Contractor shall indemnify Owner for loss of or damage to Owner's property intended to be incorporated into or used in the Work to be performed while in Contractor's care, custody or

control prior to installation aboard the Vessel provided such loss or damage does not result from Owner's negligence.

In the event Contractor has not completely discharged, released, or bonded such Lien as provided in Section 5.2 within seven (7) days, Owner may secure the removal of such Lien, in which event Owner shall be reimbursed for its cost in securing such discharge or release (which cost shall include any expenses included in connection therewith) by deducting such sum from any payment due or to become due to Contractor under this Agreement. In the event such cost is in excess of the amount of any of such reimbursement by deductions, Contractor agrees to pay the amount of such excess to Owner upon demand.

## V. INSURANCE

1. At any and all times during the term of this Agreement, each of the Parties agrees to carry insurance of the types and in the minimum amounts specified in this Section. The insurance requirements set forth herein are supplementary to and shall not limit or restrict in any way the indemnity obligations undertaken by the Parties in Article IV of this Agreement.

2. In no event shall the Owner Group and the Contractor Group be liable to each other for any incidental, consequential or special damages incurred by the other, including, but not limited to, loss of profits and loss of business opportunities, arising out of or relating in any way to this Agreement or activities or omissions or delays in connection herewith, whether arising out of the negligence (in whole or in part), gross negligence or strict liability of either Party or the unseaworthiness of the Vessel or otherwise. The Owner Group and the Contractor Group hereby mutually release each other from all such loss or damage.

## IV. WARRANTY AND LIENS

Contractor has no authority to pledge the credit of the Vessel or to allow the creation of any lien on the Vessel the Work or any property of the Owner. Contractor warrants that no liens, charges, encumbrances, security interests or rights *in remedy of* any kind, other than those arising out of the obligations of Owner, shall at any time lie or attach against or upon the Vessel or any of the Work or any property, material or equipment necessary to the Work including any item or equipment furnished by Owner, as a result of or on account of any claim against Contractor or against any manufacturer, subcontractor, or vendor of Contractor performing Work or furnishing material under

Sep 27 04 03:09p       Scott D. Webre           337-593-4159        p.3
Case 1:04-cv-00047    Document 42-9    Filed in TXSD on 09/27/2004    Page 24 of 40

Jul-06-01 04:51P                                                           P.07
07/03/2001  16:41   33    1        UNIFAB WEST                    PAGE  07

Jul-03-01 03:53P                                                          P.08

this Agreement. (hereinafter referred to individually and collectively as "Liens"). Owner may require Contractor to produce evidence satisfactory to Owner that no such Liens have, arisen or will arise as a prerequisite to any payments due under this Contract. The Parties hereto acknowledge that employees, subcontractors, and warehousemen may have "inchoate" liens until paid. Contractor agrees to pay such employees, subcontractors, and warehousemen in due course, but not later than fifteen (15) days after receiving demand for payment or when such payment is due. Contractor agrees to defend, indemnify and hold Owner, its affiliate and subsidiary companies and the Vessel harmless from and against any and all demands, claims, causes of action, foreclosure proceedings, losses, causes of action, judgments, liabilities and expenses (including reasonable legal fees, court costs, litigation expenses, bond expenses and settlement costs) related to any Lien prohibited by this Section.

If a Lien, including said inchoate lien, is filed or asserted against or attached upon the Vessel or any of the Work, or any property, material, or equipment necessary to the Work, Contractor shall promptly notify Owner thereof, and in any event no later than seven (7) days after Contractor receives notice thereof. Contractor must thereafter promptly secure the discharge or release of, or provide a bond satisfactory to Owner against such Lien.

