and Rig Ventures, Inc., et al (defendants).  Specifically, you have asked me to study, analyze, and opine on the following issues:

A.  Were Rig Ventures, Inc. and Esjay Green Shipping, Inc., Esco Marine, Inc., Dominion Shipping, Inc., Sanco International, Inc., Sanship, Inc., Saber Steel Corp., Northern Bay Peat, LLC, Atlantic Trading Group, LLC, Fort Caswell, LLC, Sanjar Properties, LLC, and Pan Holding, Inc. (collectively referred to as "the various entities") owned and controlled by Emilio Sanchez operated in such a manner as to allow the corporate veils of such entities to be pierced to impose personal liability to Mr. Emilio Sanchez;

B.  Were Rig Ventures, Inc. and the various entities owned and controlled by Emilio Sanchez operated in such a manner that such entities were in "Fact and Appearance" the mere alter egos of Mr. Emilio Sanchez;

C.  Were the corporate formalities properly followed within Rig Ventures, Inc. with respect to financial reporting, federal tax compliance, employee classification, and application of Generally Accepted Accounting Principles and Practices;

D.  Was Rig Ventures, Inc. solvent when various significant financial transactions, dealings, and transfers were effectuated and recorded in the financial books and records of the company;

E.  If Rig Ventures, Inc. was not solvent at significant and specific points in time with regard to the various transactions, dealings, and transfers, would these transactions, dealing and transfers be in direct violation of the Texas Fraudulent Conveyance Act;

F.  The significance and financial effect of various book entries made to the financial records of Rig Ventures, Inc. under Emilio Sanchez' direction and control after December 31, 2001;

G.  Were Rig Ventures, Inc. and the various entities owned primarily by Emilio Sanchez, operated in such a manner as to commingle and cross-collateralize assets, cash flows, labor, and financial resources;

H.  Was Emilio Sanchez conducting his business affairs within Rig Ventures, Inc. and all of the various entities in such a manner to suggest and establish they collectively and/or individually were operating with a "common business interest", a "common business purpose" and/or a "single profit motive";

I.  Do the financial records of Rig Ventures, Inc. reflect and establish that James David Gilbert, Richard Jaross, Phil Wells, and various other individuals were

4

providing services to Emilio Sanchez and Rig Ventures, Inc. as employees, agents, or co-owners.

My analysis, findings, and opinions with regard to these specific issues are set forth in detail in the following sections of this report.

## III.   ANALYTICAL AND INVESTIGATIVE PROCEDURES APPLIED

The analytical and investigative procedures applied to this engagement are in strict compliance with the standards set forth by the American Institute of Certified Public Accountants, the Association of Certified Fraud Examiners, and have general acceptance within the accounting and fraud investigation communities. All such procedures have been tested, have been subject to peer review, and have general acceptance within the profession. Specifically, the above described procedures included, but were not limited to, the following:

- Reviewed and analyzed deposition testimony

- Reviewed and analyzed authoritative literature

- Reviewed and analyzed bank statements and cancelled checks tracing various amounts to the financial statements, transaction detail summaries, and account summaries, when possible

- Reviewed, studied and analyzed various individual and corporate income tax returns inclusive of supporting schedules

- Studied and analyzed various promissory notes as they relate to various individuals, entities, financial statements, and financial transactions

- Reviewed and analyzed various financial statements

- Analyzed profit worksheets and traced the information to financial records, when possible

- Made inquiries when possible

- Reviewed and traced various financial ledger data to financial statements

- Reviewed and studied minutes of shareholder meetings

- Reviewed and studied all deposition exhibits

- Identified and investigated significant financial transactions

- Studied and analyzed inter-company financial activities and how they related to the various corporations and Emilio Sanchez individually

- Identified and studied significant relationships between the various entities and their owners (Emilio Sanchez and Richard Jaross), when possible

- Searched for financial dealings and transactions executed at less than "arms length"

- Studied and analyzed significant and identifiable transactions for compliance with federal and state tax statutes

- Traced various testimony to financial documentation and records while investigating inconsistencies

- Conducted an analytical approach (assets compared to liabilities and equity) to financial statements and data to investigate net worth issues, liquidity issues, risk issues, solvency issues, and potentially misrepresented financial transactions

- Such other analytical, investigative and accounting procedures as I deemed necessary

## IV.  DOCUMENTS REVIEWED AND ANALYZED

In the course of this engagement, I have studied and analyzed the various documents and information provided to me to date. In addition, I have studied and analyzed additional public, professional, and technical data and information as I deemed necessary. The above described data and information includes, but is not limited to, the following:

- Oral and videotaped deposition of Norm Garza dated July 08, 2004

- Oral and videotaped deposition of Emilio Sanchez, Sr. dated January 28, 2004

- Oral and videotaped deposition of Richard Jaross dated January 28, 2004

- The "Ocean 66" estimated profit worksheet dated September 26, 2000

- The 2001 "Ocean 66" hand written accounting ledger reflecting charges, income, and balance

- Rig Ventures, Inc. Certificate of Incorporation issued by the Secretary of State – Delaware dated October 25, 1994

- Various letters and correspondence written on Rig Ventures, Inc. letterhead and signed by Richard Jaross

- Revolving option promissory note between Rig Ventures, Inc. and Emilio Sanchez dated December 31, 1999 ($3,000,000.)

- Revolving option promissory note between Rig Ventures, Inc. and Esjay Green, Inc. Dated December 31, 1999 ($10,000.)

- Revolving option promissory note between Esjay Green Shipping, Inc. and Rig Ventures Inc. dated December 31, 1999 ($500,000.)

- Revolving option promissory note between Esco Marine, Inc. and Rig Ventures, inc. dated December 31, 1999 ($50,000.)

- Revolving option promissory note between Rig Ventures, Inc. and Esco Marine, Inc. dated December 31, 1999 ($50,000.)

- Revolving option promissory note between Dominion Shipping, Inc. and Rig Ventures, Inc. dated December 31, 1999 ($500,000.)

- Revolving option promissory note between Rig Ventures, Inc. and Dominion Shipping, Inc. dated December 31, 1999 ($500,000.)

- Revolving option promissory note between Sanco International, Inc. and Rig Ventures, Inc. dated December 31, 1999 ($500,000.)

- Revolving option promissory note between Rig Ventures, Inc. and Sanco International dated December 31, 1999 ($500,000.)

- Revolving option promissory note between Rig Ventures, Inc. and Sanship, Inc. dated December 31, 1999 ($100,000.)

- Revolving option promissory note between Sanship, Inc. and Rig Ventures, Inc. dated December 31, 1999 ($50,000.)

7

- Revolving option promissory note between Saber Steel Corp. and Rig Ventures, Inc. dated December 31, 1999 ($1,500,000.)

- Revolving option promissory note between Rig Ventures, Inc. and Saber Steel Corp. dated December 31, 1999 ($1,500,000.)

- Rig Ventures, Inc. Coastal Banc Statements and Cancelled Checks for the following periods:

  o   January 2002 thru April 2002
  o   February 2003 thru December 2003
  o   January 2004 thru June 2004

- Defendant Rig Ventures, Inc. Third Supplemental Responses to Plaintiff's First Request for Production

- Plaintiff's fifth amended complaint under General Maritime Law and State Law

- Non-Detail Chart of Accounts for Rig Ventures, Inc.

- Summary Trial Balance dated February 22, 2004 for what appears to be Rig Ventures, Inc.

