Further, even without the obvious violation of the Uniform Fraudulent Transfer Act, this transaction is evidence that Emilio Sanchez utilized Rig Ventures, Inc., Sanship, Dominion Shipping, Esjay Green, Esco Marine, Pan Holding, Saber Steel, and Sanco as his alter ego and/or operated all of these corporations as a Single Business Enterprise given their indiscriminate sharing of funds to engage in whatever business enterprise Emilio Sanchez chose.

In this same regard, these corporations functioning as the alter ego of Emilio Sanchez is further evidenced by the mere fact that all of these receivables and payables are closed out to Emilio Sanchez personally ("Due to Emilio Sanchez" account).

In summary, this transaction is another specific example that exemplifies the absolute financial control Emilio Sanchez had over all of these corporations. It further exemplifies the ability Emilio Sanchez had to simply do whatever he wanted to with regard to the financial transactions within the companies he personally owned and did so without regard to their corporate distinctions. It is highly unlikely and would be highly unusual for a transaction of this type to occur between various corporations having an arms length normal business relationship. In essence, the monies of the various corporations were effectively and constructively his, whether such money was in the account of Rig Ventures, Inc., Saber Steel, or any of the other entities. In this same regard, the timing of this transaction is highly suspect and clearly suggestive of the fact that Emilio Sanchez preferred (and needed) the accounts receivable of Rig Ventures, Inc. to be in the accounts of alternate affiliated entities he owned. This transaction is clearly to the detriment of James Gilbert and allows Emilio Sanchez to effectively avoid payment of any potential liability in connection with James Gilbert's injuries.

D. **THE DECEMBER 31, 2001 WRITE-OFF OF INVESTMENTS IN ASA CORPORATION, ATLANTIC TRADING AND JONATHAN FEFFER:**

On December 31, 2001, the following journal entries were recorded in the financial books and records of Rig Ventures, Inc. and reflects the following (Garza Deposition Exhibit "U" pages 02 and 03):

8

| Date | Num | Memo | Account | Debit | Credit |
|------|-----|------|---------|-------|--------|
| 12/31/01 | | | Investment ASA Corporation | | $ 41,352 |
| | | | Bad Debt | $ 41,352 | |
| 12/31/01 | | Atlantic Trading | Due from Atlantic Textile | | $ 9,500 |
| | | | Bad Debt | $ 9,500 | |

The substance of these two journal entries was to facilitate the write-off of additional Rig Ventures, Inc. assets in the amount of $ 50,852. Ms. Norma Garza recorded these transactions (journal entries) without being provided any support or reasonable rationale as to why it was being written off and if it was appropriate to write off such an amount (Garza Deposition Testimony pages 136-137). Ms. Garza's testimony reflects simply that her father, Emilio Sanchez, instructed her to write off the assets and she recorded the transaction. The defendants have not produced any documentation to support the write-offs nor the validity of such write-offs. To the contrary, these journal entries lend further credibility to the assertion that Emilio Sanchez was stripping Rig Ventures, Inc. of its assets to the detriment of James Gilbert in an effort to avoid the payment of any potential liability with respect to this lawsuit.

On January 01, 2001, a journal entry was recorded in the Rig Ventures, Inc. accounting books and records reflecting the following (Garza Deposition Exhibit "U" page 02):

| Date | Num | Memo | Account | Debit | Credit |
|------|-----|------|---------|-------|--------|
| 01/01/02 | | | Loan Jonathan Feffer | | $ 703,690 |
| | | | Bad Debt | $ 703,690 | |

The recording of this journal entry facilitated the charge-off of the Feffer loan receivable to bad debt expense. Ms. Norma Garza recorded this transaction (journal entry) without being provided any support or reasonable rationale as to why it was being written off and if it was appropriate to write off such an amount (Garza deposition testimony pages 114-115). Ms. Garza's testimony reflects simply that her father, Emilio Sanchez, instructed her to write off the debt and she recorded the transaction. Mr. Sanchez also indicated that he and Rig Ventures, Inc. have an ongoing and current relationship with Feffer and his offshore corporation Beau Mar Ltd. When pressed for an answer, Mr. Sanchez responded as follows:

9

Q. Well are you saying that your continuing business in Russia is in some – is in some way consideration for your forgiveness of this debt?

A. I think that – we just decided to wipe it out.

Q. So you are continuing to do business with Bomar Limited and/or Jonathan Feffer in Russia?

A. Yes

Based upon this sworn testimony and the lack of any formal documentation in support of such a transaction, it is highly unlikely this write-off qualifies as a legitimate bad debt expense. To the contrary, it lends credibility to the assertion that Emilio Sanchez was stripping Rig Ventures, Inc. of its assets in an effort to deceive James Gilbert and avoid payment of any potential liability with respect to this lawsuit.