A. Insurance coverage for all exposures under the Workmen's Compensation and Occupational Disease laws in all States where work is to be performed under this Agreement; coverage for all exposures under the United States Longshoreman and Harbor Workers' Compensation Act (including coverage for that Act as extended by the Outer Continental Shelf Lands Act); and Employer's liability coverage, including liability under the Jones Act, the General Maritime Law, Voluntary Compensation with coverage being provided for masters and members of a crew of any vessel, and coverage for transportation, wages, maintenance and cure, with limits of $1,000,000.00.

B. Employer's Liability insurance with limits of no: less than $300,000.00 per accident covering injury or death to any employee which may be outside the scope of the workmen's compensation statute of the State in which the work is performed or the U.S. Longshoreman and Harbor Workers' Compensation Act.

C. Comprehensive General Liability insurance, including Products, Completed Operations and Broad Form Blanket Contractual coverage, with watercraft exclusion deleted, with

limits of not less than $500,000.00 each occurrence for Bodily Injury Liability and $500,000.00 each occurrence for Property Damage and a deductible or self insured retention no greater than $250,000.00.

D) Automobile Liability insurance covering owned, non-owned, and hired automotive equipment with minimum limits of $300,000.00 for injury to or death of any one person and $500,000.00 any one accident and $300,000.00 property damage.

E. In the case of Owner only, All Risk Hull and Machinery insurance to the extent of the declared value of the Vessel, including any equipment thereon

F. In the case of Owner only, Protection and Indemnity Insurance with a limit of liability of $1,000,000.00 per occurrence.

G. Excess Liability insurance in the amount of $25,000,000.00  $5,000,000  above the coverage specified in (A) through (D) and (F).

H. In the case of the Contractor only, Contractor shall maintain coverage under its Comprehensive General Liability insurance and its Excess Liability insurance on behalf of Owner and the Owner Group as Named beneficiaries against any liability Owner or the Owner Group may have under the U.S. Longshoreman & Harbor Worker's Compensation Act for the injury or death of any shipyard worker or other person covered by the Act and employed by Contractor or its subcontractors.

I. Contractor will cause all its subcontractors to maintain the policies of insurance described in (A) through (D) and (G) through (I) above. All of the coverage specified in paragraphs 6.1(A) through 6.I(I) above shall be carried with insurers acceptable to Owner and shall be maintained in full force and effect during the term of this Agreement and shall not be canceled, altered or amended without thirty (30) days prior written notice having been furnished to the other Parties. All policies provided by Contractor shall be endorsed to waive subrogation against the Owner Group to the extent Contractor has assumed liability or the risk of a particular loss under this Agreement. All policies provided by Owner shall be endorsed to waive subrogation against the Contractor Group

to the extent Owner has assumed liability under this Agreement. All policies shall name the other party to this Agreement and their affiliated companies as Additional Assureds to the extent the party providing the insurance has assumed liability or the risk of a particular loss under this Agreement. All such policies shall be endorsed to provide that they are primary insurance with respect to any insurance carried by the other party and their affiliates to the extent the Party providing the insurance has assumed liability under this Agreement, and shall be endorsed to provide that any "Other Insurance Clause" contained in such policies shall be void and inoperative as to the other Party to this Agreement and its affiliates. Each Party shall furnish the other party with a certificate or certificates evidencing the required insurance coverage, and upon request shall furnish certified copies of all such policies. Claims in rem against the Vessel shall be treated as claims against the Owner for all purposes.

## VI. WORK BY OWNER

OWNER shall have the right during the performance of Work by Contractor hereunder to perform work not included in the Scope of Work on or around the Vessel using its own personnel or specialized vendor representatives. Owner also has the right to hire independent contract personnel other than Contractor's personnel, however, for each man-hour contracted for services capable of being performed by Contractor or its subcontractors, Owner will be assessed a facility fee of $7.00 per man-hour worked.

## VII. TAXES AND COMPLIANCE WITH LAW

1. Owner shall be responsible for any applicable Sales or Use tax as a result of the performance of the work. Contractor is responsible for all employment taxes or contributions imposed by any law or regulations with respect to or measured by the wages, salaries or other compensation paid to employees of Contractor in connection with the Work, including but not limited to taxes or contributions for unemployment and compensation insurance, old age benefits, welfare funds, pensions and annuities and disability insurance.