- Six page summary for Rig Ventures, Inc. titled "Transaction Detail by Account" for the period January 2000 through December 2004

- Rig Ventures, Inc. report titled "Transactions by Account" as of February 22, 2004

- Defendant Emilio Sanchez' Third Supplemental Responses to Plaintiff's first Request for Production

- Various "Waiver of Notice" and Minutes of Annual Meeting of the Shareholder" of Rig Ventures, Inc. for the years 1995 through 1999

- Emilio and Norma Sanchez U.S. Individual Income Tax Returns, Form 1040 with supporting schedules, for the years 2001 and 2002

- Lone Star Bank Statement (1 page) for Rig Ventures, Inc. dated 06/30/01

- Coastal Banc Commercial Checking Account Statements (Account No. 50-831-01419) for the periods January 2000 through December 2000; January 2001 through August 2001; November 2001 through December 2001, inclusive of cancelled checks when provided

- Rig Ventures, Inc. Balance Sheet as of 12/31/01

- Rig Ventures, Inc. Profit and Loss Statement for the period January though December 2001

- Rig Ventures, Inc. Balance Sheet as of 12/31/02

- Rig Ventures, Inc. Profit and Loss Statement for the periods January through December 2001

- Rig Ventures, Inc. U.S. Income Tax Return, form 1120S, with supporting schedules for the years 2001 and 2002

- Rig Ventures, Inc. Amended U.S. Income Tax Return Form 1120S, with supporting schedules for the year 2002

- Rig Ventures, Inc. Balance Sheet as of July 6, 2004

- Rig Ventures, Inc. Profit and Loss Statement for the period January through July 06, 2004

- Rig Ventures, Inc. one page summary titled "Transaction Detail by Account" for the period February 23, 2004 through July 06, 2004

- Notice of Intention to take oral deposition of Norma Garza with subpoena duces tecum

- Rig Ventures, Inc. Journal Entries Report for the period January 01, 2000 through February 24, 2004

- Promissory note between Rig Ventures, Inc. and Jonathon Feffer dated May 09, 1997 ($711,392.)

- Revolving option promissory note between Northern Bay Peat, LLC and Rig Ventures, Inc. dated December 31, 1999 ($1,500,000.)

- Revolving option promissory note between Atlantic Trading Group, LLC and Rig Ventures, Inc. dated December 31, 1999 ($1,500,000.)

- Revolving option promissory note between Fort Caswell, LLC and Rig Ventures, Inc. Dated December 31, 1999 ($3,000,000.)

- Revolving option promissory note between Sanjar Properties, LLC and Rig Ventures, Inc. dated December 31, 1999 ($1,500,000.)

9

- Revolving option promissory note between Rig Ventures, Inc. and Pan Holding, Inc. dated December 31, 1999 ($100,000.)

- Internal Revenue Service Manual

- Internal Revenue Service Code

- Tax Service Publications on independent contractor vs. employee issues

- Generally Accepted Accounting Principles Guide

- Generally Accepted Auditing Standards Guide

- Texas Fraudulent Conveyance Act

- CFE Fraud Examiners Manual

- AICPA Handbook of Fraud and Commercial Crime Guide

- AICPA MCS Practice Aids and Special Reports

## V.   ANALYSIS AND FINDINGS

1.  **Richard Jaross had hire and fire authority over all of the workers as well as complete responsibility for the day to day operations at Rig Ventures, Inc. with regard to the "Ocean 66" project:**

Emilio Sanchez clearly and specifically relied upon Richard Jaross to handle the day-to-day operations associated with the "Ocean 66" project. Further, Emilio Sanchez delegated not only the responsibility of daily operations but the corresponding authority as well. Clear and concise evidence to support this finding can be drawn from deposition testimony of Richard Jaross and Emilio Sanchez. Specific foundation is best found in the Emilio Sanchez deposition testimony as follows:

| | | |
|---|---|---|
| o | Page 28 | Lines 1-3 |
| o | Page 30 | Lines 6-9 |
| o | Page 41 | Lines 1-25 |
| o | Page 51 | Lines 16-25 |
| o | Page 64 | Lines 24-25 |
| o | Page 65 | Lines 1-25 |
| o | Page 98 | Lines 21-25 |
| o | Page 99 | Lines 1-8 |

2.  **Emilio Sanchez, individually, and in his capacity as president of Rig Ventures, Inc. incorporated significant cross collateralization of all of the entities' assets and a corresponding equal level of financial risk of loss of such assets:**

Adequate foundation for this finding is found in the deposition testimony of Emilio Sanchez and Norma Garza. Both individuals provided numerous admissions throughout their testimony as to the continuous and deliberate utilization of all of the entities' assets to secure loans with Lone Star Bank and Coastal Banc that did not ultimately result in an additional cash resource for Rig Ventures, Inc. The result of this cross collateralization process was that Rig Ventures, Inc. assets were subjected to a constant and continuous risk of loss without realizing a benefit from such risk. Although the concept of cross collateralization is not new, within the confines of this case it suggests clear and convincing evidence of a common business interest and absolute financial co-dependence between Rig Ventures, Inc., Emilio Sanchez individually, and all of the various entities under his control and ownership.

3.  **Richard Jaross provided services as a direct agent of Rig Ventures, Inc. and Emilio Sanchez, individually.**

Richard Jaross performed his duties and work assignments under the explicit direction and control of Emilio Sanchez acting in his capacity as president of Rig Ventures, Inc. Emilio Sanchez delegated not only the responsibility for day-to-day operations to Richard Jaross, but also the authority to hire and fire staff members, authority to sign correspondence on Rig Ventures, Inc. letterhead, and the authority to negotiate with potential vendors, suppliers and customers. All of this evidence clearly suggests that Richard Jaross was an agent of Rig Ventures, Inc. at a minimum. Specific evidence can be found in the deposition testimony of Emilio Sanchez as follows:

o    Page 47    Lines 11-25
o    Page 48    Lines 1-3
o    Page 48    Lines 11-19
o    Page 51    Lines 5-9
o    Page 51    Lines 16-25
o    Page 62    Lines 24-25
o    Page 63    Lines 1-13
o    Page 88    Lines 17-25
o    Page 89    Lines 1-8
o    Page 150    Lines 14-25
o    Page 156    Lines 7-13

4. **Richard Jaross and Emilio Sanchez participated as co-owners in at least two entities found within the mix of corporations.**

Clear and convincing support for this finding can be found in the deposition testimony of Emilio Sanchez and Richard Jaross. The co-ownership of various entities associated with the asset cross collateralization process clearly suggests that the two individuals were conducting their business affairs as business partners with a common business interest and common profit motive. With the significant financial co-dependence of all of the entities, including Rig Ventures, Inc., it clearly demonstrates that both parties could benefit from shielding certain liabilities and simply were the alter ego of each other. The two entities with co-ownership are Dominion Shipping, Inc. and Fort Caswell Properties, LLC. It also appears that Sanjar Properties, LLC may be jointly owned. Specific evidence to support this finding can be found in the deposition testimony of Emilio Sanchez as follows:

> o   Page 19   Lines 14-25
> o   Page 20   Lines 1-8
> o   Page 56   Lines 4-13
> o   Page 62   Lines 24-25
> o   Page 63   Lines 1-13
> o   Page 68   Lines 15-25
> o   Page 69   Lines 1-15
> o   Page 135  Lines 11-15

5. **Continuous and consistent co-mingling and co-dependence existed with respect to assets, labor, cash flow and financial resources between all of the corporate entities and Emilio Sanchez, individually:**

Evidence for this finding can be found in the deposition testimony of Emilio Sanchez and Norma Garza. Further evidence is found in the financial statements and the various transaction ledgers. Rig Ventures, Inc. was insolvent at all significant points in time, while at the same time, it was investing in real estate ventures and transferring significant amounts of money to and from the various other entities via inter-company loans and advances. During this same period of time, Rig Ventures Inc. was borrowing money from banks utilizing the assets of other corporations. There is simply no evidence to show that Rig Ventures, Inc. would have survived as a single going concern without this cross utilization of assets, cash flows, and cash resources. This absolute financial co-dependence between all of the entities and Emilio Sanchez individually further supports the position that all of the entities and Emilio Sanchez individually were operating with a common business purpose and single profit motive. Specific evidence to support this finding can be found within the 2000 through 2002 financial statements, as well as within the deposition testimony of Emilio Sanchez as follows:

12

      o    Page 54   Lines 9-25
      o    Page 55   Lines 1-25
      o    Page 56   Lines 1-13
      o    Page 57   Lines12-25
      o    Page 68   Lines 15-25
      o    Page 69   Lines 1-15

**6.** **Emilio Sanchez conducted his business affairs within all of the various entities in such a manner as to suggest in "Fact and Appearance" they were collectively operating with a common business interest and purpose:**

        Emilio Sanchez admitted in his deposition testimony that the reason he set up the various corporate entities was to avoid certain liabilities ("such as the liability associated with this law suit"). This not only lends credence to a corporate sham, but further suggests that Rig Ventures, Inc. and all of the various entities were operating with a common business interest and profit motive. The financial records further demonstrate a significant financial co-dependence that further supports a common business purpose theory. It appears few, if any, of the entities maintained a separate office location, separate staff, or separate supplies. All of the entities operated under Emilio Sanchez' absolute control and direction. Specific evidence to support this finding can be found in the fact that Emilio Sanchez signed all of the promissory notes in his capacity as president of Rig Ventures, Inc., as well as, his deposition testimony as follows:

      o    Page 18   Line 25
      o    Page 19   Lines 1-9
      o    Page 62   Lines 24-25
      o    Page 63   Lines 1-13
      o    Page 88   Lines 17-25
      o    Page 89   Lines 1-25
      o    Page 90   Lines 1-25
      o    Page 135  Lines 11-25

        Further, the defendants have provided no information to suggest that Rig Ventures, Inc. and the various entities were pursuing materially different interests or materially different business opportunities or operations.

**7.** **Emilio Sanchez, Richard Jaross, Rig Ventures, Inc., Tex Mex Cold Storage, Inc., and various entities used common facilities, supplies, and staff to operate their respective businesses:**

Support for this finding can be found in the deposition testimony of Emilio Sanchez and Norma Garza. In the course of providing their deposition testimony, both parties readily admitted that Rig Ventures, Inc. and possibly the various entities utilized common facilities, supplies, and staff located at the corporate offices of Tex Mex Cold Storage Inc. Further, Emilio Sanchez admitted in his deposition that no signage or other indications existed to show that Rig Ventures, Inc. or any of the various entities were either located or operating within the Tex Mex facility. Norma Garza admitted in her deposition that common supplies and staff were utilized by all of the various entities. Specific support for this finding can be found in Emilio Sanchez' deposition testimony as follows:

- o   Page 34    Lines 22-25
- o   Page 35    Lines 1-11
- o   Page 82    Lines 11-20

8.   **Richard Jaross was authorized to prepare, write, and personally sign correspondence on behalf of Rig Ventures, Inc. on the corporate letterhead of Rig Ventures, Inc. provided to him by Emilio Sanchez:**

Support for this finding can be found in the deposition testimony of Emilio Sanchez and Richard Jaross. Further, additional documents and correspondence on Rig Ventures, Inc. letterhead and signed by Richard Jaross have been produced to me. The mere act of Emilio Sanchez delegating such authority is further evidence to suggest an agency relationship between Richard Jaross and Rig Ventures, Inc. Emilio Sanchez and Richard Jaross had a common business purpose, and Richard Jaross was providing services at a level that was significantly higher than that of an independent contractor. Specific evidence to support this finding can be found in the deposition testimony of Emilio Sanchez as follows:

- o   Page 47    Lines 11-25
- o   Page 48    Lines 1-3
- o   Page 150   Lines 14-25

9.   <u>**Richard Jaross conducted his work assignments under the authority and control of Emilio Sanchez acting in his capacity as president and sole shareholder of Rig Ventures, Inc.:**</u>

Evidence to support this finding can be found in the deposition testimony of Emilio Sanchez and Richard Jaross. In essence, Richard Jaross functioned and performed his duties as if he were the chief operating officer of

14

Rig Ventures, Inc.   Richard Jaross was held responsible directly to Emilio Sanchez for the day-to-day operation of Rig Ventures, Inc.   Emilio Sanchez readily admitted in his deposition that he did not have the requisite experience nor the technical background to handle such affairs.   However, this puts forth additional evidence that Richard Jaross was performing his duties at a significantly higher level than that of an independent contractor.   Refer to Emilio Sanchez deposition testimony at Page 51, Lines 16-25 for specific evidence.

10. **Emilio Sanchez specifically relied upon Richard Jaross to run and directly supervise the daily operations of Rig Ventures, Inc.:**

Emilio Sanchez admitted on numerous occasions throughout the course of his deposition that Richard Jaross was directly responsible for day to day operations within Rig Ventures, Inc. This type of authority and control of such an operation is clearly inconsistent with that of a typical independent contractor. In reality it suggests the opposite thesis that would suggest that Emilio Sanchez and Richard Jaross were acting as partners with a common business purpose. Further, when reviewed in light of co-ownership of other entities, consistent co-mingling of financial resources, and the potential financial benefit available to each individual, it would suggest that both parties were conducting their business affairs in all of the various entities in harmony with one another to accomplish a common business purpose for a single profit motive. Specific evidence can be found in Emilio Sanchez deposition testimony as follows:

- o  Page 30    Lines 6-9
- o  Page 51    Lines 16-25
- o  Page 64    Lines 24-25
- o  Page 65    Lines 1-25

11. **Emilio Sanchez and Rig Ventures, Inc. did not follow nor adhere to standard corporate formalities with respect to:**

- • **Written contractor agreements**
- • **Corporate dissolutions**
- • **Employment status**
- • **Payments for labor**
- • **Required tax reporting**

Substantial evidence to support this finding can be found in the deposition testimony of Emilio Sanchez and Norma Garza. Both individuals stated in their depositions that no written agreements existed for the individuals working on the "Ocean 66" project. The lack of such agreements in light of other evidence showing absolute non-adherence to even the basic filing requirement of IRS Form 1099s to these individuals, indicates the perpetration of a potential

15

sham with respect to reporting wages paid to these individuals. In this same regard, a typical independent contractor will submit an invoice for services performed. No such invoices were submitted and yet Rig Ventures, Inc. continuously paid wages to these individuals. When asked under oath why none of these formalities were followed, Ms. Garza's response was "It was an oversight". However, it should be noted that Ms. Norma Garza is a Certified Public Accountant and has public accounting experience. As Ms. Garza is also the daughter of Emilio Sanchez, one must question the legitimacy of such a response. With regard to various corporate liquidations (such as with Saber Steels liquidation in 2002), Ms. Garza indicated in her deposition testimony that no investigation was performed by herself or anyone else with regard to IRS reporting requirements and she is not sure if Rig Ventures, Inc. is in compliance with such statutes.

12. One would simply need to look to the significant financial co-dependence between Emilio Sanchez individually, Rig Ventures, Inc., and the various entities to substantiate the below described findings. Such evidence of this co-dependence is not only found in the deposition testimony of Emilio Sanchez, Norma Garza, and Richard Jaross, but can also be found in the numerous revolving option promissory note terms and the intent of such notes. Based upon my analysis and the deposition testimony of Norma Garza, it appears the actual intent of executing such promissory notes was to establish a financing vehicle between Rig Ventures, Inc. and the various entities to facilitate the accomplishment of a single business purpose and single profit motive. Further evidence of co-mingling, financial co-dependence and asset cross collateralization can be extracted from the financial statements, financing arrangements, the arbitrary assignment of interest rates by Emilio Sanchez, and the repayment patterns reflected in the various inter-company financial accounts as recorded in the books and records of Rig Ventures, Inc. The books and records of Rig Ventures, Inc. clearly reflect, via inter-company account transactions, significant encumbrances of assets and disbursements of significant amounts of cash for activities completely non-related to the rig salvage business (such as the real estate investments associated with Fort Caswell Properties, LLC). When objectively viewed, in light of the comprehensive inter-relationship of Rig Ventures, Inc. and all of the various entities, one could only conclude that Emilio Sanchez exercised absolute control over the entities and such entities operated as a single conduit for Emilio Sanchez to accomplish a single "common business purpose and objective". Such evidence as described above supports and substantiates the following findings:

**Emilio Sanchez intentionally and consistently utilized Rig Ventures, Inc. and the various entities' assets and his personal assets to provide sufficient cash flows to accomplish a common business purpose.**

Emilio Sanchez individually, and in his capacity as president and sole shareholder of Rig Ventures, Inc. and the various entities had the authority, the control, and the means to transfer money, assets, and financial resources at will between Rig Ventures, Inc. and the various entities to accomplish a common business purpose or to unjustly shield assets from creditors.