These numerous debts owed by companies in which Emilio Sanchez was shareholder (some known to be majority owned by Emilio Sanchez, others with no record evidence one way or another), which were written off as "bad investments" as testified to by Ms. Garza, under questionable circumstances, are additional evidence that Emilio Sanchez operated these numerous companies as his alter ego and/or that these companies operated as a Single Business Enterprise. The assertion that such companies were operated as a Single Business Enterprise along with Mr. Sanchez is supported by the fact that Mr. Sanchez freely and indiscriminately transferred funds and forgave debts of his multiple affiliated companies when companies operating at arms length and NOT as a Single Business Enterprise would not have done so.

These transactions are not only highly suspect of foul play, but are clearly suggestive of the fact that Emilio Sanchez took concise and deliberate measures to facilitate the write-off of various investments, in excess of $1,000,000, to the detriment of James Gilbert and effectively avoid the payment of any potential liability in this lawsuit resulting from the injuries sustained by James Gilbert. It should also be noted that Ms. Norma Garza testified to additional bad debt expense associated with Atlantic Textile, Sanjar Properties, and Peat Moss. However, no documentation has been provided to adequately assess the impact of such bad debt expenses.   A summary of the total bad debt write-off transactions is as follows:

10

## BAD DEBT EXPENSE SUMMARY

| | | |
|---|---|---|
| 12/31/2001 | Investment ASA Corporation | $      41,352.07 |
| 12/31/2001 | Atlantic Textile Company | $        9,500.00 |
| 01/01/2002 | Jonathan Feffer | $    703,689.86 |
| 01/01/2002 | Caswell Properties | $ 2,365,955.04 |
| 01/01/2002 | Beau Mar Ltd. – N/Pay | ($ 2,120,258.00) |
| | **Total** | **$  1,000,238.97** |

## III.  SUMMARY AND CONCLUSION

Shortly after James Gilbert sustained his injuries, Emilio Sanchez, by exercising his absolute power and control over the financial affairs of Rig Ventures, Inc. and the other entities he operated as his alter ego (and described in this report), engaged in a deliberate practice of dissipating and transferring the corporate assets of Rig Ventures, Inc. to the detriment of James Gilbert and effectively avoid the payment of any potential liability associated with this lawsuit.  The essence of these transactions was to facilitate the payment and/or extinguishment of insider debts, the reallocation of financial borrowing capacity to entities other than Rig Ventures, Inc., and the indiscriminate act of writing off Rig Ventures, Inc. investments/assets under highly suspect circumstances.  In this same regard, most, if not all, of these transactions were executed in direct violation of the Texas Uniform Fraudulent Transfer Act.

## IV.  ASSUMPTIONS AND LIMITING CONDITIONS

a.  Certain entities have been included in my analysis and incorporated into this report even though they have been dissolved for financial reporting purposes.  Such entities have been included because they have probative value with respect to establishing a continuous pattern and practice of conduct.

11

b. My investigation and this report are based solely upon the data and information that has been provided to me and my independent research.

c. This report and its contents are to be used solely for purposes relating to this litigation.

d. This report is intended for parties fully informed of various issues and legal interpretations relating specifically to this litigation. Any other use or dissemination of this report or any of its contents is strictly prohibited without my prior permission.

e. The distribution of this report is restricted and limited solely to the appropriate legal counsel, the court with proper jurisdiction, and the parties to these proceedings having full knowledge of all relevant facts.

f. I expressly reserve the right to supplement this report at a later date in the event new information becomes available or additional discovery is produced by the defendant. I have requested additional discovery from counsel in this case and intend to supplement this report if the defendant voluntarily produces additional documents or is ordered to do so by the court with proper jurisdiction.

g. The documents produced in this case, to date, which have been provided to me are sufficient to provide a reasonable basis and foundation to support all of the findings and opinions as expressed here-in.

h. The information contained in this report is to be incorporated into my initial expert report dated and issued August 09, 2004 and is considered an integral part there-of.

i. The information contained in this report should only be read, reviewed, and analyzed in conjunction with the information contained in my August 09, 2004 expert report.

j. The information contained in this report is in NO WAY to be construed or interpreted as a substitute or change of the information, findings, or opinions contained and described in my August 09, 2004 expert report.

k. The information contained in this report should be considered as additional support and foundation for the findings and opinions as described in my August 09, 2004 expert report.