2. Contractor shall comply and secure compliance by its subcontractors with all applicable laws, ordinances, requirements or regulations of any municipal, local or any other governmental authority or agency.

3. Contractor shall defend, indemnify and hold Owner harmless from all liability for all such taxes for which Contractor is responsible pursuant to this Article VII and contributions and interest

and penalties for failure to pay the same, and from all claims, suits and proceedings brought against Owner and liability imposed owner by reason of any violation or alleged violation of law by Contractor or its subcontractors

## VIII. EQUAL OPPORTUNITY

1. It is understood by both Parties to this Agreement that Contractor is an Equal Opportunity Employer and that in the performance of this Agreement, Contractor shall not engage in any conduct or practice which violates any applicable law, order, or regulation prohibiting discrimination against any person by reason of race, color, religion, national origin, sex or age, or on account of being handicapped, a disabled veteran, or a veteran of the Vietnam Era.

## IX. CONFLICT OF INTEREST

1. Contractor shall exercise reasonable care and diligence to prevent any actions or conditions that could result in a conflict with Owner's best interests. This obligation shall apply to the activities of the employees and agents of Contractor in their relations with the employees, and their families, of Owner and of third parties arising from this Agreement and accomplishing work hereunder. Contractors efforts shall include, but not be limited to, establishing precautions to prevent its employees or agents from making, receiving, providing, or offering gifts, entertainments, payments, loans, or other considerations for the purpose of influencing individuals to act contrary to Owner's best interests.

## X. BUSINESS ETHICS

1. Contractor agrees to comply with all laws and regulations applicable to any activities carried out in the name of or on behalf of Owner under the provisions of this Agreement

2. Contractor agrees that all financial settlements, billings, invoices and reports rendered to Owner as provided for in this Agreement will, to the best of its knowledge and belief, reflect properly the facts of all activities and transactions handled for the account of Owner and may be relied upon as being complete and accurate in any further recording and reporting made by Owner for whatever purpose. Contractor agrees to notify Owner promptly upon discovery of any instance where Contractor fails to comply with this Article or where Contractor has reason to believe that any information supplied to Owner is no longer accurate and complete.

Jul-05-01 04:52P
07/05/2001 16:41        3   57  11        UNIFAB WEST                    P.12
                                                                  PAGE 12

. Jul-03-01 04:02P                                                  P.13

## ACCEPTED AND AGREED:

UNIFAB INTERNATIONAL WEST LLC                    RIC VENTURES INC.
(Seller, Print Full Legal Name)                  (Buyer - Print Full Legal Name)
Contractor – UNIFAB INTERNATIONAL                Owner – RIC VENTURES INC.
            WEST, LLC

(Seller - Signature)                             (Buyer - Signature)
Contractor                                       Owner


MATTHEW STUART ELLIOTT                           Ila Louise Max
(Witness – Print Full Legal Name)                (Witness – Print Full Legal Name)


(Witness - Signature)                            (Witness - Signature)


By:                                              By:
Name: GLENN GROS                                 Name:  Richard Gross
Title: PRESIDENT                                 Title:  Vice-President

Date: __ 7/5/01                                  Date: __  July 3rd, 2001

**PROPOSAL**

| | | |
|---|---|---|
| **SCRAP IRON** | **WILKERSON TRANSPORTATION, INC.** | **SALVAGE** |
| | **dba WILKERSON SCRAP AND SALVAGE** | |
| **BUY & SELL USED PIPE** | **POST OFFICE BOX 456** | **OILFIELD TRANSPORTATION** |
| | **CAMERON, LA. 70631** | |
| **DEMOLITION TANKS/PLATFORMS** | **PHONE: 337-775-5944** | wilkersont@camtel.net |
| | **FAX: 337-775-7966** | |