Emilio Sanchez individually and in his capacity as president of Rig Ventures, Inc. and the various entities had the authority, the control, and the means to have the financial records of the various entities reflect whatever he wanted them to, particularly with respect to avoiding liability.

Emilio Sanchez would financially benefit on an individual basis from the continuous pattern and practice of co-mingling, cross collateralization, and cross utilization of assets, cash flows, and financial resources of Rig Ventures, Inc. and the various entities.

13. The bad debt write-offs in excess of one million dollars recorded in the financial books and records of Rig Ventures, Inc. had nothing to do with Rig Ventures, Inc. business purpose. Further, it appears that these financial transactions were at less than "arms length". In addition, it does not appear that these write-offs were recorded in such a manner as to comply with Generally Accepted Accounting Principles and Internal Revenue Statutes:

Emilio Sanchez stated in his deposition testimony that the primary business purpose of Rig Ventures Inc. was the salvage and resale of rig units. The entirety of the bad debt write-offs appears to be for activities completely unrelated to this business activity. As such, one must question the legitimacy of such transactions and write-offs. Further, Emilio Sanchez stated in his deposition testimony that he simply decided to write off the assets while at the same time admitting that he didn't care because he was going to get future business from the same individuals to offset the write-off. This is clearly an inconsistent foundation to allow such a significant transaction and raises further concerns with respect to the transactions legitimacy. The timing of such write-offs being immediately after he had knowledge of James David Gilbert's injuries raises even more concerns as to the legitimacy of the transactions. In this same regard, it appears the various bad debt write-offs are not in accordance with Generally Accepted Accounting Principles. Specifically, the write-offs do not comply with SFAS #5, paragraph 3.8 and 10 nor with section 10.201 – 10.204 (loss contingencies). In this same regard, the Internal Revenue Statues specifically prohibit the write-off of a bad debt in whole when a future benefit is expected. In addition to the above, neither Rig

17

Ventures, Inc. nor Emilio Sanchez filed IRS Form 1099s for the forgiveness of debt.

14. **Ms. Norma Garza, CPA exercised little if any professional judgment and expertise with respect to how, when, and where significant financial transactions were recorded in the financial books and records of Rig Ventures, Inc. and the various entities. Ms. Norma Garza, CPA functioned simply as a bookkeeping puppet with Emilio Sanchez pulling all of the strings to facilitate the recording of such transactions exactly as he wanted to, regardless and irrespective of potential misrepresentations or Generally Accepted Accounting Principles and Tax Statute Requirements:**

One need only look to Ms. Norma Garza's deposition testimony to provide evidence in support of this finding. Throughout Ms. Garza's testimony she readily admitted that her father, Emilio Sanchez, would tell her everything from how to record the significant transactions to what interest rates to apply to indebtedness. She stated she simply provided a bookkeeping function and simply did what Emilio Sanchez (her father) told her to do. From her deposition testimony, Ms. Garza appeared to exercise no professional judgment as a Certified Public Accountant and little, if any, guidance with respect to recording transactions.

## VI.    EXPRESSION OF OPINIONS

With respect to my analysis, investigation, and findings as described in detail in the preceding section, my opinions with respect to these findings and my analysis are as follows:

1. Richard Jaross was acting as an employee, agent, business partner, or joint venture partner of Rig Ventures, Inc.

2. Emilio Sanchez would financially benefit on an individual basis from the commingling of assets and cash flows of all the various entities, as well as, the cross collateralization of assets and corresponding risk to such assets.

3. Emilio Sanchez conducted his business affairs in such a way as to establish a "common business interest", a "common business purpose", and a "single profit motive" between Rig Ventures, Inc and all of the various entities.

18

4. The assets of Rig Ventures, Inc. and all the various entities were cross collateralized in such a way as to put them all at risk for a "common business interest" including those of Emilio Sanchez, individually.

5. Rig Ventures, Inc. and all of the various entities were functioning as the mere alter ego of each other and Emilio Sanchez.

6. Emilio Sanchez and Rig Ventures, Inc. did not follow the required and necessary corporate reporting formalities with respect to employees, individual independent contractors, payments to alleged contractors and required tax reporting for such individuals.

7. The alleged independent contractor status would fail on 13 of the 20 factors set forth in IRS Revenue Ruling 87-41 (1987-1 CB 296) for claiming such employment status. The factors are:

    1)   Instruction
    2)   * Training
    3)   * Integration
    4)   * Services rendered personally
    5)   * Hiring, supervision and payment of assistants
    6)   Continuing relationship
    7)   * Set hours of work
    8)   * Full time required
    9)   * Work on employer's premises
    10)  Order or sequence set
    11)  Oral or written reports
    12)  * Payment by hour, week or month
    13)  * Payment of expenses
    14)  * Furnishing of tools and materials
    15)  Significant investment
    16)  * Realization of profit or loss
    17)  * Working for more than one firm
    18)  Services available to the general public
    19)  Right to discharge
    20)  * Right to terminate

    *  –  Indicates contractor status would fail

8. The independent contractor status would fail under Common Law as it incorporates Revenue Ruling 87-41 and vice versa.

9. The financial statements and records of Rig Ventures, Inc. do not properly report or represent (form over substance and vice versa) the financial affairs, dealings and position as would be required under Generally Accepted Accounting Principles and Internal Revenue Statutes.

19

10. Various identifiable transactions recorded during the period January 2002 through December 2002 on Rig Ventures, Inc. financial books and records are in direct violation of the Texas Fraudulent Transfers Act.

Such violations occurred as a result of:

    a.  The transfers were made at a time when Rig Ventures, Inc. was insolvent;

    b.  The transfers were made with the intent to hinder, delay, or defraud a creditor;

    c.  The transfers were made without receiving a reasonably equivalent value in exchange;

    d.  Rig Ventures, Inc. had been sued before the transfers were made;

Examples of the fraudulent transactions would be, but are not limited to, the following:

    a.  Write-off of Jonathan Feffer loan in the amount of $703,690

    b.  Write-off of the Fort Caswell Properties, LLC note receivable in the amount of $2,357,943

    c.  The payment to Sanco Inc. to pay off an inter-company debt in the amount of $54,251

    d.  The Coastal Banc loan transaction in the amount of $500,000

11. At all significant times, Rig Ventures, Inc. was operating in direct violation of Internal Revenue and Common Law Statutes with respect to its alleged independent contractor status of James David Gilbert, Richard Jaross, and Phil Wells.

12. Since the date of injuries, Emilio Sanchez has taken deliberate and intentional steps to effectuate and facilitate various financial book entries which do not properly reflect the substance of financial transactions in an effort to mislead James David Gilbert with respect to Rig Ventures, Inc. financial condition, Rig Ventures, Inc. inter-related relationship to all of the various entities and its relationship to Emilio Sanchez.

## VII.  ASSUMPTIONS AND LIMITING CONDITIONS

1.  Certain entities have been included in my analysis and incorporated into this report even though they have been dissolved for financial reporting purposes. Such entities have been included because they have probative value with respect to establishing a continuous pattern and practice of conduct.