12

## V.   COMPENSATION FOR SERVICES RENDERED

My fees for this engagement are based upon the hours expended by each assigned staff member extended by the hourly billing rate for the individual. The current billing rates range from $55 per hour to $350 per hour plus out-of-pocket expenses. My current billing rate is $350 per hour. I reserve the right to charge a flat fee for various portions or assignments within the total scope of this engagement, in my sole discretion. I am in charge of this engagement and all work has been performed under my direct supervision.

Please accept the above as a supplement to my initial expert report dated and issued August 09, 2004, with respect to this litigation. My Curriculum Vitae and a listing of my trial and deposition testimony were included as exhibits to my August 09, 2004 expert report and are incorporated into this report accordingly. Thank you for allowing me to assist you with this matter. If you should have any questions, or wish to discuss this supplemental report or any of its content further, please do not hesitate to call upon me.

Very truly yours,

Joseph B. Nelson, CPA CFE CVA

JBN/mab.gilbert supplement report.doc

13

# EXHIBIT 3

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

| | |
|---|---|
| JAMES DAVID GILBERT | * |
| | * |
| | * |
| | * CIVIL ACTION NO. B04-CV-047 |
| VERSUS | * |
| | * |
| | * JUDGE HILDA G. TAGLE |
| RIG VENTURES, INC. et al | * |

### <u>AFFIDAVIT OF SCOTT WEBRE</u>

STATE OF LOUISIANA
PARISH OF LAFAYETTE

Before me, the undersigned notary, on this day, personally appeared SCOTT WEBRE, a person whose identity is known to me. After I administered an oath to him, upon his oath, he said:

"My name is Scott Webre. I am over the age of 18 years old, of sound mind, have never been convicted of a felony, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

I represent Plaintiff, James Gilbert, in the above styled matter. I am attorney-in-charge.

The following documents were provided to me by defendant herein on the dates indicated below.

1. Contained in Rig Ventures, Inc.'s Third Supplemental Responses to Plaintiff's Request for Production, served upon Plaintiff January 16, 2004.
   a. Rig Ventures Balance Sheet as of December 31, 2001
   b. Rig Ventures Profit & Loss Jan - Dec 2001
   c. Rig Ventures Balance Sheet as of December 31, 2002
   d. Rig Ventures Profit & Loss Jan - Dec 2002
   e. Rig Ventures Tax Returns for years 2001 & 2002
2. Contained in Emilio Sanchez's Third Supplemental Responses to Plaintiff's Request for Production, served upon Plaintiff January 16, 2004.
   a. Tax Returns for Emilio Sanchez for years 2001 & 2002
   b. Revolving Option Promissory Note between Rig Ventures and Emilio Sanchez
3. Produced by counsel correspondence on June 17, 2004

     a. Rig Venture's Transaction Detail by Account (Quickbook report) for period January 2000 - February 22, 2000.

     b. Rig Ventures Chart of Accounts and Trial Balance (Quickbook report) dated February 22, 2004

4. Produced by counsel correspondence on June 29, 2004
     a. Revolving Option Promissory Notes
         i. Emilio Sanchez (lender) → Rig Ventures (borrower)
         ii. Esjay Green, Inc. (lender) → Rig Ventures (borrower)
         iii. Rig Ventures → Esjay Green
         iv. Esco Marine, Inc. → Rig Ventures
         v. Rig Ventures → Esco Marine
         vi. Dominion Shipping → Rig Ventures
         vii. Rig Ventures → to Dominion Shipping
         viii. Sanco International → Rig Ventures
         ix. Rig Ventures → Sanco International
         x. Rig Ventures → Sanship
         xi. Rig Ventures → Saber Steel
         xii. Saber Steel → Rig Ventures

5. Produced by counsel correspondence on July 1, 2004
     a. Rig Ventures bank statements for period January 31, 2002 – April 30, 2002; Feb 28, 2003 - December 31, 2003; and January 30, 2004 - June 2004

6. Produced by counsel at deposition of Norma Garza on July 8, 2004
     a. Revolving option promissory notes as follows:
         i. Pan Holding, Inc. → Rig Ventures, Inc.
         ii. Rig Ventures, Inc. → Northern Bay Peat, LLC
         iii. Rig Ventures, Inc. → Atlantic Trading, LLC
         iv. Rig Ventures, Inc. → Fort Caswell, LLC
         v. Rig Ventures, Inc. → SanJar Properties, LLC
     b. Promissory Note: Rig Ventures, Inc. → Johnathan Feffer

Prior to the deposition of Norma Garza, I diligently attempted to obtain these documents for months through numerous correspondences and phone discussions with counsel for defendant.