**COMPANY:** RIG VENTURES                    **DATE:** January 15, 2001

**ADDRESS:**

**ATTENTION:** RICK JAROSS                    **PROPOSAL:** 12993

**PHONE:**                    **FAX:**

| QTY | DESCRIPTION | AMOUNT |
|---|---|---|
| | TO BID ON FOLLOWING: | |
| | Wilkerson will pay $22.40 per long ton for approximatley 200 tons located at Unifab yard in Lake Charles, La *unsigned RJ* | |
| | | |
| | **TOTAL** | |

All materials and procedures are guaranteed to be as written. Changes from said specifications of this proposal involving extra costs will be made only by written orders, and will be added to said price.
This proposal may be withdrawn by us if not accepted within 15 days.

AUTHORIZED SIGNATURE *Wendell Wilkerson* WENDELL WILKERSON
                    **WILKERSON TRANSPORTATION, INC.**

COMPANY: *Rig Ventures, Inc.*    DATE: *1-15-02*
ACCEPTED BY: *Richard Jones*    TITLE: _____

# RIG VENTURES INC.

6665 E. 14th St. – Brownsville, Texas 78520 – Phone: 956 831 4531   Fax 956 831 3142

Friday, February 01, 2002

FAX MESSAGE TO:    Jim Walker - UNIFAB WEST – Lake Charles, La.
Fax No. 337 562 1411
Roger Sledge – UNIFAB WEST – Lake Charles, La.
Fax No. 337 373 5627

Ref: OCEAN 66 – Unifab West Invoices  - Job. No. 36001

Please excuse the long delay in responding on the OCEAN 66 invoices, but I must remind Unifab we waited many months to get replies to our original questions concerning specific charges which were reduced accordingly.

Other items on which Rig Ventures Inc. (RVI) now needs clarification or to receive credit for are as follows:

1. July 6th, 2001: On Job No. 36001 for worked performed on 7/6/001, we noticed that the crane worked for 2 hrs. – at least that is what RVI was charged for – yet we were billed 6 hrs. each for 2 riggers.

For your information, RVI's crew took the equipment Unifab was handling that day – anchors, buoys, etc. – and placed them with RVI's crane on Unifab's barge, then your crane hooked onto the items and loaded them onto a truck. There is no logical way that these riggers would have had more than 2 hrs. of work.

In addition, on the same day (7/6/01)/same Job. No. 36-001 – the foreman and 2 workers (Items #1, #5 & #8 on your labor distribution sheet) – worked overtime hours. RVI did not authorize any overtime, nor would we do so under any circumstances.

You will also note that on that day a storm came up and the rig had to be moored only because of the failure of Unifab's workers to properly moor the rig in the first place.

2. July 9, 2001: Once again you have overtime charges under Items #2 & #3 which RVI did not authorize and definitely were not necessary. We would also like an explanation of why it would cost $2,500 for shore power hook-up. How was this figure derived?

Again, after we wrote and asked you for written quotations for all work prior to commencing same, here we have a $2500 charge which was never discussed with or approved by us.

1 of 6 pages.

-2-

3. July 10, 2001: Here again there is a foreman for whom Unifab billed RVI 8 hrs. and his helper only worked 1 hr. Is this to assume the foreman did all the work and what work was he doing?

What work did they do for RVI and who authorized it?

4. July 11, 2001: RVI was charged for an operator as I also noticed in several other invoices. Please explain what equipment the operator was actually operating, since I assume the charge for the 200-ton crane includes an operator, but here (different from your other invoices), RVI was charged for 2 hrs. of crane time and 2 hrs. each for 2 riggers, although this job could have been done with 1 rigger and in no way whatsoever would 2 riggers be needed.

The foreman worked 8 hrs. yet his helper only worked 7 hrs. Pls explain.