2.  My investigation and this report are based solely upon the data and information that has been provided to me and my independent research as described in this report.

3.  This report and its contents are to be used solely for purposes relating to the litigation as described in this report.

4.  This report is intended for parties fully informed of various issues and legal interpretations relating specifically to this litigation.  Any other use or dissemination of this report or any of its contents is strictly prohibited without my prior permission.

5.  The distribution of this report is restricted and limited solely to the appropriate legal counsel, the court with proper jurisdiction, and the parties to these proceedings having full knowledge of all relevant facts.

6.  I expressly reserve the right to supplement this report at a later date in the event new information becomes available or additional discovery is produced by the defendant. I have requested additional discovery from counsel in this case and intend to supplement this report if the defendant voluntarily produces additional documents or is ordered to do so by the court with proper jurisdiction.

7.  The documents produced in this case, to date, which have been provided to me are sufficient to provide a reasonable basis and foundation to support all of the findings and opinions as expressed here-in.

21

## VIII.   COMPENSATION FOR SERVICES RENDERED

My fees for this engagement are based upon the hours expended by each
assigned staff member extended by the hourly billing rate for the individual. The
current billing rates range from $55 per hour to $350 per hour plus out-of-pocket
expenses. My current billing rate is $350 per hour. I reserve the right to charge
a flat fee for various portions or assignments within the total scope of this
engagement, in my sole discretion. I am in charge of this engagement and all
work has been performed under my direct supervision.

## IX.   SUMMARY AND CONCLUSIONS

A. Sufficient evidence was found to support the hypothesis that all of the various
   entities and Emilio Sanchez, individually, were operating the entities in such a
   manner as to allow the corporate veils of such entities to be pierced to impose
   personal liability to Mr. Emilio Sanchez. Anything less than piercing the various
   corporate veils would perpetrate an injustice to James David Gilbert and allow
   Emilio Sanchez to enjoy an unjust enrichment by evading any liability for a
   judgment by facilitating financial transactions with the various entities in an effort
   to make Rig Ventures, Inc. judgment proof.

B. Sufficient evidence was found to support the hypothesis that Rig Ventures, Inc.
   and all of the various entities were operated in such a manner as to be deemed in
   "fact and appearance" the mere alter ego of Mr. Emilio Sanchez.

C. Sufficient evidence was found to support the hypothesis that Rig Ventures, Inc. did
   not properly follow corporate formalities with respect to consistent financial
   reporting, federal tax compliance, employee classification, and the application of
   Generally Accepted Accounting Principles and Practices to the financial books
   and records.

D. Sufficient evidence exists to support the hypothesis that rig Ventures, Inc. was
   financially insolvent when numerous financial transactions and transfers of cash
   resources took place and were recorded in the financial books and records of the
   company.

E. Sufficient evidence exists to support the hypothesis that various financial
   transactions and transfers of cash resources not only took place at points in time
   when Rig Ventures, Inc. was insolvent, but most likely would also be in direct
   violation of the Texas Fraudulent Conveyance Act.

F. Sufficient evidence was found to support the hypothesis that significant entries
   were made to the financial books and records of Rig Ventures, Inc. after

December 31, 2001 to materially misrepresent and distort the financial condition of the company. All of these entries had a negative impact on the financial condition and financial health of Rig Ventures, Inc. as reported in their financial statements. Further, sufficient evidence was found to support the position that all such entries were made in accordance with Emilio Sanchez' explicit instruction and under his direction and control as president and owner of Rig Ventures, Inc.

G. Sufficient evidence exists to support the hypothesis that Rig Ventures, Inc. and all of the various entities owned primarily by Emilio Sanchez (Sanchez owned controlling interest) were financially dependant upon one another and Emilio Sanchez individually. Cash resources were "commingled and transferred at the sole discretion of Emilio Sanchez" and assets were cross collateralized with the entirety of the entities' assets at constant and continuous financial risk.

H. Sufficient evidence was found to support the hypothesis that Emilio Sanchez was conducting his business affairs within Rig Ventures, Inc. and all of the various entities in such a manner as to establish, in fact and appearance, that they collectively and individually were operating with a "common business interest", a "common business purpose", and a "single profit motive".

I. Sufficient evidence exists to support the hypothesis that James David Gilbert, Richard Jaross, Phil Wells, and various other individuals were providing services to Emilio Sanchez and Rig Ventures, Inc. as employees and/or agents. Further evidence suggests Richard Jaross may have been providing services as a partner or joint venture partner of Emilio Sanchez and/or Rig Ventures, Inc.

## X.    EXHIBITS TO EXPERT REPORT

The following exhibits are attached to this expert report and considered to be an integral part of the report:

a. Joseph B. Nelson, CPA CFE CVA Curriculum Vitae

b. Trial and Deposition Testimony of Joseph B. Nelson, CPA CFE CVA

23

Please accept the above as my analysis, findings, and opinions, to date, with respect to this litigation. Thank you for allowing me to assist you with this matter. If you should have any questions, or wish to discuss this report or any of its contents further, please do not hesitate to call upon me.

Very truly yours,

Joseph B. Nelson, CPA CFE CVA

JBN/mab.gilbert expert report.doc

24

Exhibit I

## JOSEPH B. NELSON, CPA CFE CVA
## CURRICULUM VITAE

### Professional

**Certified Public Accountant**
**Certified Fraud Examiner**
**Certified Valuation Analyst**

Active Memberships in:

> American Institute of Certified Public Accountants
> Texas Society of Certified Public Accountants
> Houston Chapter of TSCPA
> Past Chairman of the Litigation Services Committee for the Houston
>     Chapter of the TSCPA
> National Association of Certified Fraud Examiners
> American College of Forensic Examiners00..
> Board of Advisors-American Board of Forensic Accounting
> Diplomate- American Board of Forensic Accounting
> Diplomate- American Board of Forensic Examiners
> Fellow-American College of Forensic Examiners
> National Association of Certified Valuation Analysts
> Supreme Court of Texas Unauthorized Practice of Law Committee
>     Investigations

### Education

> B.S., Accounting Major, University of Dayton; Dayton, Ohio
> Post Baccalaureate Study, University of Houston; Houston, Texas

### Speaking Engagements and Articles

*January 1997*       "Preparing to be qualified and testifying as a CPA expert
Witness"-presented to the National Litigation Support Services
Association-Temple, Arizona

*December 1997*       "Check fraud" and "Changes in State and Federal law with respect
to fraud liability"-Co-presenter with Wells Fargo Bank-
Houston, Texas

| | |
|---|---|
| *January 1998* | Comprehensive peer review of the American College of Forensic Examiners article on "healthcare and insurance fraud" |
| *January 1998* | "Economic Loss Calculations in Employment Matters" Presented to The National Litigation Support Services Association-Orlando Florida |
| *July 1998* | "Health Care Litigation and Fraud & Abuse"-Presented to The National Litigation Support Services Association-Lake Tahoe, Nevada |
| *December 1998* | "The CPA's Role in Litigation"-Presented at the Texas Society Of Certified Public Accountants CPE Exposition (Houston, Texas; Dallas, Texas; San Antonio, Texas) |
| *December 1999* | "Pulling Back the Curtain-Intellectual Property Damages"-Presented to Middleton & Wrightlinger-Louisville, Kentucky |
| *January 2000* | "Pulling Back the Curtain-Business Valuations"-presented to Midland Bar Association-Midland, Texas |
| *March 2001* | "Looking Behind the Numbers"-Presented to Houston Legal Assistants Association- Houston, Texas |

## Litigation Services Experience

1. Fraud investigation and forensic analysis (Civil and Criminal)
2. Comprehensive damage studies relating to intellectual property disputes, patent infringement and theft of trade secrets
3. Damage studies relating to breach of contract, usury, fraud, professional negligence, DTPA, and others
4. Family law matters including tracing asset characterization and forensic accounting
5. Lost profits, business interruption and commercial damages
6. Lost wages and personal injury damage studies
7. Shareholder disputes and derivative actions
8. Business valuations and analysis
9. Court appointed auditor; court appointed receiver
10. Bankruptcy and reorganization matters
11. Preparation of comprehensive and detailed trial exhibits
12. Assisted legal counsel in planning and pretrial strategy inclusive of examination of witness and deposition strategies
13. Expert testimony given in State District Court, Family Law Court, Federal Court and Criminal Court
14. Participation and assistance with mediation and arbitration

15.  Evaluation of accounting, tax and auditing issues, reporting, application of generally accepted accounting principles & standards, and related matters

**Business Experience**

**Joseph B. Nelson, CPA CFE CVA**
**Litigation Service Specialists**
**Houston, Texas**
**July 2001 To Present**

**Managing Director** of the Houston practice providing expert witness testimony and expertise in comprehensive fraud and forensic accounting examinations, patent, trademark, copyright, and other intellectual property infringement, lost profits and business interruption claims, business valuations and analyses, as well as civil and criminal matters within the health care and other industries.