Subsequent to the deposition of Norma Garza, I continuously engaged with Plaintiff's retained expert, Joe Nelson, CPA, CFE, in my effort to fully understand and appreciate the complex financial transactions engaged in by Defendants herein. Until recently, I was not sufficiently comfortable with allegations of Single Business Enterprise (as contained in Plaintiff's Fifth Amended Complaint) and Fraudulent Transfer (as contained in Plaintiff's Sixth Amended Complaint) to make such allegations in this lawsuit.

Affiant sayeth not.

Scott Webre
Affiant

*Gilbert vs. Rig Ventures, et al*
Affidavit 2 of Scott Webre
Page 2

STATE OF LOUISIANA
PARISH OF LAFAYETTE

SUBSCRIBED AND SWORN TO before me on this the ___30___ day of September, 2004.

_____
Notary Public In and For the State of Louisiana

My commission Expires:

_____

Notary's Printed Name:

_____

*Gilbert vs. Rig Ventures, et al*
Affidavit 2 of Scott Webre
Page 3

# EXHIBIT  4

1        CAUSE NO. 2002-11-4448-D

2   JAMES DAVID GILBERT        )    IN THE DISTRICT COURT
                               )
3                              )
    VS.                        )    CAMERON COUNTY, TEXAS
4                              )
                               )
5   RIG VENTURES, INC.; EMILIO )
    SANCHEZ and PHIL WELLS     )    103RD JUDICIAL DISTRICT
6
7   ------------------------------------------------------

            ORAL AND VIDEOTAPED DEPOSITION OF
8
                    EMILIO SANCHEZ
9
                  JANUARY 28, 2004
10
    ------------------------------------------------------
11      ORAL DEPOSITION OF EMILIO SANCEZ, produced as a

12   witness duly sworn by me at the instance of the

13   Plaintiff James David Gilbert, taken in the above-styled

14   and numbered cause on the 28th day of January 2004, from

15   9:51 a.m. to 3:28 p.m., before Karen Geddes Piland,

16   Certified Shorthand Reporter No. 5627, in and for the

17   State of Texas, at the offices of Fleming & Hernandez,

18   P.C,  1650 Paredes Line Road, Suite 102, Brownsville,

19   Texas, pursuant to the Texas Rules of Civil Procedure

20   (and the provisions stated on the record or attached

21   hereto).

22

23

24

25

1    Q.  Well, I don't know that it would or not.

2    A.  Maybe not, yeah.  I don't know.  I don't -- I

3  would think it would not be any loan to me.

4    Q.  Okay.  And I just missed what you were talking

5  about.  Where is it indicated the loan to you?

6    A.  Here in the quick sheet, the Quick Book.

7    Q.  Okay.  This is the balance sheet '01.

8    A.  Right.  December 31st, '01, on the long-term

9  liabilities?

10   Q.  Yes, sir.  So you had loaned, at that point in

11  time anyway, the -- is that principal and interest

12  outstanding?

13   A.  I would think so.

14   Q.  Okay.  And that total is 342,869.

15   A.  Right.  That's correct.

16   Q.  And is this going to be pursuant, or was that,

17  rather, pursuant to the promissory note dated

18  December 31, '99?

19   A.  I would think so.

20   Q.  What was the interest rate on that note; do you

21  know?

22   A.  Do you have it there in front of you?

23   Q.  Yes, sir.

24   A.  Does it show?

25   Q.  It doesn't.  It doesn't show a number amount

1    anyway.

2    A.  I'm not familiar.  I don't recall.

3    Q.  I think, if I'm reading it correctly, that it's

4    the highest amount allowed by law.  Does that sound

5    right to you?

6    A.  That sounds right to me.

7    Q.  Okay.  Do you know what that amount was during --

8    A.  I'm not familiar with it, at that time, no.

9    Q.  What documents would you need to refer to -- to

10   inform us?

11   A.  Whatever -- whatever my accountant charged the

12   other people on the interest for that particular time.

13   I don't have those figures.  Norma Garza probably has

14   it.

15          MR. HERNANDEZ:  Scott, can we go off the

16   record one second?

17          MR. WEBRE:  Sure.

18          (Lunch Recess 12:12 p.m. to 1:22 p.m.)

19   BY MR. WEBRE:

20   Q.  Mr. Sanchez, earlier we looked at this Exhibit 6,

21   bylaws of Rig Ventures, and though it's not signed, you

22   indicated you would try and find a signed copy?

23   A.  Yes, that's correct.

24   Q.  Do you have any way of knowing whether or not the

25   copy that was eventually signed is the same as this one?

1    A.   I would think so.   The only copy I've ever seen

2    around is that one.   I'm pretty sure it would be the

3    same one.