5. July 12, 2001: This was for cleaning up some oil on the deck. Could we have an explanation on what a Mechanic-B (Joshua Common) did for 3 hrs?

6. July 13, 2001: We noticed that RVI was charged overtime and in no way would we authorize this work to be done on overtime.

We also very much question why it took all these man hours and this many people to load out some equipment on a truck. This definitely gives the appearance of padding a bill because to load this truck and to clean off the oil on the deck of the OCEAN 66 (a very small amount of oil and this was the second day Unifab was on this project) should not cost $1,485.00.

7. July 14, 2001: Unifab charged RVI overtime and in several cases you did not even charge us straight time. Apparently these people came to our job just on overtime hours – which we would not have authorized and for which we will not pay.

This work could have been done during regular business hours.

It is also interesting to note that Unifab took on fabricating a ladder for the rig without even the courtesy of writing up a quotation for the job or getting the owner's approval before commencing work as RVI had requested in writing to Unifab on several occasions.

8. July 15, 2001: Unifab charged RVI 4 hrs. for a crane but this did not indicate any riggers, for which we thank you.

Also, Unifab charged RVI for all this work on overtime which without question could have been done on regular time. RVI did not authorize overtime hrs. and will not pay for them.

Page 2 of _6_

Sep 27 04 03:11p     Scott D. Webre       337-593-4159      p.12
Case 1:04-cv-00047   Document 42-9   Filed in TXSD on 09/27/2004   Page 32 of 40

FROM :                    PHONE NO. : 9102540509        Feb. 04 2002 11:03AM P3

-3-

9. July 16, 2001: We noticed that on this day Unifab charged 2 hrs. for the crane but I see nothing showing what the crane was used for.

Again Unifab charged RVI for another day for cleaning the oil off the deck of the OCEAN 66, but the whole job could have been done in one day with some absorbent pads.

Please clarify what the crane did, and for that matter, what everyone did.

10. July 17, 2001: Obviously Unifab was still cleaning up the oil off the deck (again a one day job) and charging RVI as well for cleaning up the galley and eating area. RVI did not authorize Unifab to clean up the galley or the eating area. Our workers cleaned this up before they left and will support RVI on this, and even if there was a mess in these areas, RVI did not authorize Unifab to clean them up.

11. July 18, 2001: RVI was billed $1,089 for July 18, 2001 which included supposedly cleaning up oil on the deck again and taking some customers up to look at the mud pumps.

RVI still does not understand why all these excessive charges were made for what was actually a very simple job.

12. July 20, 2001: Unifab charged RVI for 2 hrs. for uses of the crane and, of course, the operator, for 2-1/2 hrs. Why should we pay additional time for the operator since after the crane stopped operating for RVI, his time should have stopped.

Also, on the on-going ladder project Unifab again charged RVI for another day to hold the access ladder in place and weld it on when Unifab apparently already did that on July 15th.

There is only one ladder and we assume it was all fabricated on the ground and it would only take one time to hold it in place and weld it on.

In addition on July 20th there is another time sheet (#760) where Unifab charged RVI for overtime for Pat Garza, although he never worked any straight time for RVI at all. All the other workers worked straight time without a supervisor, and then apparently when they left the supervisor came on the job to supervise this job only on overtime.

This is unacceptable and indicates a billing practice which does not speak well of your company.

13. July 27, 2001: Apparently there are overtime charges again, and again RVI did not authorize this. Also, Larry Miller, Jr., the rigger, worked only overtime hrs. while the other rigger only worked regular hrs.

-4-

14. July 30, 2001: (Time Sheet No. 877) – RVI has another question in that the crane worked only 1 hr. yet there were 2 riggers – apparently father and son – who worked 2 hrs. when the crane was there only 1 hr.

Please explain or so credit our account.