Responsible for providing consulting services to major corporations, law firms, banks and insurance companies in the following areas:

-Fraud Investigation and Forensic Analysis (Civil and Criminal Law)
-Forensic and Investigative Accounting
-Commercial Damages and Lost Profits Analysis
-Intellectual Property Disputes and Theft of Trade Secrets
-Shareholder and Corporate Disputes
-Family Law Matters and Disputes
-Business Valuations and Analysis
-Personal Injury, Wrongful Death, Wrongful Termination
-Bankruptcy and Reorganization Matters
-Personal and Corporation Taxation Issues involved in Litigation Matters
-Application of Generally Accepted Accounting Principles and Standards
-Application of Generally Accepted Auditing Standards and Procedures

**FTI, Inc.**
**Houston, Texas**
**February 2000-July 2001**

**Managing Director** of FTI's Financial Consulting Division Houston office. Mr. Nelson specializes in litigation consulting, complex fraud investigations and forensic accounting, as well as damage calculations and rebuttal.

Responsible for providing consulting services to major corporations, law firms, Banks and insurance companies in the following areas:

-Fraud Investigation and Forensic Analysis (Civil and Criminal Law)
-Forensic and Investigative Accounting
-Commercial Damages and Lost Profits Analysis

- Intellectual Property Disputes and Theft of Trade Secrets
- Shareholder and Corporate Disputes
- Family Law Matters and Disputes
- Business Valuations and Analysis
- Personal Injury, Wrongful Death, Wrongful Termination
- Bankruptcy and Reorganization Matters
- Personal and Corporation Taxation Issues Involved in Litigation Matters
- Application of Generally Accepted Accounting Principles and Standards
- Application of Generally Accepted Auditing Standards and Procedures

**Mann Frankfort Stein & Lipp, P.C.**
**Houston, Texas**
**1996-February 2000**

Firm Partner and Shareholder in charge of Commercial Damages and Fraud
Investigation groups within the Litigation Services Division.

- Fraud Investigation and Forensic Analysis (Civil and Criminal Law)
- Forensic and Investigative Accounting
- Commercial Damages and Lost Profits Analysis
- Intellectual Property Disputes and Theft of Trade Secrets
- Shareholder and Corporate Disputes
- Family Law Matters and Disputes
- Business Valuations and Analysis
- Personal Injury, Wrongful Death, Wrongful Termination
- Bankruptcy and Reorganization Matters
- Personal and Corporation Taxation Issues Involved in Litigation Matters
- Application of Generally Accepted Accounting Principles and Standards
- Application of Generally Accepted Auditing Standards and Procedures

**Joseph B. Nelson, P.C.**
**Certified Public Accountant**
**Houston, Texas**
**1987-1996**

Managing Partner in charge of a full service accounting firm providing services in
the following areas:

- Litigation Support Services (Civil and Criminal Law)
- Comprehensive Auditing and Fraud Investigation
- Representation before the Internal Revenue Service
- Taxation preparation and planning
- Financial reporting, compilation and analysis
- Management and Business Advisory Services

**Eight years experience teaching CPA exam preparation classes.**

Exhibit II

**Joseph B. Nelson, CPA CFE CVA**
**Trial and Deposition Testimony**

| Date | Case | Court | Attorney |
|------|------|-------|----------|
| 1997 | Wagner VS Adams | County Civil Civil Court No 2 Harris County Texas | Carole L. Riggs |
| 1997 | Yale Street Limited Partnership VS. Arnol Products, Inc. et al | 113th District Court Harris County, Texas | Martin De La Torre |
| 1997 | American Jewish Committee VS. Cynthia J. Victor | 61st District Court Harris County, Texas | Robert E. Lapin |
| 1997 | Shults Brothers Kelly Tire Service Center, Inc. et al vs. Clear Lake National Bank, et al | 164th District Court Harris County, Texas | Randall O. Sorrels Kenneth R. Breitbeil |
| 1997 | Julia & Leonard Williams Co Executors for the Estate of Ruth Waites vs. Beverly Enterprises, Inc., et al | 4th District Court Rusk County Texas | David T. Marks |
| 1997 | Filter Fab, Inc. vs. Chris Elliott, Man Pharr, Aitken, Inc., et al | 270th District Court Harris County, Texas | Timothy Henderson |
| 1998 | Ned T. Gordon, dba Stadium Bowl VS. BCC REO, LLC | 280th District Court Harris County, Texas | James R. Bailey |
| 1998 | State of Texas VS Cynthia J. Victor | 177th Criminal Court Harris County, Texas | Lester Blizzard |

| | | |
|---|---|---|
| 1998 | Filter Fab, Inc. VS. Chris Elliott, Man Pham, and Aitken, Inc. | 270th District Court Harris County, Texas | Timothy Henderson |
| 1998 | Hinojosa VS. Goliad Manor | 117th District Court Nueces County, Texas | David T. Marks |
| 1998 | Penn Octane Corporation VS. Jorge VS. Duran | 164th District Court Harris County Texas | Timothy Lee |
| 1998 | Mendenhall VS. Saudi Aramco, et al | U.S.District Court Southern District Galveston Division | Andy Vickery |
| 1998 | Julie & Timothy Fischer VS. Rawson & Company, et al | 149th District Court Brazoria County, Texas | Loinel m. Schooler |
| 1998 | Controls International, Inc. vs. Kinetrol USA, Inc. et al | Federal Arbitration | Lee Joseph |
| 1998 | Donald Scott VS. Jeanette Sicinski-Scott | 9th District Court Montgomery County, Texas | Stuart Wilson |
| 1998 | Meadow Park Partners and T. David O'Brien, III VS. Telecommunications, Inc. et al | 133rd District Court Harris County, Texas | Jerry VS.. Walker Jr. |
| 1999 | Donald Scott VS. Jeanette Sicinski-Scott | 9th District Court Montgomery County, Texas | Stuart Wilson |
| 1999 | Estate of Minerva Ferrell, by Patricia Crutcher VS. Texas Health Enterprises, Inc. | 410th District Court Montgomery County, Texas | Stephen McCarthy |