4            MR. WEBRE:   Luis, can we agree that this is

5    a business record and in the event that the signed one

6    comes in, then would you supply us with that one?

7            MR. HERNANDEZ:   That's fine.

8    Q.   Mr. Sanchez, your lawyer and I spoke about how we

9    should best conduct an inquiry into the cash flow of Rig

10   Ventures in years 2001 and 2002, and for that matter,

11   I'll have to look at it, but potentially in 2000 which

12   would go back to the beginning of the Ocean 66 project.

13   And given that we are lacking some of the documents here

14   today, I think it's been agreed that we will postpone

15   those questions until a time where we have the documents

16   and you can designate the person you would like to

17   testify about that.

18   A.   That would be fine.

19           MR. WEBRE:   Is that okay Mr. Hernandez?

20           MR. HERNANDEZ:   Yes.

21   Q.   Did Richard Jaross have authority to -- I mean,

22   say, one of these occasions where he visited the Ocean

23   66, if he saw that work wasn't being performed pursuant

24   or to his satisfaction he could fire people on that

25   platform?

1            MR. HERNANDEZ:  It's 2000.

2            THE WITNESS:  Okay.  All right.  Okay.

3   A.   It does look like they did loan Dominion

4 Shipping.  Yeah.

5   Q.   Will you look at the Rig Ventures balance sheet

6 as of December 31, '02, and if this is something that

7 Ms. Garza needs to comment on, then just tell me.  But

8 can you tell me why there was an increase of 685,000 or

9 thereabouts in the liabilities and equity portion,

10 long-term liabilities due to Emilio Sanchez, there was

11 an approximate 685,000 dollar increase from year '01 to

12 '02.

13   A.   She'll have to explain that, because I imagine

14 it's because we collapsed Esco -- I mean, we collapsed

15 Sanco and Saber, and it might have been as a result of

16 that.  She'll have to explain that.

17   Q.   Did you ever attempt to -- as president of Rig

18 Ventures, when you felt it necessary to borrow money,

19 did you compare the terms and conditions of the note

20 required by you, this installment note we looked at

21 earlier, the revolving promissory note, and the interest

22 rates that you could get from a bank, say Coastal or

23 Texas State Bank, compared to what you were charging,

24 Emilio Sanchez was charging Rig Ventures?

25   A.   Did I ever look at that?

1     Q.   And just to be perfectly clear, no written

2   agreement of any kind exists between you and Richard

3   Jaross?

4     A.   No written agreement.

5     Q.   Likewise, between Rig Ventures and Richard

6   Jaross?

7     A.   None.

8     Q.   There's been no scrap metal sold from the Ocean

9   66, has there?

10    A.   There was some scrap laying around on the dock

11  and I think we did sell very little.

12    Q.   A little --

13    A.   That was -- when they removed the vessel, there

14  was some scrap that accumulated there.

15    Q.   When is the last time operations were conducted

16  on the Ocean 66?

17    A.   The Jamie Gilbert incident when they finished up

18  three or four days after that, or five days, whatever it

19  took.

20    Q.   Was it just coincidental that that was the last

21  thing y'all had to do or --

22    A.   Yeah.  There was nothing out -- we sold all the

23  equipment.  And we couldn't move it, because there was a

24  hole in the bottom.

25    Q.   Didn't you tell me you do have a personal income

1    statement and balance sheet, correct?

2        A.   Yeah.   Financial statement, right.   Uh-huh.

3        Q.   Any reason you haven't produced those thus far?

4             THE WITNESS:   Were they requested?

5             MR. HERNANDEZ:   Yeah.

6        A.   They were requested.   I may have overlooked them,

7    but can I question why you need those?

8        Q.   No.

9        A.   No.   You can't.

10       Q.   No, sir.

11       A.   I can't ask?

12       Q.   Well, you can ask, but I don't have to answer.

13       A.   Well, if it was requested, it's probably an

14   oversight.   I thought -- I thought --

15       Q.   Well, it's been --

16       A.   Very possibly I thought that it referred to the

17   tax returns.   You want the financial statements?

18       Q.   Yes, sir.

19       A.   Well, we'll find it.   We'll furnish it.

20       Q.   Do you have a shareholder agreement of any kind

21   between you and Rig Ventures?

22       A.   No.   There's no -- other than bylaws, no, none.

23       Q.   Is there a single ledger or document that would

24   show equity payments to you from Rig Ventures and

25   payments by you to capitalize or otherwise provide

1    equity to Rig Ventures?

2        A.   There should be some deposits or transferred

3    moneys such as that.

4        Q.   But a ledger, a single document that would show

5    an account register?

6        A.   I think you'd have to ask Norma Garza what she

7    has on that.