15. July 31, 2001: With reference to material time sheet (#923)dtd 1/245/2001, Unifab evidently authorized the purchase of rope, a water cooler and push brooms, etc. in the amount of $269.78. The backup for material time sheet #923 is an invoice from Stanley Supply dtd 7/13/2001. Who authorized this and who took delivery of the supplies? Please furnish signed receipts supporting delivery.

16. August 17th, 2001: Time Sheet No. 1234 – indicates all the workers were being paid overtime with 0 straight time. This is unbelievable, and RVI did not authorize any overtime.

It is also interesting to note that on other invoices in July Unifab charged RVI for 2 riggers – sometimes for twice the time the crane was being used – but on August 17th you charged RVI for 2 hrs. for a 200-ton crane but with no riggers shown.

As I said before, even if you used riggers for unloading RVI's equipment in July, you only needed one rigger during the same time period the crane was in use – not beyond.

Comment: Docking Fee – If you check back on the days Unifab charged RVI to work on the Ocean 66 when welding the ladder and the so-called cleaning oil off the deck, I believe you told us that on those days you would not charge RVI dockage, that you would waive the docking fee for the days Unifab was working on the rig.

This would also apply to the work for which Unifab billed RVI for under Inv. 102629 indicating 57 days @ $300 per day.

17. November 16, 2001: Reference Inv. No. 102984 which you have already adjusted as per agreement for docking and surveillance fees – in addition Unifab charged RVI $1,240 for labor which, from our understanding, was not for RVI's account, for loading out the 2 Solar air compressors since Unifab was paid by Solar to do that work.

Also, we understand Unifab received $45,000 or more to do that job which was primarily done by giving Unifab RVI's personnel (which you paid for), and in addition you used the rig's crane which was not part of the agreement.

Since you benefited from the use of that crane, we feel RVI should get some credit as we had to rebuild the crane after that job because of the wear and tear of lifting the heavy compressors.

RVI would agree to a $3500 credit.

Page 4 of 6 pages.

-5-

Also, during the period Unifab was working on moving the Solar air compressors and the mud pumps, Unifab was paid by outside parties to do that work and RVI should not be charged for docking during that period of time as per our agreement.

18. Adjusted Invoices: 102278/102983/102984 — The amounts shown should only cover the docking fee, but the higher amounts indicate there are other charges included which I cannot correlate from the old invoices. We would appreciate it if you could show RI the new invoices, i.e., how you came up with the new adjusted amounts for the invoices for which we have no backup.

**Comments:**

**Rig security:** As per my numerous discussions with Jim Walker, when we left the rig in July we welded up all the doors, put on locks and gave the keys to him. (Reference RVI's fax of 9/26/2001 to Unifab)

We had an extensive amount of tools, supplies and other equipment on board, including several thousand dollars in nonperishable type food in the galley. Upon our return to the rig we found the locks had been cut off, doors were left open, and essentially anything of value had been taken away.

We understand Unifab gave permission for Dwight Toney to cut the locks (without RVI's permission), but Unifab also had the sole responsibility to lock up the rig again and make sure all equipment was secure, especially since at that time Unifab was charging RVI $300/day dockage.

We feel it would only be fair for Unifab to give RVI an adjustment of $5,000 on these charges since RVI's actual losses and costs far exceeded that amount.

**Moving Rig to another location:** Another issue that completely upsets RVI is that we came to your facility with the understanding we would be there for quite some time and were told that we would not have to move from the spot Unifab was putting us in, but no sooner did we jack the rig up – at great expense – and shut everything down when we were told we would have to move right away because you had another rig coming in.

This move resulted in a great deal of expense for RVI, but from our observations when we visited the Unifab yard shortly after the OCEAN 66 was moved, the original docking space was still available. The move and all the expense that RVI was put through was apparently unnecessary.

**Unifab bill w/Port Authority:** Another issue which we discussed with Roger Sledge is that RVI wants confirmation in writing that Unifab's bill with the Lake Charles Port Authority, or whatever entity Unifab is leasing their yard from, is paid, and, if not, that in any case RVI and the OCEAN 66 will only be responsible for docking fees as invoiced, and that the Port Authority will waive and hold harmless RVI from any claims which that entity may have against Unifab.