| | | | |
|---|---|---|---|
| 1999 | Baker Hughes, Inc. VS. Davis Lynch, Inc. | United States District Court Southern District of Texas Houston Division | Samer Al-Azem |
| 1999 | Joan K. Galway VS. Ogilvie Products, Inc | 281st District Court Harris County, Texas | Carolyn Sschultz |
| 1999 | Donald Scot VS. Jeanette Sicinski-Scott | 9th District Court Montgomery County, Texas | Steven Lindamood |
| 1999 | Alta David VS. Avalon Place Texas City, et al | 212th District Court of Galveston County, Texas | David T. Marks |
| 1999 | Hatfield and Company, Inc and Moody-Price, Inc. VS. The Foxboro Company | 11th District Court of Harris County, Texas | Guy E. Matthews |
| 2000 | Lycon, Inc. VS. EVI Oil Tools, Inc | United States District Court Western District of Louisiana Lafayette Opelousas Division | Steven Durio |
| 2000 | Hatfield and Company, Inc and Moody Price, Inc. VS. The Foxboro Company | Arbitration 11th District Court of Harris County, Texas | Guy E. Matthews |
| 2000 | Carolyn Wright and James J. Wright VS. Mitek Surgical Products, Inc. et al | 190th District Court Harris County, Texas | Rayburn Putney |
| 2000 | Meadow Park Partners and David O'Brien VS. Telecommunications Inc. | United States District Court for the Southern District of Texas Houston Division | Jerry Walker, Jr. & Jerry Walker, Sr. |

| Year | Case | Court | Attorney |
|---|---|---|---|
| 2000 | Henry McLaughlin VS. Kevin Hunt and Valvtechnologies | District Court of Harris County, Texas 133rd Judicial District | Wes Wauson |
| 2000 | Marleny Alvarado VS. Web Assembly, Inc., and Wingfoot Enterprises d/b/a Tandem Staffing | District Court of Harris County, Texas 281st Judicial District | Carolyn Schultz |
| 2000 | Marleny Alvarado VS. Web Assembly, Inc., and Wingfoot Enterprises d/b/a Tandem Staffing | District Court of Harris County, Texas 281st Judicial District | Richard Fass |
| 2000 | Judy Koch, Individually and on Behalf of Bernice Disiere, Deceased VS. Southern of Converse, Inc. et al | District Court of Bexar County, Texas 225th Judicial District | Marynell Maloney |
| 2000 | Baker Hughes Incorporated VS. Davis-Lynch, Inc | United States District Court for the Southern District of Texas, Houston Division | Clarence Ericksen |
| 2001 | Deborah Douglas et al VS. Cherry Street Annex, Parkview Convalescent Center et al | 62nd District Court Lamar County, Texas | David T. Marks |
| 2001 | Laura S. Peters VS. Davis et al | 280th Judicial District Court of Harris County Texas | John W. Able |
| 2001 | Harry McLaughlin VS. Kevin Hunt and Valvtechnologies, Inc. | In the 133rd Judicial District Court of Harris County, Texas | Wesley Wauson |
| 2001 | Billye M Hughes et al VS. Senior living Properties, L.L.C. et al | In the District Court of Childress County, Texas 100th Judicial District | David T. Marks |

| Year | Case | Court | Attorney |
|------|------|-------|----------|
| 2002 | Viscotek Corporation VS. Waters Corporation, et al | In the United States District Court for the Southern District of Texas, Houston Division | Guy E. Matthews |
| 2002 | The Estate of Leo Francis Tenczynski, et al VS. Nissi Care Homes, et al | In the 334th Judicial District Court of Harris County, Texas | David T. Marks |
| 2002 | The Estate of Ruthie Saap, et al VS. BMW Healthcare, Inc. et al | In the 133rd Judicial District Court of Harris County, Texas | David T. Marks |
| 2003 | Sulim Spring Works, Inc. Vs. Framatome ANP, Inc., et al | In the 165th Judicial District Court of Harris County, Texas | Terry B Joseph |
| 2003 | The Estate of Leo Francis Tenczynski, et al VS. Nissi Care Homes, et al | In the 334th Judicial District Court of Harris County, Texas | David T. Marks |
| 2003 | Watson & Chalin, Inc. vs. The Boler Company | In the United States District Court for the Eastern District of Texas, Sherman Division | C. Vernon Lawson |
| 2003 | Lynn James vs. The Spine Center, et al | In the 334th Judicial District Court of Harris County, Texas | Casey Magan |
| 2004 | Viscotek Corporation Vs. Waters Corporation, et al | In the United States District Court for the Southern District of Texas, Houston Division | Guy E. Matthews |
| 2004 | Parker Barber & Beauty Supply Vs. Wella Corporation, et al | In the 201st Judicial District Court of Travis County, Texas | Kelly Stevens |

Casey Magan

In the 334th Judicial District
Court of Harris County, Texas

Lynn James vs. The
Spine Center, et al

2004

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JAMES DAVID GILBERT | § § § | CIVIL ACTION NO: B04-CV-047 |
| VS. | § § | |
| EMILIO SANCHEZ; AND RICHARD JAROSS; AND RIG VENTURES, INC.; ET AL | § § § § | JUDGE HILDA G. TAGLE |

---

## SUPPLEMENTAL EXPERT REPORT OF
## JOSEPH B. NELSON, CPA CFE CVA
### PURSUANT TO RULE 26(a) 2(B)

## SUBMITTED SEPTEMBER 30, 2004

---

CONFIDENTIAL INFORMATION
PREPARED FOR: SCOTT D. WEBRE, ESQUIRE

1

**TABLE OF CONTENTS**

I.     PURPOSE AND USE.................................................................................3

II.    TRANSACTION DETAIL .........................................................................3

III.   SUMMARY AND CONCLUSION........................................................... 11

IV.    ASSUMPTIONS AND LIMITING CONDITIONS................................. 11

V.     COMPENSATION FOR SERVICES RENDERED................................. 13

## I.    PURPOSE AND USE

Please accept this report as a supplement to my expert report issued and dated August 09, 2004 ("Initial Report").  The information contained in this report is to be incorporated into the initial report dated August 09, 2004 and is considered an integral part there-of.  This supplemental report is in **no way** to be construed or interpreted as a substitute or change of the information, findings, or opinions contained and described in the initial report.  Rather, the information contained in this supplemental report should be considered as additional support and foundation for the findings and opinions as described and contained in the initial report.  Except as may be noted in this report, all of the findings and opinions as described in the initial report shall remain as stated.

## II.    TRANSACTION DETAIL

The following identifiable transactions were recorded during the twelve-month period from December 31, 2001 through December 31, 2002 in the financial books and records of Rig Ventures, Inc.  These transactions reflect the intentional dissipation of assets and/or conveyance of such assets to affiliated companies and corporate insiders in direct violation of the Texas Uniform Fraudulent Transfers Act.

### A.    COASTAL BANC  LOAN AND EXTINGUISHMENT OF PAYABLE TO SABER STEEL:

| Date | Num | Memo | Account | Debit | Credit |
|------|-----|------|---------|-------|--------|
| 01/01/02 | | | Note Payable – Coastal Banc | | $ 500,000 |
| | | | Due to Saber Steel | $ 668,270 | |
| | | | Due to Emilio Sanchez | | $ 168,270 |

The substance of this journal entry was to facilitate Rig Ventures, Inc. borrowing $ 500,000 from Coastal Banc and using the loan proceeds to directly pay Saber Steel the same amount.  In essence, $ 500,000 of Rig Ventures, Inc. assets (cash from loan proceeds) was transferred/conveyed directly to Saber Steel.  Further, $ 168,270 was transferred from a payable to Saber Steel to a payable directly to Emilio Sanchez (corporate insider).

3

This $ 500,000 transfer to Saber Steel was a fraudulent transfer in violation of the Texas Uniform Fraudulent Transfer Act, Texas Bus. & Com. Code § 24.001 et seq. because:

1. It was a transfer of money to an insider or affiliate of Rig Ventures, Inc.;
2. There was not a reasonably equivalent value provided Rig Ventures, Inc. by Saber Steel;
3. It was made when Rig Ventures, Inc. was insolvent; and
4. The transfer occurred soon after Emilio Sanchez realized he had a potential large liability in connection with James Gilbert's injuries.

Further, even without the obvious violation of the Uniform Fraudulent Transfer Act, this transaction is evidence that Emilio Sanchez utilized Rig Ventures, Inc. and Saber Steel, Inc. as his alter ego, and/or that he operated the two as a Single Business Enterprise given their indiscriminate sharing of funds to engage in whatever business venture Emilio Sanchez chose.