8                    MR. WEBRE:   Off the record.

9                    (Off the record briefly)

10   BY MR. WEBRE:

11       Q.   Did you and Mr. Jaross communicate by e-mail?

12       A.   Only when he forwards me stuff that I should know

13   about or I forward him stuff.  But his actual

14   communications, no.  We talk on the phone.  He's in town

15   here, I'm in town, or I go -- I'm by his office.

16       Q.   Well, but in 2000, 2001 he wasn't in town.

17       A.   Oh, no.  No.  No.  We didn't communicate by

18   e-mail.

19       Q.   You did not?

20       A.   No.  I didn't start using e-mail myself until

21   about six months ago.

22       Q.   Pretty neat thing, isn't it?

23       A.   Yeah, it turned out.  My daughter Norma finally

24   made me do it.

25       Q.   We've spoken a little bit about your position

# EXHIBIT  5

RECEIVED

JUN 0 5 2004

LAW OFFICE OF
FRANK COSTILLA, P.C.

CAUSE NUMBER 2002-11-4448-D

| | | |
|---|---|---|
| JAMES DAVID GILBERT | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | |
| v. | § | CAMERON COUNTY, TEXAS |
| | § | |
| RIG VENTURES, INC.; EMILIO SANCHEZ; | § | |
| and PHIL WELLS | § | 103rd JUDICIAL DISTRICT |

## ORDER

TO THE HONORABLE JUDGE OF SAID COURT:

On this day came on to be considered Plaintiff's Motion to Compel Defendants' Responses to Plaintiff's Requests for Production, and the Court, having considered its file, the motion, any responses, and the arguments of counsel FINDS with regard to the following specified discovery items as follows:

A.   **Defendant, Rig Ventures, Inc.'s Responses to Plaintiff's First Request for Production (EXHIBIT 2)**

1.   Any contracts or other legal agreements in effect on December 30, 2001, between you and any other party in this case.

   **The Court hereby ~~GRANTS~~/DENIES Plaintiff's Motion to Compel this discovery request.**

5   Please produce all personal notes or memoranda made on or before receipt of Plaintiff's Original Petition relating to Plaintiff.

   **The Court hereby GRANTS/~~DENIES~~ Plaintiff's Motion to Compel this discovery request.**

10.   Please produce all documents, memoranda, financial statements, loan applications, bank statements, personal financial statements, insurance applications and policies, contracts of

assignment, accounts receivable, data, inventory lists, judgments, and any other document and correspondence reflecting your net worth at this time as well as of December 30, 2001. This information is sought in accordance with the Supreme Court authority set forth in *Lunsford v. Morris.* *as to network; or as to all other* *[handwritten initials]*

**The Court hereby GRANTS/~~DENIES~~ Plaintiff's Motion to Compel this discovery request.**

14.     The personnel file of James Gilbert and any other persons who were located at the scene and at the time of the incident giving rise to this lawsuit, including but not limited to Frank Ruiz, Jr., Phil Wells, and Dennis _____.

      **The Court hereby GRANTS/~~DENIES~~ Plaintiff's Motion to Compel this discovery request.**

15.     The personnel file of James Gilbert's direct supervisor.

      **The Court hereby ~~GRANTS~~/DENIES Plaintiff's Motion to Compel this discovery request.**

17      Any documents of whatever kind or character reflecting communications between any of your employees, officers, directors, agents, or representatives concerning the incident giving rise to this lawsuit

      **The Court hereby GRANTS/~~DENIES~~ Plaintiff's Motion to Compel this discovery request.**

32.     Any and all documents evidencing or expressing any agreement between you and/or Emilio Sanchez and/or Richard Jaross regarding the purchase, sale, salvage, and/or other matters pertaining to the Ocean 66.

      **The Court hereby GRANTS/~~DENIES~~ Plaintiff's Motion to Compel this discovery request.**

34.     The income sheet and balance statement of Rig Ventures. Inc. for the years 2001 and 2002, including but not limited to any final such statements upon dissolution of the corporation.

      **The Court hereby GRANTS/~~DENIES~~ Plaintiff's Motion to Compel this discovery request.**

35      Any and all documents evidencing the fact of, and amount of money expended for-

        a.     purchase of the Ocean 66;

     b.     purchase of materials, supplies, equipment, and tools utilized in the salvage operations of the Ocean 66;

     c.     labor utilized in salvage operations of the Ocean 66;

     d.     liability insurance to protect against injuries to persons aboard the Ocean 66;

     e.     liability insurance to protect against loss of property aboard the Ocean 66, or against the loss of the Ocean 66;

     f.     refurbishing any equipment (e.g. tanks, vessels, valves, etc.) salvaged from the Ocean 66;

     g.     transport of Ocean 66;

     h.     costs charged by the port at which the Ocean 66 was stored in Lake Charles,

     i.     initial capitalization of Rig Ventures, Inc.; and

     j.     transportation of personnel to and from the Ocean 66 either inshore or offshore.