Page 5 of _6_ pages.

-6-

We may have other questions or find some other items which need to be adjusted after we receive answers to the above questions, along with the pertinent backup.

RVI made it clear when we came to Unifab's yard that we were scrap dealers, not a major oil company and were assured we would be treated appropriately. As a matter of fact, Unifab has gotten several nice jobs on account of the OCEAN 66 which you did at very low costs and on which you made a nice margin.

**Finishing bottom of rig:** Another serious matter is that when the bills are adjusted out, we will make a payment on the bill but we need to have absolute assurance that the rest of the bottom of the rig will be finished.

The fact that the OCEAN 66 now has a hole in the bottom seriously diminishes its value, and the failure of Unifab to complete the work which they have already been paid to do has caused RVI damages and costs well beyond the amount of RVI's account with Unifab.

———————————————

Please address our concerns and questions outlined above, make the appropriate adjustments, clarify the issues concerning Unifab's lessor and verify when the bottom of the rig will be completely finished according to ABS standards as per our agreement.

If you have any questions or need to discuss anything on the phone, please give either the undersigned or Emilio Sanchez a call.

Best regards,

Richard Jaross
RIG VENTURES INC.
1519 N. 23rd St. – Wilmington, NC 28405
Phone: 910 254 0200  Fax: 910 254 0608/0509

CC: Emilio Sanchez – RIG VENTURES INC – Brownsville, Texas

Page 6 of _6_ pages.

# RIG VENTURES INC.

### 6665 E. 14ᵗʰ ST. – BROWNSVILLE, TEXAS 78520
### PHONE: 956 831 4531   FAX: 956 831 3142



Friday, November 16, 2001                    BY FEDERAL EXPRESS

Mr. John Rubin
RIDGE LAKE ENERGY
3636 North Causeway Blvd.
Suite 300
Metairie, Louisiana 70002

Ref: OCEAN 66

Dear John:

Enclosed please find a brochure with a full description, photos, drawings and recent underwater inspection survey on the OCEAN 66.

Unifab is presently putting together some numbers delineating costs to bring the hull up to full ABS class.

You told me you would decide whether or not the existing process equipment would be removed. If so, Rig Ventures Inc. would remove the equipment at its costs.

We are asking $4.5 Mil for the rig "as is, where is", subject to prior sale or disposition.

Please advise if you need any other drawings or information.

Best regards,

Richard Jaross
RIG VENTURES INC.
1519 N. 23ʳᵈ St. – Wilmington, NC 28405
Phone: 910 254 0200  Fax: 910 254 0608/0509

CC:  Emilio Sanchez – R V I – Brownsville, Tx

Encl.

# RIG VENTURES INC.

**6665 E. 14th St. – Brownsville, Tx 78520 – Phone: 956 831 4531  Fax: 956 831 3142**

**Tuesday, November 06, 2001**

**FAX MESSAGE TO:**      Marcel Baker – Fax No. 713 266 1713

**Ref: 2 ea. Triplex Mud Pumps**

**Dear Marcel:**

Attached is our invoice for releasing the one mud pump.  The $15,000 deposit covered both pumps (or $7,500 per pump),  which makes a balance of $37,500 due on each pump when it is picked up.

We would prefer to handle it this way as it is already set up on our books like this.

Please give me a call if you have any questions.

Best regards,

Richard Jaross
RIG VENTURES INC.

CC:  Emilio Sanchez – RVI

FAXED

BY:

1 of 2 pages.