In summary, this transaction is a specific example that exemplifies the absolute financial control Emilio Sanchez had over the two corporations. It further exemplifies the ability Emilio Sanchez had to simply do whatever he wanted to with regard to the financial transactions within the companies he personally owned. It is highly unlikely and would be highly unusual for a transaction of this type to occur between two companies in an arms length normal business relationship. In this same regard, the timing of this transaction is highly suspect and clearly suggestive of the fact that Emilio Sanchez preferred (and needed) the loan proceeds to be in a Saber Steel account rather than a Rig Ventures account to effectively avoid the payment of a potential liability in connection with James Gilbert's injuries. It should also be noted (refer to Garza deposition testimony) that shortly after Mr. Gilbert was injured and this transaction took place, Saber Steel was dissolved for all practical purposes. The essence of such a dissolution is to bring all account balances to zero and distribute any and all remaining cash to the corporate owners (Emilio Sanchez). I do not know where the Saber Steel remaining funds, if any, were distributed upon dissolution because I have not been provided the necessary financial data for Saber Steel. Such information would likely be helpful in further analyzing this matter.

4

B. **WRITE-OFF OF FORT CASWELL PROPERTIES, LLC NOTE RECEIVABLE (CLASSIFIED AS AN "OTHER ASSET" AT DECEMBER 31, 2001:**

On January 01, 2002, a journal entry was recorded in the Rig Ventures, Inc. accounting books and records reflecting the following (Garza Deposition Exhibit "U" page 03):

| Date | Num | Memo | Account | Debit | Credit |
|------|-----|------|---------|-------|--------|
| 01/01/02 | | | Due from Caswell Properties | | $ 2,365.955 |
| | | | Bad Debt | $ 2,365,955 | |

The recording of this journal entry facilitated the charge-off of the "other asset" category entitled "Notes Receivable" to bad debt expense. Ms. Norma Garza recorded this transaction (journal entry) with limited knowledge of the substance of the write-off (Garza testimony pages 124-126). Further, Ms. Garza's testimony on page 124 lines 22-24 clearly reflects that this real estate transaction had nothing to do with the Ocean 66 Project. The defendant has not produced any documentation to substantiate the facts surrounding either this real estate investment or its subsequent write-off. As such, it is unclear as to whether this transaction is properly recorded in the financial books and records of Rig Ventures, Inc. or whether the subsequent $ 2,365,955 asset write-off is properly charged to this entity. However, what this transaction does clearly indicate is the consistent co-mingling and co-use of Rig Ventures, Inc. funds for uses other than their primary intended business purpose. The essence of this transaction is to unjustly punish James Gilbert by diminishing the assets of Rig Ventures, Inc. without having received adequate consideration or security for such an investment. Thus, this transaction allowed Emilio Sanchez to arbitrarily record and subsequently write off a $ 2,365,955 asset of Rig Ventures, Inc. to the detriment of James Gilbert and avoid the payment of the potential liability associated with this lawsuit.

Further, Emilio Sanchez caused Rig Ventures, Inc. to pay $ 90,000 to Fort Caswell[1] on July 03, 2001, which is only six months before Emilio Sanchez caused Rig Ventures, Inc. to write off the bad debt referenced above. If in fact this is a legitimate bad debt, it is likely that Emilio

---

[1] Ms. Guillory and the Rig Ventures, Inc. books refer to Fort Caswell and Caswell Properties interchangeably. Fort Caswell and Caswell Properties thus appear to be the same entity. Note this entity is referred to as Fort Caswell, LLC in the promissory note by and between Rig Ventures, Inc. and Fort Caswell, LLC.

5

Sanchez knew in July of 2001 that the debt owed Rig Ventures, Inc. by Fort Caswell, LLC was uncollectible. In addition, Emilio Sanchez caused Rig Ventures, Inc. to pay Fort Caswell, LLC the following amounts:

1. $ 15,000 on 10/05/01;
2. $  4,000 on 11/21/01;
3. $  4,000 on 12/06/01;
4. $ 20,000 on 12/31/01; and
5. $  4,000 on 01/23/02.

It is highly unusual that such large amounts of money would be paid Fort Caswell this soon, and after, the extraordinary bad debt transaction of 01/01/02 referenced above. Notably, Emilio Sanchez owned Fort Caswell, LLC jointly with Richard Jaross. This is more evidence of the fact that the relationship between Rig Ventures, Inc. and Fort Caswell, LLC was not an arms length relationship, and that, instead, Emilio Sanchez ran these two companies as his alter ego and/or that these two companies were engaged in a Single Business Enterprise given their indiscriminate sharing of funds to engage in whatever business venture Emilio Sanchez chose.

C. **THE PURGING AND ELIMINATION OF INTER-COMPANY ACCOUNT BALANCES ON THE FINANCIAL BOOKS AND RECORDS, INCLUSIVE OF THE EXTINGUISHMENT/PAYMENT OF $ 1,127,781 TO SABER STEEL AND $ 54,251 TO SANCO, INC. (GARZA DEPOSITION EXHIBIT "A", "C" AND "O"):**

### INTER-COMPANY ACCONT BALANCES
### AS REFLECTED ON RIG VENTURES, INC. BOOKS

|  | Description | 12/31/01 Balance | 12/31/02 Balance | 07/06/04 Balance |
|---|---|---|---|---|
| **Assets:** | Inter-company – Due from | $ 46,897 | $ 0 | $ 8,333 |
| **Liabilities:** | Due to Saber Steel | $1,127,781 | $ 0 | $ 0 |
|  | Due from Sanship (negative liability) | ($ 37,183) | $ 0 | $ 0 |
|  | Due from Esco (negative liability) | ($ 34,755) | $ 0 | $ 20,783 |
|  | Due to Tex Mex Cold Storage | $ 91,000 | $ 85,000 | $ 106,700 |
|  | Due to Sanco Inc. | $ 54,251 | $ 0 | $ 0 |
|  | Due to Emilio Sanchez | $ 342,870 | $1,027,126 | $1,044,686 |

6

On December 31, 2002, a journal entry was recorded in the Rig Ventures, Inc. accounting books and records reflecting the following (Garza Deposition Exhibit "U" page 03):

| Date | Num | Memo | Account | Debit | Credit |
|------|-----|------|---------|-------|--------|
| 12/31/02 | | | Due from Sanship | | $ 37.183 |
| | | | Due from Dominion Shipping | | $ 58,055 |
| | | | Due from Esjay Green | | $ 5,342 |
| | | | Due from Esco Marine | | $ 29,755 |
| | | | Due to Pan Holding | $ 93,736 | |
| | | | Due to Saber Steel | $ 455,892 | |
| | | | Due to Sanco, Inc. | $ 51,523 | |
| | | | Due to Emilio Sanchez | | $ 470,816 |

The substance of this journal entry was to facilitate the constructive receipt of $ $ 130,335 in inter-company accounts receivable (Sanship, Dominion Shipping, Esjay Green, and Esco Marine balances) and immediately applying such receipts to the constructive payment/extinguishment of inter-company accounts payable (Pan Holding and/or Saber Steel and/or Sanco balances) with the remaining balance being closed out to Emilio Sanchez (corporate insider of all entities).

This journal entry is a fraudulent transaction in violation of the Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code § 24.001 et seq. because:

1. The journal entry represented a transfer of Rig Ventures, Inc.'s assets (i.e. its receivables due from Sanship, Dominion Shipping, Esjay Green, and Esco Marine) to the benefit of insiders or affiliates of Rig Ventures, Inc.;
2. There was not a reasonably equivalent value provided Rig Ventures, Inc., Sanco, Inc. or Pan Holding for the transfers made to them;
3. The transfers were made when Rig Ventures, Inc. was insolvent; and
4. The transfers occurred soon after Emilio Sanchez realized he had a potential large liability in connection with James Gilbert's injuries.

7