**The Court hereby GRANTS/~~DENIES~~ Plaintiff's Motion to Compel this discovery request.**

36.     And all documents evidencing the fact of and amount of money received from any person or entity for:

     a.     sale of Ocean 66,

     b.     sale of any equipment (e.g. tanks, vessels, valves, etc) salvaged from the Ocean 66;

     c.     sale of scrap metal salvaged from the Ocean 66;

     d.     salvage of Ocean 66,

**The Court hereby GRANTS/~~DENIES~~ Plaintiff's Motion to Compel this discovery request.**

41.     The professional resume and/or curriculum vitae for the President or Chief Executive officer of Rig Ventures, Inc. at the time of the incident giving rise to this suit.

**The Court hereby GRANTS/~~DENIES~~ Plaintiff's Motion to Compel this discovery request.**

42     Any and all documents evidencing or reflecting the monies paid by Murphy Oil Company to Rig Ventures, Inc in connection with the transfer of ownership of the Ocean 66 to Rig Ventures, Inc

**The Court hereby GRANTS/~~DENIES~~ Plaintiff's Motion to Compel this discovery request.**

43     Rig Ventures, Inc. "Corporate Book", including but not limited to

     a.     The minutes of each and every meeting of the Board of

Directors, including the organizational meeting;

b.      Notices of each meeting of the Board of Directors;

c.      Corporate bylaws;

d.      Corporate stock certificates;

e.      Minutes of any shareholder meetings; and

f.      Notices of any shareholder meetings;

**The Court hereby GRANTS/~~DENIES~~ Plaintiff's Motion to Compel this discovery request.**

44.    Rig Ventures, Inc.'s tax returns for years 2001 and 2002.

**The Court hereby GRANTS/~~DENIES~~ Plaintiff's Motion to Compel this discovery request.**

**B.    Defendant, Emilio Sanchez's Response to Plaintiff's First Request for Production (EXHIBIT 3)**

**Discovery at issue:**

4      Please produce all personal notes or memoranda made on or before receipt of Plaintiff's Original Petition relating to Plaintiff

**The Court hereby GRANTS/~~DENIES~~ Plaintiff's Motion to Compel this discovery request.**

9.     Please produce all documents, memoranda, financial statements, loan applications, bank statements, personal financial statements, insurance applications and policies, contracts of assignment, accounts receivable, data, inventory lists, judgments, and any other document and correspondence reflecting your net worth at this time as well as of December 30, 2001. This information is sought in accordance with the Supreme Court authority set forth in *Lunsford v. Morris.*

**The Court hereby ~~GRANTS~~/DENIES Plaintiff's Motion to Compel this discovery request.**

10.    Any documents of whatever kind or character reflecting the results of any investigation into the incident giving rise to this lawsuit.

**The Court hereby ~~GRANTS~~/DENIES Plaintiff's Motion to Compel this discovery request.**

19     Your income sheet for the years 2001 and 2002

The Court hereby GRANTS/DENIES Plaintiff's Motion to Compel this discovery request.

20.    Any and all documents evidencing the fact of, and amount of money expended for:

        a. purchase of the Ocean 66,
        b. purchase of materials, supplies, equipment, and tools utilized in the salvage operations of the Ocean 66;
        c. labor utilized in salvage operations of the Ocean 66;
        d. liability insurance to protect against injuries to persons aboard the Ocean 66;
        e. liability insurance to protect against loss of property aboard the Ocean 66, or against the loss of the Ocean 66;
        f. refurbishing any equipment (e.g. tanks, vessels, valves, etc.) salvaged from the Ocean 66;
        g. transport of Ocean 66;
        h. costs charged by the port at which the Ocean 66 was stored in Lake Charles;
        i. initial capitalization of Rig Ventures, inc.; and
        j. transportation of personnel to and from the Ocean 66 either inshore or offshore.

The Court hereby GRANTS/DENIES Plaintiff's Motion to Compel this discovery request.

21.    Any and all documents evidencing the fact of, and amount of money received by you from Rig Ventures, Inc. during the years 2001 and 2002

The Court hereby GRANTS/DENIES Plaintiff's Motion to Compel this discovery request.