FROM :                          PHONE NO. : 9102540509        Jan. 10 2002 11:11AM P2

# RIG VENTURES INC.

**6665 E. 14ᵗʰ St. – Brownsville, Tx 78520 – Phone: 956 831 4531  Fax: 956 831 3142**

Thursday, January 10, 2002

FAX MESSAGE TO:     THE METHODIST HOSPITAL – Houston, Texas
                    Administrative Office – Fax No. 713 790 2429
                    Attention:  Rosa Perales

Ref:  Patient – Jamie Gilbert

Rig Ventures Inc. will be responsible for the medial bills of Jamie Gilbert at
The Methodist Hospital, Houston, Texas.

Please send the bills to Fax No. 956 831 3142 – Attention:  Emilio Sanchez

We also want access to all medical records and a report on his condition sent
to the undersigned.

We thank you for your cooperation.

Sincerely yours,


Emilio Sanchez
RIG VENTURES INC.


1 of 1.

FROM :                          --    PHONE NO. : 9102540509          Jan. 23 2002 04:24PM P2



# RIG VENTURES INC.

**6665 E. 14ᵗʰ St. – Brownsville, Tx 78520 – Phone: 956 831 4531  Fax: 956 831 3142**



January 23, 2002

FAX MESSAGE TO:  Dr. Lindsey – Fax No. 713 986 5681

Ref:  Patient Jamie Gilbert – The Methodist Hospital

**Our company has agreed to be responsible for the bills of Jamie Gilbert, one of your patients at The Methodist Hospital, Houston, Texas.**

**We would appreciate receiving by fax (910 254 0509) a report on his condition, what still needs to be done and when you think Jamie may be able to go back to Brownsville.**

**We have discussed this with Jamie and he would like to receive a copy of the same report.**

**We appreciate your help and cooperation.**

Sincerely yours,

Louise Max, Secretary
**RIG VENTURES INC.**
**Phone: 910 254 0200**
**Fax:  910 254 0509**

*FAXED BY:*

CC:  Emilio Sanchez – Rig Ventures Inc. (956 831 3142)

1 of 1.

05/13/2002  15:18   713984   1          VBI          PAGE  01/02

PHONE NO. : 9102540599          May. 08 2002 02:15PM P1


OCEAN 66

# RIG VENTURES INC.

6665 E. 14th St. – Brownsville, Tx 78520 ~ Phone: 956 831 4531  Fax: 956 831 3142

---

Wednesday, May 08, 2002                                          1 of 1.

**FAX MESSAGE TO:**          TRANZON – VENUEBID
                            Fax No.  713 984 7671
                            Attention:  Dwight Toney

Dear Dwight:

Congratulations on your new affiliation and hope it makes bigger and better deals for our group.

I can respond to your fax of today as follows:

1. We would be most happy for your organization to go ahead with a sealed bid on the OCEAN 66, but we are not in a position to advance or pay $14,000 in advertising, brochures and mailing. If you decide to go ahead and if you draw up an agreement, of course, you can have a budget which would be payable out of sales proceeds. In other words, if you complete a sale at a price agreeable to RVI, then the first monies would go to pay you for advertising, brochures and mailing up to an agreed upon budget, and the next monies would go to your commissions, etc.

Please advise if this is agreeable.     *IF YOU GUYS PAY ½ up Front I will pay the Remainder to be deducted*

2. In regard to your $200 invoice on the OCEAN 66, please advise what this was for, send us a copy and if this is something we owe, we will pay it.   *SEE ATTACHED.*

3. Production Platform: We do not own this but we have it tied up and suggest you go out in the market and we will cover you for a 10% commission, but we cannot do an exclusive basis. We would like to keep the initial period for 3 months. *I'm REALLY NOT interested without an Exclusive For some time Frame.*
Please advise if this meets with your approval.

4. The cranes are still available – subject to prior sale. If you have a buyer, let's throw in an offer and see if we can get a deal done.   *I thought you owned them? I won't know anything for a few days.*

Best regards,

Richard Jaross
RIG VENTURES INC.

CC: Emilio Sanchez/RVI

*I DON'T THINK WE*