25.    Any and all shareholder agreement(s) or other documents of any kind evidencing any agreement whatsoever by and between the shareholders of Rig Ventures, Inc., and specifically including but not limited to any and all such agreements regarding the capitalization of Rig Ventures, Inc. and the dissolution and distribution of assets and liabilities of Rig Ventures, Inc. upon dissolution

The Court hereby GRANTS/DENIES Plaintiff's Motion to Compel this discovery request.

26.    Any and all documents evidencing your financial contributions to Rig Ventures, Inc. at any time.

The Court hereby GRANTS/DENIES Plaintiff's Motion to Compel this discovery

request.

28.     Any and all documents evidencing or reflecting the monies paid by Murphy Oil Company
to you in connection with the transfer of ownership of the Ocean 66 to Rig Ventures, Inc.

**The Court hereby GRANTS/~~DENIES~~ Plaintiff's Motion to Compel this discovery
request.**

29.     Your tax returns for years 2001 and 2002.

**The Court hereby GRANTS/D~~ENIES~~ Plaintiff's Motion to Compel this discovery
request.**

Pursuant to the above specified findings and rulings by the Court, the Court hereby

ORDERS Defendants Rig Ventures, Inc. and Emilio Sanchez to produce documents and tangible

things responsive to those discovery requests for which the Court granted Plaintiffs' Motion to

compel no later than _January 16, 2004_ .

SIGNED AND ENTERED this _16th_ day of December, 2003

_____
The Honorable Menton Murray,
Presiding Judge

DEC 3 0 2003

Approved as to form:

_____
Scott Webre
TBN 21050070
556 Jefferson St., Ste. 200
Lafayette, LA 70503
(337) 593-4178
(337) 593-4159 (fax)
Attorney for Plaintiff

HON. RYAN KREBS
HON. LUIS R. HERNANDEZ
HON. FRANK COSTILLA

FILED ___ O'CLOCK ___ M
AURORA DE LA GARZA DIST CLERK
DEC 16 2003
DISTRICT COURT OF CAMERON COUNTY TEXAS
DEPUTY

Order
Page 6

# EXHIBIT  6

# SCOTT D. WEBRE

ATTORNEY AT LAW

556 JEFFERSON STREET
JEFFERSON TOWERS, SUITE 200
LAFAYETTE, LOUISIANA 70501
(337) 593-4178   (337) 593-4159 FAX

*Licensed in Louisiana and Texas*

July 27, 2004

*Via fax*
Mr. Luis R Hernandez
Fleming & Hernandez, P.C.
1650 Paredes Line Road, Suite 102
Brownsville, TX 78521

Re:   *James Gilbert vs. Rig Ventures, Inc., et al;* Cause No. B04-CV-047; in the United
States District Court, Southern District of Texas, Brownsville Division

Dear Luis:

This reflects our agreement today that Plaintiff's designation of experts and production of
expert reports and other information required by FRCP 26(a)(2)(B) shall be due August 9, 2004,
instead of August 2, 2004 as set forth in the scheduling order.

If this accurately represents our agreement, please sign and date in the space below and
return to me by fax on Wednesday. Thank you.

Sincerely,

Scott Webre

SW/ans

cc:   Hondo Garcia
Ryan Krebs

Agreed:

Luis Hernandez                                          DATE 7/28/04
Attorney for Rig Ventures, Inc., Emilio Sanchez, and Richard Jaross

# EXHIBIT  7

# DYMENT & FISHER
## *Attorneys & Counselors at Law*
### 401 Heights Blvd.
### Houston, Texas 77007
### (713) 880-0111; (713) 880-8574 Fax

Jeffrey B. Dyment
Michael A. Fisher*

*Board Certified Personal Injury Trial Law
Texas Board of Legal Specialization

## FAX TRANSMISSION

DATE:       MARCH 7, 2002

TO:         RIG VENTURES

ATTN:       RICHARD JAMES

FROM:       MICHAEL FISHER

FAXING TO NO:    956-838-5700

NUMBER OF PAGES INCLUDING COVER:    1

RE: JAMES GILBERT

MESSAGE. Dear Mr. Jaros: This is to let you know that I have been asked to represent James Gilbert. Please communicate with me with regard to his incident. Please do not communicate with Mr. Gilbert directly.

IF YOU ARE NOT RECEIVING A CLEAR COPY OF THIS DOCUMENT OR ARE NOT RECEIVING ALL MATERIALS TRANSMITTED, PLEASE CONTACT US AT 713-880-0111.

This message is intended only for the use of the individual to whom it is addressed and contains information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any unauthorized disclosure, dissemination, distribution or copying of this communication is strictly immediately by telephone and return the original message to us at the above address via the U.S. postal service or call us on the telephone. Thank you.